# EXHIBIT 1

> EXHIBIT A



# SunLink® Sales Contract for: American Capital Energy
## Project: C-Vec Harwich

Created by: Jonathan Eastwood
Phone: (415) 686-0196
Date: October 15, 2013

SunLink Corporation
1010 B Street, Suite 400
San Rafael, CA 94901
www.sunlink.com

## Executive Summary

Proven at more than 1,000 sites supporting over 200MW, SunLink® is the premier solar balance of system provider in the industry. Designed in consultation with integrators, installers, facility managers, site owners and roofers to meet their specific needs, SunLink's solutions are the first choice among customers seeking to optimize their solar energy systems, while increasing their property values.

SunLink's technical expertise is the hallmark of the company's continued success and adoption. Since its inception, the company has focused on creating a multi-faceted, state-of-the-art research and development program. Comprised of extensive wind tunnel testing and analysis, component and system modeling, finite element analysis, mechanical load testing, structural frame analysis, electrical bond testing, wire management modeling and materials environmental testing, SunLink's industry-leading R&D effort delivers photovoltaic (PV) integration solutions that are safe, easy to permit and install, and lower the total cost of a PV system.

SunLink is pleased to provide you with a sales contract for your solar PV project. Our mission is to provide our clients with the highest level of service combined with the highest quality equipment and components. We look forward to partnering with you on this project and future opportunities. Below is a summary of the project information.

## Project Information

| Project | C-Vec Harwich |
|---|---|
| Product Type | Ground Mount System |
| Project Location | 209 Queen Anne Rd.<br>Harwich, Massachusetts 02645<br>United States |
| Project Size | 4,491.52 kW |
| Mounting System Price (Shipping Included for Ballast, Tax Not Included for Ballast, Tax and Shipping for Hardware Not Included) | $1,616,947.00 |

## Contract Information

| Credit Approval | All orders subject to credit approval before manufacturing. |
|---|---|
| FOB Point | AZ, CA, CO, CT, IN, MN, OH, PA, TX and/or WV |
| Shipping and Handling Terms | Shipping and Handling is pre-paid by SunLink and added to the invoice. |
| Product Lead Time | All specified lead times are from receipt of signed sales contract, down payment, notice to proceed and proof of payment bond is in place at 100% of contract value. |

## Purchaser Information

| Customer | American Capital Energy |
|---|---|
| Billing Address | 1001 Pawtucket Blvd, Suite 278<br>Lowell, Massachusetts 01854<br>United States |
| Shipping Address | |
| Contact | Eric McLean |
| Phone | (978) 221-2027 |
| Email | emclean@americancapitalenergy.com |

## Product Information

| Line | Product | Specifications | | Unit Price | Qty | Total |
|---|---|---|---|---|---|---|
| 1 | Ballasted Ground Mount System<br><br>Lead Time 6 weeks<br><br>FOB Points California<br>Minnesota<br>Pennsylvania | Site Name | C-Vec Harwich Site | $1,616,947.00 | 1 | $1,616,947.00<br>$104.40/Module<br>$0.3600/Watt |
| | | Wind Speed | 120 mph | | | |
| | | Wind Exposure | C | | | |
| | | Occupancy | I | | | |
| | | Topo. Factor | 1.00 | | | |
| | | Snow Load | 35 psf | | | |
| | | Tilt Angle | 20° | | | |
| | | Module Name | ET Solar ET-P672290 (2012, 40mm) | | | |
| | | No. of Modules | 15,488 | | | |
| | | String Length | | | | |
| | | Size | 4,491.52 kW | | | |
| | | Array Layout Drawing<br>1003564-CVECHARWICH-081313-ENG-R10 | | | | |

## Cost Information

Mounting System Price (Shipping Included for Ballast, Tax Not Included for Ballast, Tax and Shipping for Hardware Not Included)                                                                $1,616,947.00

Price includes complete SunLink Module Mounting System (MMS) and Structural Engineering Advisory Load (SELA) Report. Any deviation from the attached layout or any changes to the above information will result in a change in price and/or lead time. Price excludes third-party structural engineering, any wet-stamped engineering documents, external ballast, adhesive, roof pads or sub-surface anchors, if necessary. The proposed product specifications and sales price shall be valid for 15 days from date above.

## Acceptance Summary

The above price, specification and conditions as stated in this document are satisfactory and hereby accepted. Payment will be made as outlined in Appendix B (Payment Terms). A check or wire transfer will be submitted to SunLink Corporation for a specified percentage of the SALES PRICE accompanied by this signed Sales Contract. By signing in the space provided you concur that the information in this document is correct, agree to the terms and conditions outlined in Appendix A (Terms and Conditions of Sale), Appendix B (Payment Terms) and Appendix C (Warranty) and acknowledge receipt of a complete and legible copy of this agreement and its attachments.

**American Capital Energy**                         **SunLink Corporation**

                                                    ## Ted Ridgway
                                                    Digitally signed by Ted Ridgway
                                                    DN: cn=Ted Ridgway, o=SunLink Corp, ou,
                                                    email=ted.ridgway@sunlink.com, c=US,
                                                    Date:2013.10.18 12:34:50-07'00'

Signature                                           Signature

Hey Hennessey                                       Printed Name
Printed Name

10/17/2013                                          Date
Date

Appendix A – Terms and Conditions of Sale

This Appendix A specifies the terms and conditions that pertain to sale of SunLink Module Mounting System (MMS) products and services. Unless an officer of SunLink signs an alternative version of these Terms and Conditions of Sale, the terms and conditions set forth below establish the contractual basis under which the SunLink MMS products and services are offered for sale and the conditions of fulfillment that pertain to any subsequent Proposal or Purchase Order. These Terms and Conditions of Sale include Part 1 – General Terms and Conditions and Part 2 – Country-Specific Terms and Conditions (if any). The terms of Part 2 may replace or modify the terms of Part 1.

Part 1 – General Terms and Conditions

1. **DEFINITIONS.**

    a. An "Affiliate" of a party means a person or entity that controls, is controlled by, or is under common control with, that party.

    b. "Site Owner" means the firm or organization that owns the building and/or land on which the PV System is installed. In many cases the Site Owner is represented by a property manager who is understood to act on behalf of and as agent for the Site Owner.

    c. "Contractor" means the firm authorized by the Site Owner and/or Host to install the PV System in accordance with applicable local building regulations. In many cases, the Contractor is the Purchaser of the SunLink MMS.

    d. "Host" means the firm or organization that obtains beneficial use of the PV System by establishing an electrical interconnection, in most cases metered by a utility.

    e. "Photovoltaic System" or "PV System" means an array of PV modules, the SunLink MMS and a power electrical conversion package configured for utility interconnection by the Contractor in accordance with OEM instructions and applicable codes and standards.

    f. "Proposal" means a firm, fixed price offer by SunLink to manufacture and furnish a SunLink MMS and to provide related services.

    g. "Purchaser" or "Buyer" means the party acquiring a SunLink MMS.

    h. "Purchase Order" means a purchase order submitted by Purchaser to Seller for SunLink MMS products and/or services to be provided under this Sales Contract.

    i. "Sales Contract" means an accepted Proposal, the Terms and Conditions of Sale set forth in this Appendix A, the Payment Terms set forth in Appendix B, the Warranty set forth in Appendix C and any other appendices, exhibits and schedules mutually agreed by the parties and attached hereto and any Purchase Order accepted by Seller as set forth in Section 5, which together constitute an agreement between the Purchaser and Seller under which Seller agrees to manufacture and furnish a SunLink MMS together with related services.

    j. "Seller" means SunLink Corporation or its Affiliate that is listed in and executes the Proposal.

    k. "SunLink MMS" or "MMS" means a module mounting system provided by Seller and used to install and secure photovoltaic modules on industrial, commercial and institutional rooftops and/or land/soil/ground.

2. **OFFER FOR SALE.** A description of SunLink MMS products and services purchased under this Sales Contract is set forth in the accompanying Proposal. It provides specific information pertaining to what Seller intends to deliver to the Purchaser in accordance with these Terms and Conditions of Sale.

3. **PRICE AND PAYMENT.** The accompanying Proposal sets forth the price for the MMS products and services specified therein. Payment shall be by cash, check or wire transfer in accordance with the Payment Terms set forth in Appendix B that accompanies these Terms and Conditions of Sale.

4. **TAXES.** Unless otherwise specified in the accompanying Proposal, the SunLink MMS is sold for resale by the Purchaser, who is responsible for paying the sales tax and any value-added tax or other tax and will provide Seller with a reseller's certificate that is acceptable to the applicable state or Provincial tax authority.

5. **MODIFICATIONS AND CHANGE ORDERS.** Purchaser may propose a modification or change to this Sales Contract for a specific Purchase Order by notifying Seller of the requested modification or change in writing. Any such changes or modifications are subject to acceptance by Seller, may only be accepted by a written "Change Order" that expressly amends this Sales Contract and is executed by an officer of Seller and Purchaser, is applicable only to the Purchase Order(s) expressly set forth in the Change Order, and may result in changes in prices for products, services or both and may result in changes to delivery. Any changes or modifications to a SunLink MMS product or a PV System that are recommended by a third-party (engineer, integrator, building official, end-user, etc.) may also result in additional charges to the Purchaser. Except as expressly set forth in a Change Order executed by the parties as set forth herein, in the event of a conflict between this Sales Contract and any Purchase Order, the terms of this Sales Contract shall take precedence and any conflicting or additional terms or conditions in the Purchase Order are hereby rejected and shall be null and void.

6. **INSTALLATION, SYSTEM MODIFICATIONS.** Any SunLink MMS product or PV system that is not installed as shown in the attached layout may render the attached Seller's Warranty, as described in Appendix C, null and void.

7. **REVISION POLICY.** Any requests for a revised Layout drawing and/or Structural Engineering Load Advisory (SELA) Report will result in a revision fee of as shown in Appendix D - Fee Schedule. Results of changes to the Layout drawing and/or SELA may result in additional components and cost and time for revised Layout drawing and/or SELA Report.

8. **CANCELLATION.** Purchaser may cancel this Sales Contract or any Purchase Order by providing written notice of cancellation to Seller, as follows. All cancellations are subject to the following charges. Cancellations within one (1) business day from the date of the Sales Contract or Purchase Order are not subject to any charges. Cancellations between one (1) and five (5) business days from the date of the Sales Contract or Purchase Order are subject to charges of 50% of the SALES PRICE. Cancellations between five (5) and ten (10) business days from the date of the Sales Contract or Purchase Order are subject to charges of 80% of the SALES PRICE. Cancellations after ten (10) business days from the date of the Sales Contract or Purchase Order are subject to charges of 100% of the SALES PRICE.

9. **SCHEDULE.** SunLink and Purchaser agree that scheduled delivery dates and/or lead times as set forth in the Proposal are approximate. Seller will advise Purchaser in the event of changes in schedule or in planned delivery.

10. **SHIPPING AND HANDLING.** All Seller products are furnished F.O.B. San Leandro, California, Allen, Texas or Carrollton, Texas (or any other location designated by Seller) and protectively packaged and loaded by Seller on common carrier trucks for unloading at destination by others. Shipping and handling is pre-paid by Seller and shall be added to Purchaser's invoice.

11. **STORAGE.** Upon written request, Seller agrees to store, for the benefit of Purchaser, Seller products which have been purchased by Purchaser. Storage will be in a protected, segregated space. Purchaser agrees to pay a storage fee as shown in Appendix D - Fee Schedule for handling, transport, storage and all related Seller administrative costs. Terms of payment established before the Purchaser's request for storage remain in effect unless modified through mutual written agreement.

12. **TITLE.** The entire risk of loss and damage and transfer of title to the SunLink MMS products shall pass to Purchaser upon delivery of SunLink MMS products to the common carrier at the applicable FOB point as set forth in Sections 10, 20, and 23, unless otherwise agreed by the parties in writing, in a bill-and-hold or multiple-elements arrangement.

13. **ACCEPTANCE.** Purchaser is expected to inspect SunLink MMS products upon receipt. Claims for shortages or damage resulting from shipping should be addressed to the carrier at time of delivery. Seller can provide expedited replacement service to the Purchaser to make up for goods lost or damaged in transit and the Purchaser shall be billed a reasonable price. The Purchaser is understood to have unconditionally accepted a complete SunLink MMS product fifteen (15) days after shipment is received. The SunLink MMS product warranty begins upon receipt by Purchaser of the shipment(s).

14. **WARRANTY.** Seller's warranty attached as Appendix C accompanies these Terms and Conditions of Sale and is applicable to all SunLink MMS products sold under this Sales Contract.

15. **INTELLECTUAL PROPERTY.** Purchaser and Seller shall each prevent unauthorized disclosure of confidential information and intellectual property that is owned by the other party and that is identified as such or that would appear as such to a reasonably person given its nature and/or the circumstances of disclosure, while also allowing for open discussion and for communication between the parties and with the Site Owner, property manager, Contractor and Host, as applicable, regarding the sale, application, installation and use of the SunLink MMS.

16. COMPETITION-SENSITIVE INFORMATION.   Purchaser and Seller shall each hold in strict confidence and prevent unauthorized disclosure and use of competition-sensitive information of the other party, such as costs or prices that are used by the other party, while also allowing for open discussion and for communication between the parties and with the Site Owner, property manager, Contractor and Host, as applicable, regarding the sale, application, installation and use of the SunLink MMS.

17. MARKETING APPROVAL.   Purchaser agrees to allow Seller and its Affiliates to use photographs, company names, brand names and other relevant information in their marketing materials for the purpose of promoting the SunLink brand name and MMS products. Purchaser also agrees to positively mention the SunLink brand as appropriate when promoting the project to the public. Nothing herein grants Purchaser any right or license to use the SunLink name, brand or any other trademark or service mark of Seller or any of its Affiliates.

18. LICENSES/PERMITS.   As between the parties, Purchaser is responsible for applying for and obtaining, and Purchaser shall, or shall cause its related parties (Contractor, Site Owner, Host) to, apply for and obtain, all licenses, permits and inspections required for installation of the SunLink MMS and the PV System in accordance with local laws and regulations. Purchaser shall, and shall cause such related parties to, install the SunLink MMS in accordance with applicable laws and regulations that pertain to workplace health and safety and environmental protection. Seller reserves the right to verify that handling and installation are/have been consistent with Seller's requirements as set forth in the installation manual for the SunLink MMS products.

19. PURCHASER INDEMNITY.   Seller shall not be held responsible or liable for any losses or damages sustained by the Purchaser or related parties that result from improper installation, modification or misuse of the SunLink MMS or PV System. Except for proper warranty claims as set forth in Appendix B, Purchaser shall indemnify, defend and hold harmless Seller and its Affiliates from and against any and all claims (including third party claims), liabilities, damages, debts, settlements, costs and expenses (including court costs, expert fees and attorneys' fees) of any type whatsoever that may relate to or arise on account of Purchaser's breach of this Agreement, Purchaser's business or use of the SunLink MMS products or services or the acts or omissions of Purchaser, its Affiliates, or any Site Owner, property manager, Contractor, or Host, including, without limitation, all acts or omissions of any of its or their employees, contractors, representatives, or agents.

20. SUBMISSION TO ARBITRATION.   All disputes, disagreements, controversies, questions or claims arising out of or relating to this Sales Contract or in respect of any legal relationship associated with or arising from this Sales Contract, including, without limitation, with respect to this Sales Contract's formation, execution, validity, application, interpretation, performance, breach, termination or enforcement, shall be determined by arbitration, as set forth.

Nothing herein or therein precludes either party from seeking injunctive relief or other provisional or equitable remedies in and of arbitration from a court of competent jurisdiction.

    a.  the arbitration shall be in the Commonwealth of Massachusetts in the English language;

    b.  the number of arbitrators shall be one;

    c.  the party commencing the arbitration shall include in its written notice the names of three individuals who are acceptable to it to serve as a sole arbitrator. Within seven days of the receipt of the notice, the other party shall give written notice that it accepts the appointment of one of the three individuals or shall name three other individuals who are acceptable to it to serve as sole arbitrator. If the parties are unable to agree upon a sole arbitrator within a further seven days, the appointment of a sole arbitrator shall be made by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules to have such appointments made in accordance with AAA's rules and procedures;

    d.  any award or determination of the arbitral tribunal shall be final and binding on the parties and there shall be no appeal on any ground, including for greater certainty, any appeal on a question of law, a question of fact, or a question of mixed fact and law;

    e.  the arbitral tribunal may apportion costs of the arbitration, including the reasonable fees and disbursements of the parties, between or among the parties in such manner as the arbitral tribunal considers reasonable, provided that the tribunal shall not award costs on a distributive basis; and

    f.  any award for the payment of money may include pre-award and post-award interest.

21. **GENERAL.** The following general conditions are applicable:

    a. Seller certifies that it is in full compliance with applicable federal, state, provincial and local laws that pertain to the rights of employees to equal opportunity and to a safe workplace. Seller and Purchaser agree to comply with environmental protection laws that apply to the manufacture and installation of the SunLink MMS.

    b. Seller agrees that it will not assign its obligations to furnish and deliver products and services as described in the accompanying Proposal or this Sales Contract except to an Affiliate of Seller, provided that Seller remains responsible for the performance of such Affiliate. Seller retains the right to subcontract work. Purchaser may not assign or delegate its rights or obligations under this Sales Contract, including any Purchase Order, without Seller's prior written consent, including by way of merger, sale of assets, change of control or otherwise. This Sales Contract shall be binding upon and inure to the benefit of the parties, their successors and permitted assigns.

    c. Seller shall not be viewed as in breach of Sales Contract obligations or liable to Purchaser or any third party for delays in performance caused by fire, explosion, acts of God, strikes, war, riot, government regulation, transportation delay, or any other act or cause beyond the reasonable control of the Seller.

    d. This Sales Contract, including these Terms and Conditions of Sale) shall be construed as if both parties jointly prepared it so that any uncertainty or ambiguity shall not be interpreted as against either party. If any provision of this Sales Contract is held to be unenforceable, such provision shall be fully severable and all remaining provisions shall remain in full force and effect.

    e. If Seller does not insist upon the strict performance of any term or condition in this document, this fact shall not be deemed a waiver of Seller's rights or remedies, nor of Seller's right to insist upon strict performance of the same or any other term in the future.

    f. This Sales Contract, including the Proposal and Appendices, schedules and exhibits attached hereto and all Purchase Orders hereunder that are accepted by Seller, constitutes the complete agreement between the parties with respect to the supply of SunLink MMS products and services. Except as indicated, this Sales Contract contains all the agreements and conditions of sale. This Sales Contract may not be added to, changed, superseded or otherwise altered except by a written modification signed by an officer of Seller.

    g. Seller's total cumulative liability under this Sales Contract, whether arising in contract, tort or otherwise, shall not exceed the amounts paid by Purchaser to Seller under this Sales Contract with respect to the products or services to which any alleged liability relates. In no event shall Seller, its Affiliates or its or their suppliers be liable to Purchaser or any third party for any special, indirect, incidental, consequential or punitive damages, whether arising in contract, tort or otherwise, even if advised of the possibility of same.

    h. This Sales Contract may be executed in one or more counterparts each of which shall be an original and all of which together shall constitute one and the same instrument.

    i. Sections 3, 4, 12, 14, 15, 16, 17, 19, 20, 21, 22 and 23 and Appendices B and C shall survive expiration or termination of this Sales Contract or any Purchase Order.

22. **NOTICES.** Correspondence that pertains to the supply of SunLink MMS products and services as described in this Sales Contract shall be directed as follows:

    a. for the Seller to "Contracts Manager" and

    b. for the Purchaser to "Purchasing Agent" at the business addresses specified in the accompanying Proposal.

23. **GOVERNING LAW.** This Sales Contract, including the accompanying Proposal, all attached Appendices, schedules and exhibits and all Purchase Orders shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, without regard to its conflicts of law provisions. The United Nations Convention on the International Sale of Goods will specifically not apply to transactions taking place pursuant to this Sales Contract.

Appendix B – Payment Terms

1. SELLER STANDARD PAYMENT TERMS
   a. 1.40% of LUMP SUM SALES PRICE with order. Purchaser provides check with signed Sales Contract or Purchase Order. Order fulfillment begins with receipt of payment, in addition to signed Sales Contract and approved credit.

   b. 98.60% of LUMP SUM SALES PRICE shall be due upon shipment unless otherwise agreed by the parties, in writing, in a bill-and-hold or multiple-elements arrangement.
      i. Seller will invoice Purchaser and provide an itemized invoice.

      ii. Terms are net 45 days from date of invoice.

      iii. Payments made more than 45 days late shall be charged a late fee of one and one-half percent of the outstanding balance due (1.5%) per month.

   c. When partial shipments are needed, payment shall be made per the following:
      i. For shipments comprising 90 (%) percent or greater of the order, the Purchaser shall be invoiced for the full amount due and the balance of the order will be shipped in a timely manner at no additional shipping cost to the Purchaser.

      ii. For shipments less than 90 (%) percent of the order, the Purchaser shall be invoiced for the percentage of the order shipped.

      iii. Terms are net 45 days from date of invoice.

2. SUNLINK MMS WITH MORE THAN 7,500 MODULES: TERMS TO BE DETERMINED ON AN INDIVIDUAL BASIS.

Appendix C – Warranty

Seller warrants to Purchaser that the SunLink MMS, when sold and delivered pursuant to this Sales Contract, will be new, will conform in all material respects to the specifications expressly set forth in this Sales Contract, and will be free from defects in material and/or workmanship for a period of fifteen (15) years from the date of shipment. Except for the foregoing limited warranties, Seller and its Affiliates make no other warranties, express or implied, relating to the SunLink MMS or any services.

This warranty does not apply to damage incurred during shipment and does not apply to damage that is the result of improper handling. This warranty will be void if during the warranty period, the SunLink MMS has been improperly or incorrectly installed, used, or maintained, or has been operated under abnormal conditions or contrary to applicable specifications.

This Warranty is applicable to the original SunLink MMS installation only and is granted to the original SunLink MMS Purchaser or any third-party owner that purchases the system during the warranty period. Any transfer of this warranty requires approval by SunLink Corporation, which shall not be unreasonably withheld. This Warranty does not apply to damage to the SunLink MMS that is the result of weather conditions that exceed local building code limits that were applicable at the time that the SunLink MMS was originally installed.

IT IS RECOGNIZED AND AGREED THAT THE FOREGOING LIMITED WARRANTIES ARE IN LIEU OF ALL OTHER WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED OR STATUTORY, AND SELLER HEREBY DISCLAIMS ALL OTHER WARRANTIES, INCLUDING WITHOUT LIMITATION ANY WARRANTY OR CONDITION OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF OTHER'S INTELLECTUAL PROPERTY RIGHTS, DURABILITY, OR ARISING OUT OF COURSE OF DEALING OR TRADE USAGE.

In the event the SunLink MMS fails to satisfy the foregoing limited warranties, then Seller will repair or replace, at its option and cost, the defective product. The foregoing remedy shall be Seller's sole liability, and Purchaser's sole and exclusive remedy, in lieu of all remedies that Purchaser may have, and the Purchaser waives all other remedies.

To obtain warranty service, the Purchaser shall contact Seller by telephone or email, and Seller will establish a claim file and initiate action to repair or replace the defective product. Seller will work with the Purchaser to determine the extent of the problem and may elect to perform a site inspection.

Seller will not assume expense or liability for correction of a defective SunLink MMS by the Purchaser or by third parties without Seller's prior written authorization. In the event of the authorized correction of a defective SunLink MMS, the warranty period will be extended by the length of time during which the defective equipment was in the process of being repaired or replaced.

Seller's total liability hereunder for the repair or replacement of a SunLink MMS, or any defective components thereof, shall not exceed the original purchase price of the applicable SunLink MMS. In no event will Seller, its Affiliates or their suppliers be liable for or responsible to the Purchaser, or to any other party, for any consequential, incidental, or special, loss, cost, damage, or expense arising from the curtailment or interruption of photovoltaic (PV) system operation or from the curtailment or interruption of any operations, processes, or equipment connected to the PV system.

THIS WARRANTY GRANTS THE PURCHASER SPECIFIC LEGAL RIGHTS THAT MAY VARY ACCORDING TO THE STATE OR PROVINCE IN WHICH THE SUNLINK MMS IS INSTALLED.

Warranty service contacts:

United States:

1010 B St. #400
San Rafael, CA 94901
(415) 925-9650
info@sunlink.com

Appendix D – Fee Schedule

1. REVISION FEE
   a. Layout drawing: $100/revision
   b. Structural Engineering Load Advisory (SELA): $500/revision

2. STORAGE FEE
   a. $0.12/module per day



1010 B Street, Suite 400
San Rafael, CA 94901
www.sunlink.com

Invoice

Date: October 15, 2013
Invoice #:
Customer PO#:

TO:
Eric McLean
1001 Pawtucket Blvd, Suite 278
Lowell, Massachusetts 01854
United States

FOR:
C-Vec Harwich
209 Queen Anne Rd
Harwich, Massachusetts 02645
United States

| Description | Amount |
|---|---|
| 1.40% Deposit Required to Initialize Order | $22,637.26 |
|  |  |
|  |  |
| TOTAL | $22,637.26 |

Please make all checks payable to SunLink Corporation. Payment is due immediately.

THANK YOU FOR YOUR BUSINESS!

# EXHIBIT 2

Bond No.  SU1124971

# Document A312™ – 2010

Conforms with The American Institute of Architects AIA Document 312

## Payment Bond

**CONTRACTOR:**
*(Name, legal status and address)*

AMERICAN CAPITAL ENERGY, INC.
1001 Pawtucket Boulevard
Suite 278
Lowell MA  01854

**SURETY:**
*(Name, legal status and principal place of business)*

ARCH INSURANCE COMPANY
3 Parkway, Suite 1500
Philadelphia PA  19102

Mailing Address for Notices

Same as Above

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

**OWNER:**
*(Name, legal status and address)*

REDWOOD SOLAR DEVELOPMENT, LLC
8275 S. Eastern Avenue, Suite 200-548
Las Vegas NV  89123

**CONSTRUCTION CONTRACT**
Date:

Amount: $  12,997,952.38  Twelve Million Nine Hundred Ninety Seven Thousand Nine Hundred Fifty Two and 38/100ths

Description:  Harwich Solar
*(Name and location)*

**BOND**
Date:  December 16, 2013
*(Not earlier than Construction Contract Date)*

Amount: $  11,698,157.14  Eleven Million Six Hundred Ninety Eight Thousand One Hundred Fifty Seven and 14/100ths

Modifications to this Bond:     [X] None          [ ] See Section 18

| **CONTRACTOR AS PRINCIPAL** | **SURETY** |
|---|---|
| Company:          *(Corporate Seal)* | Company:          *(Corporate Seal)* |
| AMERICAN CAPITAL ENERGY, INC. | ARCH INSURANCE COMPANY |
| Signature: _____ | Signature: _____ |
| Name | Name          Kathleen M Flanagan |
| and Title: | and Title:    Attorney-In-Fact |

*(Any additional signatures appear on the last page of this Payment Bond.)*

*(FOR INFORMATION ONLY — Name, address and telephone)*

**AGENT or BROKER:**
Alliant Insurance Services, Inc.
40 Stanford Drive, 2nd Floor
Farmington CT  06032
(860) 269-2179

**OWNER'S REPRESENTATIVE:**
*(Architect, Engineer or other party)*

S-2149/AS 8/10

§ 1 The Contractor and Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract, which is incorporated herein by reference, subject to the following terms.

§ 2 If the Contractor promptly makes payment of all sums due to Claimants, and defends, indemnifies and holds harmless the Owner from claims, demands, liens or suits by any person or entity seeking payment for labor, materials or equipment furnished for use in the performance of the Construction Contract, then the Surety and the Contractor shall have no obligation under this Bond.

§ 3 If there is no Owner Default under the Construction Contract, the Surety's obligation to the Owner under this Bond shall arise after the Owner has promptly notified the Contractor and the Surety (at the address described in Section 13) of claims, demands, liens or suits against the Owner or the Owner's property by any person or entity seeking payment for labor, materials or equipment furnished for use in the performance of the Construction Contract and tendered defense of such claims, demands, liens or suits to the Contractor and the Surety.

§ 4 When the Owner has satisfied the conditions in Section 3, the Surety shall promptly and at the Surety's expense defend, indemnify and hold harmless the Owner against a duly tendered claim, demand, lien or suit.

§ 5 The Surety's obligations to a Claimant under this Bond shall arise after the following:

§ 5.1 Claimants, who do not have a direct contract with the Contractor,
   .1    have furnished a written notice of non-payment to the Contractor, stating with substantial accuracy the amount claimed and the name of the party to whom the materials were, or equipment was, furnished or supplied or for whom the labor was done or performed, within ninety (90) days after having last performed labor or last furnished materials or equipment included in the Claim; and
   .2    have sent a Claim to the Surety (at the address described in Section 13).

§ 5.2 Claimants, who are employed by or have a direct contract with the Contractor, have sent a Claim to the Surety (at the address described in Section 13).

§ 6 If a notice of non-payment required by Section 5.1.1 is given by the Owner to the Contractor, that is sufficient to satisfy a Claimant's obligation to furnish a written notice of non-payment under Section 5.1.1.

§ 7 When a Claimant has satisfied the conditions of Sections 5.1 or 5.2, whichever is applicable, the Surety shall promptly and at the Surety's expense take the following actions:

§ 7.1 Send an answer to the Claimant, with a copy to the Owner, within sixty (60) days after receipt of the Claim, stating the amounts that are undisputed and the basis for challenging any amounts that are disputed; and

§ 7.2 Pay or arrange for payment of any undisputed amounts.

§ 7.3 The Surety's failure to discharge its obligations under Section 7.1 or Section 7.2 shall not be deemed to constitute a waiver of defenses the Surety or Contractor may have or acquire as to a Claim, except as to undisputed amounts for which the Surety and Claimant have reached agreement. If, however, the Surety fails to discharge its obligations under Section 7.1 or Section 7.2, the Surety shall indemnify the Claimant for the reasonable attorney's fees the Claimant incurs thereafter to recover any sums found to be due and owing to the Claimant.

§ 8 The Surety's total obligation shall not exceed the amount of this Bond, plus the amount of reasonable attorney's fees provided under Section 7.3, and the amount of this Bond shall be credited for any payments made in good faith by the Surety.

§ 9 Amounts owed by the Owner to the Contractor under the Construction Contract shall be used for the performance of the Construction Contract and to satisfy claims, if any, under any construction performance bond. By the Contractor furnishing and the Owner accepting this Bond, they agree that all funds earned by the Contractor in the performance of the Construction Contract are dedicated to satisfy obligations of the Contractor and Surety under this Bond, subject to the Owner's priority to use the funds for the completion of the work.

S-2149/AS 8/10

§ 10 The Surety shall not be liable to the Owner, Claimants or others for obligations of the Contractor that are unrelated to the Construction Contract. The Owner shall not be liable for the payment of any costs or expenses of any Claimant under this Bond, and shall have under this Bond no obligation to make payments to, or give notice on behalf of, Claimants or otherwise have any obligations to Claimants under this Bond.

§ 11 The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

§ 12 No suit or action shall be commenced by a Claimant under this Bond other than in a court of competent jurisdiction in the state in which the project that is the subject of the Construction Contract is located or after the expiration of one year from the date (1) on which the Claimant sent a Claim to the Surety pursuant to Section 5.1.2 or 5.2, or (2) on which the last labor or service was performed by anyone or the last materials or equipment were furnished by anyone under the Construction Contract, whichever of (1) or (2) first occurs. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

§ 13 Notice and Claims to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the page on which their signature appears. Actual receipt of notice or Claims, however accomplished, shall be sufficient compliance as of the date received.

§ 14 When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. When so furnished, the intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

§ 15 Upon request by any person or entity appearing to be a potential beneficiary of this Bond, the Contractor and Owner shall promptly furnish a copy of this Bond or shall permit a copy to be made.

§ 16 Definitions

§ 16.1 Claim. A written statement by the Claimant including at a minimum:
 .1  the name of the Claimant;
 .2  the name of the person for whom the labor was done, or materials or equipment furnished;
 .3  a copy of the agreement or purchase order pursuant to which labor, materials or equipment was furnished for use in the performance of the Construction Contract;
 .4  a brief description of the labor, materials or equipment furnished;
 .5  the date on which the Claimant last performed labor or last furnished materials or equipment for use in the performance of the Construction Contract;
 .6  the total amount earned by the Claimant for labor, materials or equipment furnished as of the date of the Claim;
 .7  the total amount of previous payments received by the Claimant; and
 .8  the total amount due and unpaid to the Claimant for labor, materials or equipment furnished as of the date of the Claim.

§ 16.2 Claimant. An individual or entity having a direct contract with the Contractor or with a subcontractor of the Contractor to furnish labor, materials or equipment for use in the performance of the Construction Contract. The term Claimant also includes any individual or entity that has rightfully asserted a claim under an applicable mechanic's lien or similar statute against the real property upon which the Project is located. The intent of this Bond shall be to include without limitation in the terms "labor, materials or equipment" that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental equipment used in the Construction Contract, architectural and engineering services required for performance of the work of the Contractor and the Contractor's subcontractors, and all other items for which a mechanic's lien may be asserted in the jurisdiction where the labor, materials or equipment were furnished.

§ 16.3 Construction Contract. The agreement between the Owner and Contractor identified on the cover page, including all Contract Documents and all changes made to the agreement and the Contract Documents.

S-2149/AS 8/10

§ 16.4 Owner Default. Failure of the Owner, which has not been remedied or waived, to pay the Contractor as required under the Construction Contract or to perform and complete or comply with the other material terms of the Construction Contract.

§ 16.5 Contract Documents. All the documents that comprise the agreement between the Owner and Contractor.

§ 17 If this Bond is issued for an agreement between a Contractor and subcontractor, the term Contractor in this Bond shall be deemed to be Subcontractor and the term Owner shall be deemed to be Contractor.

§ 18 Modifications to this bond are as follows:

*(Space is provided below for additional signatures of added parties, other than those appearing on the cover page.)*

**CONTRACTOR AS PRINCIPAL**
Company:                          *(Corporate Seal)*

**SURETY**
Company:                          *(Corporate Seal)*

Signature:
Name and Title:
Address

Signature:
Name and Title:
Address

S-2140/AS 8/10

# EXHIBIT 3

AMERICAN ARBITRATION ASSOCIATION

---------------------------------------------------x

SUNLINK CORPORATION,                              :

                        Claimant,                 :

                                                  :          Case No. 01-14-0001-7516
        -and-                                     :

                                                  :

AMERICAN CAPITAL ENERGY, INC.,                    :

                        Respondent.               :

---------------------------------------------------x

### PARTIAL FINAL AWARD

I, the undersigned Arbitrator, having been designated in accordance with the arbitration

agreements entered into by the above-named parties dated October 15, 2013, and having been

duly sworn, and having heard the proofs and allegations of the parties, hereby AWARD as

follows:

I.      **INTRODUCTION**

On or about October 20, 2014, Claimant SunLink Corporation ("SunLink") filed a

Demand for Arbitration against Respondent American Capital Energy, Inc. ("ACE"), asserting

claims for breach of contract (Count I), quantum meruit (Count II), intentional misrepresentation

(Count III), negligent misrepresentation (Count IV), and violation of G.L. c. 93A, §§ 2, 11

(Count V), arising from ACE's failure to pay for solar panel mounting systems installed on sites

on Cape Cod and Martha's Vineyard. SunLink alleged damages of $8.1 million, later refined to

$8,260,961.41,[1] plus multiple damages, attorneys' fees and costs under Chapter 93A.

---

[1] Including interest through August 25, 2015 (the outside date agreed to by the parties for issuance of this Partial
Final Award). (*See* SunLink Post-Hearing Memorandum, at p. 47).

In response to the Demand, ACE denied all material allegations and asserted various affirmative defenses, including a right of setoff (thirteenth affirmative defense) based on SunLink's "late delivery" of its products. Pursuant to Scheduling Order No. 1 ("SO"), stipulated to by the parties, ACE later itemized the "costs, expenses and damages" encompassed by its setoff claim (*see* ACE Exh. 4, asserting charges of $7,941,196 for subcontractor overtime, ACE labor and overhead, change orders, liquidated damages, and lost tax (Solar Renewable Energy Certificate – "SREC") credits).

Seven days of hearings were conducted on May 13 through May 20, 2015, in Boston, Massachusetts, chronicled in testimony from ten witnesses and approximately 280 exhibits. Following the hearings, and at the parties' request, I received post-hearing briefs and carefully reviewed the transcripts (over 1,570 "mini-script" pages), exhibits and relevant case law. Set forth below is my decision on the contested issues.

## II.   MATERIAL FACTUAL DETERMINATIONS

The parties requested, and I agreed to prepare, a "reasoned Award which describes the basis for the Arbitrator's decision, but without a comprehensive description of all facts and legal issues." (SO, ¶ 14)(emphasis added). Accordingly, I will focus on the salient facts and issues in this large, complex proceeding, avoiding, where possible, a full description of matters such as ownership, transaction and tax structures, construction details and near daily email traffic between the parties.

ACE is a Massachusetts-based corporation specializing in the development of commercial renewable energy projects. In 2007, various cities and towns on Cape Cod and Martha's Vineyard banded together and formed a cooperative called the Cape & Vineyard Electric Cooperative, Inc. ("CVEC") to develop photovoltaic (PV) energy projects. Some years

2

later, CVEC awarded approximately 16 megawatts (MW) of PV development to ACE for projects to be situated largely on capped landfills in Barnstable, Brewster, Chatham, Eastham, Harwich, Katama, Nunnepog, and Tisbury. The Town of Dennis separately awarded development rights to ACE for a substantially similar 6 MW solar array (these nine projects, collectively, the "CVEC Project or Projects"). In 2013, ACE transferred its rights to entities in the business of structuring, financing and operating solar power installations called Clean Focus Corporation ("Clean Focus") and Redwood Solar Development LLC ("Redwood"), with ACE assuming the role of the Engineering, Procurement and Construction (EPC) contractor pursuant to an EPC Agreement with Redwood. (ACE Exh. 33).

SunLink is a corporation with its principal place of business in California. SunLink sells racking or mounting systems for solar panels (modules). SunLink had sold ballasted ground-mounted solar (BGMS) systems or large ground-mounted solar (LGMS) systems to ACE in the past, and, as early as 2012, it was asked by ACE to provide quotations for mounting systems for the CVEC Projects. (SL Exh. 4, proposed Master Sales Contract and Volume Price Agreement, dated March 5, 2012).[2] SunLink does not sell solar modules or inverters, or install or construct the solar arrays. Rather, SunLink provides what is commonly referred to in the industry as the "balance of system," which for BGMS systems consists of precast or poured-in-place concrete ballasts, steel A-frames, rails on which the solar panels rest, and related hardware, and for LGMS systems consists of posts, A-frames, rails, and hardware.

On or about October 17, 2013, the parties executed nine "Sales Contracts" for the CVEC Projects (each dated October 15, 2013), under which SunLink agreed to sell and ACE agreed to

---

[2] The March 5, 2012 proposal was never implemented by the parties before it expired at the end of 2012. Thereafter, the CVEC Project was effectively put on hold while ACE pursued financing and an interconnection agreement with the local utility. There were also regulatory changes that disrupted the solar power market in Massachusetts. (*See* ACE Exh. 1 (letter dated June 6, 2013 from ACE's general counsel to creditors and others addressing delays and discussing cash flow problems caused by regulatory changes announced by the Massachusetts DOER)).

3

purchase GMS products for each CVEC site. (SL Exh. 233)(the "Agreement or Agreements").

The following terms and conditions are most important for this proceeding and are substantially

identical across the nine Agreements.[3]

### Product Lead Time

The Agreements contained two boxes with information about product "lead time," as

follows:

Contract Information

| Credit Approval | All orders subject to credit approval before manufacturing. |
|---|---|
| FOB Point | AZ, CA, CO, CT, IN, MN, OH, PA, TX and/or WV. |
| Shipping and Handling Terms | Shipping and Handling is pre-paid by SunLink and added to the invoice. |
| Product Lead Time | All specified lead times are from receipt of signed sales contract, down payment, notice to proceed and proof of payment bond is in place at 100% of contract value. |

Product Information

| Link | Product | Specifications | | Unit Price | Qty | Total |
|---|---|---|---|---|---|---|
| 1 | Ballasted Ground Mount System | Site Name | C-Vec Chatham Site | $661,359.60 | 1 | $661,359.60 $102.60/Module $0.3600/Watt |
| | | Wind Speed | 120 mph | | | |
| | | Wind Exposure | C | | | |
| | | Occupancy | I | | | |
| | | Topo. Factor | 1.00 | | | |
| | Lead Time: 6 weeks | Snow Load | 35 psf | | | |
| | FOB California | Tilt Angle | 25° | | | |
| | Points: Minnesota | Module Name | SunPreme GX 285W | | | |
| | Pennsylvania | No. of Modules | 6,446 | | | |
| | | String Length | 11 | | | |
| | | Size | 1,837.11 kW | | | |
| | | Array Layout Drawing | | | | |
| | | 1003562-CVECCHATHAM-081513-ENG-R11 | | | | |

---

[3] Under a separate Master Sales Contract and Volume Price Agreement, SunLink sold BGMS systems to ACE for solar projects in Mashpee and Duxbury, Massachusetts. (ACE Exhs. 76, 77 ("Mashpee and Duxbury Projects")). SunLink was paid in full for the Mashpee and Duxbury Projects and there is no claim associated with those Projects advanced in this case. They were nonetheless administered by the parties in conjunction with the CVEC Projects.

(Agreements, pp. 2, 3 (Chatham site used as an example)).

Product lead time for the CVEC Projects was therefore clearly expressed as six weeks (with the exception of Katama, which was eight weeks).

It was undisputed at the hearings that the term product "lead time" as used in the Agreements refers to the time between SunLink's receipt of (i) a signed contract, (ii) deposits, (iii) bonds, and (iv) notices to proceed, and the commencement of deliveries. (Tr., Day 1, 51:23-52:21; 70:8-12; 111:1-18 [Tilley]; Tr., Day 2, 462:13-464:2 [Purcell]; Tr., Day 3, 629:23-630:11 [Eastwood]; Tr., Day 3, 690:7-20 [Prasad]; Tr., Day 5, 1063:9-1064:3 [Osgood]). Product lead time is not the time by which all products will be delivered. (Tr., Day 1, 52:22-53:24; 70:8-12; 111:1-18 [Tilley]; Tr., Day 5, 1063:9-1064:3 [Osgood]).[4]

The Agreements also provide that "lead times as set forth in the 'Proposal' are approximate." (Agreements, p. 6 at § 9). The "Proposal" referred to are pages 2 through 4 of the Agreement. (Tr., Day 1, 65:15-19 [Tilley]).

### Payment Terms

The sales price for SunLink's products was set forth in each Proposal and payment was required in "cash, check or wire transfer in accordance with the Payment Terms" in Appendix B to the Agreements. (Agreements, p. 5 at § 3)). Appendix B provided:

1. SELLER STANDARD PAYMENT TERMS

    a. 1.40% of LUMP SUM SALES PRICE with order. Purchaser provides check with signed Sales Contract or Purchase Order. Order fulfillment begins with receipt of payment, in addition to signed Sales Contract and approved credit.

    b. 98.60% of LUMP SUM SALES PRICE shall be due upon shipment unless otherwise agreed by the parties, in writing, in a bill-and-hold or multiple-elements arrangement.

        i. Seller will invoice Purchaser and provide an itemized invoice.

---

[4] *But see* ACE's thirteenth affirmative defense (asserting that delivery time in Agreements was six weeks).

5

    ii.  Terms are net 45 days from date of invoice.

    iii.  Payments made more than 45 days late shall be charged a late fee of one and one-half percent of the outstanding balance due (1.5%) per month.

There were no "pay-if-paid" provisions in the Agreements (*i.e.*, payment to SunLink was not conditioned upon ACE receiving payment from the owner or any third party). Furthermore, there were no "flow down" provisions in the Agreements incorporating by reference any terms and conditions contained in ACE's EPC Agreement with Clean Focus and/or Redwood. (Tr., Day 1, 73:19-74:14; 112:19-113:2; 117:21-118:18 [Tilley]).

### Shipment and Delivery Terms

Under the Agreements, SunLink's systems were "furnished F.O.B. [Free on Board] San Leandro, California, Allen, Texas, or Carrolton, Texas (or any other location designated by [SunLink])." (Agreements, p. 6 at § 10). Remarkably, and despite critical time constraints and potential penalties imposed upon ACE (discussed further below) by the owners and/or CVEC, there was no delivery schedule incorporated in the Agreements. (Tr., Day 1, 70:8-12; 112:16:18 [Tilley]; Tr., Day 3, 617:21-618:5 [Eastwood]; Tr., Day 5, 1067:5-15 [Osgood]; Tr., Day 6, 1321:7-1322:19 [McLean]). There were also no "Buy American" provisions in the Agreements requiring the use of US manufacturers or products, which could potentially affect delivery times. (F.O.B. governs the transfer of title and risk of loss or damage; it does not refer to the place where the product was to be manufactured.) (Tr., Day 1, 120:18-121:10 [Tilley]; Agreements, p. 6 at § 12 (confirming that risk of loss and transfer of title passes upon delivery to F.O.B. points specified in Agreement)).

### Acceptance

SunLink's products were deemed "unconditionally accepted fifteen days after receipt." (Agreements, p. 6 at § 13)).

6

**Limitation of Liability**

The parties agreed that, in "no event shall [SunLink] . . . be liable to [ACE] or any third

party for any special, indirect, incidental, consequential or punitive damages, whether arising in

contract, tort or otherwise, even if advised of the possibility of same." (Agreements, p. 8 at §

21.g.).

In October 2013, ACE also agreed to provide a $100,000 deposit for SunLink's ballast

supplier to expedite the creation of forms and molds for the production of the approximately

18,000 ballasts required for the CVEC Projects. (Tr., Day 5, 1074:8-1076:1; 1077:16-1079:4

[Osgood]; *see also*, SL Exh. 32 (referencing "the down payment for the $100K for forms"); Tr.,

Day 1, 100:24-102:15; 107:1-108:5; 109:1-8 [Tilley]; SL Exh. 105 (January 20, 2014 email

from ACE acknowledging "the $100,000 down payment" for ballasts.); SL Exh. 26 (referring to

"initial payment of $100,000 that will permit [SunLink] to expedite production of the molds for

the production of the concrete ballast"); Tr., Day 3, 697:2-698:3; 699:2-6 [Purcell] (SunLink

was expecting $100,000 for ballast forms); Tr., Day 5, 912:13-913:21 [Ridgway] (describing

need for ballast deposit to provide assurance that project was moving forward in light of the

"false starts"); Tr., Day 6, 1292:6-1295:4; 1326:18-1327:2; 1329:5-7 [McLean] (agreeing that

SunLink proposed to receive a $100,000 deposit, net 30 days and ACE "did it on better terms

than net 30" and that he understood that "SunLink needed $100,000 to order forms").

As noted above, the Agreements required ACE to provide payment bonds, deposits and

notices to proceed as preconditions for SunLink to initiate production. The dates on which ACE

provided deposits and notices to proceed (NTP) under the Agreements are set forth in the chart

below:

| Site | NTP | Deposit Date | Deposit Amount |
|------|-----|--------------|----------------|
| Brewster | 9-Dec-13 | 16-Dec-13 | $10,705.95 |
| Chatham | 3-Jan-14 | 2-Jan-14 | $9,259.03 |
| Eastham | 3-Jan-14 | 2-Jan-14 | $7,458.28 |
| Harwich | 3-Jan-14 | 2-Jan-14 | $27,137.26 |
| Barnstable | 9-Dec-13 | 16-Dec-13 | $25,522.85 |
| Dennis | 9-Dec-13 | 16-Dec-13 | $34,273.49 |
| Tisbury | 3-Jan-14 | 2-Jan-14 | $10,416.56 |
| Katama | 16-Dec-13 | 2-Jan-14 | $10,416.56 |
| Nunnepog | 16-Dec-13 | 2-Jan-14 | $11,345.46 |

(SL Exhs. 56, 60, 66, 68, 80, 112, 155, 233, Tab 3).

ACE provided the $100,000 ballast deposit for the CVEC Projects on January 2, 2014.

(SL Exhs. 56, 60, 66, 68, 80, 112, 155, 233, Tab 3; Tr., Day 5, 1067:16-1068:2 [Osgood]).

### The Critical Issue: "Reasonable" Delivery Terms

The pivotal issue in this case is the time of performance – namely, when SunLink's

products were reasonably expected to be delivered in the absence of contractually-specified

dates. What follows here is a summary of the relevant exchanges between the parties respecting

delivery terms.

On August 1, 2013, two and a half months prior to the execution of the Agreements,

ACE sent SunLink a proposed ballast delivery schedule for the seven CVEC BGMS Projects

(Barnstable, Brewster, Chatham, Dennis, Eastham, Harwich, and Tisbury).[5] (SL Exh. 12

("ACE August 2013 Schedule"); Tr., Day 5, 1059:13-1060:7 [Osgood]). The ACE August

2013 Schedule was based on ACE's assumption that it would receive a notice to proceed from

the owners in August 2013. (Tr., Day 5, 1060:8-1061:21; 1062:3-6 [Osgood]).

The ACE August 2013 Schedule contemplated:

- deliveries commencing at the Chatham and Eastham sites on

---

[5] The Katama and Nunnepog sites were not landfills, so they could accommodate LGMS systems, which use
submerged posts in lieu of concrete ballasts.

8

September 25, 2013;

- deliveries ending at the Dennis site on January 9, 2014;

- deliveries occurring five days per week;

- production of 17,460 ballasts (three different types);[6] and

- an approximate four week product lead time.

(SL Exh. 12; Tr., Day 3, 690:1-6 [Prasad]; Tr., Day 5, 1060:8-1061:21 [Osgood]). The ACE August 2013 Schedule thus afforded SunLink approximately fifteen weeks to deliver just the ballasts to seven of the nine CVEC Project sites. (SL Exh. 12; Tr., Day 1, 94:22-95:7 [Tilley]; Tr., Day 3, 690:21-691:2 [Prasad]; Tr., Day 5, 1064:19-22 [Osgood]). Coupled with a four week lead time, the ACE August 2013 Schedule would span nineteen weeks from deposit and notice to proceed to final delivery of the ballasts. (Tr., Day 1, 94:22-95:7 [Tilley]; Tr., Day 3, 690:21-691:15 [Prasad]; Tr., Day 5, 1065:6-10 [Osgood]). Regardless, ACE did not make payment or issue a notice to proceed to SunLink in August 2013, and the parties never agreed to or implemented the ACE August 2013 Schedule. (Tr., Day 1, 90:15-92:1 [Tilley]).

The first post-contract delivery schedule was sent by ACE on January 8, 2014, almost three months after execution of the Agreements. This schedule covered ballast and post deliveries for the nine CVEC Project sites - the seven BGMS sites covered by the ACE August 2013 Schedule, plus the two LGMS sites at Nunnepog and Katama. (SL Exh. 87 ("ACE January 8, 2014 Schedule"); Tr., Day 5, 1090:1-17 [Osgood]). The ACE January 8, 2014 Schedule provided for:

- deliveries to the BGMS sites commencing in Barnstable and Dennis the week of January 17, 2014, and ending in Dennis the week of March 14, 2014; and

- deliveries of posts to the two CVEC LGMS Project sites

---

[6] Four types of ballasts were eventually required for the CVEC Projects. (SL Exh. 13).

9

commencing the week of January 31, 2014 and ending the week of
February 14, 2014.

(SL Exh. 87; Tr., Day 5, 1090:1-17; 1100:22-1101:3 [Osgood]).  SunLink did not agree to

the ACE January 8, 2014 Schedule, which reduced to eight weeks the time for SunLink to

deliver the ballasts and posts. (SL Exh. 90; Tr., Day 1, 152:1-153:3 [Tilley]).

On January 10, 2014, in response to ACE's January 8, 2014 Schedule, SunLink sent ACE

its version of a proposed delivery schedule for ballasts, posts and hardware for all nine CVEC

Project sites and for the Mashpee and Duxbury Projects.  (SL Exh. 90 ("SunLink January 10,

2014 Schedule"); Tr., Day 2, 474:23-475:15 [Purcell]). The SunLink January 10, 2014 Schedule

proposed:

- deliveries commencing for the CVEC Projects at the Barnstable and
  Dennis sites the week of January 27, 2014;

- deliveries ending for the CVEC Projects at the Harwich site the
  week of May 5, 2014; and

- deliveries commencing and ending for the Mashpee and Duxbury
  Projects the weeks of April 28 and May 19, 2014, respectively.

(SL Exh. 90; Tr., Day 2, 474:23-475:15 [Purcell]).

The SunLink January 10, 2014 Schedule thus afforded SunLink fifteen weeks to deliver the

ballasts, posts and hardware to the nine CVEC Project sites, roughly in line with ACE's August

2013 (pre-contract, ballast only) Schedule. (SL Exhs. 12, 90; Tr., Day 2, 474:23-475:15

[Purcell]); Tr., Day 5, 1101:16-1103:13 [Osgood] (conceding that the SunLink January 10, 2014

Schedule and the ACE August 2013 Schedule each had durations of fifteen weeks)).  Although

SunLink continuously advised ACE that it was "working to" the January 10, 2014 Schedule, *see*

SL Exh. 100; Tr., Day 1, 215:9-216:16 [Tilley]; Tr., Day 3, 718:16-21 [Purcell], ACE never

explicitly agreed to that schedule. (SL Exh. 99; Tr., Day 1, 156:18-157:8 [Tilley]).

Given ACE's disappointment with the January 10, 2014 Schedule, on or about January

10

16, 2014, SunLink sent ACE another proposed delivery schedule for all ballasts, posts and hardware for the nine CVEC Project sites and the Mashpee and Duxbury Projects.  (SL Exh. 100 ("SunLink January 16, 2014 Schedule")). The SunLink January 16, 2014 Schedule proposed:

- deliveries commencing for the CVEC Projects at the Barnstable and Dennis sites the week of January 27, 2014;

- deliveries ending for the CVEC Projects during or before the last week of March 2014 (with the exception of deliveries ending at the Harwich site the week of April 7, 2014); and

- deliveries commencing and ending for the Mashpee and Duxbury Projects the weeks of March 10 and April 7, 2014, respectively.

(SL Exh. 100; Tr., Day 1, 162:16-165:10 [Tilley]; Tr., Day 2, 479:13-480:10 [Purcell]; Tr., Day 3, 623:7-624:15 [Eastwood]). The SunLink January 16, 2014 Schedule gave SunLink eleven weeks to deliver all of the ballasts, posts and hardware to the nine CVEC Project sites (final delivery by the week of April 7, 2014, but mostly before the last week of March 2014).  (SL Exh. 100; Tr., Day 2, 479:13-480:10 [Purcell]).  This proposed schedule was conditioned on the payment of an additional $400,000, and ACE rejected it (despite its assertion at the hearings that $84 million in SREC credits were at risk if the CVEC Projects were not completed in June 2014). (SL Exh. 100, 101; Tr., Day 2, 479:13-480:10 [Purcell]; Tr., Day 1, 164:19-24; 167:19-23 [Tilley]; Tr., Day 3, 626:7-10 [Eastwood]).

On January 24, 2014, SunLink sent ACE yet another proposed delivery schedule for all ballasts, posts and hardware for the nine CVEC Project sites and the Mashpee and Duxbury Projects. (SL Exh. 117 ("SunLink January 24, 2014 Schedule")).  The SunLink January 24, 2014 Schedule proposed:

- deliveries commencing for the CVEC Project at the Dennis site the week of January 27, 2014;

11

- deliveries ending at all CVEC Project sites by the week of April 14 (except for the Harwich site where deliveries would end the week of April 21, 2014); and

- deliveries commencing and ending for the Mashpee and Duxbury Projects the weeks of April 21 and May 5, 2014, respectively.

(SL Exh. 117; Tr., Day 1, 177:6-179:16 [Tilley]; Tr., Day 5, 1112:3-10 [Osgood]). The SunLink January 24, 2014 Schedule thus afforded SunLink thirteen weeks to deliver all of the ballasts, posts and hardware to the nine CVEC Project sites (with final delivery of all products by the week of April 21, 2014, but mostly during the week of April 14, 2014). (SL Exh. 117; Tr., Day 2, 485:15-486:13 [Purcell]; Tr., Day 5, 1112:3-17 [Osgood]). SunLink informed ACE that it would cost an additional $147,000 for SunLink to implement the schedule. (SL Exh. 117; Tr., Day 2, 485:15-486:13 [Purcell]). SunLink also made clear to ACE that SunLink would continue to "work to" the SunLink January 10, 2014 Schedule until there was an agreement on the delivery schedule. (SL Exh. 117). ACE did not agree to the SunLink January 24, 2014 Schedule or pay the $147,000 for SunLink to implement it. (SL Exh. 121; Tr., Day 1, 179:17-180:4 [Tilley]; 189:22-190:1 [Tilley]; Tr., Day 6, 1387:17-1388:2 [McLean]).

On or about January 28, 2014, SunLink sent ACE another proposed delivery schedule for all ballasts, posts and hardware for the nine CVEC Project sites and the Mashpee and Duxbury Projects. (SL Exh. 125 ("SunLink January 28, 2014 Schedule")). The SunLink January 28, 2014 Schedule was based on the SunLink January 24, 2014 Schedule, as revised to show expedited shipments of hardware for six of the CVEC Project sites (Dennis, Barnstable, Brewster, Chatham, Harwich, and Eastham). Similar to the SunLink January 24, 2014 Schedule, the SunLink January 28, 2014 Schedule proposed:

- deliveries commencing for the CVEC Projects at the Dennis site the week of January 27, 2014;

- deliveries ending for the CVEC Projects at the Harwich site the week of

12

April 21, 2014; and

- deliveries commencing and ending for the Mashpee and Duxbury Projects
the weeks of April 21 and May 5, 2014, respectively.

(SL Exh. 125).  The SunLink January 28, 2014 Schedule thus afforded SunLink thirteen

weeks to deliver all of the ballasts, posts and hardware to the nine CVEC Project sites.

Furthermore, like the SunLink July 24, 2014 Schedule, the SunLink January 28, 2014 Schedule

was conditioned on an additional payment of $147,000.  (SL Exh. 154).  The parties never

agreed to implement the SunLink January 28, 2014 Schedule, and ACE never paid the $147,000

to do so.  (Tr., Day 1, 222:23-225:2 [Tilley]; Tr., Day 5, 1120:9-1222:1 [Osgood]; SL Exh. 134;

Tr., Day 6, 1394:9-1396:9; 1405:22-1406:11 [McLean]).

While continuing to perform against the SunLink January 10, 2014 Schedule, SunLink

offered a number of additional, expedited delivery options similar to those made earlier in

January 2014.  (SL Exh. 117; Tr., Day 1, 196:18-197:5 [Tilley]).  The options were separated

into categories for ballasts, hardware and mounting frames and included:

- For ballasts, SunLink gave ACE two options, with the potential for
negotiating an in-between option.  (Tr., Day 1, 197:6-198:1 [Tilley]).  The
more aggressive plan involved additional costs of between $350,000 and
$550,000.  (SL Exh. 132).  The other schedule involved an additional cost
of $150,000 and provided for all ballast deliveries to be completed by the
first week of May 2014.  (*Id*).

- Rails and hardware deliveries starting the week of February 24, 2014, and
ending a few weeks after that date.  (SL Exh. 132).

- SunLink provided ACE with three options for delivery of the A-frames.
The first option was that 25% of the A-frames could be delivered by
March 10, 2014 by air freight from China at a cost of $310,000.  The
remaining 75% of the mounting frames would be delivered starting on or
about March 31, 2014 and would be completed in two to three weeks.  The
second option was that 50% of the A-frames would be delivered by March
17, 2014 by air freight from China at a cost of $584,000. The remaining
50% of mounting frames would be delivered starting on or about April 7,
2014 and would be completed within two to three weeks.  The third option
was that the A-frames would be delivered starting on March 24, 2014 and

13

would be completed within four weeks.  SunLink provided an additional option that 500 mounting frames could be manufactured domestically and delivered during the weeks of March 17 and March 31, 2014, at a cost of $25,000. (SL Exh. 132).

SunLink informed ACE that in order to execute any of these options, a decision (and payment) would have to be made promptly. (Tr., Day 1, 202:17-203:6 [Tilley]).  ACE did not accept any of the proposed options as stated.  (Tr., Day 1, 203:7-18 [Tilley]). Instead, ACE accepted a hybrid proposal for the expedited shipment of a portion of the mounting frames from China by air. (Tr., Day 1, 207:14-208:8 [Tilley]).  ACE and SunLink agreed to share the cost of the air freight equally.  (Tr., Day 1, 208:9-21 [Tilley]).

On February 28, 2014, in the context of another acceleration opportunity presented to ACE by SunLink, this time for the delivery of 1,608 ballasts, ACE accepted one of SunLink's options, albeit orally.  (Tr., Day 1, 234:7-22 [Tilley]; SL Exh. 162).

Ultimately, ACE signed the following change orders documenting the parties' arrangements and authorizing expedited delivery of mounting frames and ballasts:

| Date | Subject | Record Cite |
|---|---|---|
| 2/17/14 | 50% split of frames from China by air (first two 10% shipments) | SL Exh. 234, Tab 1 |
| 2/25/14 | 50% split of frames from China by air (third 10% shipment) | SL Exh. 234, Tab 2 |
| 3/3/14 | Accelerate delivery of 1,608 ballasts from April to March (SunLink pays 20%) | SL Exh. 234, Tab 4 |
| 3/13/14 | Production and delivery of 180 ballasts on five Saturdays | SL Exh. 234, Tab 5 |
| 3/19/14 | Production and delivery of 80 ballasts (MBO) on six Sundays | SL Exh. 234, Tab 6 |

14

| 4/1/14 | Expediting ballasts from MBO/Scituate (by 4/16) | SL Exh. 234, Tab 8 |
| 4/21/14 | Ballast deliveries from Old Castle for Tisbury (by 4/16) | SL Exh. 234, Tab 9 |

Relying on these change orders, and ACE's corresponding commitment to pay for the products, SunLink expedited delivery of the ballasts, posts and hardware and completed "all major deliveries" for the CVEC Projects by April 18, 2014. (SL Exh. 203; Tr., Day 1, 270:21-272:19 [Purcell]).

### Evidence of SunLink's Actual Performance

SunLink introduced into evidence an integrated spreadsheet which tracked and documented the date of all deliveries made by SunLink for the nine CVEC Projects. (SL Exh. 241). SunLink's expert witness on construction projects, Steven Collins, extracted the relevant delivery information from the contemporaneous project data contained in SunLink Exhibit 241, and analyzed SunLink's performance on both a cumulative and individual site/product basis. (SL Exhs. A, B, C, D and associated testimony). I found Mr. Collins to be a knowledgeable, professional and credible witness.

The chart below (derived from SunLink Exhibit 241) shows the start and end dates for SunLink's delivery of products to the seven CVEC Project sites for which SunLink seeks damages (excluding products ordered by ACE due to customer design changes, and products in excess of the quantities specified in the Agreements):

15

| CVEC Site | Ballasts Start | Ballasts End | A Frames Start | A Frames End | Rails Start | Rails End | Hard Start | Hard End |
|-----------|----------------|--------------|----------------|--------------|-------------|-----------|------------|----------|
| Barnstable | 2/3/2014 | 4/17/2014 | 3/11/14 | 4/8/14 | 3/11/14 | 4/10/14 | 2/19/14 | 3/12/14 |
| Brewster | 2/18/2014 | 3/24/2014 | 3/11/14 | 3/31/14 | 3/24/14 | 4/14/14 | 2/19/14 | 3/20/14 |
| Chatham | 2/18/2014 | 4/7/2014 | 3/11/14 | 4/8/14 | 4/8/14 | 4/10/14 | 3/3/14 | 4/1/14 |
| Dennis | 1/30/2014 | 4/23/2014 | 3/11/14 | 4/8/14 | 3/3/14 | 4/14/14 | 2/19/14 | 4/1/14 |
| Eastham | 2/13/2014 | 2/27/2014 | 3/11/14 | 4/8/14 | 3/6/14 | 3/10/14 | 3/7/14 | 4/5/14 |
| Harwich | 3/5/2014 | 4/18/2014 | 4/7/14 | 4/8/14 | 3/27/14 | 4/14/14 | 3/7/14 | 3/24/14 |
| Tisbury | 3/24/2014 | 4/14/2014 | 4/7/14 | 4/8/14 | 4/2/14 | 4/10/14 | 3/11/14 | 3/21/14 |

Mr. Collins compared SunLink's performance to the various schedules exchanged (but never agreed to) between the parties. Specifically, Mr. Collins analyzed SunLink's performance against the ACE August 2013 Schedule, and the SunLink January 10, 2014, January 24, 2014, and January 28, 2014 Schedules.  (SL Exhs. A, B, C, D; Tr., Day 4, 787:1-803:22 [Collins]).

Mr. Collins testified that with respect to ballast deliveries, SunLink exceeded all of the relevant schedules exchanged between the parties.  (SL Exh. B; Tr., Day 4, 818:17-821:8 [Collins]).

Mr. Collins similarly analyzed all hardware deliveries to the CVEC Project sites, including frames, rails, and miscellaneous parts (nuts and bolts).  (Tr., Day 4, 839:1-841:3 [Collins]; SL Exh. D).  Mr. Collins testified that, excluding the two LGMS systems projects (Nunnepog and Katama) for which SunLink is not seeking any damages, SunLink delivered all required hardware "consistent with or ahead of" the SunLink January 10, 2014 Schedule (the schedule that SunLink was using as a baseline).  (Tr., Day 4, 849:4-15; 851:11-16 [Collins]).

In summary, Mr. Collins confirmed the completion by SunLink of all base contract deliveries by April 18, 2014. (Tr., Day 4, 809:22-810:10 [Collins]).  He opined that SunLink

performed in a "reasonable manner" given the nature, purpose and circumstances of the CVEC

Project. (Tr., Day 4, 852:20-855:17 [Collins]). ACE offered no expert testimony contradicting

Mr. Collins' analysis, or any contemporaneous business records or receipts refuting the

underlying data respecting the actual delivery dates of SunLink's products.

### ACE's Notices of Default

On January 27, 2014, ACE sent SunLink a letter asserting that SunLink was in default

under the Agreements. (SL Exh. 123; Tr., Day 5, 1114:17-1115:15 [Osgood]). The basis for the

alleged default was SunLink's "inability to meet the delivery schedule as defined in the

Contracts." (SL Exh. 123; Tr., Day 5, 1115:16-1116:2 [Osgood]). But, as ACE conceded at the

hearings, there was no delivery schedule set forth in the Agreements. (*See, e.g.*, Tr., Day 5,

1115:24-1116:6 [Osgood]).

On February 4, 2014, ACE sent SunLink a second letter purporting to place SunLink in

default, accusing SunLink of fraud and a violation of Chapter 93A and threatening to attach

SunLink's bank accounts. (SL Exh. 141; Tr., Day 6, 1399:10-14 [McLean]).[7] This time, ACE

based the alleged default on "the terms and conditions" in the Master Sales Contract and Volume

Pricing Agreement (signed on March 6, 2012). (SL Exh. 141). That contract, however, expired

on December 31, 2012. (SL Exh. 4, p. 7 ("specifications and sales price ... valid for product

delivery in the calendar year of 2012"); Tr., Day 5, 1055:7-1056:22 [Osgood]; Tr., Day 6,

1260:5-7 [McLean]). ACE also cited its payment of $903,000 to SunLink; however, the vast

majority of those funds ($803,760) were prepayments for products to be delivered to the

Mashpee and Duxbury Projects, which had different owners (not CVEC) and contracts, and are

therefore irrelevant to the parties' obligations under the Agreements. (Tr., Day 1, 130:4-23;

---

[7] Curiously, on the same day of its second default letter, ACE awarded SunLink a contract for a solar project in Charlotte, Vermont. (SL Exh. 143; Tr., Day 6, 1404:11-17 [McLean]).

132:11-133:3; 213:10-24 [Tilley]; Tr., Day 6, 1262:11-23 [McLean]; ACE Exhs. 76, 77).

Finally, ACE asserted that SunLink had failed to inform ACE that the A-frames would be

sourced in China and had somehow misled ACE by listing domestic F.O.B. points in the

Agreements. (SL Exh. 141). The Agreements, however, do not contain a "Buy American"

requirement, and F.O.B. terms have no bearing on sources of manufacture.

Overall, I find that the notices of default were utterly baseless, and reflect ACE's

apparent misunderstanding of the terms of the Agreements, coupled with an interest in pressuring

SunLink to expedite performance and absorb the associated cost.

### ACE's Interactions with Bridge Bank Concerning SunLink's Invoices

On March 7, 2014, SunLink informed ACE that SunLink's lender, Bridge Bank, would

be contacting ACE to verify invoices and anticipated dates of payments. Bridge Bank was

providing SunLink with a line of credit based on SunLink's eligible accounts receivables (AR).

(SL Exh. 175; Tr., Day 1, 252:21-253:3 [Tilley]; Tr., Day 5, 920:3-18 [Ridgway]). That same

day, Bridge Bank sent ACE an "AR verification form" seeking confirmation of monies owed to

SunLink for the CVEC Project. (SL Exh. 178).

On March 25, 2014, ACE personnel confirmed internally that all of SunLink's invoices

had "been reviewed and … approved" without qualification. (SL Exh. 192). The next day,

ACE's controller signed the Bridge Bank AR verification form for the following SunLink

invoices:

| Invoice No. | Invoice Date | Anticipated Payment Date | Amount | Confirmed | Comments |
|---|---|---|---|---|---|
| 11099 | 3/14/2014 | Per Contract | $97,607.06 | | Approved |
| 11100 | 3/14/2014 | Per Contract | $133,908.36 | | Approved |
| 11101 | 3/14/2014 | Per Contract | $90,036.81 | | Approved |
| 11102 | 3/14/2014 | Per Contract | $398,625.31 | | Approved |
| 11103 | 3/14/2014 | Per Contract | $141,575.87 | | Approved |
| 11104 | 3/14/2014 | Per Contract | $215,164.48 | | Approved |

| 11105 | 3/14/2014 | Per Contract | $172,157.22 | | Approved |
| 11106 | 3/14/2014 | Per Contract | $529,862.06 | | Approved |
| 11107 | 3/14/2014 | Per Contract | $96,206.46 | | Approved |

(SL Exh. 195; Tr., Day 1, 260:23-262:10 [Tilley]).  The form asked ACE to "indicate if any

contras, offsets or credits against the invoices . . . exist or if there is any reason why payment

will not be made."  (SL Exh. 195).  ACE did not identify any contras, offsets or credits, or

express any reason why payment would not be made.  (SL Exh. 195; Tr., Day 1, 260:23-262:10

[Tilley]).  Rather, ACE represented to Bridge Bank that SunLink's invoices had been

"Approved."  (SL Exh. 195; Tr., Day 1, 263:9-20 [Tilley]).  In the "Anticipated Payment Date"

column of the form, ACE informed Bridge Bank that payment would be made "Per Contract"

(*i.e.*, within 45 days of invoice).  (SL Exh. 195; Tr., Day 1, 263:9-20 [Tilley]).

        ACE executed another AR verification form on April 2, 2014 for the following SunLink

invoices:

| Invoice No. | Invoice Date | Anticipated Payment Date | Amount | Confirmed | Comments |
|---|---|---|---|---|---|
| 11156 | 3/14/2014 | Per Contract | $589,505.13 | Approved | |
| 11157 | 3/14/2014 | Per Contract | $143,709.56 | Approved | |
| 11158 | 3/14/2014 | Per Contract | $86,865.62 | Approved | |
| 11159 | 3/14/2014 | Per Contract | $329,798.45 | Approved | |
| 11160 | 3/14/2014 | Per Contract | $101;172.97 | Approved | |
| 11162 | 3/14/2014 | Per Contract | $539,708.35 | Approved | |
| 11163 | 3/14/2014 | Per Contract | $234,367.93 | Approved | |
| 11148 | 3/14/2014 | Per Contract | $64,485.30 | Approved | |
| 11150 | 3/14/2014 | Per Contract | $21,423.11 | Approved | |
| 11153 | 3/31/2014 | Per Contract | $93,349.30 | Approved | |
| 11149 | 3/31/2014 | Per Contract | $9,921.77 | Approved | |
| 11151 | 3/31/2014 | Per Contract | $22,034.46 | Approved | |
| 11152 | 3/31/2014 | Per Contract | $22,034.46 | Approved | |

(SL Exh. 239; Tr., Day 1, 272:20-275:3 [Tilley]).  As with the first verification form, ACE

expressed no reason why the "approved" invoices would not be paid in full per the terms of the

19

parties' Agreements.

ACE's controller executed a third unconditional AR verification form on May 1, 2014 for

the following SunLink invoices:

| Invoice No. | Invoice Date | Amount | Confirmed Received (Y/N) | Anticipated Payment Date | Comments |
|---|---|---|---|---|---|
| 11221 | 4/18/14 | $ 286,244.16 | Yes | Per Contract | |
| 11222 | 4/18/14 | $ 266,714.34 | Yes | Per Contract | |
| 11223 | 4/18/14 | $ 365,993.85 | Yes | Per Contract | |
| 11224 | 4/18/14 | $ 385,744.88 | Yes | Per Contract | |
| 11225 | 4/18/14 | $ 260,821.85 | Yes | Per Contract | |
| 11226 | 4/18/14 | $1,050,655.54 | Yes | Per Contract | |

(SL Exh. 240; Tr., Day 1, 276:13-277:13 [Tilley]).

In the aggregate, and without even hinting at any offsets, credits or reasons why payment

would not be forthcoming, ACE verified to Bridge Bank that SunLink invoices totaling

$6,749,681 for the CVEC Projects had been approved and would be paid in accordance with the

terms of the Agreements. (SL Exhs. 195, 239, 240; Tr., Day 1, 277:14-278:4 [Tilley]).

### ACE's Assurances of Payment and Requests for Additional Products

In May 2014, after SunLink had supplied all contractually-required products, ACE

submitted changes orders to SunLink for additional (apparently missing) products. (SL Exhs.

207, 209, 211). Concerned about ACE's account balance, SunLink had placed all change order

shipments on hold until ACE satisfied its arrears. (SL Exh. 212, p. 2; Tr. Day 1, 283:12-284:1

[Tilley]). On May 27, 2014, ACE promised to provide a payment schedule. (Exh. 212, p. 1;

Tr., Day 5, 922:20-923:24 [Ridgway]). On May 29, 2014, ACE informed SunLink that ACE

would attend to its account balance by wire transfers during the following week or two. (SL

Exhs. 215, p. 1, 216.).

Evidently unconvinced, on May 30, 2014, SunLink informed ACE that SunLink required

20

a conference call with Clean Focus, ACE, and Bridge Bank to discuss ACE's arrears and the

possibility that SunLink might have to place supplier liens on the CVEC Projects. (SL Exh.

219, p. 3).   In response to SunLink's concerns, ACE wrote:

> Working on it now, a lot will depend when they fund ACE.  [W]e have over
> 11.5 million outstanding, *all is in process just timing*.
>
> *Some payments to you are in process now.  You should be receiving some …*
> *today and early next week.*

(SL Exh. 218 (emphasis added); Tr., Day 1, 286:18-287:5 [Tilley]; Tr., Day 5, 924:5-15

[Ridgway]).  These statements proved to be untrue, as no significant further payments were ever

made to SunLink for the CVEC Projects.

As of June 2, 2014, ACE was approximately $6.92 million past due on the CVEC

Projects. (SL Exh. 220). That day, the parties participated in a conference call with Bridge Bank

and Clean Focus during which ACE again agreed to provide a payment schedule.  (Tr., Day 1,

287:11-290:17 [Tilley]; Tr., Day 5, 925:12-927:2 [Ridgway]). At no point did ACE assert that

SunLink was in default, or that ACE was entitled to any offsets or damages, or that there was

any justification for withholding payment other than perhaps ACE's capital constraints. (Tr.,

Day 1, 290:18-291:15 [Tilley]; Tr., Day 5, 927:12-17 [Ridgway]).  SunLink lifted the hold on

shipment of additional products. (Tr., Day 2, 309:12-19 [Tilley]).

On June 4, 2014, ACE provided an "estimated" payment schedule, as it had agreed to do

on the June 2, 2014 conference call.  (SL Exh. 224, pp. 1-2; Tr., Day 1, 291:16-293:20 [Tilley]).

The schedule contemplated payment of all SunLink invoices by the end of June 2014.  (SL Exh.

224, p. 3; Tr., Day 1, 291:16-293:20 [Tilley]).  In the covering email, however, ACE asserted

that SunLink was in default because of an alleged "late delivery of equipment" and, that

SunLink would be paid once ACE achieved its milestones under the EPC Agreement and

received payment from Clean Focus. (SL Exh. 224, p. 2). This position is inconsistent with the terms of the Agreements, as payment to SunLink was not in any way conditioned on the schedule in the EPC Agreement or ACE's receipt of funds from Clean Focus or any third party.

### ACE's "Credit Letter" for Alleged Offsets

On June 19, 2014, ACE sent SunLink a self-styled "Credit Letter," setting forth the costs allegedly incurred by ACE due to SunLink's "default and late delivery." (SL Exh. 222). The Credit Letter makes no mention of the three unqualified AR verifications sent to Bridge Bank, or the promise of payment in the May 30 email, or the conference call on June 2, or the June 4 payment plan. Coincidentally, or perhaps not, ACE asserted a credit for almost the precise amount of the outstanding SunLink invoices (~$6.94 vs. $6.92 million). ACE asserted that the credit was comprised of the following "incurred" costs:

- Overtime and lost production by subcontractors of $2,883,217

- ACE direct labor costs of $186,805

- Redwood liquidated damages of $1,647,150

- Redwood lost SREC production of $2,225,000

According to Mr. Hunton, the President of ACE, the basis for the liquidated damages and SREC production offsets was an internal June 5, 2014 email. (Tr., Day 7, 1556:22-1557:15 [Hunton]; ACE Exh. 4, at p. 3). However, the June 5 email relates only to the Eastham site and does not set forth any claims by the owner for liquidated damages or lost SREC production. (Tr., Day 7, 1558:1-11 [Hunton]; ACE Exh. 4, at p. 3). At the hearings, ACE conceded that these costs were not actually "incurred" after all, and abandoned its offset claims for liquidated damages and lost SREC production. (Tr., Day 7, 1563:1-6; 1565:2-5 [Hunton]).[8]  Mr. Hunton

---

[8] The offsets for liquidated damages and SREC production are also barred by the limitation on indirect or consequential damages in Section 21(g) of the Agreements.

22

admitted on the final day of these arbitration proceedings that ACE owes SunLink at least $3,872,150. (Tr., Day 7, 1564:11-13; 1565:10-21 [Hunton]). ACE claims to have requested payment for that amount from an escrow fund established by Clean Focus/Redwood. (Tr., Day 7, 1538:2-17; 1563:9-15 [Hunton]). While the gesture was no doubt appreciated by SunLink, the Agreements do not require SunLink to seek recovery from the escrow account.

### SunLink's Damages

There is no controversy over the amount SunLink is theoretically owed under the Agreements (subject to ACE's defenses discussed below). Under the Agreements, with the exception of Nunnepog, ACE agreed to pay SunLink a total amount of $7,288,919.80. (Tr. Day 5, 927:21-929:1; 931:1-12 [Ridgway]; SL Exh. 233).

Eventually, SunLink issued invoices to ACE for the CVEC BGMS Projects and Katama in the amount of $8,161,340.75. (Tr. Day 5, 927:21-929:1; 931:1-12 [Ridgway]; SL Exh. 233).

The accumulated interest/late fee through April 30, 2015, at the Appendix B (1)(b)(iii) contractual rate of eighteen percent (18%) per annum, on unpaid invoices that SunLink issued to ACE for the CVEC BGMS Projects and Katama totaled $1,128,612.70. (Tr. Day 5, 927:21-929:1; 931:1-12 [Ridgway]; SL Exh. 233).

The total amount of change orders relating to the CVEC Projects is $520,703.97.[9] (Tr. Day 5, 927:21-929:1; 931:1-12 [Ridgway]; SL Exh. 233; SunLink Change Orders Binder).

The total amount ACE paid to SunLink under the Agreements, with the exception of Nunnepog, is $1,954,007.82. (Tr. Day 5, 927:21-929:1; 931:1-12 [Ridgway]; SL Exh. 233).

Less a credit for Katama, the total amount outstanding to SunLink for the seven CVEC

---

[9] SunLink alleges that the total for change orders is $543,203.97. (SunLink Post-Hearing Memorandum, at p. 47; SL Exh 233). While ACE has not challenged that amount, my computation of the change orders entered into evidence yields a slightly lower figure (by $22,500, as reflected in the text). (SunLink Change Orders Binder (change orders 1-16); ACE Exh. 4 (change orders 1-9)).

Projects at issue in this case as of April 30, 2015 was $7,856,649.60. (Tr. Day 5, 927:21-929:1;

931:1-12 [Ridgway]; SL Exh. 233)(net of my deduction of $22,500 in change orders)).

## III.   RULINGS ON SUNLINK'S CLAIMS

### A.   SunLink's Claims for Goods Sold, Delivered and Accepted

Under various legal theories (*see* Counts I-IV of the Demand),[10] SunLink seeks the

account balance under the Agreements for the solar panel racking systems for seven of the

CVEC Projects (Barnstable, Brewster, Chatham, Dennis, Eastham, Harwich, and Tisbury).

There is no serious dispute about the amount of the invoices and change orders (*i.e.*, the math),

or that all of the products were delivered to the CVEC Projects, accepted by ACE and installed

in the now functioning solar arrays.[11]

Accordingly, under the Uniform Commercial Code (UCC), as adopted in

Massachusetts,[12] ACE is obligated to make full payment for SunLink's products in accordance

with the terms of the Agreements, unless it can establish that SunLink breached the Agreements

or the account is subject to a legally cognizable offset. *See* G.L. c. 106, § 2-301. Here, ACE

asserts various breaches or misbehavior by SunLink, or other excuses for its failure to pay, none

of which has any merit.

ACE's principal defense is that SunLink breached the Agreements by failing to timely

deliver the mounting systems, primarily due to SunLink's undisclosed sourcing of the A-frames

---

[10] SunLink's claims for misrepresentation (intentional and negligent) and quantum meruit seek payment on the seven CVEC BGMS Projects for which amounts remain outstanding. These claims will not be separately addressed because the damages sought are duplicative of the breach of contract claim. SunLink's Chapter 93A claim presents different liability and damage issues, and is discussed *infra*.
[11] Nor is there any dispute with respect to approximately $3.87 million owed to SunLink even assuming the applicability of the two remaining offsets asserted by ACE. Rather, it appears the "defense" to the undisputed amount is that the project owners will not permit SunLink to be paid from project funds in the escrow account. As noted above, there is nothing in the Agreement which obligates SunLink to look only to the escrow account for payment or otherwise conditions payment on ACE's receipt of funds from third parties. There is also nothing precluding ACE from paying SunLink from other sources of capital rather than relying on SunLink's forbearance.
[12] Section 23 of the Agreements requires the application of the laws of the Commonwealth of Massachusetts.

in China. ACE asserts that its course of dealings with SunLink on other projects, and earlier

(inoperative) versions of CVEC contracts or proposals, led it to believe that *all* products would

be delivered in six to eight weeks, and that the A-frames would be manufactured domestically.

If a six to eight week delivery schedule for *all* products to *all* CVEC Project sites truly was

ACE's expectation, it took no steps to ensure that the assumption was incorporated in the

Agreements. The Agreements contain no delivery schedule whatsoever. Indeed, the Agreements

generally provide for a product "lead time" of six weeks following NTP, bonds and deposits,

and even the lead time for production is expressly qualified as "approximate." Where, as here,

there is no prescribed time for shipment or delivery, the UCC sets performance within a

"reasonable time." G.L. c. 106, § 2-309(1). What is "reasonable" depends upon the nature,

purpose and circumstances of the agreement. G.L. c. 106, § 1-205(a).

Most of the exchanges between the parties respecting delivery schedules, as analyzed by

Mr. Collins, confirm an average course of performance in the eleven to fifteen week range

(some at an added cost). ACE's suggestion of an eight week ballast/post delivery schedule for

all nine CVEC Projects in the ACE January 8, 2014 Schedule was flatly rejected by SunLink as

not feasible, and the more aggressive schedules offered by SunLink in January 2014 were

declined by ACE. Ultimately, SunLink delivered its products in accordance with the SunLink

January 10, 2014 Schedule that SunLink repeatedly and explicitly advised ACE it was using as

a target in the absence of an agreement on a schedule. I find and rule that the timing of the

delivery of ballasts, posts and hardware to the CVEC Projects was reasonable. What was plainly

*unreasonable* was ACE's failure to include a firm delivery schedule in the Agreements and/or a

"Buy American" provision, if those terms were truly important to its business objectives and its

obligations under the EPC Agreement, or for ACE to have allegedly relied on a course of dealings for jobs much different in scale than the CVEC Projects.[13]

   As ancillary support for its breach claim, ACE asserts that the parties modified the Agreements, voided them or entered into some species of a contractual novation pursuant to which SunLink agreed to provide a "pre-panelized" solution for the rails and solar panels, thereby expediting the assembly process. The argument is based on an email exchange between the parties on January 28 (from SunLink) and February 3, 2014 (from ACE). (SL Exhs. 124, 139). This correspondence does not constitute a binding undertaking by either party or a modification or novation of the Agreements. SunLink's January 28 email addresses ACE's notice of default and also advises that SunLink "*will* propose" that the CVEC Projects be staged using a pre-panelization technique. None of the customary or required business terms (including cost) are fully expressed, and no change order was ever prepared or executed for any pre-panelization arrangement.[14] Even if this indication of intent by SunLink could be deemed an offer, it was never unequivocally accepted by ACE. The February 3 email from ACE merely provides its understanding of the assumptions of the proposal, which it would "plug into [the] schedule and see how it works," and indicates that it "would like to move forward with it (we may need some slight tweaks)" and absorb "some portion of the cost."[15]

---

[13] I reject ACE's post-hearing argument that SunLink assumed the heightened duties of a fiduciary because it provided consulting and/or engineering services under a Consulting Services Agreement dated August 8, 2013 (the "CSA"). (ACE Exh. 90). SunLink was not the engineer of record for the CVEC Projects and its CSA relationship with ACE was purely an arms-length services arrangement between sophisticated companies. No claim has been advanced under the CSA, and it has no relevance to the parties' obligations under the fully integrated supply Agreements signed two months later. Perhaps for this reason, the proposition that SunLink served as a fiduciary was never raised as a defense until it appeared in ACE's Post-Hearing Memorandum.
[14] Section 5 of the Agreements provides that any modification of terms may only be effectuated by a written change order.
[15] Numerous contemporaneous documents also confirm the absence of a binding agreement on a pre-panelization regime. (*See* SL Exhs. 141, 154, 155, 157, 160, 161, 164, 166, 167, 176, 194, 204; ACE Exh. 35).

ACE also alleges that it entered into change orders under economic "duress" – meaning that it committed to the change orders because it harbored a fear that SunLink would not provide the balance of system products on an accelerated basis, or at all, thereby jeopardizing the SREC incentives. The standard for establishing economic duress under Massachusetts law is "difficult to meet." *Pizzeria Uno Corp.* v. *Pizza by Pubs, Inc.* 2011 WL 4020845 at *5 (D. Mass. Sept. 9, 2011).

The elements of economic duress in Massachusetts are: (1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that the circumstances were the result of coercive acts, that is, "the duress resulted from defendant's wrongful and oppressive conduct and not by plaintiff's necessities." *Cabot Corp.* v. *AVX Corp.*, 448 Mass. 629, 637-8 (quoting *Int'l Underwater Contractors* v. *New Eng. Tel. & Tel. Co.*, 8 Mass. App. Ct. 340, 342 (1979)).

As described above, the acceleration of the delivery schedule reflected in various change orders was the product of negotiations beginning in January 2014, shortly after ACE had issued notices to proceed under the Agreements. On January 17, 2014, SunLink proposed an expedited eleven week schedule that would have resulted in the delivery of all products to all sites mostly by the last week of March 2014. This option would have cost ACE an additional $400,000. ACE rejected the proposal, and many that followed, only later to agree to a series of piecemeal change orders for the accelerated delivery of SunLink's products through mid-April 2014, at a roughly equivalent cost. The change orders were not the product of "wrongful and oppressive" business

conduct by SunLink. They were instead the culmination of a post-contract negotiation of a delivery schedule that ACE should have codified in the Agreements in October 2013.[16]

Finally, ACE's assertion that it was fraudulently induced to execute the Agreements because SunLink failed to disclose that it could not deliver all of the mounting systems to all nine CVEC Projects within six to eight weeks, and that the A-frames would be produced in China, is baseless. SunLink never represented that it would complete its performance within that time frame, a fact that should have been apparent from the "approximate" six week product lead time in the Agreements. No ACE witness could credibly support the "six to eight week" assertion at the hearings. And, significantly, under Massachusetts law a party is not liable for non-disclosure unless there is an affirmative duty to speak. *Greenery Rehab. Group, Inc. v. Antaramian*, 36 Mass. App. Ct. 73, 77 (1994). SunLink, a supplier of goods to a construction project, had no duty to volunteer its sources of manufacture, and, as practical matter, it had no ability in October 2013 to construct a reliable delivery schedule given the information then at its disposal from ACE. If ACE was truly concerned with SunLink's sourcing of materials, all it had to do was inquire before it signed the Agreements, or it could have specified approved manufacturers/countries in the Agreements.[17]

### B.  SunLink's Chapter 93A Claim

A mere breach of contract does not constitute an unfair or deceptive trade practice in violation of Chapter 93A. However, where the breach is tantamount to commercial extortion, or is bundled with misrepresentations, or is a purposeful violation of the implied covenant of good

---

[16] In any event, ACE waived its purported duress defense and ratified the Agreements by accepting and installing SunLink's products under the signed change orders. *Cabot*, 448 Mass. at 642-3.
[17] Although it filed no counterclaim, ACE also requests that it be allowed to recover, presumably by way of an offset, for SunLink's violations of Chapter 93A. (*See* ACE Post-Hearing Memorandum,, at pp. 44-46, 48). As I have found no contractual breach, misrepresentation or other actionable conduct by SunLink, the request is denied.

he

faith and fair dealing, there is an actionable claim under Chapter 93A. *See, e.g., Commercial Union Ins. Co. v. Seven Provinces Ins. Co., Ltd.,* 9 F. Supp. 2d 49, 68–9 (D. Mass. 1998), *aff'd,* 217 F.3d 33 (1st Cir. 2000), *cert. denied,* 531 U.S. 1146 (2001); *Pepsi-Cola Metro. Bottling Co., Inc. v. Checkers, Inc.,* 754 F.2 10, 18 (1st Cir. 1985) (affirming Chapter 93A award where defendant withheld payment as leverage to force plaintiff to supply products); *Mass. Empl'rs Ins. Exch. v. Propac-Mass., Inc.,* 420 Mass. 39, 43 (1995) (conduct which "has a coercive quality" and is "undertaken as leverage to destroy the rights of another party to the agreement while the agreement is still in effect" violated Chapter 93A); *Anthony's Pier Four, Inc. v. HBC Assocs.,* 411 Mass. 451, 475 (1991) (withholding approvals as a pretext to force a party into changing price of underlying contract violated the implied covenant of good faith and fair dealing and Chapter 93A); *Physician Ins. Agency of Mass. v. Investors Capital Holdings, Ltd.,* No. 0303597, 2005 WL 3722373, *4 (Mass. Sup. Ct. Dec. 30, 2005); *Atkinson v. Rosenthal,* 33 Mass. App. Ct. 219, 225–6 (1992); *New Kappa City Const. v. National Floors Direct Inc.,* No. 11-ADMS-40002, 2011 Mass. App. Div. 249, **2-3 (Oct. 19, 2011).

SunLink maintains that ACE violated Chapter 93A by, *inter alia,* entering into the Agreements with insufficient liquidity, issuing specious credit and default letters, prosecuting baseless defenses (including the belatedly withdrawn SREC and liquidated damages offsets for over $3 million), lying to Bridge Bank, and withholding monies that it has repeatedly acknowledged are due and owing to a (financially-squeezed) supplier.

I do not believe that ACE entered into the Agreements in October 2013 with the plan or expectation that it would not meet its financial obligations to SunLink. The CVEC Project was a huge undertaking (the largest solar development in New England), involving nine sites, over 22 MW of PV development, and scores of suppliers and subcontractors operating under a

compressed timeframe. As events unfolded, ACE was simply unprepared for the complexity of

the assignment (particularly when combined with the Duxbury, Mashpee and Vermont Projects).

Specifically with respect to SunLink, ACE failed to ensure that the overall CVEC Project

schedule and the milestones under its EPC Agreement were coordinated with firm contractual

deadlines in its Agreements with SunLink. This became apparent by January 2014, shortly after

the notices to proceed, yet ACE deferred efforts to accelerate the delivery schedule and mitigate

its exposure until mid-February 2014. By then, ACE knew that its EPC Agreement milestones

were in jeopardy and it executed multiple change orders to expedite delivery under what it now

characterizes as "duress." (Tr. Day 5, 1474:6-1475:4)[McLean]). The anxiety associated with

ensuring supply under the change orders spawned a program of deception that relegated SunLink

to the position of an involuntary and unsuspecting financier of ACE's accounts receivables. ACE

signed the change orders recklessly, without reasonable confidence in having the resources to

pay them, and solely as a means to temporize and to encourage SunLink to expedite performance

and continue the supply of critical products. ACE confirmed to SunLink's lender on three

separate occasions that it had no offsets or defenses to SunLink's invoices, and it admitted at the

hearings that it owes SunLink over three million dollars. The defense that the 'owner won't let us

pay' is no defense at all under the terms of the Agreements. I find that ACE's conduct in duping

SunLink into accelerating deliveries and supplying additional products under the change orders

falls comfortably within a common law, statutory, or other established concept of unfairness, and

is immoral, unethical, oppressive, or unscrupulous. It is, therefore, an unfair act in violation of

Chapter 93A. *See Purity Supreme, Inc. v. Atty. Gen.,* 380 Mass. 762, 776-9 (1980); *Morrison v.*

*Toys "R" Us, Inc.,* 441 Mass. 451, 457 (2004).

It is undisputed that ACE executed change orders totaling at least $520,703.97. (SunLink Change Orders Binder, uncontested as to amount by ACE, but reduced by $22,500 based on my calculations). I find that the proper measure of damages associated with ACE's unfair and deceptive acts is the amount of such unpaid change orders. Moreover, where, as here, a Chapter 93A violation is willful or knowing,[18] a party is entitled to a recovery of up to three, but not less than two times, the amount of actual damages. G.L. c. 93A, § 11.  I award SunLink two times the amount of the change orders executed in bad faith by ACE, or $1,041,407.94, without pre-judgment interest.

Chapter 93A also requires an award of attorneys' fees and costs upon the finding of an unfair or deceptive act or practice (regardless of whether the act or practice was willful or knowing).  G.L. c. 93A, § 11. Accordingly, SunLink is entitled to an award of attorneys' fees and costs incurred as a consequence of ACE's Chapter 93A violation. Within fourteen (14) days of the date of this Partial Final Award, SunLink shall file and serve an application for attorneys' fees and costs. The application shall include: (a) an itemization of its attorneys' fees, including the date, person, time spent, billing rates, and description of the activities (redacted, as necessary, for privileged material); (b) an itemization of allowable costs, with supporting documentation, as necessary; (c) an affidavit of counsel verifying the foregoing information as true and accurate and within the scope of a permissible Chapter 93A fee and cost award. Within fourteen (14) days of receipt of the application, ACE shall file and serve any opposition. I will thereafter determine whether further activity by the parties is required.

---

[18] Reckless conduct that is willfully undertaken is sufficient to satisfy the willful and knowing standard. *Kattar v. Demoulas*, 433 Mass. 1, 16 (2000); *Heller v. Silverbranch Const. Corp.*, 376 Mass. 621, 627 (1978). ACE's interactions with SunLink, its repeated promises of payment and its callous disregard of financial obligations, as described in this Award, are easily viewed as reckless, if not worse. *See Computer Sys. Eng'g, Inc. v. Qantel Corp.*, 571 F. Supp. 1365, 1374-5 (D. Mass. 1983), *aff'd*, 740 F.2d 59 (1ˢᵗ Cir. 1984).

31

IV.  **CONCLUSION**

By way of summary and conclusion, I FIND and AWARD as follows:

1.  I find in favor of SunLink on its claims for the account balance on the seven (7)
    CVEC BGMS Projects at issue in this case, and award it the sum of
    $7,856,649.60, which amount includes interest at the contractual rate of eighteen
    percent (18%) per annum through April 30, 2015. Interest shall continue to accrue
    at the contractual rate on any unpaid balance from April 30, 2015 until the entry
    of any judgment confirming this Award, at which point the statutory rate
    applicable to judgments in the Commonwealth of Massachusetts shall prevail.

2.  I find in favor of SunLink on its claim under G.L. c. 93A, §§ 2, 11, and award it
    the sum of $1,041,407.94, without pre-judgment interest.

3.  I find that SunLink is entitled to an award of attorneys' fees and costs pursuant to
    G.L. c. 93A, §§ 2, 11. Within fourteen (14) days of the date of this Partial Final
    Award, SunLink shall file and serve an application for attorneys' fees and costs.
    The application shall include: (a) an itemization of its attorneys' fees, including
    the date, person, time spent, billing rates, and description of the activities
    (redacted, as necessary, for privileged material); (b) an itemization of allowable
    costs, with supporting documentation, as necessary; (c) an affidavit of counsel
    verifying the foregoing information as true and accurate and within the scope of a
    permissible G.L. c. 93A, §§ 2, 11 award. Within fourteen (14) days of receipt of
    the application, ACE shall file and serve any opposition.

4.  The administrative fees of the American Arbitration Association, and the
    compensation and expenses of the Arbitrator, shall be borne equally by the

parties, and shall be quantified in the Final Award.

5. Except for the issue of attorneys' fees and costs under G.L c. 93A, §§ 2, 11, and
the assessment of the fees, compensation and expenses of the arbitration under R-
47(c), for which I reserve jurisdiction, this Partial Final Award is in full
settlement and satisfaction of any and all issues submitted to this arbitration. To
the extent that any claim is not specifically addressed herein, it is denied.

Dated: August 18, 2015

David L. Evans, Arbitrator

I, David L. Evans, do hereby affirm upon my oath as Arbitrator that I am the individual
described in and who executed this instrument, which is my Partial Final Award.

8/18/15
Date

David L. Evans, Arbitrator

33

# EXHIBIT 4

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| SUNLINK CORPORATION, )<br><br>Claimant, )<br><br>v. )<br><br>AMERICAN CAPITAL ENERGY, INC. )<br><br>Respondent. ) | AAA No. _____ |

## DEMAND FOR ARBITRATION

Claimant SunLink Corporation ("SunLink") files this Demand for Arbitration against

Respondent American Capital Energy, Inc. ("ACE") alleging as follows:

### PARTIES

1.      SunLink is a California corporation with a principal place of business located at

1010 B Street, Suite 400, San Rafael, California 94901.  SunLink designs, produces and supplies

Module Mounting Systems (MMS) used to install and secure photovoltaic modules on solar

array projects.

2.      ACE is, on information and belief, a Massachusetts corporation with a principal

place of business located at 1001 Pawtucket Boulevard, Suite 278, Lowell, Massachusetts 01854.

ACE is a solar engineering, procurement, and construction contractor and solar developer.

### FACTS

3.      In or about September 2007, the Cape & Vineyard Electric Cooperative, Inc.

("CVEC") was formed.  CVEC's membership is limited to public entities, principally cities and

townships located on Cape Cod or Martha's Vineyard.  CVEC was formed by its members to

develop renewable energy projects, and to procure and sell electric supply or other energy-

related goods and services at competitive prices to its member communities and consumers within its member communities.

4.     On information and belief, in 2011, CVEC entered into certain "inter-governmental agreements" with eight of its "Host Town" members (Harwich, Barnstable, Brewster, Chatham, Eastham, Tisbury, Katama, and Nunnepog) (the "CVEC-Related Projects") whereby (i) CVEC was provided lease and development rights to capped landfill and other real estate sites in each of the Host Towns to construct solar energy (photovoltaic panel array) projects, and to assign all of CVEC's rights to a third party developer who would develop each of the projects; and (ii) CVEC would sell net-metering credits generated on each of the projects to its member communities and rate payers within those communities.

5.     In or about April 2011, CVEC awarded the development and construction of the CVEC-Related Projects to Defendant ACE.  Thereafter, between June and October 2011, CVEC entered into an Energy Management Services ("EMS") Agreement with ACE on each of the eight CVEC-Related Projects whereby CVEC, in turn, assigned to ACE all of its lease and development rights, and agreed to pay ACE a net-metered power purchase price for all power generated on the CVEC-Related Projects.  CVEC, in turn, passes through the price paid to ACE for power to each of the Host Towns under its inter-governmental agreements.

6.     On information and belief, at apparently the same time that the CVEC-Related Projects were awarded to ACE, the Town of Dennis, Massachusetts, separately awarded ACE the solar energy (photovoltaic panel array) project which Dennis was then contemplating for its capped landfill site (the "Dennis Project").  The Dennis Project was structured similarly to the eight CVEC-Related Projects, however, without having CVEC as the intermediary.  The CVEC-Related Projects were designed to leverage its members' aggregate size to purchase solar power

2

at favorable rates. Dennis, on the other hand, chose instead to contract directly with the developer/owner of the solar project for its solar power. On information and belief, like CVEC, however, Dennis also entered into an Energy Management Services Agreement with ACE whereby ACE would develop and own the Dennis Project, and sell Dennis net-metering credits generated on the Dennis Project.

7.    The combined nine solar projects (the eight CVEC-Related Projects, plus the Dennis Project), represent a 22MW portfolio of solar (PV) arrays, alleged to be the largest solar development in New England. It is estimated that the solar power generated from the nine PV plants will supply 45% of the Cape Cod and Martha's Vineyard municipal electrical load.

8.    On information and belief, the nine projects were initially anticipated to be completed in early 2013. The permitting and approval of the nine projects by the Massachusetts Department of Energy Resources ("DOER") was, however, substantially delayed. These delays allegedly caused ACE substantial cash flow problems in 2013, and ultimately required ACE to sell 100% of its ownership interests in the nine solar projects to a subsidiary corporation of Clean Focus Corporation ("Clean Focus"), a Delaware corporation with a principal place of business located in Sunnyvale, California. On information and belief, Clean Focus finances, owns and operates solar power installations throughout the United States and the Americas.

9.    On information and belief, sometime prior to November 2013, Clean Focus entered into one or more contractual or other arrangements whereby another entity, Redwood Solar Development, LLC ("Redwood"), a Delaware corporation with a principal place of business located in Las Vegas, Nevada, acquired an ownership or other beneficial interest in each of the nine solar energy projects being developed by Clean Focus. On information and belief, Redwood, at all times material hereto, acted on behalf of, in concert with, and/or at the direction

of, Clean Focus in connection with any or all of its activities associated with the nine solar

projects at issue.

10.     On information and belief, sometime prior to November 2013, on each of the nine

projects, Redwood entered into an Engineering, Procurement and Construction (EPC) Contract

with ACE whereby ACE agreed to design, build and initially operate the nine solar projects at

issue for the benefit of Redwood/Clean Focus.

11.     In the summer of 2011, ACE began discussions and negotiations with SunLink to

supply the SunLink MMS system on each of the nine projects. The projects were, however,

substantially delayed as referenced above. It was not until October 15, 2013, that ACE and

SunLink finally executed nine sales contracts, one for each of the projects, and all contracts

containing the same terms and conditions with the exception of the specific nature and amount of

product to be furnished, and the sales price.

12.     There were no delivery and/or construction schedules furnished to SunLink by

ACE at the time the sales contracts were entered into in mid-October 2013 as the projects were

still effectively in suspense. Pursuant to the sales contracts, "lead times" for delivery of

SunLink's products are "approximate" and SunLink is not responsible for delays caused by,

among other things, "government regulation, transportation delay, or any other act or cause

beyond the reasonable control [SunLink]."

13.     Despite having executed sales contracts with ACE, SunLink did not immediately

receive notice to proceed on any of the projects. The initial notice to proceed on some, but not

all, of the projects did not occur until December/January 2014. On a number of the projects,

SunLink did not receive notice to proceed until after it had commenced production; and on

others, formal notice was never properly effected. ACE's delayed project commencement

4

pushed the projects into a particularly harsh winter on Cape Cod, and also pushed the

manufacture of certain required SunLink equipment in China into the Chinese New Year. This

latter consequence completely halted the China supply chain for necessary components of the

SunLink MMS systems being installed on the Projects.

14.     Change Orders were eventually agreed upon in 2014 by and between ACE and

SunLink for a sharing of the cost to allow for the expedited delivery of products manufactured

outside of the U.S. SunLink met or exceeded the delivery schedules ultimately agreed upon by

ACE and SunLink in 2014 for all of SunLink's products on all nine projects.

15.     ACE has fully and unconditionally accepted and installed all of SunLink's

products furnished on all of the nine projects. Construction of all nine projects was completed in

June 2014.

16.     On September 30, 2014, the "partnership" of CVEC, the Town of Dennis, Clean

Focus (Redwood) and ACE officially dedicated the entire nine project, 22MW portfolio of solar

arrays located on Cape Cod and Martha's Vineyard. Massachusetts Governor Deval Patrick was

present at the dedication and praised all parties involved. Stanley Chin, the CEO of Clean Focus,

the owner of the projects stated, "It was terrific partnering with this exceptional team of

professionals to bring clean, reliable and renewable solar electricity to Massachusetts –

contributing to the health and vibrancy of this region." For his part, CVEC's president stated the

following: "Our outstanding partners, Clean Focus and American Capital Energy, have

demonstrated significant expertise and skill in deploying these valuable solar assets." CVEC, the

Town of Dennis, Clean Focus and ACE have had full use and benefit of all nine projects now for

several months.

17.    The nine SunLink sales contracts for the "portfolio" of nine projects on Cape Cod and Martha's Vineyard have an aggregate contract value of more than $9M. SunLink has been paid, however, only approximately $2.4M on an aggregated basis to date, leaving a balance due under the nine sales contracts of approximately $6.6M, excluding late fees due under the sales contracts of $1.5% per month, attorneys' fees, interests and costs.

18.    At all times relevant to this dispute, to afford itself necessary operating capital, SunLink maintained a line of credit/loan facility with Bridge Bank Capital Finance Division ("Bridge Bank") located in San Francisco, California, in the amount of approximately $10M (the "LOC"). The LOC was secured by SunLink through a pledge of its qualified accounts receivable, including accounts receivable due from ACE under the sales contracts on the nine projects at issue in an aggregate amount of approximately $6.6M.

19.    During the months of March, April and May, 2014, in the context of its ongoing audit of SunLink's accounts receivable balances, Bridge Bank sought confirmation directly from ACE of the outstanding invoices for services/materials furnished by SunLink on the portfolio of nine solar projects at issue. Bridge Bank also specifically requested whether ACE possessed any "contras, offsets, or credits" against any of the outstanding invoices, or "any reason why payment will not be made."

20.    In March, April and May 2014, ACE signed, confirmed and approved payment of all outstanding invoices in written communications sent directly to Bridge Bank. ACE did not identify any offset or "credit" owing to it under the sales contracts.

21.    When payment of the outstanding balance owed SunLink from ACE did not occur, Bridge Bank notified SunLink that SunLink's LOC facility was at risk of default, which would, in turn, cause a freeze of the LOC, leaving SunLink without critical operating capital.

22.     On June 2, 2014, in a telephone conference with senior representatives of SunLink, ACE, and Redwood, SunLink made ACE and Redwood fully aware of its situation with Bridge Bank, and the critical need to obtain a reliable payment schedule for the approximately $6.6M in outstanding accounts receivable due and owing SunLink from ACE.

23.     On June 4, 2014, in follow up to the conference call referred to above, despite referencing an earlier Notice of Default sent by ACE, which notice was without basis and, in any event, had long been cured by SunLink, ACE provided SunLink and Bridge Bank an annotated spreadsheet with "estimated payment dates" for the outstanding invoices on the nine projects. ACE further stated that, "ACE will pay SunLink in accordance with the contract and once milestones are achieved and payments received from Clean Focus."

24.     There were, and are, no impediments under the sales contracts to ACE's obligation to make payment for SunLink's services and materials furnished on the nine projects. The sales contracts provide, "[ACE] is understood to have unconditionally accepted a completed SunLink MMS product fifteen (15) dates after shipment is received." The sales contracts further provide,

> [SunLink's] total cumulative liability under this sales contract, whether arising in contract, tort or otherwise, shall not exceed the amounts paid by [ACE] to [SunLink] under this sales contract with respect to the products or services to which any alleged liability relates. In no event shall [SunLink], its affiliates or its or their suppliers be liable to [ACE] or any third party for any special, indirect, incidental, consequential or punitive damages, whether arising in contract, tort or otherwise, even if advised of the possibility of same.

Finally, there is nothing in the sales contracts which conditions payment to SunLink upon ACE's receipt of payments from Redwood, Clean Focus, or any other third party.

25.     ACE failed to make any of the payments which were promised to SunLink and Bridge Bank.

26.     On June 19, 2014, on the advent of a mediation session agreed to between the parties, ACE provided SunLink a so-called "Notice of Credit Owed to ACE" in the total amount of approximately $6.9M, essentially the balance owing to SunLink on the nine projects at issue. This was the first notice of any "credit" or claim being sought by ACE, coming after complete performance by SunLink under the sales contracts, and the completion of the nine projects at issue.  On information and belief, ACE's "Notice of Credit" was known by ACE to be without merit and was advanced merely to generate an "offset" to SunLink's damages which ACE could argue before the mediator.

27.     There is no provision in the sales contracts which grants ACE the right to issue a "Notice of Credit" in any amount.

28.     The three major elements which comprise ACE's alleged "credit" are all plainly indirect, consequential and/or punitive in nature, and thus not recoverable as a matter of law under the sales contracts.

29.     As a direct and proximate result of ACE's failure and refusal to make payment of the amounts approved, due and owing SunLink under the nine projects at issue, SunLink has been defaulted on its LOC, has had to undertake a complete restructuring of virtually all of its debt/equity, and has, to date, incurred late fees, penalties, interest and other costs of more than $1M in the process (the "restructuring costs").  These restructuring costs are over and above the approximate $6.6M due in the aggregate due under the sales contracts at issue, late fees due under the sales contracts of more than $500,000 to date, attorneys' fees, interest and cost.

8

## COUNT I
### (Breaches of the Sales Contracts)

30.     SunLink reasserts and incorporates herein by reference the allegations contained in paragraphs 1 through 29 of this Demand for Arbitration as if each were separately and specifically realleged herein.

31.     ACE has materially breached each of the nine subcontracts on each of the nine solar projects at issue.

32.     As a direct and proximate result of ACE's numerous material breaches of the sales contracts, SunLink has suffered damages for its unpaid work and materials on all of the projects at issue, approximating $6.6M, incurred late fees under the sales contracts of approximately $500,000 to date, incurred approximately $1M in restructuring and other costs due to ACE's failure to make payments due, plus attorneys' fees, statutory interest, and the costs of this arbitration.

## COUNT II
### (Quantum Meruit)

33.     SunLink reasserts and incorporates herein by reference the allegations contained in paragraphs 1 through 32 of this Demand for Arbitration as if each were separately and specifically realleged herein.

34.     SunLink conferred a material benefit upon ACE in connection with each of the nine projects at issue, reasonably expecting to be fully compensated by ACE.

35.     ACE accepted the benefit of the work and materials provided by SunLink with the knowledge of SunLink's reasonable expectations of payment.

36.     ACE has failed to make payment to SunLink for its work and materials, and thus has been unjustly enriched; and SunLink has suffered unjust detriment.

## COUNT III
### (Intentional Misrepresentation)

37.     SunLink reasserts and incorporates herein by reference the allegations contained in paragraphs 1 through 36 of this Demand for Arbitration as if each were separately and specifically realleged herein.

38.     ACE repeatedly represented to SunLink that it would be paid in full under each of the nine sales contracts for its work/materials, all the time knowing that such representations would cause SunLink to continue in good faith to furnish critical products and equipment to the nine projects at issue.

39.     ACE knew its statements and representations to SunLink were false when made, or were recklessly made by willfully disregarding their truth or falsity.

40.     ACE's statements and representations were made with full intention that SunLink would rely upon the same, which SunLink in fact did; such reliance being entirely reasonable under the circumstances.

41.     As result of its reliance upon ACE's intentional misrepresentations, SunLink has suffered substantial financial losses.

## COUNT IV
### (Negligent Misrepresentation)

42.     SunLink reasserts and incorporates herein by reference the allegations contained in paragraphs 1 through 41 of this Demand for Arbitration as if each were separately and specifically realleged herein.

43.     ACE repeatedly represented to SunLink that it would be paid in full under each of the nine sales contracts for its work/materials, all the time knowing that such representations

would cause SunLink to continue in good faith to furnish critical products and equipment to the nine projects at issue.

44.    ACE acted negligently with respect to such statements and representations insofar as it failed to use the amount of care a reasonable person would use in those circumstances to ensure that what it was representing was in fact true.

45.    ACE made its statements and representations to SunLink, intending that SunLink would rely upon the same, which SunLink in fact did; such reliance being entirely reasonable under the circumstances.

46.    As a result of its reliance upon ACE's negligent misrepresentations, SunLink has suffered substantial financial losses.

## COUNT V
### (Violations of G.L. c. 93A, §§ 2 and 11)

47.    SunLink reasserts and incorporates herein by reference the allegations contained in paragraphs 1 through 46 of this Demand for Arbitration as if each were separately and specifically realleged herein.

48.    At all times, SunLink and ACE were engaged in trade or commerce as contemplated in Chapter 93A.

49.    The conduct of ACE alleged herein as violative of Chapter 93A occurred primarily and substantially in the Commonwealth.

50.    The conduct of ACE alleged in this Demand for Arbitration constitutes one or more unfair and deceptive acts or practices in violation of Chapter 93A.

51.    ACE's conduct in violation of Chapter 93A was done knowingly and willfully.

52.    SunLink incurred damages as a direct and proximate result of ACE's unfair and deceptive practices in an amount to be determined at arbitration.

11

## PRAYERS FOR RELIEF

WHEREFORE, SunLink respectfully requests the following:

a.    with respect to Count I, that an Award enter in favor of SunLink against ACE for all sums due under each of the nine sales contracts on each of the nine projects at issue, including all late fees, restructuring costs, attorneys' fees, interest and costs; and

b.    with respect to Count II, that an Award enter in favor of SunLink against ACE for the reasonable market value of the services and materials rendered/provided on each of the nine projects at issue, less payments made, plus interest, attorneys' fees and costs; and

c.    with respect to Counts III and IV, that an Award enter in favor of SunLink against ACE for the full amount due and owing under each of the nine sales contracts on each of the nine projects at issue, plus additional damages incurred by SunLink in relying upon the intentional and/or negligent misrepresentations of ACE identified herein; and

d.    with respect to Count IV, that an Award enter in favor of SunLink against ACE for all damages incurred as a proximate result of ACE's violation of G.L. c. 93A, §§ 2 and 11, plus as much as three, but not less than two, times such amount due to ACE's willful and knowing violation of G.L. c. 93A, § 2; plus award SunLink its interests, costs and reasonable attorneys' fees incurred; and

e.   that the Arbitrator award such other and further relief as he/she may deem just and appropriate.

Claimant,

SUNLINK CORPORATION,

By its attorneys,

_____
Paul J. Murphy
David G. Thomas
Greenberg Traurig LLP
1 International Place
Boston, MA 02110
617-310-6000
murphyp@gtlaw.com
thomasda@gtlaw.com

Mark Ginalski
SunLink Corporation
1010 B Street, Suite 400
San Rafael, CA  94901
mark.ginalski@sunlink.com

Dated:  October 20, 2014

13