# EXHIBIT Z

1

1          Volume I, Pages 1-302

2

3          AMERICAN ARBITRATION ASSOCIATION

4

5   SUNLINK CORPORATION,

6                Claimant,

7   vs.                    AAA No. 01-14-0001-7516

8   AMERICAN CAPITAL ENERGY, INC.,

9                Respondent.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - -

11          ARBITRATION HEARING, DAY 1

12  Before:    David Evans, Attorney, as Arbitrator

13  Held at:   Law Office of Greenberg Traurig

14             One International Place

15             Boston, Massachusetts  02110

16  Date:      Wednesday, May 13, 2015

17  Commence:  9:49 a.m.

18  Reporter:  Judith M. Williams, RPR, CLR, CRR, CSR

19

20          K. L. GOOD & ASSOCIATES

21             Post Office Box 367

22      Swampscott, Massachusetts 01907

23             Tel. 781-367-0815

24          Kathleen.Good@verizon.net

2

```
1    APPEARANCES:
2            Greenberg Traurig
3            Paul Murphy, Attorney.
4            David G. Thomas, Attorney
5            20th Floor
6            One International Place
7            Boston, Massachusetts  02110
8            617-310-6000
9            murphyp@gtlaw.com
10           thomasda@gtlaw.com
11           Attorneys for the Claimant
12
13           Robert K. Dowd, Attorney
14           4814 Bengal Street, Unit One
15           Dallas, Texas  75235
16           214-922-9330
17           robtdowd@sbcglobal.net
18           Attorney for the Respondent
19
20
21
22
23
24
```

3

```
1    ALSO PRESENT:
2            Mark Ginalski, General Counsel - SunLink
3            Casey Purcell (exiting at 10:25 a.m.)
4            Steven Collins
5            Eric McLean
6            Dale Hackbart
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

4

```
1                    INDEX
2
3
4    WITNESSES:       Direct   Cross   Redirect   Recross
5    CHRISTOPHER TILLEY
6    By Mr. Murphy      15
7
8
9        EXHIBITS:
10   No.           Description              Page
11   Claimant      One-page letter dated April 2,    273
12   Exhibit 239   2014, To Whom It May Concern
13                 on letterhead of BridgeBank
14                 Capital Finance
15   Claimant      One-page letter dated May 1,      276
16   Exhibit 240   2014, To Whom It May Concern
17                 on letterhead of BridgeBank
18                 Capital Finance
19
20
21
22
23
24
```

5

```
1                 P R O C E E D I N G S
2                        - - -
3        ARBITRATOR EVANS:  On the record.
4        This is the commencement of the
5    arbitration involving SunLink Corporation and
6    American Capital Energy.  So the schedule for
7    the proceedings is that we have allotted I
8    believe eight days, including this Saturday --
9        MR. MURPHY:  That's correct.
10       ARBITRATOR EVANS:  — to accomplish the
11   arbitration, and we are going to have the
12   arbitration concluded by then.  So we will see
13   how it goes.  Sometimes it goes a little slower
14   at the beginning, but people start to develop
15   their themes, and then they understand after a
16   while that it is not necessary to continue to
17   repeat that.  So we will continue to check in on
18   the progress of the proceedings, and I have your
19   witness list.
20       So we will proceed every day from 9:30
21   until 5:30-ish, 5, 5:30-ish, depending on
22   whether — how we fall with our witness'
23   testimony.  We will take a 15 minute or so
24   comfort break in the morning and in the
```

**6**

1  afternoon.
2      So before we begin, I would like to have
3  everybody just identify themselves for the
4  record, starting with Mr. Thomas.
5      MR. THOMAS:  Sure.  David Thomas for the
6  claimant.
7      MR. MURPHY:  Paul Murphy for the
8  claimant, SunLink.
9      MR. GINALSKI:  Good morning.  I am Mark
10  Ginalski.  I am the general counsel for SunLink.
11      MR. PURCELL:  Casey Purcell, former
12  project manager.
13      MR. COLLINS:  Steve Collins from
14  Navigant engaged by counsel for SunLink.
15      MR. TILLEY:  Christopher Tilley, former
16  CEO of SunLink.
17      MR. McLEAN:  Eric McLean, executive
18  president of operations, ACE.
19      MR. DOWD:  Robert Dowd representing
20  outside general counsel for American Capital
21  Energy.
22      MR. HACKBART:  Dale Hackbart.  I work
23  for Mr. Dowd.
24      ARBITRATOR EVANS:  Okay.  Are we going

**7**

1  to have opening statements?
2      MR. MURPHY:  We are not going to open.
3  We were going to go right to Mr. Tilley and
4  effectively waive our opening.  There has been a
5  lot of communication about our motion until this
6  point in time.  I think it would be better to
7  use the time to get through witnesses.
8      MR. DOWD:  I would prefer doing an
9  opening.  What has transpired here is I have
10  filed a couple of motions, and they have
11  basically presented their position to you.  You
12  asked for a contract.  They sent you a contract
13  with their position.  I filed a motion on the
14  BridgeBank documents.  They also sent another
15  position letter.  They have had a chance, I
16  think, to lay out some of the things we need to
17  be thinking about.  I feel like we should at
18  least be able to talk about certain issues that
19  are part of our case and what we are dealing
20  with.
21      ARBITRATOR EVANS:  Okay.  Would you like
22  to --
23      MR. MURPHY:  Could I make a suggestion?
24  Would Mr. Dowd want to reserve that until the

**8**

1  beginning of his case?
2      ARBITRATOR EVANS:  That was going to be
3  my question.
4      MR. DOWD:  I would prefer to do a short
5  statement now dealing with certain issues that
6  are key before the testimony starts coming out
7  with respect to that.
8      ARBITRATOR EVANS:  Okay.
9      MR. DOWD:  That is up to you, your
10  Honor.
11      ARBITRATOR EVANS:  Well, I will
12  certainly give you that opportunity.  So we will
13  -- is there anything else in terms of
14  preliminary matters?  I did get a motion that I
15  just skimmed from SunLink respecting exhibits,
16  and I don't think that needs to be dealt with at
17  this moment.  Is there any other -- are there
18  any other preliminary matters from ACE's
19  perspective?
20      MR. DOWD:  I believe that the different
21  rulings you were making this morning around 9:30
22  took care of various issues that were
23  outstanding from that standpoint.  The only
24  thing that I would probably be requesting later

**9**

1  today is they noted that Mr. Tilley would take
2  six hours which means that that would take up
3  the day basically.  I got all of these exhibits
4  yesterday about eleven o'clock, another thousand
5  I got about three or four o'clock.  So I would
6  request that I would not start my cross of
7  Mr. Tilley until I have had a chance tonight to
8  put this together from there.  Otherwise, I
9  think we will be wasting a lot more time trying
10  to grind through this stuff.
11      ARBITRATOR EVANS:  Well, are these
12  exhibits that you hadn't -- are these documents
13  that you hadn't seen before?
14      MR. DOWD:  No.  They were sent to --
15  they were supposed -- I was told they were sent
16  to Dallas.  I never got them in Dallas.  So they
17  hand delivered and had them delivered yesterday
18  out to ACE arriving around eleven o'clock
19  yesterday.  That is the three boxes here, and
20  then I sent someone down, and we picked up
21  another box of documents which was delivered to
22  me about three or four.
23      ARBITRATOR EVANS:  All right.  Let me
24  ask this question.  Mr. Tilley, are you expected

## 10

1  to be around tomorrow?
2      THE WITNESS: Yes.
3      ARBITRATOR EVANS: Okay. So we have a
4  little bit of flexibility. We will try to work
5  around that. Do you have something you want to
6  say?
7      MR. MURPHY: Just for the record.
8      MR. THOMAS: Other than that we sent the
9  exhibits on a USB drive Thursday night per the
10  scheduling order to Mr. Dowd's office.
11      MR. DOWD: They sent someone to my
12  office on Monday night to find it. There is
13  nothing there, so.
14      MR. MURPHY: We didn't have any exchange
15  from Mr. Dowd until last night. That is the
16  first time we ever saw any of his exhibits, and
17  it was supposed to be an exchange on the 7th,
18  which is essentially what the scheduling order
19  plus what the parties had talked about. I just
20  make those comments for the record at this
21  point.
22      ARBITRATOR EVANS: Well, I don't mean to
23  be picky. Under the scheduling order, all of
24  these documents were supposed to be exchanged

## 11

1  March 2nd I think.
2      MR. MURPHY: Then we agreed.
3      ARBITRATOR EVANS: A pox on everyone's
4  houses in some respects.
5      Why don't we proceed with Mr. Dowd wants
6  to make a statement. Keep it relatively brief.
7      MR. DOWD: The a major issue in this
8  case that has not been unfolded or dealt with
9  deals with the SREC issue with respect to the
10  case itself. SRECs are in fact Solar Energy
11  Renewable Certificates. They are in fact
12  consist of about in this particular case with 40
13  quarters of SRECs their cash flow is $84 million
14  in this case.
15      This project was moving forward with
16  respect to its construction over a period of
17  years, when in fact in May of 2013 the
18  Department of Energy issued a statement to the
19  effect that the SREC is now filled; it is now
20  over its application process.
21      This deal was then dead. $84 million
22  was going down the tube, and although ACE had
23  executed MIPA, which is net interest purchase
24  agreement, it executed an agreement to pay

## 12

1  $5 million for created SRECs and EPC contracts.
2  Everything was put on hold, all of which was
3  totally within the knowledge of and sent to
4  specifically Jonathan Eastwood, John Eastwood,
5  with regards to that this transaction was dead
6  as of that unless the Department of Energy would
7  step forward and change the regulations for our
8  proceeding forward.
9      We stayed in touch with SunLink and
10  provided them the SREC regulations that set
11  forth that this project could in fact qualify
12  for SRECs if it in fact had a number of things
13  done, interconnection agreements, the various
14  permits, et cetera, all of which ACE did.
15      However, there was an absolute specific
16  deadline that this project had to be built by
17  June of 2014. If this project is not built by
18  June 2014, $84 million would have been lost,
19  because it would not qualify under the new
20  regulations that the SREC had set forth.
21      That was all known to SunLink from the
22  very inception of it. And in October of 2013,
23  SunLink was specifically contacted that they can
24  fulfill what is in fact in the contracts for

## 13

1  delivery of the various products in this case.
2  That they would arrive so that this could in
3  fact be built by the June deadline and not lose
4  the SREC-1 qualifications.
5      In that those different documents -- as
6  a result of the representations made by SunLink
7  at the time, ACE paid $5 million to purchase
8  SRECs to CV Owner One LLC, to purchase the
9  5 million of SRECs at $285. That is something
10  that has to be, of course, created by the
11  construction of this job.
12      At no time did SunLink reveal that in
13  fact they were going to deal with the production
14  of the rails, A-frames, which is really the key
15  items here, in China, which in fact after we
16  signed the contract, after we pay the
17  $5 million, after we're set to move forward with
18  the construction, we receive a schedule from
19  SunLink in January that sets forth that they are
20  going to complete these projects by August of
21  2014.
22      August of 2014, after supplying John
23  Eastwood and everyone of the seriousness of the
24  SRECs, the necessity of moving forward with

**14**

1  that, all of a sudden they're coming back from
2  their operation saying that, "Well, we'll get
3  this done by August."
4      By all of their delays and dealings, we
5  ended up getting this material as late as June,
6  when in fact it has to be built in June.  The
7  result of all of that was that we had to hire
8  hundreds and hundreds of electricians to be able
9  to finish this project.
10      And that the two things that I would
11  like to emphasize here is that the SRECs, their
12  knowledge of the SRECs, their representations
13  about what they would in fact get done, when in
14  fact it totally would cost us a tremendous
15  amount of money because of it, and we barely
16  made it because of it, but I lay those out.
17      And also the fact that the key elements
18  here really deal with A-frames and rails.  Those
19  are the items coming out of China that were
20  causing the greatest headache with respect to
21  the construction of this deal.
22      You have a base which is a concrete
23  base.  You have on top of that rods.  You have a
24  series of things that have to be done for the

**15**

1  job:  ballast, rods.  The rods then go the
2  frames, the A-frames, and then you have the
3  rails, and then you have the modules.
4      So you cannot do anything, you cannot
5  bring in your electricians and do anything,
6  until you get these items which could have been
7  delivered by February 28th but weren't in fact
8  delivered until as late as June.
9      Those are the points I would like to
10  point out before we start, your Honor.
11      ARBITRATOR EVANS:  Thank you.
12      MR. MURPHY:  Thank you, Mr. Evans.
13  We call Mr. Tilley to the stand, please.
14      (Witness sworn by the Arbitrator.)
15      CHRISTOPHER TILLEY
16      DIRECT EXAMINATION
17  BY MR. MURPHY:
18  Q.  Good morning, Mr. Tilley.
19  A.  Good morning.
20  Q.  Could you tell us where you live, sir, please?
21  A.  California.  Larkspur, California.
22  Q.  Okay.  And you identified yourself as the former
23  CEO of SunLink.  Could you just tell us the
24  years when you were the CEO of SunLink?

**16**

1  A.  2007 through the end of 2015.
2  Q.  Okay.
3  A.  2014.  Excuse me.
4  Q.  Could you just briefly summarize for us your
5  educational background, your formal educational
6  background starting with your college, please?
7  A.  Okay.  You don't want elementary school?
8  Q.  Not junior high.
9  A.  Okay.  So I have a Bachelor's in Engineering,
10  Mechanical Engineering, from Louisiana State
11  University.  I have a Master's in Mechanical
12  Engineering from Perdue University.  And I have
13  a Master's in Business Administration from a
14  school called INSEAD, I-N-S-E-A-D, it is an
15  acronym, in France.
16  Q.  And do are you a licensed professional engineer?
17  A.  I am, in California.
18  Q.  In California?
19  A.  Yes.
20  Q.  Okay.  And can you summarize for us some of your
21  background before joining SunLink in the 2007
22  time frame?
23  A.  Sure.  I went directly from undergraduate to
24  graduate at Perdue.  After that I took my first

**17**

1  job at Bechtel Corporation.  So I worked at
2  Bechtel in San Francisco in the research and
3  development division working on engineering
4  technologies.  I worked at Bechtel for about
5  three years on different energy and related
6  projects and tools for their projects and
7  construction and the engineering business.
8      I left Bechtel and went to France to do
9  an M.B.A.
10      After France, I left and moved to
11  Argentina.  I lived in Buenos Aires working
12  briefly for a management consulting firm by the
13  name of Booz Allen Hamilton.
14      I then went to work for a large Spanish
15  investment bank, Santander Investment, and
16  worked in their investment arm of the bank --
17  actually they --
18  Q.  Santander?
19  A.  -- are in this lobby -- in Argentina in the
20  early '90s.
21      After about three years in Buenos Aires,
22  I moved back to the United States to California,
23  to San Francisco, and I started my first
24  business, which was a business that provided a

## 18

1　business in -- emerging market business
2　information to management consulting firms and
3　investment banks, you know, Goldman, Merrill,
4　McKinsey, Booz Allen were all clients --
5　customers of that service. I grew that to a
6　reasonably successful company. Ultimately I
7　sold it to Thompson Financial here in Boston.
8　　　　I stayed on to run it for Thompson for a
9　year, and then in 2000 I left and spent some
10　time trying to figure out what I wanted to do
11　working on different clean energy technologies.
12　I like technologies. I like environmental sort
13　of clean income stuff. So I spent time looking
14　at fuel cells in different areas.
15　　　　I ended up meeting someone who had a
16　small what is called a solar integrator, and
17　they were just starting some commercial work,
18　and they asked me to come in as president. So I
19　came in as president of that company. We raised
20　money, and we grew that to be one of the larger
21　solar integrators in California.
22　　　　What an integrator does is essentially
23　we sell solar projects. We then do the
24　engineering. We then run the construction, and

## 19

1　we deliver to a client, so.
2　Q. What is the name of that company?
3　A. That name of that was Prevalent Power.
4　Q. Prevalent Power?
5　A. Prevalent Power.
6　　　　That was my introduction to the solar
7　market, and a good introduction at that, because
8　you get to see from soup to nuts what needs to
9　be done.
10　　　　I sold that company. We sold that
11　company in I think it was 2004, 2005, after
12　doing a lot of projects. So we did -- we were
13　one of the larger ones in California at the
14　time. We had done schools; we had done office
15　buildings; we had done wineries; we did water
16　districts. We did, you know, lots of different
17　commercial solar systems. Not residences. All
18　large commercial stuff.
19　　　　After I left, after we sold it to a
20　company called Energy Innovations, I stayed on
21　for a year after that, and after that, I came on
22　to SunLink, so.
23　Q. And how were you brought into SunLink? Did you
24　have someone who essentially hired you?

## 20

1　A. Yes. John Eastwood.
2　Q. John Eastwood?
3　A. Yes. Who was the founder.
4　Q. You said that was in the 2006-'07 time frame?
5　A. Yes. 2005-2006 time frame.
6　Q. All right. Can you explain the business of
7　SunLink? I mean you were there obviously as the
8　CEO from 2007 until just this year. What --
9　　　　ARBITRATOR EVANS: I am sorry. What are
10　the dates of your tenure at SunLink?
11　　　　THE WITNESS: So the first stint
12　starting in 2006 or 2005 I worked largely as a
13　consultant helping do things. You can call that
14　that I was with SunLink. I think 2007 is when I
15　officially came in as CEO, although I had been
16　acting somewhat like that for several months
17　before that. I officially left as CEO
18　December 31st of last year, so.
19　BY MR. MURPHY:
20　Q. Do you have a current relationship with SunLink
21　today?
22　A. Right now I have a strategic consulting
23　agreement with them.
24　Q. Okay. You are consulting on business matters

## 21

1　with them presently?
2　A. Yes. Different strategies on different business
3　matters, and I am here under that.
4　Q. Okay. Can you describe for me, please,
5　SunLink's business? And obviously there is a
6　span of time where you are the CEO of that
7　organization. I gather things changed. Not
8　everything stays the same.
9　　　　Can you give us a little bit of a
10　50,000-foot view of the organization, its
11　growth, what it did when you got there, and sort
12　of what happened under your tenure there to that
13　company, please?
14　A. I will be happy. I think it may be worthwhile
15　to start a little bit with the reason I went to
16　SunLink.
17　Q. Sure.
18　A. If you look at like a slightly different
19　picture, if you look at a solar project and you
20　are trying to put together a solar project, you
21　have really -- to make it simple, you have four
22　or five things you need to worry about, three of
23　which are material supply-type items.
24　　　　One is your modules. That is always a

## 22

1    big deal.  These are the panels that you see
2    that turn into DC electricity.  They typically
3    represent -- at the time they represented
4    probably 70 or 80 percent of the value of the
5    project.  Now it is a lot less.  They are still
6    probably the major expense.
7  Q.  The solar panels themselves?
8  A.  Yes.
9  Q.  Yes.
10 A.  You have something that is called an inverter,
11    which converts DC electricity into AC
12    electricity.
13        And those things are both kind of -- I
14    don't want to call them commodities.  Close to
15    it.  You can buy them.  There is packaged,
16    well-developed industries around them.
17        Then the other, for lack of a better
18    word, the other stuff is called the balance of
19    system.  The main component of the balance of
20    system is structures or racking.
21        So if you put one of these modules on a
22    rooftop, you need a structure to connect it to
23    the rooftop or support it there.  To put it in
24    the ground, you need a post in a structure.

## 23

1    That is called a mounting system.  I am sure
2    that language will come up a lot in this,
3    mounting system, mounting structure.  That is
4    mainly what SunLink does.
5        I mention there are two other aspects to
6    a project when you are looking at it as an
7    integrator or developer.  You have got your
8    labor cost, which is a really big one as well.
9        And you have some engineering.
10    Engineering tends to be to get permitting, make
11    sure things are safe.  It tends to be a low cost
12    item.  It can have a big impact on things.
13        When you are doing this --
14 Q.  I am sorry.  One second.  You said labor costs.
15    Do you mean the costs to install?
16 A.  Contracting, yes.
17 Q.  The actual installation?  The construction?
18 A.  That's right.
19 Q.  Okay.
20 A.  So you have got modules, inverter, balance of
21    system, and construction costs, and when I was
22    in that business, the thing that was the most
23    challenging to some degree oftentimes was the
24    balance of system, because it changes depending

## 24

1    on what your site is, where you are at.  It
2    affects the things that are difficult to do.
3        If you are on a rooftop, maybe the roof
4    can support something or it can't.  So what
5    would keep me up at night in terms of an
6    integrator as a risk in getting a project done
7    would be the balance of system.  It had a
8    knockdown effect on labor, making sure you can
9    get things installed at the cost point you
10    needed to.
11        So I saw, when I left Prevalent Power, I
12    saw balance of system being a real opportunity,
13    an area of real opportunity.  That is why I
14    liked it.
15        When I came to SunLink, it does balance
16    of system work.  At the time I joined, John
17    Eastwood developed a roof mount product.  It is
18    a roof structure product that didn't penetrate.
19    You didn't have to go into the roof membrane to
20    put it on.  So it was a ballasted product.
21        I thought that was a great place to
22    start.  So over time, you know, for many years
23    that was our core product, and we developed an
24    enormous amount of IP, intellectual property,

## 25

1    around this roof mounting product system.  It
2    probably will be worthwhile at some point, maybe
3    now is the time to talk a little bit about that
4    IP, because I think it is fundamental to what
5    SunLink does.
6  Q.  Sure.
7  A.  I found this really interesting when I was
8    starting out in looking at how people design
9    roofs.  I figured you are sticking this stuff on
10    a rooftop.  How do you know how to design for
11    that?  Right?  How do you know what the loads
12    are?
13 Q.  You say the "loads."  Do you mean structural
14    loads or wind loads?
15 A.  All of them.
16 Q.  All of them?
17 A.  But mainly wind loads.  Wind loads are the
18    really tricky ones.  As an engineer, you can't
19    write equations for this, for wind loads.  It is
20    too complex.  Right?  So you have to do testing.
21        And what I found out was that the way
22    that the U.S. Building Code is built, it is
23    built around a series of tests that were done in
24    the '70s where they did a lot of wind tunnel

## 26

1   testing. They said a building, like a flat roof
2   building out there, you need to design the roof
3   for this much wind load. They did it by putting
4   a building like that in a wind tunnel and
5   measuring the pressures on it. But they had to
6   draw a base that extrapolated out to the whole
7   building code. To this day the building code is
8   based on the tests done in the early 70s.
9        My idea was let's figure out how to do
10  this for solar risk because if you just use the
11  roof pressures to design what the pressures will
12  be on the solar modules on a roof, the answer
13  would be incorrect, completely incorrect. Wind
14  works very differently.
15       I found the people that did the original
16  testing in the '70s, and it is an aerodynamic
17  lab in Canada. I went to them. I said I want
18  you to put together a program for me that will
19  do the same thing for modules so we will be the
20  only guys that know really how you install these
21  properly. And I want something that fits into
22  the U.S. Building Code. Right?
23       So we embarked probably six years, many
24  millions of dollars on the testing program,

## 27

1   understanding that, understanding what the wind
2   loads are on modules, to understand.
3        So that is the core piece of what
4   SunLink did early on.
5   Q. All right.
6        MR. MURPHY: Excuse me, Chris.
7        I have this note that Eli Florence wants
8   to come in for the arbitration. Did you tell
9   him to be here today?
10       MR. DOWD: No. His counsel was advised
11  of everything from there, so.
12       MR. MURPHY: Can I just take a minute?
13       ARBITRATOR EVANS: All right.
14       MR. MURPHY: I think this is a
15  disconnect from this morning.
16       (Recess taken at 10:13 a.m.)
17       (Recess ended at 10:18 a.m.)
18       ARBITRATOR EVANS: Are you ready to
19  resume, Mr. Tilley?
20       THE WITNESS: Yes.
21  BY MR. MURPHY:
22  Q. Sorry, Mr. Tilley. You were talking about your
23  SunLink experience. You were talking about some
24  of the background information relative to the

## 28

1   company and how it got to where it is.
2   A. Yes. So I mentioned the aerodynamics being
3   really our specialty. So what that enables is
4   SunLink is a supplier of components for the
5   mounting system, mainly racking components,
6   structures. One of the things that gives us an
7   advantage is the engineering knowledge, the way
8   that we configure those structures and the way
9   we design those structures to provide what the
10  loads are on a building specifically, but in
11  general, loads.
12       So when we put out an array, depending
13  on its configuration -- by "an array," it is a
14  lot of modules. Depending on the tilt angle,
15  depending how high it is off the roof, depending
16  on where it is on the roof, the tilt angle, how
17  high it is off the ground, those types of
18  things, we from the data from the testing
19  program, which is proprietary, we can say, you
20  know, with a great deal of certainty what the
21  loads should be used for design.
22       So SunLink sells these mounting
23  structures, but along with it comes this energy
24  component.

## 29

1   Q. Okay.
2   A. And that's what we do.
3   Q. Sure. Sure.
4        At some point -- and we are going to
5   hear a lot more in this arbitration about BGMS,
6   or ballasted ground mount systems. Just explain
7   that and sort of SunLink's role, sort of
8   evolving role in that space, please.
9   A. So I should point out that the first many years,
10  the first three or fours years of SunLink's
11  existence from 2007 to really 2010, almost all
12  of our business was on roof mount, flat
13  commercial roof mount projects. We did the same
14  type of testing for stuff on the ground, which
15  is different. We built a series of structures
16  for ground mount systems. One of those systems
17  is very similar. It turns out the projects in
18  question, many of them, most of them are on a
19  capped landfill. It turns out that a capped
20  landfill is somewhat like a roof, because you
21  have a structural thing that you are not
22  supposed to mess up. Right?
23  Q. The cap?
24  A. The cap? So the loads from aerodynamic loads

**30**

1  when wind blows against the modules that are at
2  a tilt angle, it pushes down on them or pulls
3  up, depending on, you know, the scenario, and so
4  a ballasted system, you don't want -- oftentimes
5  if the soil is good you just drive a pile in,
6  put a concrete foundation or put something into
7  the ground.
8  Q. Or a post?
9  A. If you have something like a capped landfill,
10  similar to a rooftop, you may just try to do it
11  with a big concrete block. You are not actually
12  going to go into the soil. You are just putting
13  something on top of it. The weight of that
14  block is called a ballast block, we will refer
15  to. That is what keeps it from flying away --
16  right? -- or moving. It can move in a lot of
17  different ways.
18        So you have this big ballast block. Our
19  ballasted ground mount system is a mounting
20  structure for solar modules on the ground that
21  has a big ballast block of concrete. It then
22  has a steel mounting structure that goes up.
23  You will hear this term, something called an
24  A-frame that sits on a big ballast block. It

**31**

1  looks like an "A." That is why it is called an
2  A-frame.
3        Then there are two rails that go across
4  like this.
5        (Witness gesturing.)
6  A. And the modules go on the rails like this.
7        (Witness gesturing.)
8  A. It is a very simple system. That is our
9  ballasted ground mount system, and that was the
10  system that was deployed on almost all of these
11  projects.
12  Q. SunLink is not in the business of installation,
13  is it?
14  A. No.
15  Q. Does it do any construction per se?
16  A. No. Absolutely not.
17  Q. It is strictly supply of materials?
18  A. We are a material supplier with a little bit of
19  engineering. We do provide some engineering.
20  Q. We don't turn a screw on the job? We don't
21  install a thing?
22  A. No.
23  Q. Okay. And as to the modules generally, we don't
24  participate in the supply of the modules

**32**

1  themselves, do we?
2  A. No.
3  Q. Okay. And typically that is undertaken by the
4  developer independently or the EPC contractor or
5  whomever?
6  A. Absolutely. I should mention that we oftentimes
7  have to work with the module manufacturers to
8  certify that our mounting system will work with
9  their modules. We are involved in modules that
10  way. We don't supply modules. We are not part
11  of that business in any other way than that.
12  Q. Okay. Now could you tell us --
13        MR. DOWD: I am sorry. That is -- may I
14  interrupt for one second? I thought you said
15  you were Mike Pristoni. Are you Casey Purcell?
16        MR. PURCELL: I am Casey Purcell.
17        MR. DOWD: Your Honor, I would like to
18  invoke the rule as far as having witnesses
19  present during the course of the proceedings
20  unless they are representing the company. I
21  thought he was Mike. I don't know why. My ears
22  are bad.
23        MR. MURPHY: I have no reason to have
24  Mr. Purcell excluded from the room.

**33**

1        ARBITRATOR EVANS: The general rule is
2  that witnesses are excluded with the exception
3  of party representatives. I will say Mark -- I
4  don't know your last name -- can stay. The rule
5  doesn't apply to experts either.
6        MR. MURPHY: Okay.
7        ARBITRATOR EVANS: Regrettably,
8  Mr. Purcell, you have to leave.
9        MR. MURPHY: If you want to check back,
10  we have a number for you. We will advise you as
11  work it out. Okay?
12        MR. PURCELL: Yes.
13        MR. MURPHY: Thanks, Casey.
14        (Mr. Purcell exiting the hearing room at
15  10:25 a.m.)
16        MR. MURPHY: Okay. Back on the record?
17        ARBITRATOR EVANS: Yes.
18        THE WITNESS: Can I -- maybe I shouldn't
19  ask this question. I am just curious. So Eric,
20  for example?
21        MR. MURPHY: What is Eric doing here?
22        MR. DOWD: He is here as a
23  representative of the company.
24        MR. MURPHY: He is also going to

34

1  testify.
2        MR. DOWD:  Yes.  But we get to have a
3  representative from the company.  He can stay as
4  a party representative even though he will be a
5  witness.  The only time this comes up, people
6  start to shuffle party representatives around
7  and be witnesses.  That is not the case here.
8  He is the only party representative.  He is
9  entitled to be here.  The only issue that would
10  come up is if he is testifying I would like to
11  have a representative of the company of course
12  present for when he is testifying, essentially
13  during that.
14        ARBITRATOR EVANS:  We will cross that
15  bridge when we come to it.  For the time being,
16  he is entitled to stay.
17        Did you want to say something else?
18        MR. MURPHY:  No.  I am fine.  Thank you.
19  BY MR. MURPHY:
20  Q.  Mr. Tilley, getting back to your testimony, so
21      we are talking about -- could you explain the
22      sort of structure of the SunLink organization
23      essentially when you were there as CEO?
24  A.  In general?

35

1  Q.  Yes.
2  A.  I think I know what you mean.  Let me --
3  Q.  Yes.
4  A.  -- give it a try and you tell me.
5  Q.  Yes.
6  A.  We were functionally divided into groups where
7      there is a supply chain group, which managed our
8      suppliers and manufacturing to produce stuff.
9      We had a sales group that was a separate group.
10      We had a finance and accounting group that was a
11      separate group.  And we had a marketing group
12      that was separate.  But that is generally how we
13      were organized.
14  Q.  Okay.  In sales you had project management and
15      supply chain, you had engineering?
16  A.  Engineering was a separate group.  I forgot
17      engineering.
18  Q.  All reporting ultimately up to you as CEO?
19  A.  That is correct.
20  Q.  Can you give us a sense of sort of, you know,
21      where the company was sort of sizewise when you
22      got there and where when you left kind of thing?
23      Kind of an overview?
24  A.  Yes.  So we -- when I came there, they had the

36

1      first sales, they were a couple of hundred
2      thousand dollars, I think $300,000 in sales at
3      the time I arrived.  So this would have been in
4      2006 -- 2006 or so.  And when I left last year
5      its sales were almost 60 million, so
6  Q.  All right.  When you were there, was ACE,
7      American Capital Energy, the respondent in this
8      case, were they an existing customer of
9      SunLink's?
10  A.  Yes.  They were an early -- they weren't a
11      customer when I arrived, but very soon, they
12      were a customer, one of our older longer-term
13      customer.  They had been a customer of ours for
14      quite a while before these projects started.
15  Q.  All right.  Had you ever had any difficulties in
16      the relationship with ACE, SunLink?
17  A.  Well —
18  Q.  Obviously prior to this.
19        MR. MURPHY:  I am going to reference the
20      CVEC jobs/Dennis jobs are the ones at issue in
21      this case, Mr. Arbitrator, and subject to the
22      nine contracts.
23  BY MR. MURPHY:
24  Q.  This is sort of prior to CVEC and so forth?

37

1  A.  We had, I think, a good relationship with ACE
2      and worked generally well.
3  Q.  Okay.
4  A.  The only exception is that they were notoriously
5      bad at paying us on time.
6  Q.  Okay.  And had you ever had any major lawsuits
7      or issues about your product that you supplied
8      or whether it meet the needs and so forth or
9      whether you had fulfilled your supply contracts
10      with ACE?
11  A.  No.
12  Q.  But you had some difficulties over time you said
13      getting paid.  Had you ever had to lien
14      projects?
15  A.  Yes.
16  Q.  Okay.  And other than what I would describe as
17      sort of project-related sort of discourse, was
18      there ever any major claims that SunLink had
19      failed to supply their products on a timely
20      basis for ACE?
21  A.  No.
22  Q.  As the CEO of the SunLink organization, did you
23      have final responsibility for sign off or
24      approval with respect to sales contracts?

## 38

1  A. Yes.
2  Q. Okay. And did you typically review those sales
3     contracts before they were executed by the
4     company, by someone on behalf of the company?
5  A. Yes. Yes. The general rule, if it is a
6     completely standard contract, in other words, no
7     change from our typical contract, I would allow
8     typically my head of sales to sign those without
9     my review if they were the standard. If there
10    were any changes, it had to be bubbled up, so.
11 Q. All right. Did SunLink under your direction,
12    Mr. Tilley, did SunLink develop a set of
13    standard terms and conditions for its contracts
14    and supply contracts?
15 A. Yes.
16 Q. And were you personally involved in that
17    process?
18 A. Yes.
19 Q. Okay. And did you in effect standardize its
20    terms and conditions for SunLink's sales and
21    sales contracts?
22 A. Yes.
23 Q. I would like to sort of have you lead us into
24    the CVEC jobs. Do you recall first discussing

## 39

1  these jobs, which are the nine jobs which are,
2  or at least some of the nine jobs, which are the
3  subject of this particular proceeding with ACE,
4  do you have a memory of when that sort of
5  conversation began?
6  A. Yes. It goes back quite a ways. I believe I
7     want to say 2010, 2011.
8  Q. Okay.
9  A. These were coming for a long time.
10 Q. Could you describe what the concept of these
11    projects were that ACE was pursuing you,
12    SunLink, to supply for?
13 A. Yes. These were ballasted ground mount systems
14    to go on capped landfill sites.
15 Q. When roughly in time did this conversation first
16    begin as best you can recall?
17 A. You know, originally it would have been between
18    my sales team and ACE. So I know that it was a
19    good deal prior to 2012. But I am not —
20 Q. Sometime prior to even 2012? The contracts in
21    this case being October of 2013, just for
22    reference.
23 A. Oh, yes.
24 Q. So well before that?

## 40

1  A. Oh, yes. Yes. I am sure we will —
2  Q. And were these projects related? Was there some
3     relationship to these projects? Were they
4     treated as a portfolio? Were they treated
5     independently? How were the discussions with
6     ACE carried out?
7  A. We definitely treated these as portfolio
8     projects. We often will do portfolio projects
9     to get sort of volume pricing.
10 Q. When you say "portfolio projects," what do you
11    mean?
12 A. A mean a number of projects that are typically
13    at different locations but use the same or very,
14    very similar equipment for us.
15 Q. Okay. All right. And so ACE came to you with a
16    portfolio of some number of these projects.
17    Were they always talking about the same number
18    of projects in these conversations or was that
19    shifting?
20 A. It definitely shifted over time, my recollection
21    of the details early on.
22 Q. Was there anything particularly unusual about
23    this portfolio of projects that ACE came to you
24    with — I say you, I mean SunLink — in let's

## 41

1  say the 2011 time frame?
2  A. Other than that it was on a capped landfill, no.
3  Q. Okay. Okay. But the actual — the technical
4     aspects of these projects, did they present any
5     particular challenges? Were they particularly
6     complex in any way?
7  A. No. Not at all.
8  Q. All right. What was the —
9  A. I should be a little bit careful about that.
10    From our perspective, they were very simple.
11 Q. Right.
12 A. From the point of view of the engineers having
13    to determine what is on the land, on the cap,
14    they might have been really, really complex.
15    That interchange may have been. That is not our
16    job to be clear. We have to provide the loads
17    and be sure the structures can take it.
18 Q. You don't get into soils engineering?
19 A. I should be careful. We never get into roof
20    engineering. We do from time to time do some
21    soils. On this project we certainly weren't
22    going to do it because of the capped landfill.
23 Q. Your engineering on these projects was — what
24    is the simplest way to describe?

42

1   A.  We provide the loads, our structures are
2       adequate to support the loads, and what the
3       loads were from those ballast blocks, how heavy
4       the ballast blocks needed to be, and what the
5       actual aerodynamic loads needed to be on to the
6       feet in the capped landfill.
7   Q.  And does SunLink participate in -- and we will
8       see it come up in contracts -- the layout of the
9       arrays, how the thing is laid out on the
10      landfill?
11  A.  We help with that for sure.
12  Q.  Could you explain the significance of that to
13      SunLink?
14  A.  There are a number of points that are important
15      there.  The first is just from an engineering
16      point of view.  The layout will affect the loads
17      depending on there is a sheltering effect just
18      to give you an idea from wind.  To get the
19      loads, we need the layout to start.
20          The second thing that is even more
21      critical is that that essentially gives us our
22      bill of materials.  You are not going to know
23      what components and configurations you need
24      until you have done your layout.  Layouts are

43

1       fundamental to a contract, fundamental to our
2       work.
3   Q.  Who actually creates the layouts?
4   A.  We will create layouts internally, but that is
5       usually in hand with the customer, saying well,
6       you know, that doesn't work on the site.  Now
7       move this over here.  So they will have an
8       approved layout, upon which we both are working.
9   Q.  Ultimately you don't proceed until you have an
10      approved layout?
11  A.  That's right.
12          ARBITRATOR EVANS:  Excuse me.  Do you
13      generally get like a site plan or something?
14      How do you know the environment in which the
15      units are going to be built?
16          THE WITNESS:  That is exactly right.  We
17      get a site plan from the customer.
18  BY MR. MURPHY:
19  Q.  That is dialogue back and forth, finally this
20      approval on the other end and you have something
21      you can contract for and with?
22  A.  That is right.  Our contract references a very
23      specific layout.  We have had enough history
24      over time to know that that is the key.  You

44

1       have to agree on layout.
2   Q.  And did there come a point in time when a
3       contract, even before the contracts that are the
4       subject of this particular arbitration, was
5       there a contract that actually was reached with
6       respect to at least some of the projects which
7       are at issue in this case?
8   A.  Yes.  There was a master supply agreement that
9       was signed for I believe nearly all of the
10      projects.  Yes.
11  Q.  Would you please turn to what is in your book
12      one there which we have marked as Exhibit 4?
13          MR. MURPHY:  Mr. Arbitrator, just a
14      point of order here.  Mr. Evans, I don't know
15      how you want us to treat this.  Do we move the
16      admission of these things?  Obviously you don't
17      want to do it seriatim.  We have not had,
18      because we didn't get documents until last night
19      and never got a comment back, disputed,
20      undisputed sort of thing from Mr. Dowd and ACE,
21      you know, effectively telling us what ones they
22      would object to of these, which ones they
23      wouldn't.
24          So we provided a list and all of that

45

1       back on the 7th.  We didn't have theirs, too.  I
2       want to understand how we are going to proceed
3       with these.  Are these going to be exhibits?
4       How do you want to proceed.
5           ARBITRATOR EVANS:  I was just about to
6       address that when you got to your first exhibit.
7       So have you had an opportunity to review in fact
8       the SunLink exhibits at all?
9           MR. DOWD:  No, I have not at all, your
10      Honor.  Of course, in arbitration it is up to
11      you, not dealing with the rules of evidence, do
12      we just let everything in and proceed?
13          ARBITRATOR EVANS:  Well, the rules of
14      evidence certainly don't apply.  It doesn't mean
15      that every scrap of paper will necessarily be
16      appropriate to admit.  But the reason why we
17      have the protocol that we do in the scheduling
18      order and in the discussions we do, it is much
19      more efficient if the body of evidence can come
20      in en masse and that the parties can agree to.
21      If there are specific exhibits that you don't
22      agree to, I will have to take that up one at a
23      time.  It is much more efficient to put into
24      evidence, in fact we have 232 exhibits, to put

## 46

1   those in, and if some of those prove to be
2   useless to the proceeding, I won't read them and
3   we won't talk about them, and there is no harm.
4   It is much more efficient that way.
5       If you are telling me that you don't
6   know whether within the 232 exhibits there are
7   documents that are troubling to you, I am
8   not going to force you to do that now, but I am
9   going to ask you to burden your evenings over
10  the next couple of days to walk through their
11  documents, and I will ask the same of SunLink,
12  to identify any exhibits that you have a problem
13  with, and I will keep checking back with you on
14  how you are doing on that project.
15      But I think for purposes of today,
16  SunLink is going to be talking about exhibits,
17  and unless you say, "I object to the exhibit,"
18  those exhibits will be deemed in evidence for
19  all purposes.
20      MR. DOWD: That's fine. Yes. I will
21  work on it when I can. As I said, coming out of
22  the surgery and the rest, I would say my
23  evenings have been pretty full as is. For quite
24  a period of time, we have been putting this

## 47

1   together. I will go through in light of what
2   you are saying with what we object to and go
3   forward.
4       ARBITRATOR EVANS: Thank you.
5       So I am sorry. We are on Exhibit 4?
6       MR. MURPHY: Yes. Yes.
7       ARBITRATOR EVANS: And I presume that
8   there is no objection to this document?
9       MR. DOWD: No objection.
10      ARBITRATOR EVANS: All right. So we now
11  have one exhibit formally in evidence in this
12  proceeding.
13      MR. MURPHY: Start with one. We have to
14  start with one.
15      ARBITRATOR EVANS: Baby steps.
16      MR. MURPHY: Okay.
17  BY MR. MURPHY:
18  Q. Have you had a chance to take a look,
19     Mr. Tilley, at what is here as Exhibit 4?
20  A. Yes.
21  Q. At tab 4?
22  A. Yes.
23  Q. What is this document, please?
24  A. It is a master sales contract and volume pricing

## 48

1   agreement for a series of ballasted ground mount
2   projects.
3   Q. Just by way of observation, if you would go in
4      the tab to like half a dozen pages actually to
5      what has been Bates labeled SunLink 113?
6   A. Yes.
7   Q. Is that your signature appearing on this
8      contract on March 9, 2012?
9   A. It is.
10  Q. That is Mr. Hennessey of ACE? Correct?
11  A. That's correct.
12  Q. And so this contract was executed in 2012?
13  A. Yes.
14  Q. Did this contract ever become effective, or take
15     effect essentially?
16  A. I guess I need to know what you mean by in
17     effect. I'm not --
18  Q. Okay. Fair enough.
19      Did this contract -- ultimately we did
20  not construct --
21      MR. MURPHY: Strike that.
22  BY MR. MURPHY:
23  Q. Ultimately we did not supply the projects
24     indicated in here pursuant to this particular

## 49

1   instrument, this agreement? Right?
2   A. That's correct.
3   Q. And we ultimately have nine different contracts
4      that are single contracts as opposed to this one
5      contract, correct, with a lot of differences
6      that we will point out?
7   A. Yes.
8   Q. All right. And just looking at this, it looks
9      like there is Harwich, Barnstable, Brewster,
10     Eastham, Chatham, Tisbury, Mashpee, Dennis and
11     Duxbury.
12      Just a point of clarification. Those
13  are not the exact nine that are at issue in this
14  case today? Correct?
15  A. That's correct.
16  Q. And in fact, Mashpee and Duxbury are not the
17     subject of this proceeding? Correct?
18      MR. DOWD: I object to that.
19  A. That's correct.
20      MR. DOWD: Mashpee and Duxbury are very
21  much a part of this proceeding with respect to
22  this case.
23      ARBITRATOR EVANS: He asked a question,
24  and the witness answered. You may disagree with

50

1    the question and the answer, but it is not a
2    basis to object.
3              MR. MURPHY:  We are not seeking any
4    recovery on the Mashpee or Duxbury jobs.  They
5    will be alluded to periodically, I think, in
6    this proceeding.
7              ARBITRATOR EVANS:  Proceed.
8    BY MR. MURPHY:
9    Q.  And is this contract familiar to you, sir?
10   A.  Yes.
11   Q.  Okay.  And when this contract — and just so we
12       are clear, am I correct we are pursuing recovery
13       on two other projects not mentioned that get us
14       to the nine we have here that are not Mashpee
15       and Duxbury, and those would be Nunnepog and
16       Katama?
17   A.  Yes.
18             MR MURPHY:  Okay.  And that would be we
19       do have nine we are pursuing recovery here for.
20       It is a little confusing.  It will become clear.
21   BY MR. MURPHY:
22   Q.  Do you recognize this, sir, as incorporating
23       standard terms and conditions effectively of
24       SunLink, many standard terms and conditions you

51

1    helped create for the organization?
2    A.  Yes.  This is basically our standard contract
3        with a few modifications.
4    Q.  Turning to the page "executive summary," were
5        there discussions -- was there any schedule or
6        time frame discussed in the context of this
7        contract?
8    A.  Yes.  I mean I anticipated by reading this first
9        thing that they were going to start and we were
10       being told estimates ACE will begin installation
11       of the project in April of 2012 and finish by
12       the end of the calendar year.  So that gives me,
13       you know, a good idea of what is expected in
14       terms of these projects.
15   Q.  Okay.  And that is found in the third paragraph
16       on the executive summary?
17   A.  That's correct.
18   Q.  And turning to the page, page 109, where it says
19       "contract information."
20   A.  Um-hmm.
21   Q.  It says "product lead time."  Do you see that?
22   A.  Yes.
23   Q.  Okay.  And can you explain to us, sir, what
24       product lead time is --

52

1    A.  Sure.
2    Q.  -- in this contract?
3    A.  Sure.  I mean it is in general.  It is the same
4        in all of our projects.  It takes a while, once
5        we get an order, we don't provide -- we don't
6        supply large projects out of inventory.  We
7        don't have the inventory.  I mean that is not
8        the way we work.
9              So when we are providing a project, we
10       have to go out to our manufacturers, and they
11       have to -- often they have to buy material.
12       They get material from somewhere else, raw sheet
13       or tube or something.  They need to set up their
14       production line to be able to manufacture our
15       components.  That takes some period of time.
16       Four to six weeks is what we are saying in this
17       case.  That is the lead time.
18             Now once they produce that, once they
19       have done that, they can start producing the
20       product, and we start shipping.  That is what
21       lead time is.
22   Q.  And does lead time represent a delivery
23       schedule?
24   A.  No.  Well, let me be -- this is -- there is --

53

1    let me clarify this.
2    Q.  Okay.
3    A.  The vast majority of projects that we do are
4        projects that would ship in one or two
5        truckloads.  Right?  So the lead time and the
6        delivery time are almost identical, right, for
7        those projects.  Because once our guys are set
8        up and they may have produced, they will produce
9        for a half day or a day, and then they will ship
10       it.  So we will ship very close to whatever
11       their production.
12   Q.  Like one truckload of materials or two?
13   A.  Right.
14             For any large project, absolutely not.
15       That will be clear through a lot of the stuff
16       that is here.  It has been clear in our business
17       forever that you have a lead time is how long it
18       takes you to begin receiving material.  That is
19       how long it is going to take us to begin
20       producing material.
21             Then there is a delivery schedule that
22       comes after that -- right? -- and the delivery
23       schedule is defined separately -- right? -- than
24       the lead time.

54

1  Q. All right.
2  A. But sometimes people will say things like, you
3     know, the lead time, it is going to arrive at
4     that time. That is true for small projects.
5  Q. Right. Right. But in this one?
6  A. Not for a project this size.
7  Q. Not for projects this size?
8  A. No.
9  Q. And is there a -- we see there is also some
10    language here about FOB points. Do you see
11    that?
12 A. Where?
13 Q. 109, just above the "product lead time."
14        Now in this particular instance, it was
15    FOB locations in Boston -- strike that -- in
16    Massachusetts to be set forth later? Right?
17 A. Yes.
18 Q. Did that change in the ultimate contracts?
19 A. Yes. This is where -- we don't typically like
20    to do FOB from at the job site. There are a lot
21    of potential issues there. FOB is usually set
22    for our suppliers or our warehouses is usually
23    where it is set.
24 Q. All right. And this contract also references

55

1     where it says you have the various projects
2     listed, and under each one has a line that says
3     reference photovoltaic module. It says Yingli
4     or Yingli Panda 265 or it has different numbers
5     associated. Can you explain what that is?
6  A. That is a module. The modules are, you know, it
7     is important for us. They are typically large
8     form modules and smaller form modules. If you
9     have a larger one, it is oftentimes a mounting
10    structure detail, there is less of it. You get
11    a better price per watt. Right? So for each
12    module, the mounting holes may be in different
13    places, so we might have to adjust our system
14    for that. It is very important to know which
15    module.
16        There is another class all together that
17    comes into play later in this, ones that don't
18    have frames around them, just glass, and those
19    are really pretty rare in the market, it is
20    called thin film modules. The modules are
21    important. All of the things in this thing are
22    important to pricing and delivery.
23 Q. Again you don't supply the photovoltaic module?
24 A. No.

56

1  Q. And these were all ballasted projects. It is
2     indicated method of hold down looks to be
3     ballast? Correct?
4  A. Correct.
5  Q. And there is a volume price that is negotiated
6     at Bates number 113, price per watt?
7  A. Yes.
8  Q. Is that typically how this pricing is
9     accomplished?
10 A. Yes. I mean we would prefer to provide a price
11    per module, but most of our customers want price
12    per watt. It is okay as long as we agree on
13    what the module is. That is what we have done.
14    We have provided a price per watt.
15 Q. Is there any delivery schedule set forth in this
16    contract?
17 A. No.
18 Q. Okay. And what would be SunLink's expectation
19    after entering into this contract? We will
20    speak more about the contract in terms of where
21    the next steps will proceed.
22 A. This contract, you know, we had heard from them
23    clearly that this is going to start -- you know,
24    the estimated start time would be April. And

57

1     then it would go on. This is March. We would
2     expect things -- I would have expected things to
3     move reasonably quickly at this point in terms
4     of I am not sure where we are on engineering.
5     You have to have your engineering and permitting
6     done. Then we would have expected, you know, a
7     schedule certainly when are they going to want
8     to take and deliver this stuff.
9  Q. Who would provide the scheduling typically?
10 A. It is our customers telling us when they want
11    it.
12 Q. Telling you --
13 A. Yes.
14 Q. -- when they want the product?
15 A. That's right.
16 Q. Again that is not provided for in this contract
17    now?
18 A. No.
19 Q. There is no specific delivery schedule?
20 A. No. This is just waiting on POs. I think it is
21    a trigger. This contract has a trigger of
22    waiting for a PO before anything starts.
23 Q. Okay. Typically -- I want to speak to the
24    concept of notice to proceed. You are familiar

## 58

1     with that term?
2 A. Yes.
3 Q. How does lead time and notice to proceed work in
4     these contracts?
5 A. Well, you know, I will go into it.  In the
6     simple case, it's all the same thing.  Right?
7     In a really simple case, we will get a deposit.
8     We will get a schedule.  Notice to proceed are
9     all embedded in that with the contract.  You get
10     the contract and you go.
11         Sometimes with larger contracts, for
12     larger projects, often sometimes they are trying
13     to get it financed.  They have the price on the
14     racking.  There is a time where they need to
15     work it.  Oftentimes we will set up a contract
16     like this so they can put together the plan,
17     maybe get things financed.
18         And there will be another trigger,
19     called a notice to proceed, or there may be
20     deposits or different triggers we put in for
21     them.  Notice to proceed is one where someone
22     specifically tells us you need to go forward.
23 Q. Lead time would follow notice to proceed?
24 A. Yes.

## 59

1 Q. And turning here to a couple of your standard
2     terms and conditions, looking at that signature
3     page again, please, page 113.  There is a
4     sentence here that indicates at the top:
5         "Any deviation from the attached
6     layout," et cetera, et cetera, et cetera.
7         Do you see the sentence I am referring
8     to?
9 A. Yes.
10 Q. Could you just explain that provision in your
11     standard terms?
12 A. That is critical.  Those are critical.  That is
13     critical because once we have a layout, we are
14     going into production on those components --
15     right? -- that is what we are having built.  We
16     are committing to that to our manufacturing
17     suppliers.  If you start changing that, the
18     engineering is based on those components.  If
19     you start changing the layout of the components,
20     all bets are off to anything related to time or
21     price.  These contracts are very specific.  Our
22     contracts are very specific in saying here are
23     layouts.
24 Q. They say specifically:  "Any deviation from the

## 60

1     attached" --
2         ARBITRATOR EVANS:  I am sorry.  What
3     page are you on?  I don't have Bates numbers on
4     mine.
5         MR. MURPHY:  You don't?
6         ARBITRATOR EVANS:  No.
7         MR. MURPHY:  I apologize.  If you could
8     turn in to the page where the signatures are, it
9     is about five or six pages in.  Maybe a little
10     more.
11         ARBITRATOR EVANS:  I have the signature
12     page.
13         MR. MURPHY:  At the top it talks about
14     volume pricing.  I was reading from the sentence
15     that says "Any deviation" --
16         ARBITRATOR EVANS:  I have got it.
17         MR. MURPHY:  -- "from the attached
18     layout or any changes."
19 BY MR. MURPHY:
20 Q. I am going to go over this with the witness --
21     "to the above information will result in a
22     change in price and/or lead time"?
23 A. That's correct.
24 Q. Effectively sort of a reset if there is a change

## 61

1     in these layouts?
2 A. That's correct.
3 Q. All right.  Just looking at this, so appendix A
4     that you executed with ACE here in 2012 also had
5     terms and conditions of sales, general terms and
6     conditions of sales?
7         MR. MURPHY:  That is a couple more
8     pages, Mr. Arbitrator, down, the next page.  It
9     starts on the next page, Appendix A.
10 BY MR. MURPHY:
11 Q. And there are some definitions here.  Do you
12     recognize these as again general terms and
13     conditions of sale at SunLink that you helped --
14 A. Yes.
15 Q. -- create at SunLink?
16 A. Yes.
17 Q. Okay.  I just want to point out a few of them
18     without belaboring it here.  We talk about, you
19     know, in the definitional section we talk about
20     the sales contract.  That is defined under 1(i)?
21 A. Yes.
22 Q. Do you see that?
23 A. Yes.
24 Q. And that is intended to, you know, involve other

**62**

1    things, including schedules mutually agreed upon
2    by the parties. Do you see that?
3 A. Yes.
4 Q. And there is a paragraph with respect to the
5    so-called SELA, Structural Engineering Load
6    Advisory?
7 A. Yes.
8 Q. That is defined in 1(l)?
9 A. Yes.
10 Q. Can you just again briefly tell us what that is?
11 A. That is the loads. The SELA is our Structural
12    Engineering Load Advisory that I mentioned
13    earlier. These are the loads. The SELA is our
14    engineering document that says these are the
15    loads that go from our structure into whatever
16    you are supporting, on to a capped landfill or
17    roof or whatever. The SELA picks up proprietary
18    wind load data, determines this is what the
19    loads are from the wind, and we provide that as
20    an engineering document to our customers. That
21    is what SELA is.
22        ARBITRATOR EVANS: How are the loads
23    expressed?
24        THE WITNESS: They are expressed however

**63**

1    they need them. They will be point loads. If
2    it is a surface that is the ballast block, it
3    will be obviously whatever the weight is plus
4    the maximum load. If it is a -- you could say
5    it is another, you know, thousand pounds --
6    right? -- a thousand pounds of weight and
7    another thousand pounds of down push, which is
8    the maximum load that can be expected.
9        ARBITRATOR EVANS: Expressed in terms of
10    pounds?
11        THE WITNESS: A force. It is a load in
12    terms of force. Yes.
13        ARBITRATOR EVANS: Does that factor in
14    the wind speeds?
15        THE WITNESS: You take in the wind
16    speed. You take the exposure categories, height
17    off the ground, you take -- there are a lot of
18    different parameters that go into that.
19        ARBITRATOR EVANS: The end result is you
20    say that this system can support a module array
21    of X pounds?
22        THE WITNESS: There are two things.
23    There are two things. One is, you know, we are
24    sort of finding that our system can support

**64**

1    whatever loads we are providing. That is
2    intrinsically part of this. The important part
3    of the SELA is it is saying on the feet of the
4    system on a roof or on the feet of the system on
5    a landfill, these are the maximum forces that
6    you need to account for on the structure below.
7        So, you know, if we say it is an array
8    that is going to be on the roof and if we say on
9    one of those feet it needs to be able to take
10    1,200 pounds, the engineer looking at the
11    building needs to say can the roof take 1,200
12    pounds there. If it can't, we can't permit it,
13    it shouldn't be done. If it can, everything is
14    fine, and they would stamp calculations that say
15    that the roof can handle that. We would
16    typically provide calculations that say these
17    are what the loads are, so.
18        ARBITRATOR EVANS: Thank you.
19 BY MR. MURPHY:
20 Q. Your revision policy on that same page that we
21    just started talking about the SELA down at the
22    bottom, paragraph 7, is -- we are not going to
23    go through it -- but this obviously references,
24    ties back to the SELA report and any revisions

**65**

1    to either the layout drawing and/or to the SELA
2    report, you know, resulting in changes in the
3    contract which may result in among other things
4    additional components and cost and time for
5    revised layout drawings, et cetera?
6 A. Yes.
7 Q. And we will come back to the cancellation.
8        But paragraph 9 on the next page says
9    "schedule"?
10 A. Yes.
11 Q. And I will just read it. It says:
12        "SunLink and purchaser agree that the
13    scheduled delivery dates and/or lead times as
14    set forth in the proposal are approximate."
15        So a couple of questions first. Is the
16    proposal that is referenced there in this
17    document essentially the first few pages that
18    sort of precede the signature?
19 A. Yes. That is what it is.
20 Q. Obviously we are in the general terms and
21    conditions. All of these dates, anything that
22    is in provided in there -- and that is where the
23    lead times are found, is that correct, that are
24    specified?

66

1  A. Yes.
2  Q. Those are all approximate? Correct?
3  A. Yes.
4  Q. As well as any scheduled delivery dates that may
5     or may not be sort of available at the time of
6     contract?
7  A. That's right.
8  Q. Okay. Is that a standard provision in all
9     SunLink contracts?
10 A. Sure.
11 Q. Okay. And it also indicates here, the second
12    sentence:
13        "Seller shall not proceed with the
14    manufacturing of the product until, pursuant to
15    each purchase order, purchaser issues seller a
16    separate written notice to proceed."
17        That is also a general term?
18 A. No. It is not actually.
19 Q. It is not?
20 A. It is not. That is not. Typically we won't
21    have a separate PO and a separate notice to
22    proceed in our contracts.
23 Q. Okay.
24 A. This was changed for this --

67

1  Q. Okay.
2  A. -- specifically, right.
3  Q. So this envisioned some purchase orders coming
4     out and so forth?
5  A. Yes.
6  Q. The contracts ultimately at play here -- and we
7     will get to those shortly, I promise -- do not
8     have --
9        MR. MURPHY: Strike that.
10 BY MR. MURPHY:
11 Q. -- do not envision any purchase orders issuing?
12    They were all sales contracts? They were in and
13    of themselves?
14 A. Different provisions, neither of which of these
15    are standard standard.
16 Q. Is the acceptance provision fairly typical, 13
17    here, sir?
18 A. Yes.
19 Q. In this case, I am not going to read it, but
20    effectively after 15 days things are deemed
21    unconditionally accepted?
22 A. That's correct.
23 Q. If they are not rejected and returned?
24 A. That's right.

68

1  Q. And I would like to direct your attention to --
2        MR. MURPHY: I am sorry, Mr. Arbitrator.
3  BY MR. MURPHY:
4  Q. It is a few pages down. I am looking at
5     paragraph 25 under "general."
6  A. Yes.
7  Q. It is on your Bates 119.
8  A. Yes.
9  Q. These are some, I guess, general general terms.
10    They are general terms found within the general
11    terms?
12 A. Yes.
13 Q. And I would like to direct your attention to
14    subparagraph 25C.
15 A. Okay.
16 Q. And that particular provision with force majeure
17    and events, transportation delay, causes beyond
18    the reasonable control of the seller and so
19    forth, and you're not being liable for those
20    kinds of things, that is a typical?
21 A. That is typically in our contract. Yes. In
22    every contract.
23 Q. All right. And there is an integration clause
24    obviously, 25F, which makes whatever is in this

69

1     document the complete agreement for purposes of
2     the parties contracting? Correct?
3  A. That's correct.
4  Q. Okay. And directing your attention to the next
5     page, 25(g), as in George.
6  A. All right.
7  Q. And this provision provides in the second
8     sentence actually, I direct your attention to
9     that -- well, first of all, the first sentence
10    sort of addresses your cumulative ability under
11    the contract not exceeding the total amount of
12    these purchase orders.
13 A. Yes.
14 Q. Then it says:
15        "In no event shall a party, its
16    affiliates, or its or their suppliers be liable
17    to the other party or any third party for any
18    special, indirect, incidental, consequential or
19    punitive damages, whether arising in contract,
20    tort or otherwise, even if advised of the
21    possibility of the same."
22        Do you see that?
23 A. That's correct. Yes.
24 Q. Is that, sir, a typical term and condition found

## 70

1    in your contracts?
2  A. Yes, it is.
3        And I will note -- I mean at some point
4    we can talk about this -- all of those over time
5    -- you know, most of these things we modified at
6    one point or another under negotiation with
7    customers, but these are our standard terms.
8  Q. But the ones I pointed to principally did not
9    get modified in this instance when we went to
10   the nine contracts ultimately in October?
11   Correct?
12 A. Absolutely not. You are correct.
13 Q. Before we leave this, I want to address some
14   things that are not in the this contract. Okay?
15       You have already testified, I believe,
16   that there are no delivery dates of any kind
17   specified in this contract? Correct?
18 A. That's correct.
19 Q. Okay. Are there any provisions -- we just read
20   obviously an exculpatory provision -- but are
21   there any provisions which makes SunLink liable
22   under any set of circumstances for consequential
23   losses or indirect losses or liquidated damage
24   figures?

## 71

1  A. It is my understanding when based on what I have
2    heard from my lawyers that no. That is what
3    that clause specifically is to exclude.
4  Q. It better not be?
5  A. Yes. You are right. I don't know. I am not a
6    lawyer. But I will be upset if that is not the
7    case.
8  Q. Are you familiar with the term "buy American"?
9  A. Yes.
10 Q. And is there a buy American provision in this
11   contract?
12 A. Not in this contract.
13 Q. What do you mean buy American clauses to be?
14 A. So we have put buy American clauses in
15   contracts, and we have done work for the Navy
16   sites, VA. There are different projects that
17   sometimes require a buy American provision. It
18   is quite an education process for me. There are
19   different buy American provisions. Some allow
20   you to buy -- every fastener has to be done.
21   Lots of different ones. When we do that, we
22   have to source -- we have to agree to whatever
23   those terms are.
24       There is no -- there is nothing in this

## 72

1    agreement that says --
2        (Pointing to Exhibit 4.)
3    -- everything has to be -- there is no
4    -- there is nothing on that.
5  Q. Is there anything that says you have to source
6    products exclusively domestically?
7  A. Absolutely not.
8  Q. Are you familiar with the term "pay-if-paid
9    provisions"?
10 A. Yes. That is a term that, you know, typically
11   means that they won't pay us or our customer
12   won't pay us until they in fact are paid.
13 Q. Are there any pay-if-paid provisions in this
14   contract?
15 A. Absolutely not. Those are -- at some point we
16   will talk about that. That is something that --
17 Q. Let's talk about it right now.
18 A. That is something that we cannot accept. We
19   can't accept on a project -- we can't -- we
20   particularly a project this size. There was a
21   lot of dialogue at some point we can talk about.
22   I know in my input to the contract formation
23   process on this that this was our key issue.
24   There is a lot of working capital to put

## 73

1    together a project like this, and the terms had
2    to be negotiated. A certain number of days, you
3    know, from FOB, from the time we can invoice,
4    that we need to be paid.
5        There can not be a provision, because we
6    couldn't finance it. Our bank, working capital
7    line, will not finance projects that are pay
8    when paid. They said, "No. There has to be a
9    date when you are paid."
10       For our customers, very, very
11   explicitly, it is net 45 or net 60. We can work
12   around those. But there is never a provision in
13   these contracts, and there is not a provision I
14   would accept, I would not sign a contract, that
15   provided for we will pay you whenever we get
16   paid. That is just not -- that won't work for
17   us. It certainly won't work for projects this
18   scale.
19 Q. You read the integration clause and so forth.
20   Does this contract -- and I will ask the same
21   question again in October -- does it incorporate
22   the provisions of any other contract, for
23   instance, one that might be in place between the
24   EPC contractor or a general contractor and the

74

1    developer/owner of these projects?
2  A. No.
3  Q. So-called flow down provisions?
4  A. No. I have dealt with then when I was an
5      integrator. When it was my own, you push it
6      down to your suppliers. There are none of those
7      in these contracts. I have dealt with them as a
8      supplier. Right? I have had people push
9      provisions from their contracts. There is none
10     of that here.
11 Q. So none of the performance here is contingent
12     upon the experience of ACE upstream, as it were,
13     with the sort of developers of these projects?
14 A. That is exactly right.
15 Q. All right. So with respect to this project, was
16     there ever a schedule that came out that was, a
17     delivery schedule, which was ever associated
18     with what is articulated in Exhibit 4, this MSA,
19     master sales agreement?
20 A. No. Not that I know of. No.
21 Q. Okay. Do you know if --
22         MR. MURPHY:  Strike that.
23 BY MR. MURPHY:
24 Q. Just turning to tab 6, sir, Exhibit 6, just two

75

1      documents down.
2         (Witness complying.)
3  Q. This appears to be an e-mail from Mr. Eastwood
4      to Mr. McLean right here?
5  A. Yes.
6  Q. March 23, 2012. Could you just look at that for
7      a second, please?
8  A. I am sorry. I must be on the wrong one.
9  Q. Look at 6, please. Skip over one and go to 6,
10     please.
11 A. All right. I am at 7. I apologize.
12 Q. Right out of the gate.
13 A. I am good. I am good. I am looking at 6.
14 Q. My simple question is going to be what
15     Mr. Eastwood is trying to do here to get a more
16     definitive schedule, information concerning
17     deliveries, is that the typical process
18     following these contracts where you have to
19     pursue schedules from the parties who should be
20     generating these schedules, the EPC
21     contractor/GC?
22 A. Yes.
23         MR. DOWD:  I object as to what
24     Mr. Eastwood has to say. It is said here. He

76

1      can't testify as to what Mr. Eastwood had in his
2      head.
3         ARBITRATOR EVANS:  Overruled.
4  BY MR. MURPHY:
5  Q. You can answer.
6  A. So yes. I mean we -- we -- it is not that
7      complex. If we are going to produce something
8      for a customer in a certain time period, we have
9      to know to tell our manufacturers you need to
10     produce it in this time period -- right? -- so.
11 Q. Those suppliers, what do they need to go into
12     production?
13 A. It depends on the supplier and the component.
14     They require a bill of materials. They may need
15     to build some sort of tooling of forms. It
16     depends what it is, but.
17 Q. Your ballast suppliers, what do they need to do?
18 A. Typically need to build forms.
19 Q. Concrete forms?
20 A. Concrete forms to pour the concrete in. There
21     is some hardware they will need to be able to
22     lift islets to connect things. I don't know
23     enough about the concrete business, but I am
24     sure they probably have to make sure they can

77

1      get the right additives for the concrete as to
2      how it is specified, so.
3  Q. Is the schedule development important to the
4      suppliers?
5  A. It is critical.
6  Q. Can you explain that a little more?
7  A. It depends. I guess I should be careful about
8      that. If it is a real small job, it is probably
9      not as big of a deal. But for a large project
10     where somebody -- my supplier is making the same
11     commitments to some degree. Right? They are
12     saying we are going to take three months of our
13     own production and dedicate it to this and go
14     out to our material guys and order a ton of
15     stuff. So they need to know.
16 Q. Okay. You testified that to your knowledge we
17     never received any scheduling?
18 A. No.
19 Q. This project, this portfolio of projects, at
20     least as they are articulated in the master
21     sales agreement did not go forward?
22 A. That's correct.
23 Q. Can you tell us what happened sort of next in
24     this dialogue with ACE over the what eventually

1    became for the most part the CVEC portfolio of
2    projects?
3  A.  You know, we kept hearing that they were in the
4    works and they were going to be financed and
5    something was going to happen, but we never got
6    the follow on things that are required in this
7    contract in terms of --
8  Q.  Okay.  This thing never --
9  A.  It never died.  They never said, "No.  This is
10    not going to happen."  They were saying it is
11    still looking like it is going to happen.  We
12    are looking on timing.
13  Q.  Was the sales team and ACE counterparts,
14    obviously there are other projects going on with
15    ACE?  Correct?
16  A.  Yes.
17  Q.  There were touch points there where they were
18    talking about sort of keeping this thing alive,
19    but it hadn't gone live so to speak and it
20    didn't go live?
21  A.  That's correct.
22  Q.  Okay.  Do you recall this coming back into
23    focus, these projects, or at least perhaps a
24    slightly different iteration of these project,

1    coming into focus in 2013?
2  A.  Yes.
3  Q.  Okay.  And now I will --
4        MR. MURPHY:  Strike that.
5  BY MR. MURPHY:
6  Q.  Do you know if in the spring of 2013, do you
7    recall in the spring of 2013 there being
8    discussions about a possible different or new
9    solar panel being utilized on maybe half of --
10    as much as half of these projects?
11  A.  Yes.
12  Q.  Could you just explain what happened and what
13    occurred in the spring of 2013?
14  A.  Yes.  So, you know, there was no longer the
15    Yingli ones we had talked about.  They had moved
16    -- if it moves to another framed module, it is
17    not really --
18  Q.  You say "moved."  In terms of what they were
19    specifying?
20  A.  Yes.  It is not that big of a deal, but I think
21    they recognized and everyone recognized if you
22    moved to a module that doesn't have A-frame,
23    particularly a new module, it would have great
24    difficulty and may or may not work with the

1    mounting system.
2        They came to us, I believe they said at
3    this time, I may be wrong, and I certainly found
4    out later, that one of the financiers they were
5    working with wanted them to use these modules.
6    They wanted to make sure that our system could
7    support those modules on these projects.
8  Q.  So ACE came to you with a request to coordinate
9    with them in offering a different or a newer
10    solar panel on some of these projects?
11  A.  That's correct.
12  Q.  Okay.  And that happened roughly in the spring
13    of 2013-ish?
14  A.  Yes.
15  Q.  Okay.  I am going to direct your attention here
16    to Exhibit 7, please.
17        (Witness complying.)
18  A.  Yes.
19  Q.  Take a little look at that.
20  A.  All right.
21  Q.  Is this the subject area we are talking about in
22    terms of this Sunpreme, it is called a Sunpreme,
23    S-u-n-p-r-e-m-e, module that they want to look
24    toward this sort of frameless module?

1  A.  That's correct.
2  Q.  And do you know where the Sunpreme module is
3    manufactured?
4  A.  You know, I don't.
5  Q.  Okay.  Well, do the spec sheets behind it
6    evidence the fact that it is actually sourced,
7    it is actually manufactured in China?
8  A.  That would make sense.  Most of the modules are.
9    Yingli is in China as well, so.
10  Q.  Do you understand as you sit here today that the
11    Sunpreme issue involved a manufactured product
12    that you were trying to design against here
13    which was manufactured in China?
14  A.  That's correct.
15  Q.  Okay.  And did you have to do anything as a
16    company to help ACE with this solution that they
17    wanted to employ?  Just to be clear, the
18    company manufacturing these new Sunpreme modules
19    was some sort of portfolio company maybe of the
20    lenders that ACE was dealing with on the project
21    and they had a desire to utilize these products?
22  A.  Yes.  This is a -- I mean the honest truth is
23    anything -- decision around this would likely
24    come through me, because there are a lot of

82

1    little module suppliers. A lot of times there
2    are customers that will come to us and say, "Can
3    you support this module?" It requires a fair
4    amount of effort from us to do. The typical
5    answer to that is no.
6  Q. Okay.
7  A. When you have a customer that you know -- and
8    Sunpreme is not a big name. This is something
9    that worked that we could do for this module
10   that would be a bunch of resources sunk into it
11   and not bear any profit for us. We are
12   investing in this because we believe these
13   projects may still be good and we want them to
14   work. We actually worked with Sunpreme to help
15   get it to work.
16 Q. Very briefly, what did you have to do to
17   accommodate ACE's request?
18 A. We have other systems that are similar, similar
19   enough. We had to contact Sunpreme as I recall,
20   test them to make sure that we knew what they
21   required, and had to mock things up, had to
22   create prototypes. We probably did some load
23   testing on one, our structure, to make sure that
24   the module didn't crack or there weren't issues

83

1    with it. There is a design effort for a module
2    that is different. This is definitely a
3    different module.
4  Q. Okay. We went ahead with that, you know,
5    revising, sort of revving up, sort of versioning
6    up our system to accommodate the Sunpreme issue?
7    Right?
8  A. Yes.
9  Q. After that, you were in the process of that mid
10   sort of 2013. Do you recall what happened next
11   in this dialogue? Do you ultimately in fact
12   create new versions, if you will, of some of
13   these products that you supplied to accommodate
14   Sunpreme?
15 A. Yes, we do.
16 Q. Did the projects actually go live in early 2013?
17 A. No.
18 Q. What happened, sir, as best you can?
19 A. Well, nothing happened until, you know, I think
20   they were still trying to get them financed --
21   right? -- so.
22 Q. All right.
23 A. So, you know --
24 Q. Directing your attention to Exhibit 8 in your

84

1    binder, please.
2        (Witness complying.)
3  Q. And I would like you to look at the attachment
4    to Exhibit 8 as well, which is the blue slip
5    sheet.
6  A. All right.
7  Q. Do you recall this correspondence?
8  A. Yes, I do.
9  Q. And this is a letter from Mr. Dowd, June 6,
10   2013, addressed To Whom It May Concern?
11 A. That's correct.
12 Q. What is your understanding surrounding this
13   particular correspondence?
14 A. ACE is having cash flow issues, and they have
15   laid off some people, and my interpretation is
16   that the purported cause of it is these projects
17   they have been trying to develop, these landfill
18   projects.
19 Q. Did you know who Mr. Dowd was at that time?
20 A. Yes. I had -- you know, he has been with ACE
21   for a while. I had met him at conferences, out
22   for dinner, you know, one of our conferences. I
23   recognized him as being part of the ACE team.
24 Q. Okay. Was Mr. Dowd part of the ACE team

85

1    throughout sort of effectively this -- all the
2    events we are going to talk about here at this
3    arbitration?
4  A. Yes. I think you will see he is on almost all
5    the e-mails. He is cc'd by them or by us. Yes.
6  Q. Mr. Dowd, so he essentially is telling folks
7    that there is going to be layoffs at ACE, and
8    things are going to come to a stop, these might
9    rebound, it might come back. In fact he is
10   predicting that they might well come back. Did
11   this have an effect on us?
12 A. My concern -- and I don't remember the details.
13   My initial concern would not have been for the
14   projects we are talking about. It would have
15   been for other projects we have done with them.
16   I am sure as soon as we got this I went to
17   accounting asking do we have outstanding
18   receivables from ACE. It looks like a problem.
19   That is how I would have reacted to this.
20 Q. However, he was holding out promise of funding
21   and notices to proceed once that funding ever
22   materialized or matured?
23 A. Yes.
24 Q. It is actually described as a crisis at ACE, he

**86**

1    says with officers and directors assuming
2    additional responsibilities during the crisis.
3    Right?
4  A. Yes.
5  Q. At some point, sir, does ACE in fact rebound and
6    these obviously come back?
7  A. Yes.
8  Q. Okay. And do you recall when that occurred?
9  A. I remember my recollection is early August was
10    the next time that everybody got real excited
11    about this, because we had heard that it was
12    imminent. Right.
13  Q. Approximately how many swings had you had about
14    this was imminent or this was going to come, by
15    the August of 2013 time frame?
16  A. A lot of skepticism in the company and me
17    personally about whether these products would
18    ever go forward. Right? Not terribly atypical
19    in the industry when people are trying to
20    finance new projects, because there are a lot of
21    pieces to it.
22  Q. Sure.
23  A. But I was taking everything with a grain of
24    salt. We were told many, many times they were

**87**

1    imminent.
2  Q. Now we have no contract in place in this August
3    of 2013 time frame? Correct?
4  A. That's correct.
5  Q. And the one we signed before has now expired?
6  A. Well, yes.
7  Q. Actually, there is expiration terms in it?
8  A. Yes. That was one of the things in it. But I
9    mean that contract was for Yingli module. It
10    was different.
11  Q. Everything was different?
12  A. I don't know if it expired. Probably if they
13    had signed it, we probably would have worked
14    forward with it, tried to work forward.
15  Q. It was ultimately made clear that --
16  A. That that is not the contract.
17  Q. Did you do anything from an engineering
18    standpoint? Is there anything triggered in the
19    fall of 2013 that SunLink undertakes?
20  A. Yes. The next thing is I'm sure that we have
21    done iterations on engineering on this project
22    before, but as things change, you change
23    modules, you change layouts, I have to redo
24    engineering. So, you know, we are at the stage

**88**

1    where I think they are asking us in August, as I
2    recall in general, we need to get permitting.
3    We need to get this done. We need engineering
4    from you right away. And it is actually quite a
5    big engineering effort to try to turn something
6    around this quickly.
7  Q. Did you have a series of sort of separate
8    agreements to address engineering?
9  A. Yes, that is one of the ways that I dealt with
10    it. It was a little bit of risk. We said let's
11    get an engineering services agreement for the
12    engineering. If they can pay that, it is not a
13    lot of money, but it will be a little bit of a
14    qualifier for me that this thing is looking like
15    it --
16  Q. Did --
17        MR. DOWD: What was the last answer? I
18    thought you said something about separate. I
19    couldn't quite hear what you said.
20        THE WITNESS: What I said is we had an
21    engineering services agreement that I think were
22    executed to do engineering.
23        MR. DOWD: Sorry.
24  BY MR. MURPHY:

**89**

1  Q. Do we ultimately play a role, did SunLink
2    ultimately have a role in assisting in the
3    permitting process from the point of providing
4    stamped plans?
5  A. Yes. That would be under the engineering
6    services.
7  Q. That is all treated as a separate matter that we
8    are not here about? The engineering was
9    effectively separate?
10  A. It's -- yes. That's correct.
11  Q. In the context of —
12        MR. MURPHY: Strike that.
13  BY MR. MURPHY:
14  Q. I would like to direct your attention to Exhibit
15    12, please.
16        (Witness complying.)
17  Q. Just take a moment to look at the attachment and
18    obviously the covering e-mail.
19        (Pause.)
20  Q. Are you familiar -- so the correspondence here
21    has a gentleman named Jeff Gadomski from
22    American Capital Energy sends Jonathan Eastwood,
23    copy to Zac Osgood, another gentleman named Tom
24    Gadomski, with a ballast delivery schedule, and

90

1    he sends that to you on August 1st. So this
2    comes from ACE, August 1, 2013? Correct?
3  A. That's correct.
4  Q. And are you familiar with the schedule?
5  A. Yes.
6  Q. Okay. Is this schedule something which the
7    parties invested a fair amount of debate over
8    throughout the course of this case?
9  A. Yes.
10  Q. Okay. And in looking at this, sir --
11  A. I guess I should say it was referred to over and
12    over again. Whether we were debating this
13    actual schedule -- the context maybe so. We
14    didn't debate the schedule much.
15  Q. What do you understand this schedule was and was
16    intended to represent?
17  A. So this was provided to us in August, and we
18    were told to expect these projects to move
19    forward as early as the very beginning of
20    September -- right? -- that we were going to get
21    -- that they were going to move forward.
22        And so they were laying out a delivery
23    schedule for the ballast on these projects. And
24    so we got this schedule, as I understand it, or

91

1    supply chain looked at it and went to suppliers
2    and said, "Can we do it?"
3        It is an aggressive schedule. We never
4    agreed to this schedule. But it, you know, it
5    was also something that was in the realm of we
6    thought we could do. Right? It would be
7    difficult, but we could do it.
8  Q. Okay.
9  A. And I had asked when I first looked at the
10    schedule, what was the -- when did we expect the
11    notice to proceed on this. So, you know, and I
12    was told the end of August.
13  Q. Okay.
14  A. The very, very beginning, which meant for me
15    looking at the schedule that we had a pretty
16    tight -- a reasonably tight lead time on this.
17    It is like a four- or five-week lead time is
18    what is being contemplated. We didn't agree to
19    it. I don't know that we would have.
20  Q. You say the period of time before they were
21    calling for deliveries commencing
22    September 25th?
23  A. That's right. And we couldn't have done that
24    unless they had given us an okay really at the

92

1    end of August or beginning of September, and
2    they knew that.
3        ARBITRATOR EVANS: The question is, this
4    is specifically for ballast? Is that the
5    totality of the SunLink project?
6        THE WITNESS: No. Ballast is the real
7    -- was the real challenge in terms of time. But
8    the other components are steel structures and
9    rails and the like.
10        ARBITRATOR EVANS: Did you understand
11    the schedule then to apply to all the products
12    that SunLink was to provide?
13        THE WITNESS: No. This was clearly just
14    talking about ballast.
15        ARBITRATOR EVANS: Just the concrete?
16        THE WITNESS: That's correct.
17        ARBITRATOR EVANS: All right.
18        THE WITNESS: You have to have the
19    concrete down, though, before you can put down
20    the other components, though.
21  BY MR. MURPHY:
22  Q. This is a ballast-only delivery schedule?
23    Right?
24  A. Yes, yes.

93

1  Q. And you understood this to mean that prior to
2    this point in time, because you got it on
3    August 1st, there was going to be some amount of
4    lead time, you felt it was going to be tight,
5    but something you could work with. Just to get
6    this said here, there is no contract here
7    between the parties?
8  A. That's correct.
9  Q. ACE sends this over to you in terms of what?
10    Laying out its expectations in terms of at least
11    the delivery schedule?
12  A. Yes.
13  Q. And now this also, in terms of what we
14    ultimately end up doing here, one, two, three,
15    four, five, six -- this is seven projects?
16    Correct?
17  A. Yes.
18  Q. Okay. And this calls for delivery on a five day
19    a week schedule?
20  A. That's correct.
21  Q. Okay. And ultimately this is going to become an
22    issue in our case later when you get told -- we
23    get told about four days for the first time in
24    January. Right?

94

A. Yes.
Q. Do you know if this was an accurate portrayal of the different ballasts? It says ballast one, ballast two and ballast three here. Do you know if there are more ballast types?
A. There ended up being more ballast types than three.
Q. Do you have to make different forms for different ballasts?
A. That's correct.
Q. Okay. But this was never agreed to by the parties, was it?
A. No, it wasn't.
Q. This is what at least ACE had sent along?
A. This is what we were working on.
Q. Ballast only, three types. It has the delivery commencing September 25 and ending on January 9?
A. That's correct.
Q. Okay. So approximately --
A. After a four-week lead time -- I guess a three- or four-week lead time.
Q. How did you interpret this schedule in terms of the ultimate time that was being suggested by ACE for SunLink to --

95

A. Deliver the ballast?
Q. -- to basically deliver the ballast only on these seven projects?
A. About 20 weeks from the time that we got the notice to proceed. So this schedule is about 15 to 16 weeks of delivery schedule after a lead time of 3 to 4 weeks.
Q. Okay. And did this schedule ever itself ever become operative?
A. No.
Q. And it was never -- and yet it came at a time when we had not executed our contracts? Correct?
A. That's correct.
Q. Do you know if there was any contemplation in this in terms of how many ballasts per day would be delivered to sites or things like that, or is that a better question for somebody else?
A. No. I mean other than the fact that they have got 100 here. They have got numbers here.
Q. Okay.
A. The thing I would point out, at some point, you know, this is real important to bear in mind, is the scale of this. Right?

96

Q. You said the scale of this?
A. The scale of this.
Q. Please explain.
A. This is about 18,000 of these ballast blocks, are a couple of tons each. It turns out this is about a thousand semi trucks that are fully loaded -- right? -- to be delivered.
This is not an easy logistically and transportationwise. This is a very, very, very large set of trucks. I mean I don't think there has been a project, and we have done projects that are larger than that, but I don't think there is a project we have run that many trucks. A thousand trucks out to the Cape that are fully loaded -- right? -- with concrete just for the ballast is a big deal. These numbers are not --
Q. Just roughly how big is one ballast, I mean? Half this table? Whatever? I don't know.
A. Yes. I would say a third of the table.
Q. Okay.
A. Yes. A quarter of the table, whatever.
Q. Okay. And you get upwards of 20 blocks on a truck to actually deliver, half the lead time, manufactured, poured?

97

A. Yes. They are loading them as much as they can, to meet legal requirements and the rest of it.
Q. Okay. So and this talks about, and you referred to, sort of a total here of 17,460 blocks. Right?
A. That's correct.
Q. Now eventually we contract for not only these seven projects but two other ballast projects? Correct?
A. Yes.
Q. And in fact, and those are Nunnepog and Katama --
MR. MURPHY: Strike that.
A. No. Those weren't ballast projects.
BY MR. MURPHY:
Q. It is -- well, they actually put into the schedules --
A. Yes.
Q. -- they built into the schedules later -- and we will get to those -- supply of ballast not only for these seven ballasted projects, but they built in ballast for the Mashpee and Duxbury project, which is entirely separately contracted for? Correct?

## 98

1   A. Yes. That's correct.
2   Q. And those are ballasted projects, but they
3      conflate the delivery of Mashpee/Duxbury with
4      these seven so-called CVEC projects? Right?
5   A. Yes.
6   Q. Okay. So I just think we might -- can you very
7      briefly explain what CVEC is?
8   A. So when we refer to, I am probably not the best
9      expert. I know the Cape and Vineyard Electrical
10     Cooperative.
11  Q. You understand it is essentially a cooperative
12     on the Cape to buy power?
13  A. Yes. There is a complex arrangement between all
14     of these guys. We call it that, but it --
15  Q. None of our issues here are about how they
16     constructed the EPC contracts to effect this.
17         ARBITRATOR EVANS: At some point when it
18  is convenient for you, we should take a break.
19         MR. MURPHY: Fair enough. This is
20  actually fine.
21         ARBITRATOR EVANS: All right. We will
22  resume in 15 minutes.
23         MR. MURPHY: Thank you.
24         (Recess taken at 11:29 a.m.)

## 99

1          (Recess ended at 11:46 a.m.)
2          ARBITRATOR EVANS: Are you ready to
3   proceed?
4          MR. MURPHY: Yes.
5          MR. DOWD: Yes, sir.
6   BY MR. MURPHY:
7   Q. Mr. Tilley?
8          MR. MURPHY: Sorry?
9          MR. DOWD: I said yes, sir.
10         MR. MURPHY: Oh.
11  BY MR. MURPHY:
12  Q. Mr. Tilley, we left off at I think Exhibit 12.
13     We were talking about that schedule.
14         Again this schedule never becomes
15     operative?
16  A. No.
17  Q. I think that is what you testified to?
18  A. Yes.
19  Q. Do you know --
20         MR. MURPHY: Strike that.
21  BY MR. MURPHY:
22  Q. Who was your principal supply chain personnel in
23     the company that reported to you?
24  A. Ranjan Prasad was the VP of the supply chain.

## 100

1   Q. Do you think this is something that Mr. Prasad,
2      who is expected to testify here, will be able to
3      tell us what the scheduling and supply chain
4      people do in terms of interface with the
5      down-line precast people to work out feasibility
6      and so forth?
7   A. Yes.
8   Q. I think that is something we can probably do
9      better with him.
10         During this time frame, were there price
11     negotiations being pursued --
12  A. Yes.
13  Q. -- or efforts being made to negotiate towards
14     some sort of contract again?
15  A. Yes.
16  Q. Okay. And in terms of price negotiation, was
17     John Eastwood involved in that process?
18  A. Yes.
19  Q. And ultimately, is there a price that is sort of
20     negotiated for this project to at some point get
21     going and people to move to sort of definitive
22     contracts?
23  A. Yes.
24  Q. Okay. Turning your attention to Exhibit 26,

## 101

1      please, in the binder before you.
2          (Witness complying.)
3   Q. You are copied on this correspondence from
4      Mr. Eastwood to Mr. McLean. Do you recall these
5      being the sort of culmination of the
6      negotiations that were ensuing toward these
7      projects coming on line?
8   A. Yes.
9   Q. And again Mr. Eastwood would have actually been
10     the one negotiating the price?
11  A. That's correct.
12  Q. Okay. And there is reference here to an initial
13     payment of $100,000 which would permit SunLink
14     to expedite production of the molds for
15     production of concrete ballasts. Do you see
16     that?
17  A. Yes.
18  Q. Could you explain what that is and why that is a
19     part of this arrangement?
20  A. Yes. The first thing that I will comment on,
21     that I can talk to, is that this price is
22     substantially -- we are pushed pretty heavily on
23     this price compared to the price that was in the
24     original MSA. Right?

102

1  Q. Okay.
2  A. There is a lot of pressure being put on to get
3     costs down for them.  That is one reason there
4     are new sets of contracts.  The price is
5     substantially lower for this than before.
6  Q. The price per megawatt?
7  A. Per megawatt.
8        The 100,000 bucks is if we are going to
9     try to ramp up really quickly to get, you know,
10    a certain number of molds done and in a certain
11    time, we need to pay our suppliers to build
12    those forms to do it.  We had gone — I believe
13    at this point we had gone to suppliers and found
14    out what they would need.  That is where the
15    $100,000 comes from.
16 Q. Okay.  I would like to direct your attention to
17    Exhibit 32, please.
18       (Witness complying.)
19 Q. At some point do you recall before the contracts
20    were signed your being made aware of some of the
21    negotiation that was transpiring between
22    Mr. Osgood and Mr. John Eastwood and others over
23    the contracts?
24 A. Yes.

103

1  Q. Okay.  And you will see here attached are some
2     comments that came back from Mr. -- not too many
3     — comments that came back from Mr. Osgood of
4     ACE --
5  A. Yes.
6  Q. -- with respect to the standard form terms and
7     conditions in the sales contract, and attached
8     here to number 32, incidentally, is just the
9     Dennis contract, which was representative of all
10    of the others?  Correct?
11 A. I believe that that is true.
12 Q. Okay.  At some point did you go over these few
13    comments that Mr. Osgood had?
14 A. Yes.
15 Q. And did you also end up proposing some
16    additional terms of your own as part of this
17    negotiation before this culminated in an
18    agreement?
19 A. Yes.  I mean I remember the main focal point for
20    me, and actually for my CFO and for the company,
21    was around the payment terms.  Because again big
22    projects, we needed -- we had to finance this,
23    use our working capital line.  So there are
24    other terms in here that we looked at, and they

104

1     were handled one way or another.  The big
2     discussion around this time and later internally
3     were around cash flow, guarantees, bonds, those
4     types of things.  We knew ACE had had financial
5     trouble a while back.  This is a big commitment
6     for us, so.
7  Q. Just a few months before?
8  A. That's right.
9  Q. They had effectively laid off their workforce;
10    right?
11 A. Yes.
12 Q. And they were in the process of ramping up
13    themselves; right?
14 A. That's right.
15 Q. Turning to Exhibit 36, please.
16       (Witness complying.)
17 Q. This is -- do you recognize these documents to
18    be -- I don't know if it is all of them, but a
19    number of the contracts that are ultimately
20    signed in this case for various projects
21    starting with Barnstable on top?  And there are
22    different slip sheets that go to Brewster and so
23    forth.
24 A. Yes.  I believe so.

105

1  Q. And this is Mr. Osgood sending back to Jonathan
2     Eastwood in the sales group signed versions of
3     these?
4  A. Yes.
5  Q. At least these contracts at this time, October
6     18, 2013?
7  A. Yes.
8  Q. And Mr. Osgood instructs you specifically:
9        "Please do not begin the manufacturing
10    process for these projects until ACE gives a
11    formal notice to proceed."
12       Do you see that?
13 A. Yes.
14 Q. Okay.  And did you adhere to that?
15 A. Yes.  And other things that we wanted to put in
16    before we started production as well.
17 Q. Let's talk about those other things.  Directing
18    your attention to the first -- let's just go to
19    the Barnstable contract.  It comes up first in
20    the attachments here.
21       On the second page, it says page 2 of 12
22    at the bottom?
23 A. Yes.
24 Q. Directing your attention to "product lead time."

## 106

1   Again these are the contracts that we are
2   ultimately here on today and ultimately this
3   dispute concerns?
4   A.  Yes.
5            ARBITRATOR EVANS:  Just to clarify for
6   me?
7            MR. MURPHY:  Yes.
8            ARBITRATOR EVANS:  All nine projects
9   here, the CVEC projects?
10           MR. MURPHY:  CVEC/Dennis.  Dennis was
11  the one up to that that didn't join the
12  cooperative.  They were big enough to have their
13  own buying power.  CVEC/Dennis are the nine
14  projects, and there is Mashpee and Duxbury as
15  well, which were listed on the master contract
16  originally.
17           ARBITRATOR EVANS:  They are not part of
18  the claim?
19           MR. MURPHY:  Right.
20           MR. DOWD:  It is not part of our claim.
21  It is part of our offset to their claim.
22           ARBITRATOR EVANS:  Okay.
23           MR. MURPHY:  All right.
24  BY MR. MURPHY:

## 107

1   Q.  Directing your attention back to my question,
2       which was the product lead time --
3   A.  Yes.
4   Q.  -- elements here, was there some -- does this
5       pick up some of the changes you were just
6       alluding to?
7   A.  Absolutely.
8   Q.  Could you explain, please?
9   A.  Well, I think all of the -- I think if we read
10      the sentence, it is pretty clear what we added.
11      All specified lead times are from receipt of
12      signed sales contract, down payment, notice to
13      proceed and proof of payment bond in place at
14      100 percent of contract value.
15           We wanted the proof of the bond in
16      place.  We wanted the down payments.  We wanted
17      a notice to proceed.  And we had to have a
18      signed sales contract before we were going into
19      production on anything.
20  Q.  And the $100,000 figure that we talked about a
21      little while ago as sort of a payment to get the
22      suppliers going, how does that fit into the
23      context of this?
24  A.  Deposit.

## 108

1   Q.  Okay.  So basically there are deposits that were
2       spread out over the nine projects that
3       effectively took care of that $100,000 that you
4       had to have?
5   A.  Yes.
6   Q.  Okay.  When you negotiated these contracts,
7       immediately after you negotiated them, what did
8       you expect to happen in terms of the notices to
9       proceed on these projects?  In other words, did
10      you expect they were all going to come on line
11      together?  What were your expectations at the
12      time you signed these contracts?
13  A.  Yes, so we signed them, and that is a really
14      good sign.  So it looks to me like the projects
15      are all going to move forward at this point
16      pretty quickly, and I think we are being told
17      that, to expect this to move.  I would have
18      expected we would have ended up with a formal
19      schedule on it in a couple of weeks and end up
20      with deposits in a couple of weeks and ended up
21      with the bonds.  It sounded like it was all
22      going to come together such that we would be
23      moving on this a month from now, a month from
24      this time.

## 109

1   Q.  What were your expectations on the receipt of
2       the $100,000 deposit that your precast suppliers
3       were requiring to build forms?
4   A.  I expected that deposit to show up in a week or
5       two weeks -- right? -- maybe even quicker.  I
6       didn't know.
7   Q.  Did you expect effectively one check?
8   A.  Yes.
9   Q.  Okay.  And is that what in fact ensued here in
10      terms of coming up to -- actually before I get
11      to that.  I will come back to that question.
12  A.  All right.
13  Q.  Just to tie off, and just sticking with the
14      Barnstable contract which is the first attached
15      here, and I am not going to belabor it, because
16      we went through it in some detail with the
17      master sales agreement, just for the record on
18      page 4 of 12.
19           (Witness complying.)
20  Q.  The phrase I directed your attention to earlier
21      about "any deviation from the attached layout or
22      any changes to above the information will result
23      in a change of price and/or lead time," that is
24      obviously picked up in these contracts?

110

1    Correct?
2 A. Yes.
3 Q. And the --
4 A. And I think these contracts have more developed
5    layouts. I think we have already done all the
6    engineering on them.
7 Q. Let's look at page 2. I am actually glad you
8    brought up that. It says "array layout
9    drawing." It has a specific bunch of numbers
10    indicative of a specific layout drawing for the
11    Barnstable landfill?
12 A. That's correct.
13 Q. And so how does that play into this contract?
14 A. That is what we are contracting for.
15 Q. And if it is anything but that, what happens?
16 A. Then it is a change.
17 Q. It is a change?
18 A. That's right.
19 Q. All right.
20 A. That is why we have that language. We had had
21    enough experience over time to know that is what
22    you put in your contract. This is what we're
23    going to deliver. If you change it, we can talk
24    about it, but.

111

1 Q. And the concept -- well, on that page the
2    concept there is the six-week lead time. Again
3    that refers to the lead time you testified to
4    earlier? Correct?
5 A. Yes. That is correct.
6 Q. Which is preliminary obviously to delivery
7    schedules?
8 A. When we start shipping product.
9 Q. Okay.
10 A. Six weeks or later if we can. Right?
11 Q. Six weeks' lead time is going to be the point
12    that you start shipping product to the site?
13 A. That's right.
14 Q. Again we don't have to go into it, but the
15    provision, the standard terms and conditions at
16    Exhibit A are substantially similar to the
17    master sales agreement? Correct?
18 A. Yes.
19 Q. And you have the paragraph regarding schedule
20    and approximate and scheduled delivery dates
21    and/or lead times being approximate.
22       You have the acceptance is the same, the
23    15-day unconditional acceptance.
24       We are going to arbitration now, as

112

1    opposed to litigation. We have one change.
2       And paragraph 21, the general terms
3    within the general terms, so to speak?
4 A. Yes.
5 Q. 21(c), (f) and (g) are identical to the sort of
6    provisions we went over a little earlier in that
7    area, the ones respectfully with, or I should
8    say respectively, the force majeure, for lack of
9    a better word, provision, in C, and the
10    integration clause is in F, among others, the
11    exculpatory provisions in 21G, all the same?
12    Correct?
13 A. That's correct.
14 Q. And all signed off on by ACE? Correct?
15 A. That's correct.
16 Q. And does this contract, sir, contain any
17    delivery schedule of any kind?
18 A. It does not.
19 Q. Does this contract incorporate any contracts?
20    You heard Mr. Dowd in his opening talk about
21    contracts and SREC agreements and EPC demands
22    and June 1 substantial completion dates. Any of
23    that find a home in any of our contracts?
24 A. There are no flow down provisions. There are no

113

1    liquidated damages provisions. There are no buy
2    American provisions in this contract.
3       ARBITRATOR EVANS: I have not seen --
4    and I don't know if it matters -- any versions
5    of the contracts that have been signed by both
6    parties. I assume there is a separate packet
7    with SunLink's signature?
8       MR. MURPHY: Yes.
9       ARBITRATOR EVANS: Is there an agreement
10    between the parties as to what we should deem
11    the operative date of execution of these
12    contracts? It looks like Mr. Hennessey signed
13    on October 17th. I don't know when SunLink
14    signed, and I don't know if it matters, so.
15       MR. MURPHY: Honestly I'm not sure that
16    it does matter, but we do have them. We will
17    put them in, the actual dates. I think for the
18    most part they were countersigned by Ridgway,
19    and the front page of -- the front of every
20    contract has an effective date.
21       ARBITRATOR EVANS: Yes.
22       MR. MURPHY: The signatures came in
23    October 17, 18, 19. This one from Mr. Osgood
24    came in on the 18th to us. Mr. Ridgway signed

## 114

1   on the 17th -- basically 10-18 I think
2   countersigned.
3            ARBITRATOR EVANS: By SunLink?
4            MR. MURPHY:  Correct.
5            ARBITRATOR EVANS:  So that would be the
6   latest operative date?
7            MR. MURPHY:  Yes.  I think that is fair.
8   BY MR. MURPHY:
9   Q.  So we have contracts that are signed?
10  A.  Yes.
11  Q.  You are somewhat looking -- SunLink is looking
12      forward to moving forward on this?
13  A.  Yes.
14  Q.  What transpires after you sign the contracts?
15  A.  We are expecting delivery schedules. We are
16      expecting deposits.  We are expecting all of the
17      items that need to happen for us to -- we are
18      certainly I believe at this point talking to all
19      of our suppliers saying, "Look, this is coming.
20      Right?  Get ready.  Try to figure out how we get
21      this rolling.  We are excited about this.  This
22      is going to move forward, but we are going to be
23      giving you deposits at some time soon and" --
24  Q.  And schedules?

## 115

1   A.  -- "notices and schedules so you can get things
2       going."
3   Q.  Okay.  Moving up in this.  At some point do sort
4       of the initial deposits and payment bonds for
5       these projects come sort of trickling in?
6   A.  Yes.
7   Q.  Do they come in at once --
8   A.  No.
9   Q.  -- like you had expected?
10  A.  No.
11  Q.  Were you ever cut a check for $100,000 to go pay
12      the suppliers you were working with to get them
13      to start?
14  A.  No.
15  Q.  Okay.  Directing your attention to Exhibit 61,
16      please.  We will jump ahead here.
17  A.  I have got one comment.
18  Q.  Sure.
19  A.  A comment on the contract.
20  Q.  Yes.
21  A.  I also want to point out that we got the terms
22      that we want in here that are essentially net 45
23      days.  There is no pay-when-paid provision.  And
24      there is a commitment here we are going to be

## 116

1   paid 45 days from the time that we --
2   Q.  I was remiss.  In fact, Appendix B, I believe,
3       addresses payment terms?  Correct?
4   A.  That's correct.
5   Q.  And that is found on page 9 of 12 on the
6       contracts, the Barnstable contract that we have
7       been looking at?  Right?
8   A.  Yes.
9   Q.  So the payment terms are -- first of all, could
10      you just explain?  When in the cycle, what is
11      the cycle with respect to when under these
12      contracts in a typical situation that SunLink,
13      you know, invoices for things, when things are
14      due, when things become overdue and sort of the
15      cycle of that?
16  A.  Well, you know, these are --
17  Q.  When do we bill for what we are doing?
18  A.  We bill when we ship.  FOB, you take that point.
19  Q.  All right.
20  A.  And you say okay, when we have shipped from this
21      point, we can invoice.  Okay?  They have 15 days
22      from once it arrives at the site to reject one
23      way or another.  But the invoice date starts
24      when we essentially ship.  Right?  And so terms

## 117

1   are net 45 from date of invoice.  Right?  And
2   that's fundamentally important.
3   Q.  The date of invoice follows immediately upon
4       shipment?
5   A.  That's correct.
6   Q.  And there is a late fee of 1 and a half percent
7       per month on any outstanding balance after 45
8       days?
9   A.  That's right.
10           The other thing -- and I want to add one
11      other thing.
12  Q.  Does the 45 days begin -- I think you said it.
13      The 15 days sort of acceptance period, that
14      doesn't create -- that doesn't turn this into 60
15      days?  Right?
16  A.  No.
17  Q.  In other words, that time gets eaten?
18  A.  Concurrent.
19  Q.  Concurrent?
20  A.  Yes.
21  Q.  I am sorry.  You were about to say something.  I
22      think I cut you off.
23  A.  Yes.  I was going to say as well something that
24      is completely absent from this is any other

118

1    provisions for payment.  Right?  And I have had
2    contracts in the past where they said you need
3    to provide me, you know, lien releases from
4    this.  You need to provide this certification or
5    you need to provide that, you know, where --
6  Q.  One statement --
7  A.  -- those credentials essentially flow down from
8    the EDC contract.  Even if it is not pay when
9    paid, they may say we need these three things
10   before we can pay you.
11        These contracts don't have any of that.
12   It is when we ship, we invoice you, and you have
13   got 45 days to pay.  And that was I'm sure very,
14   very clear in all the negotiations, because that
15   was our key point, and it was signed with based
16   on that --
17 Q.  Premise?
18 A.  -- premise.
19 Q.  I want to talk.  You brought up FOB.  I want to
20   just hit that before I move on from this.
21        In the context of the MSA agreement you
22   looked at earlier, Exhibit 4 --
23 A.  Yes.
24 Q.  -- there was the FOB points were the sites in

119

1    Massachusetts -- okay? -- the actual sites
2    themselves.  What are the FOB points in the
3    contracts that were executed and that are at
4    issue in this case?
5  A.  They are all different places where we would
6    have expected to ship our product from.
7  Q.  From?
8  A.  From.
9  Q.  And it says in here, there is a provision under
10   "shipping," actually I will read you the
11   shipping provision.  It is at paragraph 10.  It
12   is on page 6 of 12 of this document,
13   paragraph 10 says:
14        "Shipping and handling."
15 A.  Um-hmm.
16 Q.  And it says there:
17        "All seller products are furnished FOB
18   San Leandro, California; Allen, Texas; or
19   Carrolton, Texas (or any other location
20   designated by seller) and protectively packaged
21   and loaded by seller on common carrier trucks
22   for unloading at destination by others.
23   Shipping and handling is prepaid by seller and
24   should be added to purchaser's invoice. "

120

1        Do you see that?
2  A.  That's correct.
3  Q.  So typically -- and again we designate what the
4    FOB points are?  Correct?
5  A.  Yes.
6  Q.  And is there any FOB point designated -- we will
7    start in this contract -- for site delivery,
8    like there was in the MSA agreement?
9  A.  No.  That has been changed.  It is not.
10 Q.  So obviously there are FOB points identified
11   under the product information in this particular
12   contract, Barnstable, for California, Minnesota
13   and Pennsylvania, and there are some FOB --
14   obviously we still have the FOB San Leandro and
15   the Texas and Carrolton.  Basically none of
16   these locations -- what this is not is FOB site?
17 A.  That's correct.
18 Q.  Okay.  And is the -- are the FOB points
19   necessarily the place of manufacture of the
20   products?
21 A.  Absolutely not.  That is not the concept of FOB.
22 Q.  What is the concept of FOB?  What does that
23   mean?
24 A.  Free on board.  That's it.

121

1  Q.  Your responsibility?
2  A.  Exactly that point.  We often manufacture things
3    different places.  Our fasteners come from
4    wherever.  We bring them into San Leandro a lot
5    of the time to QC or things on them.  Then when
6    we ship it out to a customer, it is FOB San
7    Leandro.  At that point here is the product.  It
8    is not ours.  It is yours.  We are invoicing you
9    for it.  We are managing the shipping.  But that
10   is what it means.
11 Q.  I think I directed your attention up further in
12   the book to Exhibit 61.  You jumped back --
13 A.  Yes.
14 Q.  -- to the contract?
15 A.  Yes.
16 Q.  Does this refresh your memory, sir, of sort of
17   receiving some deposit payments on three of the
18   projects, Dennis, Barnstable and Brewster, in or
19   about, you know, mid December, December 16th?
20 A.  Yes.
21 Q.  This is an e-mail from Casey Purcell, the
22   gentleman who exited the room not too long ago.
23   Casey was your project manager on this job?
24 A.  That's correct.

---

## 122

1  Q. And Casey indicates here that:
2       "ACE let me know that they will be
3  sending over a schedule for ballast deliveries
4  tomorrow, which I will forward to you."
5       And up until this point, we had no
6  schedule for these contracts from ACE?  Correct?
7  A. That is correct.  And I remember quite clearly
8  that between the time the contract was signed
9  and now, I mean I know that I had been asking
10 everybody on this project to get a schedule from
11 them, and I believe that everybody on my team
12 has been asking for a schedule from ACE for this
13 project on a -- on a very regular basis.
14 Q. Starting with the contracts being signed?
15 A. Starting with the contracts being signed.
16 Q. Up until this point, had ACE been forthcoming
17 with any delivery schedule?
18 A. None.  Not as far as I know.
19 Q. Had ACE promised several times delivery
20 schedules?
21 A. I know they have.  I am not sure of the timing,
22 but they certainly.  This looks to be a case
23 right here.  Right?
24 Q. At this point had we received payment of the

## 123

1  $100,000 that had been promised by ACE in order
2  to engage your precast suppliers in some of
3  their work?
4  A. No.  We don't have the $100,000 at this point.
5  Quite honestly I'm not sure if we have the bonds
6  as well at this point or the other stuff,
7  although I know my team was working to pull that
8  together.
9  Q. So the payment bonds were fairly critical in
10 this process?  Correct?
11 A. Yes.
12 Q. Okay.  What was the discussion between the
13 parties surrounding the payment bond element of
14 notice to proceed and its necessity?
15 A. We had to have them all in place.
16 Q. Okay.  And why did you insist on 100 percent
17 payment bonds?
18 A. Risk of ACE not being able to pay at some point.
19 We wanted bonds behind it.  I believe we had at
20 this point -- I'm not positive -- but I would
21 have thought that we would have had discussions
22 with our bank about financing this credit.  So
23 payment bonds would certainly have made that
24 more --

## 124

1  Q. Okay.  Do you know --
2  A. Just to -- just to -- just to talk a second
3  about that, because I don't want to leave any
4  confusion.
5  Q. Sure.
6  A. We have a working capital line that is a
7  receivables line.  And so the bank would loan us
8  80 percent of eligible receivables.  "Eligible"
9  was the key.  Right?  You had to make sure that
10 they were going to be willing to accept that
11 receivable to finance it.
12      So that is why the bonds were important.
13 We had to make sure going into a project like
14 this that we could execute.  We had to make sure
15 that the bank was going to be willing to finance
16 these, and they were if there were payment bonds
17 and the like.
18 Q. Is that the concept of factoring receivables?
19 A. I wouldn't call it factoring.  Factoring has a
20 different connotation.  It is essentially
21 factoring, but slightly different.
22 Q. They will lend against those receivables?
23 A. That's right.
24 Q. Eligible receivables?

## 125

1  A. That's right.
2  Q. Up to a certain percentage?
3  A. That's right.
4  Q. That flowed into your cash flow for these
5  projects?
6  A. That's right.
7  Q. And was ACE made aware of that?
8  A. Yes.
9  Q. Yes.  Okay.
10      MR. DOWD:  I request at this time that
11 they produce these loan documents from
12 BridgeBank which they filed in the motion to
13 compel and which we have never received with
14 respect to this arrangement they had with the
15 bank and in fact one of the terms and conditions
16 as I suspect those loan documents will also show
17 that if they are in default, as we put them in
18 default, that would be something they should
19 have reported to the bank under the loan
20 documents, which we never received.
21      ARBITRATOR EVANS:  I think I already
22 addressed your motion and denied it.
23      MR. DOWD:  But I think you mentioned to
24 bring it up during the hearing.

126

1       ARBITRATOR EVANS:  Right.
2   BY MR. MURPHY:
3   Q. Mr. Tilley, turning to, just as an example,
4       would you turn to tab 66 please.
5           (Witness complying.)
6   Q. You could even hold your thumb in that, and also
7       turn -- open to 68, Exhibit 68, as examples of
8       things.
9           (Witness complying.)
10  Q. Again are these documents indicative of your
11      direction to your personnel to pursue schedules
12      on these jobs?
13          (Witness complying.)
14  A. Yes.
15  Q. And specifically Exhibit 66 is Mr. Osgood.  Who
16      is Mr. Osgood in this process?  Could you tell
17      us what you remember?
18  A. ACE's point person on sort of field -- on a lot
19      of things.
20  Q. On field issues?
21  A. Yes.
22  Q. Ultimately we will get to your issues and
23      dealings directly with Mr. McLean.
24  A. That's correct.

127

1   Q. We are going to get into a very extensive back
2       and forth between you and Mr. McLean.
3           Mr. Osgood was working with Mr. McLean
4       on the CVEC projects?
5   A. That's correct.
6   Q. Mr. Osgood indicates here at the bottom, the
7       embedded e-mail on 66:
8           "Please begin to work on these projects.
9       We will have updated delivery schedules to you
10      shortly."
11          This is dated December 17.
12          And you know, that -- later that day,
13      Mr. Purcell follows up:
14          "Do you have the updated delivery
15      schedule for these projects?"
16          We are still at this impasse where we
17      are asking for schedules and they are not
18      providing them?  Is that fair?
19  A. Yes.
20  Q. How is this impacting what we are trying to
21      accomplish at this point?
22  A. You know, to get our suppliers rolling, we need
23      some idea of a schedule.  Right?  I mean they
24      don't want to go off and build X number of

128

1       forms, and there is a lot of things they have to
2       do, so we need a schedule to be able to deliver
3       these projects in any sort of reasonably
4       efficient manner.
5   Q. On Exhibit 68, there is a chain of e-mails again
6       between Mr. Osgood, actually Mr. McLean and
7       Mr. Osgood and Mr. Purcell and others in the
8       organization, your organization and their
9       organization, on the subject of schedules.
10      Correct?
11  A. Yes.
12  Q. And in fact Mr. McLean tells you on the 17th:
13          "We need delivery ASAP, so please start
14      production.  Please do not wait for a schedule."
15          And is that consonant with what you were
16      directing your people internally?
17  A. I am telling them to move as best they can.  We
18      have to make sure that the contract provisions
19      are met.  We need the deposits.  We need the
20      bonds in place.  We need the other things.
21      Quite honestly, we need a schedule.  We have
22      been asking for it for months at this point.
23  Q. Mr. Purcell in fact responds to Mr. McLean and
24      says:

129

1           "All we are waiting for is a schedule to
2       provide a time line to our suppliers."
3           Right?
4   A. Yes.
5   Q. And Mr. Osgood actually promises on the 17th:
6           "We will call you tomorrow to go over
7       it."
8           Right?
9   A. Right.
10  Q. Did that happen to your knowledge?
11  A. Well, we never got a schedule out of it.  I can
12      say that.  I don't know.
13  Q. Okay.  And at any point in this continuum, did
14      ACE ever -- anyone from ACE ever take the
15      position with you that why do you need a
16      schedule, we have a contract for six weeks'
17      delivery of all of these projects?
18  A. No.
19  Q. Was that ever even uttered by these folks in the
20      context of this schedule request and back and
21      forth?
22  A. No.  Not to me.
23  Q. Okay.
24  A. And I don't believe to anyone else.

130

1   Q. I would like to direct your attention to Exhibit
2       67, please.
3           (Witness complying.)
4   Q. We have already had some back and forth here
5       with Mr. Dowd concerning Duxbury and Mashpee.
6       Can you explain from sort of superficially what
7       transpired with respect to Duxbury and Mashpee
8       and how it plays or doesn't play a role in this
9       particular circumstance, in this case?
10  A. Sure. Duxbury and Mashpee were very similar
11      projects from an equipment perspective. So, you
12      know, there was an interest in getting sort of
13      the volume pricing, running the same production
14      just a bit longer to get Duxbury and Mashpee
15      done. We could offer a better price based on
16      that. That is how they got rolled into it.
17          They had different owners. They were
18      very different projects. And this was, you
19      know, you know, kind of an incredible surprise.
20      And I joked internally, you know, about being
21      the ACE Christmas miracle. Right? We would get
22      paid all of these projects up front, which was
23      very, very rare.
24  Q. So, in other words, ACE committed to pay up

131

1       front the Duxbury and Mashpee projects alone?
2       All the others, notwithstanding --
3   A. Yes.
4   Q. -- you know, the nine at issue in this case
5       there was no prepayment on?
6   A. No. That's correct.
7   Q. So you are saying that Duxbury and Mashpee alone
8       were paid before year end by ACE?
9   A. Yes.
10  Q. Do you have any -- was it ever shared with you
11      why that was done?
12  A. No. But I have a good guess.
13  Q. Okay. Do you understand there are any tax
14      implications with having to make some payments
15      by year end?
16  A. That would be my assumption.
17          MR. DOWD: Objection. Speculation.
18          ARBITRATOR EVANS: Sustained.
19  BY MR. MURPHY:
20  Q. In any event, you do receive -- had ACE ever in
21      its history prepaid you on any project?
22  A. The only time that I have ever been prepaid for
23      projects other than when we demanded it for
24      credit reasons -- right? -- were in cases where

132

1       at the end of the year someone needs to have
2       invested a certain amount in a project to
3       qualify for the investment tax credit, and that
4       had happened maybe one or two times in my
5       history, and that is why in the past I would
6       have been paid in full for a project is because
7       somebody is trying to take advantage of the
8       investment tax credit that requires a certain
9       amount of money invested and that is an easy way
10      to do it.
11  Q. We are going to come back to this, but were any
12      of the funds -- you were in fact prepaid on
13      Duxbury and Mashpee?
14  A. We were.
15  Q. In any of those funds -- was there any
16      discussion about -- I mean did those funds have
17      any application or utilization or were they ever
18      intended or could they legally be utilized in
19      the context of the CVEC projects at issue here?
20  A. Absolutely not. I mean that is my
21      interpretation. I wouldn't take money from one
22      owner's project and use it on another one.
23  Q. It is an entirely different owner. You got
24      prepaid on it. It factors back into this case

133

1       because you supply at or about the same time
2       those projects with a common supplier?
3   A. That's right.
4   Q. And does ACE communicate with you and suggest
5       that these payments, you know, later in this
6       case, that they were --
7           MR. MURPHY: Strike that. Strike that.
8       That's a terrible question. We will come back
9       to this.
10  BY MR. MURPHY:
11  Q. And again Duxbury and Mashpee are not part of
12      this particular litigation? Correct? We are
13      not pursuing any claims? Correct?
14  A. That's right.
15  Q. I am moving to a separate subject here.
16          MR. DOWD: While we are looking, sir,
17      what is your schedule for lunch? Did you say
18      earlier?
19          ARBITRATOR EVANS: I think sometime in
20      the next 30 minutes that is a convenient
21      breaking point.
22          MR. DOWD: Sure.
23          ARBITRATOR EVANS: Is that okay with
24      you?

## 134

1      MR. MURPHY: Perfect. Perfect.
2  BY MR. MURPHY:
3  Q. You may want to pull book two in front of you,
4      please.
5          (Witness complying.)
6  Q. I am just going to direct you up to Exhibit 76,
7      please. It is just around the end of the year
8      of 2013, December 31. It is an e-mail from a
9      Joel Stella, S-t-e-l-l-a, of American Capital
10     Energy to Jonathan Eastwood and others in both
11     organizations.
12         Do you see this?
13 A. Yes.
14 Q. We talked earlier about layout provisions. Were
15     there -- and again this is December 31. We are
16     under contract on all the jobs. Where do we
17     stand NTPwise as of this date, December 31,
18     2013?
19 A. I'm not sure. I know that we don't have all the
20     deposits on the projects. I'm not sure exactly
21     where NTP is per se on all of them.
22 Q. Okay.
23 A. I know we haven't met all the --
24 Q. If I suggested that all the deposits finally

## 135

1      came in January 2nd, 3rd, thereabouts, would
2      that refresh your memory?
3  A. Yes.
4  Q. We had a period -- we had contracts signed back
5      in mid October. Now here it is two and a half
6      months later. Do you know what was transpiring
7      up at ACE's level? You were getting things
8      trickling in and so forth. Do you know if they
9      were working on financing? Did you have any
10     idea why this two-and-a-half-month delay?
11     Right?
12 A. I have no idea. I am confused as to why we
13     don't have a schedule. I don't know what is
14     going on.
15 Q. At this point in time, were there layout
16     revisions experienced on these projects?
17 A. Well, that's -- I mean I see this one. This is
18     December 31. It is saying there needs to be a
19     change to the Dennis project -- right? -- in
20     terms of layout.
21 Q. It says:
22         "The attached ballast placement plan for
23     Dennis. Due to an error in the field,"
24     et cetera, "ballast prep pads," et cetera, "were

## 136

1      put in the wrong" -- these were issues that have
2      occurred in the field that have influenced or
3      caused a change in the layout?
4  A. Yes.
5  Q. Right?
6  A. Yes.
7  Q. And it talks later down three paragraphs down,
8      it talks, the third paragraph: "Panel
9      assemblies and their associated ballast blocks
10     having to be reworked"; correct?
11 A. Yes.
12 Q. The last full paragraph here on the first page,
13     they are talking about the requirement that
14     SunLink check all the as-built plans and
15     basically make sure these revisions are
16     incorporated.
17         So this causes you to undertake
18     engineering, does it, of plans and back up?
19 A. Yes. I would have to look a little closer to
20     look at the changes. The changes, of course,
21     new engineering can be new components. It can
22     be a bunch of things.
23 Q. Sort of keep your finger in that. That is the
24     Dennis project, one of the nine? Right?

## 137

1  A. Yes.
2  Q. If you turn up to 83, tab 83?
3  A. Um-hmm.
4          (Witness complying.)
5  Q. January 6th, there is a revised plan for the
6      Barnstable layout; correct?
7  A. Yes.
8  Q. Apparently in the field, surveying gas vents,
9      ACE found out they had to move the location of
10     the proposed array? Right?
11 A. Yes.
12 Q. Does that cause these same engineering sort of
13     concerns and issues?
14 A. Yes.
15 Q. Turn up to 93, please, or 92. I'm sorry.
16          (Witness complying.)
17 Q. January 13, we have the Brewster project check
18     in with monitoring wells were detected that
19     again cause a reconfiguration of the arrays?
20     Right?
21 A. Yes.
22 Q. And this is January 13?
23 A. Yes.
24 Q. These projects have been engineered and

**138**

1    reengineered now by ACE for how long?
2  A.  (No audible response.)
3  Q.  Years?
4  A.  Yes.  A long time.
5  Q.  Then if you turn to 96.
6        (Witness complying.)
7  Q.  We have changes in the layout, the layout needs
8       to be modified at Nunnepog, right, and that is
9       January 14th?
10 A.  Yes.
11 Q.  And then if you look at 98.
12       (Witness complying.)
13 Q.  The Chatham array needs to be revised?  We need
14      to revise the design of Chatham?
15 A.  Yes.
16 Q.  And gas vents are located and borings that
17      weren't there and so forth?
18 A.  Yes.
19 Q.  Just as examples -- and that is dated January
20      15, 2014?
21 A.  Yes.
22 Q.  What we just sort of went through fairly
23      quickly, is that sort of -- is that what was
24      transpiring on all -- I realize some of them may

**139**

1       look smaller than others but was this --
2  A.  It is terrifying -- right? -- from my
3       perspective, because it means that the site prep
4       work hasn't necessarily been thoroughly done.
5       You don't -- we signed contracts in October with
6       a very specific layout and the rest of it.  Here
7       in January and continuing from December into
8       January they are saying, "Oh, we need to make
9       changes.  The site survey didn't show this or it
10      didn't show this."
11           So it is a yellow flag for me.  It is
12      saying, you know, something wasn't -- hasn't
13      really been done well on the prep side of this.
14      Combined with the idea I am not getting a
15      schedule, I am getting a little bit nervous
16      about this.
17 Q.  Were layout revisions requested and generated by
18      ACE after mid January and into ensuing months?
19 A.  Oh, yes.  I believe that there were.  Yes.
20      Certainly other changes.  But I'm --
21 Q.  Do you know if there were layout revisions into
22      the mid May time frame?
23 A.  Yes.  I mean there were -- I know that there
24      were as-built changes that they came back to us,

**140**

1       some of which they didn't come for revisions
2       until after they had installed, right,
3       differently.
4  Q.  There were errors in the field.  It happens?
5       Right?
6  A.  Yes.
7  Q.  There were errors in the field that caused the
8       layout revisions almost throughout the entire
9       course of the project?
10 A.  Yes.
11 Q.  I just want to direct your attention to
12      Exhibit 78, please.
13       (Witness complying.)
14 Q.  This is just to refresh your recollection.  I
15      asked you this question earlier.  Mr. Purcell is
16      indicating on January 2nd:
17           "For notice purposes, if nothing else
18      internally, that we have not received a schedule
19      from ACE," this is January 2nd, "with regards to
20      the pending CVEC projects.  We have received
21      signed contracts and deposits for the nine
22      projects and the two LGMS projects.  Let's
23      discuss next steps tomorrow.  Let me know a good
24      time to set up a meeting," and so forth.

**141**

1           How does this document, assuming it
2       does, relate to NTP status?
3  A.  I believe at this point we have everything we
4       need for NTP.
5  Q.  For NTP?
6  A.  That's right.
7  Q.  And how did -- and you testified earlier that
8       lead time follows NTP?
9  A.  That's correct.
10 Q.  Okay.  These two -- before we get off that
11      document, please, 78, just to clear up the --
12      there is a reference to LGMS products?
13 A.  Yes.
14 Q.  Okay.  Projects I should say.
15           What are those?
16 A.  Those are the Nunnepog and Katama which are not
17      ballasted projects.  They are actually post
18      driven into the ground.
19 Q.  I think there actually might be an error here.
20      There is not -- this 11 combined projects is
21      wrong?  Right?
22 A.  Yes.  That's right.  It must be a typo.
23 Q.  Okay.  But bottom line --
24 A.  I think.  Or maybe there were another two.  I

142

1    don't --
2    Q.  The bottom line, not to add confusion here, but
3        --
4    A.  It might have been Mashpee and Duxbury and the
5        nine.
6    Q.  At issue in this arbitration are nine --
7            MR. MURPHY:  Strike that.
8    BY MR. MURPHY:
9    Q.  -- seven BGMS projects?
10   A.  Yes.
11   Q.  And two LGMS projects?
12   A.  That's correct.
13   Q.  And the two LGMS projects being Nunnepog and
14       Katama?  Correct?
15   A.  I believe so.
16   Q.  The difference there is ballasts are not used
17       but posts are.  Can you explain just the post
18       briefly?
19   A.  You just drive a pile, essentially a section of
20       steel, a steel post, into the ground a certain
21       depth.  Then you mount the stuff on top of that.
22   Q.  Is there a reason why these projects could allow
23       for --
24   A.  They weren't on landfills.

143

1    Q.  They weren't on landfills?
2    A.  I am sorry to answer your question before you
3        asked it, but I think that is what --
4    Q.  Good.  These are the two projects that are not
5        landfill projects and didn't require ballast?
6    A.  That's right.
7    Q.  Is there any significance to these acronyms?
8        What does the "L" mean?
9    A.  Large ground mount system.  Large scale ground
10       mount system.  For a time we had a smaller scale
11       system.  And "BGMS" is ballasted ground mount
12       system.  "GMS" means ground mount system.  "RMS"
13       products are roof mounts.  "GMS" are ground
14       mount.
15   Q.  Did there come a time, Mr. Tilley, when the
16       inability of obtaining a schedule from ACE
17       caused SunLink to undertake activity in the
18       context of a schedule?
19   A.  Yes.  We had an enormous amount of frustration
20       at this point in the fact we didn't have a
21       schedule from them, and we talked about, you
22       know, what to do, and it was, you know,
23       determined that maybe the best thing to do was
24       to just go ahead and float one out there, say,

144

1        "Here is a schedule.  Here is a schedule that we
2        -- you know, that we propose," and at least
3        hopefully get the ball moving.  Because, you
4        know, we had been promised schedules for quite a
5        long time, you know, tomorrow, and we have never
6        received one.  Right?  So we're really -- now we
7        have everything that we're supposed to have to
8        get moving, and we are having trouble moving,
9        because we don't have a schedule.  Right?  So
10       that's what is going on.
11   Q.  Okay.  Do we in fact -- do you task our folks to
12       do just that --
13   A.  Yes.
14   Q.  -- to put a schedule out there --
15   A.  Yes.
16   Q.  -- and to try to commence the dialogue?
17   A.  That's what we decided to do.  Yes.
18   Q.  And if you turn to Exhibit 86, please.
19           (Witness complying.)
20   Q.  If you want to take a look at the e-mail and the
21       attachment to it.  There is a schedule attached
22       to 86.
23           (Pause.)
24           (The witness viewing Exhibit 86.)

145

1            MR. DOWD:  I am sorry.  Are you saying
2        86?
3            MR. MURPHY:  86.
4            MR. DOWD:  It has a schedule?  Oh, I
5        see.
6    BY MR. MURPHY:
7    Q.  Take a little peak at the schedule that is
8        attached.
9    A.  All right.
10   Q.  And does this appear to be the schedule that was
11       put out by Mr. Purcell on behalf of our
12       organization on or about January 7, 2014, to
13       provide a draft to get this topic to the top of
14       mind here?
15   A.  Yes.
16   Q.  Okay.  And Mr. Purcell indicates that:
17           "We'll make every effort to adjust this
18       where needed after your review.  Let us know
19       what you need."
20   A.  Yes.
21   Q.  So was this a hard and fast, this is the only
22       schedule we ever perform to, or anything like
23       that?
24   A.  No.

146

1  Q.  Turning to the schedule itself.
2  A.  All right.
3  Q.  Mr. Dowd alluded to this in his opening.  It
4      provides a schedule from roughly January -- the
5      week of January 27 to the week of August 4, but
6      the vast majority -- and again this is ballast
7      and hardware?
8  A.  Yes.
9  Q.  Okay.  And I will ask you to trust me on the
10     numbers.  I won't ask you to go through each of
11     the little numbers associated with the ballast.
12     But does it appear there are like four types of
13     ballast on this project?
14 A.  Yes.
15 Q.  Okay.
16 A.  But, you know --
17 Q.  There is 11, 12, 20, I will represent to you,
18     and 9, okay?
19 A.  It looks like there are five in there.
20 Q.  Four or five?
21 A.  A number of different ones.
22 Q.  A number of different ballasts.  Recalling the
23     schedule from August 1 we talked about,
24     Exhibit 12 that we talked about earlier, that

147

1      only had three types of ballast and it had no
2      hardware on it and it had seven projects?
3      Correct?
4  A.  That's correct.
5  Q.  And now Mashpee and Duxbury pop on to this, and
6      Katama and Nunnepog are on here as well which
7      are not ballasted projects.  We already talked
8      about those.
9          From Katama and above, Eastham, Tisbury,
10     Harwich, Chatham, Brewster, Barnstable, Dennis,
11     et cetera, those had been in discussion?  Right?
12 A.  Yes.
13 Q.  And most of, with the exception of Chatham and
14     Harwich, pretty much everything is sort of
15     slated to come in ballast and hardwarewise by
16     effectively by the week of the 19th,
17     thereabouts?
18 A.  I am sorry?
19         ARBITRATOR EVANS:  What month?
20         MR. MURPHY:  May.  I apologize.
21 A.  Yes.  Of the Dennis, Barnstable, Brewster, those
22     are all by mid May.
23 BY MR. MURPHY:
24 Q.  Right.  And were there any other significant

148

1      differences to the schedule that is being put
2      out January 27 versus one being put out August 1
3      of 2013 that would sort of distinguish this from
4      the August contract preschedule that ACE gave
5      you?
6  A.  I am not sure of the question.
7  Q.  Okay.  Did this, as opposed to the August 1
8      schedule, was this schedule now impacted by
9      winter conditions?
10 A.  Yes.
11 Q.  Okay.
12 A.  By a number of things.  Right?  I mean it was --
13     well, I am sure we will get to it.  There was,
14     you know -- there is a whole series of issues.
15 Q.  That are different from the August 1?
16 A.  Yes.
17 Q.  The environment when the August 1 schedule was
18     put out?
19 A.  That's right.
20 Q.  Turning to -- do you recall ACE's response to
21     this schedule?
22 A.  I mean I know that they didn't like it.
23 Q.  Okay.
24 A.  But I know we would have expected them to get

149

1      back to us.
2  Q.  Directing your attention to Exhibit 87.
3          (Witness complying.)
4  A.  All right.
5  Q.  On January 8, 2014, appears to be Mr. Osgood's
6      response to that schedule?  Correct?
7  A.  Yes.
8  Q.  And Mr. Osgood indicates:
9          "Thank you for sending over the material
10     schedule.  Unfortunately, this schedule does not
11     work for ACE at all.  All of these projects
12     needs to be operational by April."
13         He attaches a schedule himself for what
14     he thinks needs to happen.
15         Had you heard, prior to this e-mail, had
16     you ever heard about any projects being
17     operational at any point in time?
18 A.  No.  Not by -- not by -- certainly not by May.
19 Q.  So when Mr. Dowd in his opening talked about
20     this constant communication and repeated
21     communication of dates and whenever, when things
22     were to be made, can you put that in the context
23     of this?  Was this the first representation of
24     when -- of any sort of scheduling?

150

1  A. Well, it is a hard question for me to answer.
2     Let me explain why.  ACE isn't unique in this.
3     Customers oftentimes say, well, we need this, we
4     are going to need it quickly, or we need it
5     tomorrow, we need it yesterday, we need it this
6     time or that time.
7         You know when those are real when they
8     are in the, for me personally, I know absolutely
9     they are real when they are in the contract and
10    somebody is saying, "Okay, you get LDs if you
11    don't."
12        That is what I typically see when people
13    are pushed against schedule.
14        I had heard these projects -- I heard
15    all sorts of different things about these
16    projects.  And I look at this one and say
17    operational by April?  I have certainly never
18    heard these need to be operational by April.
19    And I don't even think that is what he meant.
20    Right?  I think -- it is inconceivable to me
21    that they would have had -- had an operational
22    system by April.  You have to have mechanical
23    completion.  You have to have interconnection.
24    You have to have a lot of things done.  I don't

151

1     even know that that is what he meant.
2         So I am looking at this and I am saying
3     this is crazy.  I don't know where this is
4     coming from.
5  Q. And the schedule itself that is attached, and it
6     is actually several different changes, in a
7     little different format?
8  A. Okay.  Yes.
9  Q. But even just starting with the first page, sort
10    of cumulative deliveries and so forth, it is
11    January 8.  They are providing you a cumulative
12    ballast received sort of schedule to get 6,400
13    ballasts in the month of January delivered?
14 A. Where is this?
15 Q. If you turn to the first page of the schedule
16    right after the blue sheet.  Yes.  That one.
17 A. Yes.  6,400 ballasts.
18 Q. They are talking about cumulative by month?
19 A. Yes.
20 Q. On January 8 they sent you a schedule.  And this
21    is the first schedule you have received since
22    the August 1, 2013 schedule?  Correct?
23 A. That's correct.
24 Q. And we understand that was precontract.

152

1         And this is January 8, and it is calling
2     for 6,400 ballasts by the end of the month?
3  A. Yes.
4  Q. And do you have any -- so and you haven't --
5     there is no lead time in here.  So did you
6     review this at all and did you give it any
7     consideration?  Did your team give it any
8     meaningful consideration?
9  A. I am sure they looked at it and said, "Oh, my
10    God.  This is absurd."  Right?
11 Q. And do you know that this schedule was -- what
12    ACE sought to impress, was there further
13    conversation about this schedule?
14        MR. MURPHY:  Strike that.
15 BY MR. MURPHY:
16 Q. Did your people internally react to this
17    schedule?
18 A. I'm not sure what their reaction -- I mean other
19    than the reaction -- I mean just I want to give
20    little bit of context on this so it is clear.
21        I think it was about 20 ballast blocks
22    on a truck.  6,400?  Where are we at?  You know,
23    320?  In the middle of winter starting in
24    whatever?  To be delivered?  Much less the forms

153

1     built and the rest of it?
2  Q. Right.
3  A. This is not rational.
4  Q. You received the money to build the forms
5     January 2nd?
6  A. Yes.
7  Q. And that would --
8  A. And the production -- I mean, you know, I would
9     wonder whether all the capacity in Massachusetts
10    for this could have even done this.  We are not
11    -- this is a big deal.  Right?
12 Q. A lot of concrete?
13 A. Yes.  And very, very different than the schedule
14    that was in August.  Right?
15 Q. Right.  Okay.  And what happened — what happens
16    after this?  We have this initial schedule.
17    Obviously we offer one.  We, I guess, succeed in
18    getting the dialogue going.  We get this back.
19    Do you recall just in a general sense -- I know
20    you are probably not in it day to day.  That
21    would be the supply chain people.  What sort of
22    happened from your view of things in terms of
23    this schedule situation and the sort of
24    development of it?

## 154

1  A. It is getting -- I mean I am not -- I mean I am
2     clearly looking over things and I am reviewing
3     things as they pop up, but I am not at this
4     point completely freaked out about this or think
5     it -- I am confident that John -- that Jonathan
6     and Casey, the people that are involved, are
7     going to be able to deal with it, and, you know,
8     I am definitely keeping my eye on it. It looks
9     like a bit of a yellow flag. But, you know, we
10    need to come to agreement on the schedule.
11    Right? I mean it's -- it is very clear.
12 Q. And do you recall in a more general -- and again
13    we will come back to it, because you become very
14    involved in this shortly.
15 A. Yes.
16 Q. But sticking with this time frame, just this
17    time frame, you were not necessarily blow for
18    blow going back and forth on these schedules --
19 A. No.
20 Q. -- or communicating necessarily with
21    Mr. McLean --
22 A. No.
23 Q. -- yet on this? Right?
24 A. No. Not at all.

## 155

1  Q. Do you remember at some point -- I just want to
2     surface one more schedule then I will move on to
3     something else here. We have others that can
4     talk to it, and you will talk to it anyway.
5        If you look at tab 97, please.
6        MR. MURPHY: Sorry. Strike that.
7  BY MR. MURPHY:
8  Q. 90, nine-zero please.
9     (Witness complying.)
10 Q. On the 10th, in further response to what was
11    received from Mr. Osgood on the schedule you
12    just spoke about, which was Exhibit 87, which
13    was attached to Exhibit 87, there is a January
14    10th schedule. This kind of comes up in later
15    communications.
16       But could you just walk us through what
17    this January 10 schedule sort of attempted to do
18    that is attached to this?
19 A. So it looks to me like we are bringing it all --
20    we brought the delivery of all the ballast under
21    the schedule into, you know, the mid May time
22    frame, everything being completed on the CVEC
23    jobs by the end of April or the very first week
24    of May. Right?

## 156

1  Q. Okay.
2  A. And, you know, that's -- you know, that would be
3     very, very consistent, for example, with the
4     August schedule that we had had prior to the
5     contract.
6  Q. Okay. Explain that.
7  A. Well, we were talking about 19 or 20 weeks --
8     right? -- which is from the time that we got
9     NTP. That would be similar to what -- I find
10    about this later. One of the questions, I go
11    back into, I say what could reasonably -- what
12    would they have been reasonably expected. I got
13    the August schedule. I said, okay, guys. Even
14    though we didn't agree to this and it was a
15    challenge, this is what -- I'm not sure whether
16    it is here, we have done it prior, but we put
17    together a schedule that is roughly.
18 Q. This schedule on January 10th pulls in the
19    ballast delivery.
20 A. That's right.
21 Q. The only two jobs that sort of lag behind here
22    are Duxbury and Mashpee? Right?
23 A. Yes.
24 Q. And the CVEC jobs are shown on this one, the

## 157

1     last one being Harwich, coming in the week of
2     May 5? Right?
3  A. That's right.
4  Q. Okay. Do you know if this one was accepted or
5     reacted to favorably by ACE?
6  A. No.
7  Q. Okay.
8  A. No, it wasn't reacted to favorably.
9  Q. Okay. And as it turns out --
10       MR. MURPHY: Or strike that.
11 BY MR. MURPHY:
12 Q. Again from your perspective, mid January into
13    February, this back and forth on schedule,
14    actually late January you do become pretty
15    intimately involved. We will get to that maybe
16    right after the lunch break or something.
17 A. Okay.
18 Q. But just in terms of where we are, it is mid
19    January-ish, later January, and are we having
20    dialogue, at least more dialogue now, with ACE
21    about what their expectations are in terms of
22    whatever contracts they have in place?
23 A. We are trying to -- we are trying to get a
24    solution. We have got a lot -- the e-mails will

158

1     bear this out.  We have a lot of people working
2     on this trying to figure out how to --
3   Q.  When you say a lot of people working on that,
4     what does it mean?
5   A.  It means I have got two or three people in my
6     supply chain that are probably spending many,
7     many hours a day on this.  I have got people on
8     my project management team and maybe somebody on
9     my sales team that are spending hours on it
10    trying to find different solutions, mainly the
11    supply chain team, trying to come up with how do
12    we make these guys happy.  On the sales side,
13    and this is borne out through the e-mails, we
14    are constantly going saying, "Tell us what you
15    need" -- right? -- "that is within the realm of
16    the reasonable."
17  Q.  Again in this particular time frame, the mid
18    January time frame, does it ever surface to you,
19    surface up to you, that ACE is making the
20    demands for I contracted for a six-week delivery
21    on all of these jobs, everything completed?
22  A.  No.  That's not -- I don't -- I don't remember
23    exactly when that came in, but that is
24    certainly --

159

1   Q.  So this conflation of lead time and delivery
2     time --
3   A.  No, no.
4   Q.  -- that was not being expressed at this point in
5     time by ACE?
6   A.  No.
7   Q.  All right.
8   A.  As best I know.
9   Q.  All right.
10        MR. MURPHY:  This may be a good time to
11    recess.
12        ARBITRATOR EVANS:  It is 10 of 1.  We
13    will proceed again at 10 of 2.
14        MR. MURPHY:  Yes.
15        MR. DOWD:  Thank you.
16        ARBITRATOR EVANS:  All right.
17        (Luncheon recess taken at 12:50 p.m.)
18
19
20
21
22
23
24

160

1           A F T E R N O O N   S E S S I O N
2                1:53  P. M.
3         ARBITRATOR EVANS:  Mr. Murphy, are you
4     ready to proceed?
5         MR. MURPHY:  Yes, I am.
6         ARBITRATOR EVANS:  Ready?
7         MR. DOWD:  Yes.
8   BY MR. MURPHY:
9   Q.  Mr. Tilley, when we broke we were talking about
10    the January 10th schedule, Exhibit 90.  We will
11    go over that a little bit.
12        Do you recall a visit that was made to
13    San Rafael by Mr. McLean and Mr. Osgood in or
14    about the mid January time frame?
15  A.  Yes.
16  Q.  Did you participate in the meeting with them?
17  A.  No.
18  Q.  Okay.  Did you just introduce yourself kind of
19    thing?
20  A.  Yes.  I met them I think in the hallway.
21  Q.  In the hallway?
22  A.  Yes.  And I said hi.
23  Q.  Do you know who did meet with them at that time?
24  A.  I'm not sure, but I --

161

1   Q.  All right.
2   A.  Probably John Eastwood.
3   Q.  Coming out of that meeting, were there any
4     reports made to you concerning the schedule and
5     the CVEC projects that came out of this
6     particular meeting?
7   A.  I don't know.
8   Q.  I will direct you to something in a moment.
9         Do you know if there was also
10    discussions in the mid January time frame about
11    ACE awarding SunLink another project, a project
12    in Charlotte, Vermont?
13  A.  Yes.
14        ARBITRATOR EVANS:  I am sorry.  Where?
15        MR. MURPHY:  Charlotte, Vermont.
16        ARBITRATOR EVANS:  Okay.
17  BY MR. MURPHY:
18  Q.  What kind of project was that just roughly,
19    generally?
20  A.  I think it was a similar project.
21  Q.  A similar project?  A ballasted project?
22  A.  Yes.
23  Q.  And you were in negotiations -- SunLink was in
24    negotiations at the time over the Charlotte,

162

1   Vermont project when they were out visiting in
2   January?
3   A.  I assume so.
4   Q.  Okay.  Do you recall at some point getting the
5       -- we will come back to that.
6   A.  Yes.
7   Q.  Okay.
8   A.  I wasn't involved in the details of negotiating
9       that.  I mean I know it was negotiated at that
10      time.
11  Q.  Okay.
12  A.  And I know we got the project, and I assume at
13      this time.
14  Q.  Okay.
15  A.  But I wasn't really a party to a lot of those.
16  Q.  Okay.  I would like to direct your attention,
17      please, to Exhibit 100.
18          (Witness complying.)
19  Q.  I would just like you to take a moment to read
20      this letter, please, or familiarize yourself
21      with it.
22          (Pause.)
23          (The witness viewing Exhibit 100.)
24  A.  I -- yes.  I remember this.  It outlines pretty

163

1       clearly where we are on everything, so.
2   Q.  Do you recall this letter sort of being
3       circulated in draft in the company and a number
4       of folks having input on this particular
5       correspondence?
6   A.  Yes.
7   Q.  And Mr. Eastwood sent this out on January 17th,
8       and he references, quote-unquote, what he calls
9       the prevailing schedule.  He attaches the
10      January 10th schedule which we just saw most
11      recently in terms of the schedule exchange.
12  A.  Yes.
13  Q.  And he explains it, and he also talks about --
14      he also addresses, however, he provides an
15      option to provide a more aggressive schedule
16      than even the 1-10, the January 10th, schedule
17      in this correspondence.
18          Do you recall there being discussion
19      within SunLink at this time, the senior
20      management specifically, about trying to provide
21      options to ACE in terms of what they were
22      requesting?
23  A.  Yes.
24  Q.  Okay.  And what do you understand -- and there

164

1       is a schedule attached to -- there are two
2       schedules.  One is the January 10th one we just
3       talked about.  The other, the second schedule,
4       is the revised schedule that Mr. Eastwood refers
5       to.  He actually calls it a curtailed schedule,
6       January 16th version.  Can you just explain?
7       This schedule pulls everything into essentially
8       the end of March, first week of April?
9   A.  That's correct.
10  Q.  Okay.  And is it your understanding that --
11          MR. MURPHY:  Strike that.
12  BY MR. MURPHY:
13  Q.  Was one of the principal purposes behind this
14      correspondence to provide this option,
15      admittedly at a cost of what was going to be in
16      excess of $400,000 to get this particular
17      aggressive delivery schedule?
18  A.  That's correct.
19  Q.  Okay.  And did ACE act on, ever accept, this
20      accelerated option provided by Mr. Eastwood and
21      SunLink on January 17 --
22  A.  No.
23  Q.  -- 2014?
24  A.  No.

165

1   Q.  And again for that cost, all of the ballast for
2       this project with the exception of some in
3       Harwich and some on the Duxbury job would have
4       all been delivered, so substantially all of the
5       ballast, would have been delivered by the end of
6       March 2014?  Correct?
7   A.  Yes.  And I think this includes more than the
8       ballast.  I think it includes --
9   Q.  This includes hardware as well?
10  A.  Yes.
11          ARBITRATOR EVANS:  Does this schedule
12      then include all of the SunLink product for
13      those nine jobs at issue here?
14          THE WITNESS:  Yes.  It is a -- I think
15      it also includes -- yes.  It includes -- yes.
16  BY MR. MURPHY:
17  Q.  Chris, I am going to have you look at the third
18      book, please.
19  A.  Okay.
20          MR. DOWD:  The third volume?
21          MR. MURPHY:  Yes, please.
22  BY MR. MURPHY:
23  Q.  At some point did you -- please turn to tab 105.
24      Exhibit 105.

166

1    (Witness complying.)
2  Q. Do you recall ACE -- this response that
3    Mr. McLean provided to John Eastwood in response
4    to Exhibit 100, which we just had in front of
5    you?
6  A. Yes.
7  Q. And incidentally, Mr. Eastwood, just looking at
8    100 real quickly -- I am sorry -- you just
9    pulled it out.  I just want to turn to it for a
10    couple of things.
11    (Witness complying.)
12  Q. Mr. Eastwood mentions in his January 17th
13    letter, obviously in addition to providing the
14    options that you testified about, he also talks
15    about having logistical concerns and he talks
16    about no allowance having been made for
17    inclement weather or other unpredictable events
18    and also saying that this assumed that ACE would
19    have sufficient personnel to offload everything
20    that was being requested?
21  A. Yes.
22  Q. Okay.  Was there a concern within SunLink
23    whether they had the manpower to actually pull
24    off what they were suggesting should occur here

167

1    on this job in terms of what promises they may
2    or may not have made to the ownership?
3  A. Yes.  I mean I certainly was hearing that from
4    my team.  They were thinking that what they were
5    requesting in terms of acceptance of ballast and
6    the rest of it wasn't sustainable.  I don't
7    know, but that was certainly the --
8  Q. And were there -- do you recall whether there
9    were in fact a number of inclement weather
10    events on this project?
11  A. Oh, gosh yes.  That winter was a very bad
12    winter.
13    ARBITRATOR EVANS:  Compared to this past
14    winter?
15    MR. MURPHY:  It was a light winter as
16    compared to this winter.  I know, everything is
17    in perspective.
18  BY MR. MURPHY:
19  Q. In any event, turning to Exhibit 105 now.
20    (Witness complying.)
21  Q. Mr. McLean rejects this effort and does not
22    avail himself of the $400,000 offer?  Correct?
23  A. I believe that is correct.  Yes.
24  Q. Okay.  And he does say, "With the current

168

1    schedule I am now faced with" --
2    ARBITRATOR EVANS:  Can you identify
3    which portion of this?
4    MR. MURPHY:  Yes.  I apologize.
5  BY MR. MURPHY:
6  Q. There is sort of an embedded message, although
7    we don't have the data on it.  But Mr. Eastwood
8    responds to above.  That is John Eastwood's
9    response.
10    Below, do you understand that that is
11    Mr. McLean's response?  If you follow the e-mail
12    string, it actually picks up the 17th behind it.
13    Sort of below on the first page, below the
14    initial one-liner, that sort of picks up
15    Mr. McLean's e-mail?  Correct?
16  A. That's correct.
17  Q. That is in direct response to Exhibit 100 that
18    we just looked at.
19    And incidentally, Mr. McLean mentions at
20    the bottom here.  He says:
21    "If this is a cash flow issue, which I
22    find hard to believe because I sent you almost
23    $1 million in the last four weeks."
24    Do you see that?

169

1  A. Yes.
2  Q. Do you know what he is referring to there?  Did
3    you receive a hundred -- strike that -- a
4    million dollars on the CVEC project?
5  A. No.
6  Q. Do you know what he is referring to?
7  A. I assume he is referring to Duxbury and Mashpee.
8  Q. So you received nothing beyond deposits at this
9    point on the nine projects that are at issue in
10    this case?
11  A. That's correct.
12  Q. And the money you received for Duxbury and
13    Mashpee went to the Duxbury and Mashpee efforts?
14  A. Yes.
15  Q. Correct?
16  A. (The witness nodding his head.)
17  Q. You have to say yes if you are going to say yes.
18    She has to write it.
19  A. Yes.
20  Q. Mr. McLean also says in the second paragraph, he
21    talks about "the start date has changed but
22    durations never have."  He says:
23    "We had discussions very long ago prior
24    to any of the delays about the ballast being

170

1    critical path and expectation of receiving 100
2    ballasts per site per day six weeks after NTP."
3         Do you see that?
4    A. Yes.
5    Q. Is that consistent with our overall expectation
6       and understanding of lead time and NTP?
7    A. He is saying a six-week lead time on this. Six
8       weeks after NTP, we are going to start receiving
9       ballast. We are going to receive it -- I don't
10      know that we agreed with that amount. But he
11      has clearly laid out the framework for lead time
12      and production schedule and delivery schedule.
13   Q. Okay. He also suggests there may be some
14      deceptive practices here under Massachusetts
15      General Laws. Was there ever any claim or
16      demand made of any kind under Massachusetts
17      General Laws? Forget 97A. I think the
18      reference is probably to 93A. Was there ever
19      any claim of that nature ever exerted?
20   A. No.
21   Q. Now had any of our -- to your knowledge, had
22      anything ever been communicated from SunLink to
23      the ACE organization that we would be delivering
24      100 ballast blocks per day per site?

171

1    A. Not that I'm aware of.
2    Q. That would be on the order of 900 ballasts going
3       across Sagamore Bridge and the Bourne Bridge?
4    A. Yes.
5    Q. All right.
6              MR. DOWD: Can I get clarification on
7       that? You say 900?
8              MR. MURPHY: Forget my example.
9              MR. DOWD: Are you saying seven minus
10      the two? Are you including Mashpee and Duxbury?
11             MR. MURPHY: Forget my example. I am
12      not including Mashpee and Duxbury. You can
13      strike my poor math and the application of it.
14   BY MR. MURPHY:
15   Q. Let's stick with the question of 100 blocks per
16      site per day irrespective of how many sites.
17      Was that ever communicated by ACE?
18   A. Not to my knowledge.
19   Q. There is also a response -- or there is also a
20      response to the January 17th offer by
21      Mr. Eastwood of the option to pull everything
22      into March for $400,000. That is offered by
23      Mr. Osgood. That is Exhibit 106. Do you see
24      that? You were copied on that as well?

172

1    A. Yes.
2    Q. And this was an independent response. Both Mr.
3       McLean and Mr. Osgood responded to
4       Mr. Eastwood's letter, correct, on the 20th?
5    A. Um-hmm.
6    Q. And in similar fashion, if you turn down to the
7       fourth paragraph, Mr. Osgood indicates:
8            "ACE was under the assumption that once
9       the down payments for the forms were received
10      that SunLink would begin the manufacturing
11      process and ballasts and posts would start
12      rolling within three to four weeks."
13           Do you see that?
14   A. Yes.
15   Q. He says that was clearly not the case.
16           Do you, sir, have a view with respect to
17      that representation by Mr. Osgood?
18   A. Yes. It is -- well, again he is referring to a
19      starting point, a lead time, and then delivery
20      of three to four weeks. I would point that out.
21           The second one is that we got all the --
22      the assumption, you know, that down payments for
23      the forms would be received at the beginning.
24      That was January 3rd. I believe we delivered

173

1    the first ballast blocks at the end of January.
2    Q. All right.
3    A. So we're -- I don't know that that is clearly
4       not the case, I guess. I would probably object
5       to that.
6    Q. Okay.
7    A. But maybe. Maybe it's --
8    Q. And it seems that Mr. Osgood is more concerned
9       about the references in the next paragraph, the
10      $400,000 offer, "to meet our schedule."
11           Do you see that?
12   A. Yes. I see that.
13   Q. It says:
14           "I am also concerned about the added
15      cost to meet our delivery schedule. We again
16      are under the assumption that all of your costs
17      to deliver are rolled into one price. Now we
18      are hearing $400,000 to meet our schedule,"
19      et cetera, et cetera.
20           When you received this -- go ahead. I
21      am sorry.
22   A. I was excited. I am sorry to cut you off. I
23      was excited to see that point. Because it meant
24      to me we finally have a schedule that they, you

174

1    know, this is a schedule that they -- it is
2    their schedule. He is saying this meets our
3    schedule. It is 400,000 bucks. This is a big
4    project. 400,000 bucks is not a lot of money --
5    it is a lot of money -- but we are in the realm
6    now of January 20th, January 17th, of getting to
7    something that actually works -- right? -- so.
8    Q. In reading this, did you think progress was
9       being made with respect to reconciling schedule?
10   A. Absolutely.
11   Q. Okay. And he indicates if SunLink can't meet
12      ACE's delivery schedule at no additional cost to
13      ACE, he is going to have to make a
14      recommendation to go in a different direction.
15         Do you see that?
16   A. Yes.
17   Q. Did you see any concrete proposals to go in any
18      different direction or --
19         MR. MURPHY: Well, withdrawn. That is a
20      lousy question.
21   BY MR. MURPHY:
22   Q. And he mentions again. He repeats it in the
23      last paragraph. I guess I will have that
24      question.

175

1         Was there ever any suggestion, any
2    letter or anything to us, that they were going
3    to reach out to another supplier?
4    A. Yes. They spoke a number of times we are going
5       to find another supplier, we are going to do
6       something different.
7    Q. All right.
8    A. Yes. It becomes a repeated refrain.
9    Q. So you thought things were sort of coming into
10      focus, and now turning to there was a conference
11      call on the 21st of January apparently. Exhibit
12      109 references it.
13         At this time, were you in the U.S. at
14      this time?
15   A. I believe at this time I was probably in China.
16   Q. Okay. Do you recall participating on the call?
17   A. I believe -- I believe I tried to.
18   Q. Oh, you tried to?
19   A. Yes.
20   Q. Now immediately -- if you turn to Exhibit 111.
21         (Witness complying.)
22   A. All right.
23   Q. Immediately prior to the call -- I shouldn't say
24      immediately -- but prior to the call, if you

176

1    turn to Exhibit 111, Mr. Osgood circulated to
2    everybody the August 1, 2013 schedule, and he
3    indicates: "Team" -- and this is sent to ACE and
4    to SunLink personnel -- that he wants to make
5    sure "all involved in the conversation at 1 p.m.
6    have a copy of the project portfolio ballast
7    delivery schedule that was delivered back in
8    August."
9         And attached to it is the schedule which
10      has already been marked independently as Exhibit
11      12 which we talked about earlier on this.
12   A. Yes.
13   Q. And do you recall from the call whether this was
14      effectively the schedule that ACE was
15      predicating its arguments to SunLink on?
16   A. It depends on the e-mail. But yes. Yes. There
17      are ones where -- in this case he is referring
18      us to this, this August 1.
19   Q. And do you recall the discussions that were
20      transpiring relative to this at that time on the
21      January -- on that January call?
22   A. I don't remember a lot of the details on it.
23      I'm not --
24   Q. Okay. Do you recall coming out of that call

177

1    that there was further discussion about, you
2    know, options and providing even more options?
3    A. Well, we were providing options all the time
4       over a long period of time. So I don't -- there
5       is not a specific one that I recall, but.
6    Q. Let me turn your attention briefly to Exhibit
7       117.
8         (Witness complying.)
9    Q. This is from Mr. Purcell.
10   A. Um-hmm.
11   Q. In this 117, he is offering a schedule coming
12      out of the call. He says:
13         "Per our recent conversation, evidently
14      ACE wanted another schedule."
15   A. Yes.
16   Q. And he talked about, okay, as compared to our
17      current schedule, he offers this schedule on
18      January 24. It is a 1-24 schedule. And it
19      involves pulling product in, maybe not as
20      aggressively as the $400,000 option, but for
21      $147,000 effectively he is saying we can at
22      least move it in. Since ACE was unwilling to
23      pay the $400,000, can we move it into April, May
24      more definitively, and what would this cost.

178

1    Do you know if you went to suppliers to
2    price that out?
3  A. Yes.
4  Q. Did you authorize this offer of $147,000 to meet
5    this schedule, if they didn't want the really
6    aggressive one for $400,000?
7  A. I don't recall if I authorized it. I am
8    assuming I did.
9  Q. Would Mr. Purcell likely have sought out your
10    approval or certainly his superiors?
11 A. Certainly his superiors in the supply chain
12    group. This came out of what we knew we could
13    do it for. So I am sure that that was the
14    check.
15 Q. Okay. Do you know if ACE ever --
16    ARBITRATOR EVANS: Just to go over this
17  for a second, this is contemplating delivery
18  program through the first week of -- excuse me
19  -- through the week of May 5th for $147,000?
20    THE WITNESS: I think it is completion
21  by the week of April the 21st, doesn't it?
22    ARBITRATOR EVANS: I am looking at the
23  last page of the exhibit.
24    MR. MURPHY: The last page of the

179

1    exhibit on the schedule.
2  BY MR. MURPHY:
3  Q. The last two are the Duxbury and Mashpee jobs?
4    Correct?
5  A. Oh, okay.
6  Q. So on the CVEC project, when are the CVEC
7    projects represented to be completed here, the
8    ballast and the hardware?
9  A. It looks like almost all of it by the second
10    week of April, but maybe there was a tiny bit in
11    the third week.
12 Q. Harwich there? A little bit in Harwich?
13 A. Yes.
14 Q. Some ballast in Harwich coming in in the week of
15    April 21? Right?
16 A. Correct.
17 Q. They had options to bring it in to --
18    essentially by this time they had options to
19    bring it into March for the most part; we talked
20    about it a minute ago with John Eastwood's
21    e-mail of January 17 for $400,000. They were
22    offered this schedule to bring it all in, as I
23    say it, all CVEC projects in, to April for
24    $147,000, because they were looking for options

180

1    obviously?
2  A. That's correct.
3  Q. And do you know if they acted on this option?
4  A. No, they did not.
5  Q. Now up until this point in time -- I say this
6    point in time. Up until let's say January 27th,
7    okay, had we ever been advised of when
8    deliveries could be accepted at these projects?
9    Were they presuming a five-day, all of these
10    schedules presume a five-day delivery schedule?
11 A. Yes.
12 Q. Work week?
13 A. Yes. Absolutely.
14 Q. Did there come a point in time when you were
15    advised otherwise?
16 A. Yes.
17 Q. And specifically directing your attention to
18    Exhibit 120.
19    (Witness complying.)
20 Q. Mr. Osgood on January 27 here provides
21    correspondence to SunLink personnel and others
22    that there can't be any shipments coming in on
23    Fridays to Brewster, Chatham and Dennis. Right?
24 A. Yes.

181

1  Q. And had we ever heard this before?
2  A. No.
3    ARBITRATOR EVANS: I am sorry. Which
4  page?
5    MR. MURPHY: I am sorry. Exhibit 120.
6    ARBITRATOR EVANS: Thank you.
7  BY MR. MURPHY:
8  Q. And had we ever been advised of this?
9  A. No.
10 Q. What does this information do at this point with
11    respect to schedule?
12 A. It is absolutely incredible to me. I mean I
13    think most of my team was in complete shock, and
14    I certainly was. I looked at this and said, You
15    are telling me you have this deadline to get
16    this stuff done. We have done all of the talk
17    we have talked, we have gone back and forth, and
18    now you are telling me that I are knocking out
19    20 percent of your delivery dates?
20    And you have to understand with regard
21    to ballast, there is not a huge amount of space
22    at these ballast yards. So when you knock out a
23    delivery date, you knock out 20 percent of
24    production unless they can stack it all up.

**182**

```
1    Right?
2         Because so this is just crazy at this
3    point in the project to be saying we're going
4    from delivering five days a week to now you can
5    only deliver four days a week.  So our suppliers
6    look at us and go, "Well, what are we going to
7    do?  We have produced this stuff.  We can't have
8    the stuff back up.  We produced the stuff on
9    Thursday.  We can't produce on Friday?"
10 Q. Do precast suppliers typically have great layout
11   area for this stuff?
12 A. No.  Particularly not for something this large.
13   So they had a real problem with.
14 Q. And --
15 A. I mean this is a schedule that --
16 Q. Do you recall ultimately the Barnstable job also
17   being one that had some delivery problems,
18   similar to, delivery acceptance issue?
19 A. Yes.  I think there was.  There were more than
20   just these three eventually, but.
21 Q. If I suggested that like half of the ballast
22   shipment here and hardware shipments were going
23   to be impacted by this?
24 A. Yes.  I mean Dennis is one of the larger
```

**183**

```
1    projects.  These are larger projects.  This is
2    not an insignificant piece of it.  As I remember
3    I thought it was more than half, but we can
4    look.
5  Q. Okay.  Now on the scheduling issue, it sort of
6    continues.  If you turn to, please, Exhibit 121.
7  A. I mean this is -- just to give you an example.
8    I want to go back to this for one second
9    (pointing at Exhibit 120) --
10 Q. Sure.
11 A. -- saying this is the importance of schedule.
12   Right?  We have given our suppliers a schedule
13   saying you produce five days a week, and you
14   ship five days a week.  We have gone into that
15   with deposits and everything else to have these
16   guys produce it.  And we are beating on our
17   suppliers to get faster stuff.  We made a
18   commitment to them.  And then we find, out wait
19   a second, the schedule, whatever that is at this
20   point, is only four days a week.
21        Suppliers are saying, what do you think?
22   You know, we are going to charge you.  This is a
23   problem for us.  Right?  This is not -- so it
24   just goes to the point that we needed a schedule
```

**184**

```
1    for this project way back when, and I will have
2    people in my company that you are saying, this
3    is why we don't want to go into production on
4    stuff without a schedule.  This is a classic
5    example -- right? -- so.
6  Q. Turning to Exhibit 121.
7         (Witness complying.)
8  A. Okay.
9  Q. And this is in direct response to Mr. -- this is
10   an e-mail from Mr. Osgood to Mr. Purcell, and it
11   is in direct response to Mr. Purcell's offer
12   that we looked at a moment ago which was I think
13   Exhibit 117, and Mr. Osgood responds to the
14   scheduling for the $147,000 that was offered to
15   pull everything into at least April, and he says
16   -- he maintains it is nowhere -- he says,
17   Mr. Osgood to Casey, I have read your schedule.
18   It is nowhere close to where we need to be.  It
19   puts us over our projects for a month.  He talks
20   about based on your current schedule, there
21   would be a total of 19 weeks.  And he talks
22   about -- he sort of analyzes it.  He says:
23        "With that said, I have attached a
24   schedule with the worst case that ACE can accept
```

**185**

```
1    in order to meet our substantial completion
2    deadlines -- the worst case that ACE can accept
3    in order to meet our substantial completion
4    deadlines."
5         And he says:
6         "If SunLink can't do this, we will have
7    no other choice," et cetera.
8         And the schedule that he attaches, it is
9    attached here behind this exhibit, and it
10   effectively shows everything being supplied by
11   mid April on the CVEC projects with admittedly
12   Duxbury and Mashpee being the outliers at the
13   week of April 28, the week of May 5.  But the
14   CVEC projects all coming in essentially in mid
15   -- being done by mid April.  Do you see that?
16 A. Yes.  It looks to me like it is --
17 Q. It is actually more aggressive?
18 A. That's right.
19 Q. A lot of zeros there.  Actually the end of
20   March?
21 A. Yes.  With a little bit in Harwich in April.  Is
22   that right?
23 Q. Yes.  They are sort of now back to now wanting
24   -- is it fair to say this was effectively the
```

## 186

1    more or less or very close to the $400,000
2    option that they had?
3    A. Yes.
4    Q. That was communicated on January 27th? Correct?
5    A. That's correct.
6    Q. I would like to direct your attention to Exhibit
7      122.
8         (Witness complying.)
9    Q. Do you recall Mr. Purcell reporting to the
10     senior management and commenting upon
11     Mr. Osgood's e-mail that was just — that we
12     just went over, Exhibit 121?
13   A. I remember seeing this.
14   Q. Okay. Effectively, Mr. Purcell interlineated
15     the points that Mr. Osgood had made, and I would
16     just like you to look at those and ask if that
17     effectively represents SunLink's position,
18     certainly at that time, and arguably through
19     today?
20   A. Yes.
21   Q. And he is referencing, he says the original
22     schedule. He is talking about the August 1
23     schedule, 15 weeks for deliveries with no ramp
24     up or lead time and not including, you know,

## 187

1    Duxbury and Mashpee.
2         And he sent this on the 27th? Correct?
3    A. Correct.
4    Q. Now on January -- again Mr. Purcell was actually
5      responsible for documenting sort of what was
6      received when on the site and so forth, what was
7      shipped when, when they started, when NTPs were
8      received and so forth? He was cataloguing all
9      of this information? Correct?
10   A. Yes. And with accounting. With the team,
11     right.
12   Q. Okay.
13   A. He wouldn't have had it all himself, but.
14   Q. All right. Now there is a -- on January 27th,
15     the same day, or actually it was e-mailed to you
16     on the 28th, if you look at Exhibit 123.
17        (Witness complying.)
18   Q. This is an e-mail from Mr. Osgood to you and
19     others, copy to Mr. McLean. The e-mail is dated
20     the 28th. The attachment, the actual letter, is
21     dated the 27th that is attached, and it purports
22     to be a notice of default.
23        Do you recall receiving this on or about
24     the date indicated here, January 28, 27?

## 188

1    A. Yes, I do.
2    Q. Do you recall having any communications with
3      anybody from ACE before your receipt of
4      Exhibit 123?
5    A. Yes. I received a call from Eric prior to this.
6    Q. Okay.
7    A. And he said, you know --
8    Q. What did he say? Eric McLean?
9    A. Eric McLean. Yes.
10   Q. What did he say?
11   A. He said we're in a situation where, you know, we
12     are going to have to do this. I don't want this
13     to get -- to be such an issue that we can't work
14     through it. You know, I wanted to give you a
15     heads up on that. We will leave it to the
16     lawyers. Between us, we can work through. We
17     need to continue to work through the project and
18     keep things going. And -- and -- and that was
19     the call that I received.
20   Q. Okay. And Mr. Osgood sends this letter to
21     Jonathan Eastwood. He suggests if SunLink can't
22     remedy this default. First of all, he says your
23     current delivery schedule, your product does not
24     ship within the six-week time frame in the

## 189

1    contract. Do you -- if you look at the attached
2    — well, I think you have gone further into the
3    document.
4    A. Okay.
5    Q. If you look at 125.
6    A. 125?
7    Q. Sorry. 123.
8    A. Okay. I was at 124. That's why.
9    Q. The attachment to 123?
10   A. The attachment to 123? After the blue sheet?
11     Yes. Okay.
12   Q. Mr. Osgood indicates in his default notice, he
13     says in the second sentence:
14        "The contracts clearly state the lead
15     time for your product is six weeks from the date
16     the contracts are signed and the receipt of down
17     payment for each project."
18        And he says, then he goes on to say, and
19     he references the schedule, one of the schedules
20     we just looked at, and he is calling it our
21     current schedule.
22        Was that our current schedule? Did he
23     pay the $147,000 that would have got him that
24     schedule?

190

1  A. No.
2  Q. He says your product has not shipped within that
3     six-week time frame.
4         By January 27th, that six-week time
5     frame hasn't even expired yet, correct --
6  A. Yes.
7  Q. -- from NTP?
8  A. Yes.
9  Q. And he says:
10        "ACE will have no other choice than to
11    take further action to protect its rights."
12        Was there any further action ever taken
13    by ACE, whatever further action -- it sounds
14    legal in nature -- was there any further action,
15    let's just say legal action, taken by ACE in
16    respect of this?
17 A. No.
18 Q. Okay. Looking at the first section -- the first
19    sentence:
20        "American Capital Energy, Inc. would
21    like to formally notify SunLink that you are in
22    default of your obligations under the contracts
23    as a result of your inability to meet the
24    delivery schedule as defined in the contracts."

191

1         Could you -- when you read this, did you
2     have a reaction with respect to that particular
3     issue?
4  A. Well, there was no delivery schedule. This -- I
5     mean we had been trying to get a delivery
6     schedule out of these guys forever and try to
7     get them to agree on one. It is certainly not
8     one defined in the contracts.
9  Q. Right.
10 A. Just about everything in here to me appeared to
11    be ludicrous, just not -- it didn't make sense.
12 Q. Okay. And Exhibit 124 behind it, that you
13    jumped to a minute ago.
14        (Witness complying.)
15 Q. Is this the response offered the next day by
16    SunLink, by Jonathan --
17 A. Eastwood.
18        MR. MURPHY:  Strike that.
19 BY MR. MURPHY:
20 Q. By John Eastwood the next day addressing the
21    points and then some raised in Mr. Osgood's
22    notice of default?
23 A. Yes.
24 Q. And amongst other things, the argument is made

192

1     about everything not having been paid by January
2     2nd, the notice to proceed, conference calls,
3     layout changes, the learning of Brewster, Dennis
4     and Chatham allowing deliveries on a four-day
5     rather than a five-day schedule, et cetera, and
6     yet we maintain that we are going to nonetheless
7     work with them to try to shorten the delivery
8     schedule as much as we can?
9  A. That's correct.
10 Q. Is that the state of -- is essentially, you
11    know, SunLink's position as of that particular
12    point in time --
13 A. That's right.
14 Q. -- in your organization?
15 A. That's right.
16 Q. Has it changed?
17 A. No.
18 Q. Do you know, sir -- you mentioned before -- if
19    you would turn to Exhibit 125, please.
20        (Witness complying.)
21 Q. Sorry. I apologize. 127.
22        (Witness complying.)
23 Q. You testified to when the first loads of ballast
24    went to Dennis and when the ballast shipments

193

1     began. This suggests the first load going to
2     Dennis the next day. The e-mail is dated
3     January 29. Does it refresh your memory that
4     January 30 or thereabouts were the first
5     shipments of product?
6  A. Yes.
7  Q. How does that play into SunLink's position with
8     respect to this?
9  A. From my perspective, you know, lead time started
10    January 3rd on these, and we are delivering
11    within four weeks of that. So we're clearly
12    within any lead time that we have mentioned in
13    the contract.
14 Q. Okay. Did your role in this, these contracts,
15    change following the default issue at that
16    particular level?
17 A. Yes.
18 Q. Could you describe how it changed a little bit?
19 A. So, you know, I was very much leaving things to
20    John and the rest of my team. I was involved,
21    as I would see things, but when we got the
22    default and it became -- it looked like it was
23    going to be -- could be a big issue, although I
24    couldn't -- there are a bunch of indications

## 194

1 here that were confusing as to how big an issue,
2 but it looked like it was a big enough issue for
3 me to step in. I became a lot, lot more active
4 after this.
5 Q. In this dialogue?
6 A. In everything.
7 Q. Okay. Do you recall participating in a call, a
8 conference call, Thursday, January 30th with the
9 ACE folks and a lot of folks from both sides of
10 the aisle, so to speak?
11 A. Yes.
12 Q. Can you describe what was going on that call
13 in the end of January, the very end of January?
14 A. There were enough different calls that I need a
15 little help trying to remember which.
16 Q. Fair enough. Fair enough. If you would, let's
17 look at -- let's start with Exhibit 132 maybe.
18     (Witness complying.)
19 Q. This is January 31st. Perhaps the call was the
20 31st?
21 A. It was the 31st. It was this day.
22 Q. Okay. Your e-mail is dated 1:23 a.m. on Friday,
23 January 31?
24 A. Right.

## 195

1 Q. So you begin with "Per our discussion today."
2 Does this refresh your memory as to when you
3 had --
4 A. I remember this one.
5 Q. -- as to when you had that call and the fruits
6 of it?
7 A. Yes.
8 Q. Let's back up to the call itself. Can you just
9 tell us what transpired on the call?
10 A. This is a call where we haven't been able to
11 agree on delivery dates, delivery schedule as
12 best I can tell. We are hearing we are in
13 default. We are hearing they want to work with
14 us. We are trying to work with them.
15     I am getting a lot of pushback from my
16 team because I have had people working day and
17 night to produce schedules for these guys,
18 alternatives, and they are feeling like they are
19 being yanked around, because no schedule is
20 being accepted. So I have an internal problem
21 moralewise in dealing with this because it is an
22 issue.
23     I am worried about the project. They
24 have been a good customer. I don't want this to

## 196

1 go bad. I don't want anything bad to happen. I
2 want to do the best job we can.
3     So I have stepped into this. We go into
4 this call, and we go through here are the
5 options. Before this call, I get the options as
6 best I know them as they exist from my supply
7 chain team that I can propose. And I agree --
8 we agree based on those options that I will get
9 back to Eric with details on them. So that's --
10 Q. You say:
11     "I committed to getting this to you this
12 evening."
13     You say:
14     "Per our discussions today, here are the
15 options on delivery date and options we
16 discussed, which I committed to getting you this
17 evening."
18     Can you walk me through this as to what
19 you had to undertake? Obviously you -- do you
20 recall, you know, essentially being up at this
21 hour with this particular e-mail on the 31st?
22 A. Yes. As I recall, Eric was saying we need stuff
23 by the end of March. Right?
24 Q. Right.

## 197

1 A. So option one, this is how we get you stuff by
2 -- everything by the end of March. You know, we
3 have another option that pushes things out a
4 little bit more. And that is -- you know, there
5 is a cost for each of these. Right?
6 Q. You break it out to ballast, hardware and
7 mounting frame deliveries? Right?
8 A. Yes.
9 Q. And as to the ballast, just focusing on the
10 ballast for a second, the options are again
11 what?
12 A. Yes. It is also I give two options which are
13 the book marks. Right? One is most aggressive,
14 kind of around here. Here is another one that I
15 think is in the realm of the reasonable. I am
16 saying we can do anything in between. Pick.
17 You know, you want this one? This is the one we
18 go with. Or we go with this one. And here are
19 the costs associated with all of those.
20     That's -- so I will am trying to lay out
21 a universe of a couple options for ballast. I
22 am trying to lay out the universe of all options
23 actually but doing it by putting the two end
24 points and saying let's come to some meeting of

198

1     the minds.
2 Q. And you report on the rails and the fastening
3     hardware --
4 A. Yes.
5 Q. -- that is going to begin to be delivered?
6     Right?
7 A. That's right.
8 Q. And you report on -- I just want direct your
9     attention to the mounting frames issues here.
10     What are the options being laid out here with
11     respect to the mounting frames?
12 A. So the mounting frames are the component that is
13     manufactured overseas, and we have an issue with
14     Chinese New Year's in terms of production where
15     everything shuts down.
16 Q. Would you explain what Chinese New Year is?
17 A. It is like their Christmas, and it is very
18     heavily -- everything shuts down. There is no
19     work.
20 Q. It is basically at the end of -- toward the end
21     of January?
22 A. It moves around from year to year.
23 Q. Right.
24 A. Right? So it is not always a set --

199

1 Q. Right.
2 A. -- time. And on this project, we miss getting
3     our stuff in by I believe only a few days to be
4     able to produce this stuff without an issue.
5 Q. Okay.
6 A. But with delays and other things, it just slid.
7     And we don't always know exactly how long it is
8     going to take the supplier to get materials that
9     he needs, so our supplier in China also has to
10     source materials elsewhere. Sometimes it can be
11     really short; sometimes it can be long.
12 Q. All right.
13 A. But what happened on this project is that the
14     production of these A-frames slid into that
15     Chinese New Year. That meant that production
16     was therefore going to be delayed one to two
17     weeks because of their not going to work for one
18     or two weeks.
19 Q. Okay.
20 A. Now the nice thing about the Chinese suppliers
21     is that they have huge ability to produce. So
22     once they start producing, the volumes can be,
23     you know, pretty large.
24            Now Eric was telling me that delay was

200

1     very costly to them. Right? In other words, if
2     they couldn't get the A-frames in. Ballast is
3     one thing. But they need the A-frames. Then
4     they can build the rest of it. So we were
5     trying to find a way to help. And I don't know
6     if it was in this one, but I can tell you in
7     general we looked at a lot of options.
8            One of the options that turned out
9     surprisingly to be the most economic would be to
10     air freight -- because the issue with the
11     Chinese New Year was not just when they are
12     produced, but then it goes on the boat to us --
13     right? -- and then we ship. So there is a --
14     there is a four-weeks-on-a-boat aspect of this.
15     It adds a problem.
16            So we looked at options of shipping, you
17     know, via air, so putting crates on 747s and
18     bringing them over.
19 Q. Crates on a 747?
20 A. Yes. And bringing them over. There was a big
21     cost for that, but it allowed those to be
22     delivered in a way that it could help. So I am
23     laying out those options as well.
24 Q. Okay. Those are down at the bottom?

201

1 A. That's right.
2 Q. And you are talking about various percentages
3     that you can bring over by air, and you are
4     having conversations directly -- now you are
5     speaking directly with Mr. McLean on all of
6     this? Correct?
7 A. That's right.
8 Q. Okay. And just incidentally do we ultimately --
9     is that an option that is selected?
10 A. Yes.
11 Q. By --
12 A. Yes. It is exciting. I get an option that is
13     selected that we are actually going to go with.
14 Q. Coming out of this letter --
15         MR. MURPHY: Strike that.
16 BY MR. MURPHY:
17 Q. Coming out of this phone call, coming out of
18     your letters, and I think this sort of exchange
19     continues into Exhibit 133.
20         ARBITRATOR EVANS: Before we move off
21     this --
22         MR. MURPHY: Sorry.
23         ARBITRATOR EVANS: -- so the products
24     under the mounting frame delivery, those are

202

1  sourced in China?  Correct?
2          THE WITNESS:  That's correct.
3          ARBITRATOR EVANS:  How about the
4  hardware excluding the mounting frames, the
5  rails and the fasteners?  Are those made in
6  China, too?
7          THE WITNESS:  No.  The rails are made in
8  the U.S. in Ohio.  There are some other stamped
9  parts made somewhere else in the U.S., and then
10  the fasteners themselves are generally almost
11  all fasteners are made in China actually or
12  outside of the U.S., but where we would pick
13  them up, and we picked them up on this, would be
14  from a U.S. supplier that would have them in
15  inventory.
16  BY MR. MURPHY:
17  Q. So you provide all of these options in Exhibit
18     132, and you tell Mr. McLean that, you know, you
19     recognize how critical the situation is, your
20     second-to-last paragraph, and you have been
21     working very hard to come up with solutions.
22          "I believe we now have all viable
23     solutions identified.  In order to make any of
24     these expedited schedules work, we must choose

203

1  quickly.  Please review as soon as possible and
2  we can discuss tomorrow."
3          And you say, you describe, "I believe
4  it's in both our interests to make a decision
5  tomorrow and agree on a schedule."
6  A. Yes.
7  Q. Was there any agreement on any of your options
8     from Mr. McLean on the following day or any time
9     shortly thereafter?
10  A. No.  So this was -- you know, I mean I am up to
11     midnight getting this out.  My focus is on let's
12     get to a schedule.  So everything about this was
13     let's get this resolved.  I mean let's figure
14     out how we get on the same page.  Whatever it is
15     costwise, let's figure it out.
16          And I can tell you that, no, I do not
17     get a response that moves the ball in that
18     direction.
19  Q. Directing your attention to Exhibit 133.
20          (Witness complying.)
21  Q. And I am going to direct your attention to this
22     is a string of e-mails that begins with your
23     options e-mail that we just went over.
24  A. Um-hmm.

204

1  Q. Right behind it is Mr. McLean's response to you.
2     He responds a few hours later.  You might want
3     to take a moment.  It begins on the bottom of
4     the page which is Bates numbered 5036, and it
5     goes over to 5037.
6  A. Um-hmm.
7  Q. Does this refresh your memory as to how
8     Mr. McLean responded to your options memo?
9  A. Yes.
10  Q. Effectively what was your takeaway from his
11     response?
12  A. Honestly I was pissed off.
13  Q. And why?
14  A. Because he is asking me for things like a
15     breakdown of costs for each supplier.  He is
16     asking me for can you go out and find some other
17     smaller concrete suppliers to do this.  Can you
18     give me the details how much equipment -- you
19     know, he is asking for all of these details, but
20     he is not responding to the fact of let's get
21     anything done.
22          And he has the audacity to say we have
23     wasted another week and you have doing nothing.
24     I mean I have been busting my ass on this.  He

205

1  is not taking any options.  He keeps saying that
2  time is of the essence, we are going to lose a
3  lot of money, but he won't select an option.  He
4  -- that is my reaction reflected in the
5  response.
6  Q. He closes the letter here:
7          "Chris, ACE has continually tried to
8  work with your company even while you are
9  clearly in default of our contract, and from
10  where I stand you" -- you personally -- "have
11  not done anything to elevate the situation.  We
12  have wasted another week and you have done
13  nothing."
14          Right?
15  A. Yes.
16  Q. And you respond with the e-mail at the top of
17     133.  And you now up at 12:07 the following
18     day --
19  A. Right.
20  Q. -- I gather still on this?  Right?
21  A. Yes.
22  Q. And what was the point of this communication
23     effectively?
24  A. Well, it is, look, we are going to continue to

## 206

1   work with you.  We are going to continue to try
2   to find something.  I reiterate that given the
3   urgency of the situation I had hoped we could
4   agree on a schedule and costs.  Every day we
5   spend analyzing different options, we run the
6   risk of losing options we propose.  We propose
7   things.  They don't act on them.  And the
8   options go away.  Exactly the same scenario.  My
9   team has been telling me about it.  I am
10  experiencing it firsthand here.  And then throw
11  in this kind of -- excuse my language -- but
12  this crap at the end of us being in default
13  irritates me.  I say we are not in default.  To
14  say we haven't elevated it is ridiculous.  You
15  have the CEO, the chairman, the CFO, you have
16  everybody working on it.  So I am saying, look,
17  we are not -- it is not productive doing this
18  back and forth and arguing over it.  We need to
19  push forward and try options that you want.  But
20  I am pretty discouraged at the end of this.
21  Q.  On the same day, the day isn't over yet for you.
22  If you turn to Exhibit 134, you provide some of
23  the options that had been or some of the detail,
24  I should say, concerning the mounting frames,

## 207

1   some of the questions that Mr. McLean had put to
2   you?  Correct?
3   A.  Yes.
4   Q.  Okay.  And you provide further explication of
5   the options surrounding the potential
6   alternative to air freight of the mounting
7   frames?
8   A.  Yes.  I am working my team pretty damn hard to
9   get this kind of stuff, too.  This is not stuff
10  you just figure out.  You have to call suppliers
11  and figure out what they are.  I am saying my
12  suppliers are getting pretty damn skittish on a
13  lot of this stuff because --
14  Q.  At this time or shortly thereafter, do we reach
15  -- you said the first time an option was
16  selected was concerning the air freight for the
17  mounting frames?  Correct?
18  A.  Yes.
19  Q.  Directing your attention to Exhibit 139, please.
20          (Witness complying.)
21  Q.  It is an e-mail from Mr. McLean on February 3,
22  2014.  He is responding to your e-mail, your
23  precedent e-mail here, and apparently a phone
24  call you had that day with him on or about the

## 208

1   3rd where you had more conversation relative to
2   -- again all stemming back from sort of options
3   provided on January 31 by you.  How do you read
4   this particular letter when you receive it?  Do
5   I read it to understand that on or about this
6   time Mr. McLean finally sort of said yes to the
7   options on the A-frames?
8   A.  Yes.  I am happy about that at least.
9   Q.  And what is the ultimate resolve on the mounting
10  frames and shipping them via air, at least a
11  percentage of them by air?
12  A.  We -- we shipped the first few percentage by air
13  so that they can get moving.  They will be
14  delivered.  And we actually agree to split the
15  cost of that air freight.
16  Q.  So ACE and you, SunLink, agree to go 50-50 on
17  the cost of the 747 --
18  A.  Yes.
19  Q.  -- to bring a percentage of the frames into the
20  U.S.?
21  A.  That's correct.
22  Q.  Okay.  And do you recall how many different
23  shipments there were?
24  A.  I believe there were three when it was all said

## 209

1   and done.  It was either two or three.
2          ARBITRATOR EVANS:  Two or three plane
3   shipments?
4          THE WITNESS:  Yes.  Two or three.  Yes.
5   BY MR. MURPHY:
6   Q.  So Mr. McLean, however, while he apparently
7   accepted the offer with regard to the mounting
8   frames, he did not undertake the election at
9   this time, or at least by February 3rd, of any
10  cost sharing or anything else or action on your
11  options you presented for pulling the ballast
12  into either March or to April?
13  A.  That's correct.
14  Q.  Okay.  And in lieu of that, what was his
15  position?  Was he just asking for better
16  scheduling with no costs?
17  A.  I think we were asking -- we will have to go to
18  the e-mails.  But it was more detail.  More
19  options.  More detail.  More options.
20  Q.  Okay.  But no election --
21  A.  No election.
22  Q.  -- on the $400,000, or the $150,000 -- the
23  $147,000?
24  A.  No.

1  Q. Turning your attention to Exhibit 141.
2       (Witness complying.)
3  Q. This is a follow-up letter to the original
4       notice of default. It is called a second notice
5       of default, but it is actually a response to the
6       -- it is a response to the response that SunLink
7       had provided to the notice of default received
8       January 27th? Correct?
9  A. Yes.
10 Q. And do you recall receiving this document? This
11      one is signed by Mr. McLean. The first one was
12      signed by Mr. Osgood.
13 A. Yes.
14 Q. Had you any forewarning of this particular
15      default coming?
16 A. Not that I remember.
17 Q. Okay. And again there is sort of a -- you know,
18      sort of, respectively, a rehash of their
19      arguments that the contract states the deadline
20      is six weeks and what the freight on board
21      points are. Skipping down, he clearly says that
22      delivery will occur four to six weeks from
23      notice to proceed. They are still maintaining
24      that. At no time did SunLink indicate that

1       equipment would be sourced out of the country
2       and that delivery times would extend for more
3       than 15 weeks.
4           Just on the issue of whether there were
5       communications about sourcing product outside
6       the country, first of all, is that at all
7       relevant to what you were doing?
8  A. Not to me at all.
9  Q. Could you explain that?
10 A. If we buy fasteners in China, we bring them into
11      San Leandro and we inspect them, and we sign a
12      contract FOB San Leandro. You know, there are
13      essentially no fasteners, you may not know this,
14      that are made in the U.S. anymore. Right? I
15      don't have a buy American provision. I asked my
16      team did we ever represent that this was all
17      going to be made in the U.S., you know, in the
18      context of let's take a year before this
19      contract. No one said they did. Right? So I
20      don't know where this is coming from. Right? I
21      mean not -- it shouldn't have been a surprise.
22          The FOB point for our China product is
23      San Leandro. Right? I mean it is not -- our
24      contract, this may be a little more detailed

1       than people want, but our contract with our
2       Chinese supplier is for them to deliver -- our
3       FOB point with them is San Leandro. So they
4       deliver it to us in San Leandro in Oakland.
5       Right? That is our cost from them. Once they
6       deliver it, we have it. That goes into
7       inventory and we inspect it. Our FOB point to
8       our customers is San Leandro. FOB and where it
9       is manufactured are two different things. If
10      you want it manufactured in the U.S., you tell
11      me in my contract that's what you want. We did
12      not, contrary to all the stuff I have heard and
13      seen in the e-mails, we were not saying we were
14      going to make all of this for you in the U.S.
15 Q. In terms of extending to more than 15 weeks, do
16      you understand that to be a reference to that
17      August schedule?
18 A. I don't know what it is.
19 Q. Okay. But if the delivery times are 15 weeks
20      and there is --
21 A. The August schedule was about a 15-week delivery
22      time period, so that would make sense, but I am
23      not sure.
24 Q. He says deliveries will occur four to fix weeks

1       from notice to proceed. Is that the lead time?
2  A. It should be. I mean that is what I assume.
3  Q. On a combined basis you have 19 -- strike that
4       -- you have somewhere between 19 and 21 weeks --
5  A. That's right.
6  Q. -- that he is talking about in this? That is
7       how you interpreted this e-mail?
8  A. Right. That is how I interpreted a lot of this.
9       Yes.
10 Q. All right. There is indication on the issue of
11      the -- it says:
12          "ACE executed contracts and forwarded
13      sums in excess of $903,000."
14          Do you know what that is referring to?
15 A. No. I can't say. I guess I would guess that
16      may be --
17 Q. Do you think that is the Duxbury-Mashpee?
18 A. I believe so.
19 Q. You were not forwarded sums on the CVEC jobs of
20      $903,000?
21 A. No. I was not.
22 Q. In fact you received nothing -- little beyond
23      the deposits?
24 A. That's correct.

214

1  Q.  You know they are accusing you of deceptive
2      practices under 97A and that SunLink will not
3      live up to -- et cetera.
4           Now it says on the next page that:
5           "If SunLink cannot remedy this default
6      and provide ACE with an acceptable damage-free
7      delivery schedule, ACE will have no other
8      recourse than to commence legal action.  A copy
9      of this letter has been forwarded to outside
10     general counsel, Mr. Dowd, who will proceed with
11     all legal remedies, including trustee process
12     and attachment proceedings to seek recovery of
13     said deposits pursuant to Mass. General Laws.
14     ACE demands SunLink submit and commit to a
15     revised schedule no later than February 7th."
16          Was there ever any commencement of legal
17     action ever by ACE under this particular
18     contract?
19 A.  No.
20 Q.  No legal remedies, trustee processes,
21     attachments proceedings, nothing to recover
22     deposits made by these?
23 A.  No.
24 Q.  Did we ever commit, you know, incidentally, to a

215

1      revised schedule within any time frame that they
2      are demanding here on the second page beyond the
3      1-10 schedule?
4  A.  No.
5           ARBITRATOR EVANS:  Beyond the what?  I
6      am sorry.
7           MR. MURPHY:  The 1-10 schedule.
8  BY MR. MURPHY:
9  Q.  Had we agreed to commit to the 1-10 schedule?
10 A.  Yes.  We had.  We said this was the commitment
11     -- committed in the sense that this is the
12     schedule we are working toward.
13 Q.  You kept working against that January schedule?
14 A.  Yes.  That is the one we said we informed them
15     in the middle of January this is the schedule we
16     are working toward until we come up with
17     something else.  We tried to improve it.
18 Q.  Even though you had myriad of ones with monetary
19     solutions, the January 10th you stuck with
20     unless and until you had the money to do
21     something different?
22 A.  Right.  An agreement to do something different.
23          ARBITRATOR EVANS:  Is that then the
24     position of SunLink in this case that the

216

1      operative schedule is the January 10th schedule?
2           MR. MURPHY:  I will let you.  Go ahead.
3           THE WITNESS:  I don't know if there is
4      an operative schedule in this case.  Right?  It
5      is the one we worked on on our own behalf.  It
6      was never accepted by them.
7           MR. MURPHY:  Candidly I don't think
8      there was ever a firm agreement from ACE
9      accepting any schedule.
10          ARBITRATOR EVANS:  That is what you were
11     relying or working towards?
12          MR. MURPHY:  Correct.  Correct.  And
13     that is what we had committed to.
14          ARBITRATOR EVANS:  And I know it is a
15     disputed point.  Right.  I just wanted to
16     understand their position.
17          THE WITNESS:  Up until this point.
18     Eventually, there are some things that they
19     agree to that we will --
20          MR. MURPHY:  Yes.  The story doesn't end
21     there.
22          MR. DOWD:  Mr. Evans, can we break for a
23     little bit?
24          ARBITRATOR EVANS:  Sure.

217

1           MR. MURPHY:  I missed what you are
2      saying.
3           MR. DOWD:  I was wondering if we can
4      break in a little bit.
5           MR. MURPHY:  Sure.
6           ARBITRATOR EVANS:  Do you want to take a
7      15-minute break now?
8           MR. MURPHY:  Sure.  That would be fine.
9      Thank you.
10          (Recess taken at 2:59 p.m.)
11
12          (Recess ended at 3:14 p.m.)
13          ARBITRATOR EVANS:  Are you ready?
14          MR. DOWD:  Yes, sir.
15          MR. MURPHY:  Yes, I am.  Thank you.
16 BY MR. MURPHY:
17 Q.  Mr. Tilley, we had left off I think looking at
18     Exhibit 141 --
19 A.  Yes.
20 Q.  -- which was the follow-up letter on
21     February 4th from ACE.  Do you know who a G.L.
22     Harvey is?  Does that mean anything to you?
23 A.  Yes.
24 Q.  Who is that?

## 218

1  A.  He was the owner -- I am trying to remember
2      whether he was owner -- owner of another set of
3      projects.  Maybe Mashpee or Duxbury.  It might
4      have been another one.
5  Q.  On the same day that you received this Exhibit
6      141, the February 4th follow-up letter alleging
7      defaults, if you turn to Exhibit 143?
8  A.  Um-hmm.
9          (Witness complying.)
10 Q.  On that same day we were awarded -- we received
11     a commitment from American Capital Energy for
12     the supply of a mounting system associated with
13     the Charlotte post mounted GS project?
14 A.  Right.
15 Q.  Obviously Eric McLean is copied on this.  It is
16     sent from John Eastwood to Mr. or Ms. Harvey
17     confirming that commitment?  Correct?
18 A.  That's correct.
19 Q.  Did we in fact perform that project that was
20     awarded to us on February 4th?
21 A.  Yes.
22         Is that the same day as we get the
23     default letter?  I haven't looked at that.
24 Q.  It is the same day as the letter.  Yes.

## 219

1  A.  Okay.
2  Q.  And you never heard from Mr. Dowd about
3      commencing legal action --
4  A.  No.
5  Q.  -- as we talked about in the default letter?
6  A.  That's right.
7  Q.  Okay.  At about this time, you know, mid -- sort
8      of February-ish, can you tell me sort of what
9      was happening next, where we were in the
10     project, where we were sort of with options?
11     Had they only exercised options, if you will, on
12     the mounting frames?
13 A.  I believe that is the case.  Yes.
14 Q.  Okay.  Did that situation persist?
15 A.  I am sorry.  What do you mean "persist"?
16 Q.  Okay.  Let's just ask it this way.
17         So just if you look at Exhibit 147, you
18     followed up with Mr. McLean again on the
19     mounting frames issue and so forth?
20 A.  Yes.
21 Q.  You continued to provide information to him?
22     Correct?
23 A.  Um-hmm.
24 Q.  And that schedule was agreed upon.

## 220

1          Now as of in Exhibit 149, at some point
2      we put together a response -- the company
3      responded to the second letter that we looked at
4      of alleged default, which was the Exhibit 141,
5      and that is Exhibit 149.  Correct?
6  A.  That's correct.
7  Q.  Okay.  And the last paragraph, you talk about
8      working around the clock in collaboration and
9      mutual agreement, and SunLink has provided
10     alternative proposals and schedules, the most
11     recent being Casey, and we reference his on
12     January 24th.  That was the $147,000.  We
13     reference your options on 1-31.  And, you know,
14     we are looking for action on these options.
15     Correct?
16 A.  Yes.
17 Q.  And as of this date, they had elected none of
18     them?
19 A.  That's correct.
20 Q.  And this date being February 12th?  Mid
21     February?
22 A.  That's right.
23 Q.  So they almost had the options for about a
24     month, close to a month, a little shy of a month

## 221

1      from Mr. Eastwood?  Correct?
2  A.  Correct.
3  Q.  And Casey is on the 24th; you are on January
4      31st.  None of those get acted on?
5  A.  Right.  Some of those expired.  Right?  You
6      can't keep -- you have a window to do some of
7      these things.  Right?  So.
8  Q.  Did there come a point when ACE was
9      reprioritizing the sites in terms of which got
10     deliveries when?  Do you remember any of that?
11 A.  Yes.  We were definitely trying to ship -- you
12     know, there are certain ones that need to get
13     done first.  I believe the Eastham had to get
14     done by the end of February or the end of March,
15     I don't remember the exact date, but there was a
16     lot of work trying to shuffle delivery so that
17     we met those schedules.  Right?
18 Q.  Okay.  So at some point they said -- you know,
19     they started shifting deliveries to Eastham to
20     try to get that one completed earlier than the
21     others?
22 A.  That's right.
23 Q.  And we worked with them on that and solved that?
24     Correct?