COMMONWEALTH OF MASSACHUSETTS

BARNSTABLE, ss

SUPERIOR COURT
CIVIL ACTION NO.  1472CV00511

SUNLINK CORPORATION, )
)
)
Plaintiff, )
)
)
v. )
)
AMERICAN CAPITAL ENERGY, INC.; )
ARCH INSURANCE COMPANY; )
BERKLEY REGIONAL INSURANCE )
COMPANY; and BERKLEY INSURANCE )
COMPANY, )
)
Defendants. )
)

# APPENDIX VOLUME III OF III

# EXHIBIT AA

**AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| SUNLINK CORPORATION,<br><br>      Claimant,<br><br>v.<br><br>AMERICAN CAPITAL ENERGY, INC.,<br><br>      Respondent. | <u>**AAA NO. 01-14-0001-7516**</u> |

# SUNLINK CORPORATION'S

# POST-HEARING MEMORANDUM OF LAW

SUNLINK CORPORATION,
By its attorneys,

Paul Murphy, Esq. (BBO 363490)
David G. Thomas, Esq. (BBO 640854)
Greenberg Traurig, LLP
One International Place
Boston, MA 02110
Telephone: (617) 310-6000

Date: June 17, 2015

## TABLE OF CONTENTS

Page

STATEMENT OF FACTS................................................................................................1

  A.    THE PARTIES, HEARING WITNESSES, AND COLLATERAL
       THIRD-PARTIES.......................................................................................... 1

       i.    SunLink Corporation. ........................................................................1
       ii.   American Capital Energy, Inc.............................................................4
       iii.  Collateral Third-Parties......................................................................5

  B.    THE "CVEC PROJECTS"; THE "MASHPEE AND DUXBURY"
       PROJECTS................................................................................................... 7

  C.    THE SALES CONTRACTS FOR THE CVEC PROJECTS. .......................... 8

       i.    Product Lead Time; Layouts................................................................8
       ii.   Price and Payment; Late Fees. ..........................................................10
       iii.  Shipping and Handling; No Delivery Schedule..................................11
       iv.  Acceptance.........................................................................................12
       v.    Force Majeure. ...................................................................................12
       vi.  Limitation of Liability........................................................................12

  D.    PAYMENT BONDS, DEPOSITS FOR BALLAST PRODUCTION
       FOR THE CVEC PROJECTS, AND NOTICES TO PROCEED. ................. 12

  E.    THE PARTIES' FAILURE TO AGREE TO A DELIVERY
       SCHEDULE................................................................................................ 14

       i.    ACE's *Original* Fifteen-Week Delivery Schedule (August 1,
           2013). ................................................................................................14
       ii.   ACE's Eight-Week Delivery Schedule (January 8, 2014).....................15
       iii.  SunLink's Fifteen-Week CVEC Projects Delivery Schedule
           (January 10, 2014). ...........................................................................16
       iv.  SunLink's Eleven-Week CVEC Projects Delivery Schedule
           (January 16, 2014). ...........................................................................18
       v.    SunLink's Thirteen-Week CVEC Projects Delivery Schedule
           (January 24, 2014). ...........................................................................19
       vi.  SunLink's *Revised* Thirteen-Week CVEC Projects Delivery
           Schedule (January 28, 2014)..............................................................20

  F.    SUNLINK'S ADDITIONAL OPTIONS TO EXPEDITE DELIVERY
       OF PRODUCTS AND RESULTING CHANGE ORDERS; SUNLINK
       COMPLETES ALL CONTRACT DELIVERIES BY APRIL 18, 2014........ 22

G.  ACTUAL DELIVERY OF SUNLINK'S PRODUCTS TO THE CVEC PROJECT SITES; REASONABLENESS OF DELIVERY............................ 25

H.  ACE'S BREACH OF THE SALES CONTRACTS......................................... 28

I.  ACE'S UNFAIR AND DECEPTIVE BUSINESS PRACTICES. ................. 28

    i.  Issuing Notices to Proceed Knowing it Could Not Meet Contractual Payment Terms.........................................................28

    ii.  Misrepresenting the Progress of the CVEC Projects. ............................29

    iii.  Refusing to Provide or Agree to a Reasonable Delivery Schedule with SunLink..................................................................................31

    iv.  Issuing Baseless Default Letters. ...........................................35

    v.  False Promises of Payment of all Outstanding Invoices to SunLink and Its Lender, Bridge Bank; Securing Additional Products from SunLink with No Intent to Pay. ................................................36

    vi.  Issuing Baseless Credit Letter.................................................41

    vii.  Raising and Prosecuting Baseless Defenses. ...............................45

J.  SUNLINK'S DAMAGES. ................................................................. 47

ARGUMENT ..............................................................................................48

A.  THE MASSACHUSETTS UNIFORM COMMECIAL CODE GOVERNS THE PARTIES' DISPUTE; SUNLINK'S DELIVERY WAS REASONABLE UNDER THE CIRCUMSTANCES. ............................ 48

B.  ACE BREACHED THE SALES CONTRACTS BY FAILING TO PAY SUNLINK ACCORDING TO THE PAYMENT TERMS IN THOSE CONTRACTS.................................................................. 49

C.  ACE VIOLATED MASSACHUSETSTS GENERAL LAWS CHAPTER 93A. ............................................................................. 50

D.  SUNLINK IS ENTITLED TO AN AWARD OF REASONABLE ATTORNEY'S FEES AND COSTS UNDER CHAPTER 93A. ..................... 55

REQUESTED AWARD ..............................................................................56

# TABLE OF AUTHORITIES

**Federal Cases**

*In re Access Cardiosystems, Inc.,*
  361 B.R. 626 (D. Mass. 2007) ........................................................................52

*Arthur D. Little, Inc. v. Dooyang Corp.,*
  147 F.3d 47 (1st Cir. 1998) ...........................................................................53

*Canal Elec. Co. v. Westinghouse Elec. Co.,*
  973 F.2d 988 (1st Cir. 1992) ..........................................................................52

*Commercial Union Ins. Co. v. Seven Provinces Ins. Co.,*
  9 F. Supp. 2d 49 (D. Mass. 1998) ..............................................................50, 53

*Computer Sys. Eng'g, Inc. v. Qantel Corp.*
  571 F. Supp. 1365 (D. Mass. 1983) .................................................................54

*Ken-Weld Co., Inc. v. Eng'g Plastics, Inc.,*
  No. 04-2315B, 2005 WL 1812316 (Mass. Sup. Ct. May 26, 2005) ..........................49

*Pepsi-Cola Metro. Bottling Co., Inc. v. Checkers, Inc.,*
  754 F.2d 10 (1st Cir. 1985) ...........................................................................50

*In re Swasey,*
  488 B.R. 22 (D. Mass. 2013) ..........................................................................54

*Trent Partners & Assocs., Inc. v. Digital Equip. Corp.,*
  120 F. Supp. 2d 84 (D. Mass. 1999) ................................................................53

**State Cases**

*American Capital Energy, Inc. v. Redwood Solar Development, LLC, et al.,*
  C.A. No. 1572-cv-00026 (Mass. Sup. Ct.) (June 13, 2014) ...................................33

*Anthony's Pier Four, Inc. v. HBC Assocs.,*
  411 Mass. 451 (1991) ...............................................................................50, 53

*Atkinson v. Rosenthal,*
  33 Mass. App. Ct. 219 (1992) .........................................................................50

*Cesco Mf. Corp. v. Norcross, Inc.,*
  7 Mass. App. Ct. 837 (1979) ..........................................................................49

*Chapman v. Katz,*
  448 Mass. 519 (2007) ...................................................................................55

*Cherick Distribs., Inc. v. Polar Corp.,*
  41 Mass. App. Ct. 125 (1996) .........................................................................53

*D.D.S. Indus., Inc. v. P.J. Riley & Co., Inc.,*
  SUCV2009-00978 (Mass. Sup. Ct., May 8, 2014) (unreported) ..............................51

*Heller v. Silverbranch Construction Corp.,*
    376 Mass. 621 (1978) ................................................................54

*Jet Line Servs., Inc. v. Am. Employers Ins. Co.,*
    404 Mass. 706 (1989) ................................................................55

*Kattar v. Demoulas,*
    433 Mass. 1 (2000) ....................................................................54

*Lowell Paper Box Co., Inc. v. Omni Resources Corp.,*
    No. 917721, 2 Mass.L.Rptr. 649 (Mass. Sup. Ct. Sep. 23, 1994)...............53

*Mass. Emp'rs Ins. Exch. v. Propac-Mass., Inc.,*
    420 Mass. 39 (1995) ..................................................................50

*Mexamerican Hides S.A. v. Central Int'l Co.,* No. 1279,
    2000 Mass. App. Div. 327 (Dec. 19, 2000) ...................................49

*Montanez v. Bagg,*
    24 Mass. App. Ct. 954 (1987)....................................................54

*Morrison v. Toys "R" Us, Inc.,*
    441 Mass. 451 (2004) ................................................................53

*New Kappa City Const. v. National Floors Direct Inc.,* No. 11-ADMS-40002
    2011 Mass. App. Div. 249 (Oct. 19, 2011) ...............................50, 51

*Pentagram Software Corp.v. Voicetek Corp.,*
    No. 9200873, 1 Mass.L.Rptr. 320 (Mass. Sup. Ct. Nov. 18, 1993)...........52

*Physician Ins. Agency of Mass. v. Investors Capital Holdings, Inc.,*
    No. 0303597, 2005 WL 3722373 (Mass. Sup. Ct. Dec. 30, 2005)............50

*Purity Supreme, Inc. v. Attorney General,*
    380 Mass. 762 (1980) ................................................................53

*Shaw v. Rodman Ford Truck Ctr., Inc.,*
    19 Mass. App. Ct. 709 (1985)....................................................54

*Still v. Comm'r of the Dep't of Employment & Training,*
    423 Mass. 805 (1996) ................................................................54

## State Statutes and Commentary

MASS. GEN. LAWS CH. 93A, § 11 ...............................................*passim*

MASS. GEN. LAWS CH. 106, § 1-205(a) .......................................48

MASS. GEN. LAWS CH. 106, § 2-301 ...........................................49

MASS. GEN. LAWS CH. 106, § 2-309 ...........................................48

MASS. GEN. LAWS CH. 106, § 2-719(3) .......................................52

MASS. GEN. LAWS CH. 251, § 10 ...............................................55

Lemelman, Mass. Prac. Series, v. 25, §2.32 .................................48

Lewin, <u>Mass. Prac. Series</u>, Construction Law, v. 57, §12.9 ........................................................48

**Rules**

AAA Rules, R-1(b) ...............................................................................................................55

AAA Rules, R-47(d)(ii) ........................................................................................................55

## SUNLINK CORPORATION'S MEMORANDUM OF LAW

Claimant SunLink Corporation ("**SunLink**") respectfully submits its Post-Hearing Memorandum of Law following the hearings conducted in this proceeding on May 13 ("**Day 1**"), May 14 ("**Day 2**"), May 15 ("**Day 3**"), May 16 ("**Day 4**"), May 18 ("**Day 5**"), May 19 ("**Day 6**"), and May 20 ("**Day 7**").

## STATEMENT OF FACTS

A.   **THE PARTIES, HEARING WITNESSES, AND COLLATERAL THIRD-PARTIES.**

i.   **SunLink Corporation.**

1.   Claimant SunLink Corporation ("**SunLink**") is a company based in San Rafael, California. *See* SunLink Hearing Exhibit ("**SL Ex.**") 36, p. 1. SunLink sells racking or mounting systems for solar panels (sometimes called solar modules). *See* Transcript ("**Tr.**"), Day 1, 21:9-23:1 [CT].[1] SunLink sold ballasted ground mounted solar ("**BGMS**") systems and large ground mounted solar ("**LGMS**") systems to Respondent American Capital Energy, Inc. in connection with various solar projects on Cape Cod and Martha's Vineyard, which are the subject matter of this proceeding. *See infra.*, Statement of Facts ("**SOF**") ¶¶ 19, 20. SunLink does not sell solar panels/modules. *See* Tr., Day 1, 31:23-32:11 [CT]. Rather, SunLink sells the "balance of system," which for (i) BGMS systems consists of concrete ballasts, steel a-frames for mounting, rails on which panels rest, and hardware, and (ii) LGMS systems consist of posts, a-frames, rails, and hardware. *See* Tr., Day 1, 29:4-31:11; 141:10-18; 142:13-143:14; 165:1-10 [CT]. Also, SunLink helps engineer BGMS and LGMS systems; however, SunLink does <u>not</u> install or construct the systems. *See* Tr., Day 1, 31:2-31:22 [CT].

---

[1] Citations to the Hearing Transcript will be in the following form: Tr., [hearing day reference], [page and line reference], and [witness reference by initials]. Witness initials are as follows: Chris Tilley [**CT**], Casey Purcell [**CP**], John Eastwood [**JE**], Ranjan Prasad [**RP**], Steven Collins [**SC**], Ted Ridgeway [**TR**], Zac Osgood [**ZO**], Eric McLean [**EM**], Lawrence Slatkin [**LS**], and Thomas Hunton [**TH**].

2.      Chris Tilly ("**Mr. Tilley**") is SunLink's former Chief Executive Officer and held that position from 2007 through 2014. *See* Tr., Day 1, 15:15-16:3; 20:9-18 [CT].   He has a Master's Degree in Mechanical Engineering from Purdue University and a Master's Degree in Business Administration from INSEAD in France. *See* Tr., Day 1, 16:4-15 [CT]. Mr. Tilley is a licensed professional engineer in California. *See* Tr., Day 1, 16:16-19 [CT]. Also, he worked for various companies prior to joining SunLink, including (i) Bechtel Corporation, (ii) Booz Allen Hamilton, (iii) Santander Investment, (iv) Thompson Financial, (v) Prevalent Power, a solar integrator for large commercial solar projects, and (vi) Energy Innovations. *See* Tr., Day 1, 16:20-19:22 [CT].

3.      Casey Purcell ("**Mr. Purcell**") is SunLink's former Senior Project Manager and held that position from July 2012 to June 2014. *See* Tr., Day 2, 453:19-454:1-6; 457:19-24 [CP]. He has a Bachelor's of Science Degree in Marketing and International Business from Northeastern University. *See* Tr., Day 2, 454:7-16 [CP]. Mr. Purcell worked for various companies in the solar field prior to joining SunLink, including GeckoLogic and Sullivan Solar Power. *See* Tr., Day 2, 455:1-457:13 [CP]. As Senior Project Manager at SunLink, Mr. Purcell acted as a project facilitator, coordinated delivery of SunLink's products, and trained purchasers how to install the products. *See* Tr., Day 2, 458:5-459:15 [CP].

4.      John Eastwood ("**Mr. Eastwood**") is SunLink's founder. *See* Tr., Day 3, 602:11-13 [JE].   He has a Degree in Civil Engineering from London University and has worked in the renewable energy field since 1962. *See* Tr., Day 3, 602:1-13 [JE]. Mr. Eastwood founded SunLink in 2002 to develop a product that would be suitable for large commercial solar projects. *See* Tr., Day 3, 606:11-17 [JE].  After developing the product, it was introduced in July 2004 to

the American Solar Energy Society and given the name "SunLink." *See* Tr., Day 3, 606:11-607:3 [JE].

5.      Ranjan Prasad ("**Mr. Prasad**") is SunLink's former Vice President of Operations and Supply Chain and held that position from July 2, 2007 to April 11, 2015. *See* Tr., Day 3, 684:1-10; 686:9-16; 687:18-23 [RP].  He has a Bachelor's of Science Degree in Industrial Engineering from California Polytechnic State University, San Luis Obispo and a Master's Degree in Engineering Management. *See* Tr., Day 3, 684:14-685:1 [RP].  Prior to joining SunLink, Mr. Prasad worked for Cisco Systems as a product engineer, operations manager, program manager, and supply chain manager. *See* Tr., Day 3, 685:5-686:8 [RP].  As Vice President of Operations and Supply Chain at SunLink, Mr. Prasad "ran all of IT, supply chain fulfillment, planning, [and] quality." *See* Tr., Day 3, 688:2-9 [RP].  Mr. Prasad reported directly to Mr. Tilley; Joost deWilde and Scott Morrison reported directly to Mr. Prasad. *See* Tr., Day 3, 688:10-21 [RP].

6.      Theodore Ridgway, Jr. ("**Mr. Ridgway**") is SunLink's former Chief Financial Officer and held that position from January 2013 through July 2014. *See* Tr., Day 5, 909:11-15; 911:2-6 [TR].  Mr. Ridgway has a Bachelor's Degree in Economics from the University of North Carolina at Chapel Hill and a Master's Degree in Business Administration from the University of California at Los Angeles. *See* Tr., Day 5, 909:16-23 [TR].  Mr. Ridgway worked for various companies prior to joining SunLink, including (i) Solomon Brothers, (ii) Volpe Brown Whelan, (iii) Credit Suisse First Boston, (iv) Radisys Corporation, (v) Seven Hills, (vi) Impact Marketing Displays, and (vii) Credit.com. *See* Tr., Day 5, 909:24-911:1 [TR].

7.      Steven A. Collins ("**Mr. Collins**") testified as an expert witness on behalf of SunLink.  *See generally*, Tr., Day 4.  Mr. Collins has a Bachelor's of Science in Civil

Engineering from Northeastern University. *See* Tr., Day 4, 763:11-763:23 [SC]. He is a Director in Navigant Consulting's Global Construction practice. *See* Tr., Day 4, 774:3-6 [SC]. Mr. Collins has been qualified and has testified as an expert witness in project scheduling, delay claim analysis, supply chain management, and logistics as they apply to the construction industry over a dozen times. *See* Tr., Day 4, 764:24-765:13 [SC]; *see also*, SL Ex. 242 (Mr. Collins's curriculum vitae).

ii.      **American Capital Energy, Inc.**

8.      Respondent American Capital Energy, Inc. ("**ACE**") is a company located in Lowell, Massachusetts. *See* Tr., Day 7, 1523:8-10 [TH]. ACE was founded by Thomas Hunton, Art Hennessey ("**Mr. Hennessey**") and Juris Kalejs in 2005. *See* Tr., Day 7, 1511:9-1512:14; 1522:11-18 [TH].

9.      Zac Osgood ("**Mr. Osgood**") is ACE's Vice President of Engineering, Procurement, and Construction. Tr., Day 5, 982:10-15; 984:15-985:4 [ZO]. Mr. Osgood has a Bachelor's of Arts Degree in Political Science from the University of New Hampshire. *See* Tr., Day 5, 982:18-23 [ZO]. Mr. Osgood was ACE's project manager for the projects that are at issue in this proceeding. *See* Tr., Day 5, 1012:16-18 [ZO]; 1145:9-10 [ZO].

10.      Eric McLean ("**Mr. McLean**") is ACE's Executive Vice President of Operations. *See* Tr., Day 6, 1155:4-9; 1165:12-15 [EM]. Mr. McLean has a Bachelor's of Science Degree in Civil and Environmental Engineering from the University of Massachusetts, Lowell. *See* Tr., Day 6, 1155:10-13 [EM]. Mr. McLean was Mr. Osgood's direct supervisor for the projects that are at issue in this proceeding. *See* Tr., Day 5, 1027:15-19 [ZO].

11.      Lawrence Slatkin ("**Mr. Slatkin**") worked for SunLink from January 2005 through sometime around August 2011. *See* Tr., Day 7, 1494:9-14; 1495:12-1496:12 [LS]. Mr. Slatkin then worked for ACE between April 2012 and February 2015. *See* Tr., Day 7, 1502:12-

16 [LS]. Mr. Slatkin has a Bachelor's of Science Degree from the University of California at Berkley. *See* Tr., Day 7, 1494:15-19 [LS]. Mr. Slatkin had no involvement in the projects that are at issue in this proceeding between 2012 and 2013. *See* Tr., Day 7, 1502:17-21 [LS].

12.     Thomas Hunton ("**Mr. Hunton**") is ACE's President and a 47.5% shareholder/owner of ACE. *See* Tr., Day 7, 1511:1-13 [TH]. Mr. Hunton has an undergraduate degree from the University of Vermont and a Master's of Administration and Management Degree from St. Michael's College in Vermont. *See* Tr., Day 7, 1512:19-1513:1 [TH]. Mr. Hennessey also owns 47.5% of ACE. *See* Tr., Day 7, 1511:14-21 [TH]. Mr. Hunton handles bringing in new business, while Mr. Hennessey handles finances and operations. *See* Tr., Day 7, 1522:19-1523:5 [TH]. Mr. Hennessey did not appear to testify at the hearings.

### iii.     Collateral Third-Parties.

13.     Cape & Vineyard Electric Cooperative, Inc. ("**CVEC**") is a cooperative of various cities and townships on Cape Cod and Martha's Vineyard formed to develop renewable energy projects. *See* Demand for Arbitration, ¶ 3; Respondent's Answer, ¶ 3; Tr., Day 1, 98:6-14 [CT]. In 2011, CVEC enter into various agreements with the Towns of Barnstable, Brewster, Chatham, Eastham, Harwich, Katama, Nunnepog, and Tisbury, Massachusetts whereby CVEC obtained lease and development rights to capped landfills and other real estate within those towns to construct solar energy projects and to assign CVEC's rights to a third-party developer who would develop the projects. *See* Demand for Arbitration, ¶ 4; Respondent's Answer, ¶ 4. In 2011, CVEC awarded the development and construction of the projects to ACE and assigned all of CVEC's lease and development rights to ACE.    *See* Demand for Arbitration, ¶ 5; Respondent's Answer, ¶ 5. Separately, the Town of Dennis awarded ACE development rights to a capped landfill in that town, without having CVEC as an intermediary. *See* Demand for Arbitration, ¶ 6; Respondent's Answer, ¶ 6. Due to a decline in its business, in May 2013, ACE

effectively sold the development of the Projects to third parties Clean Focus Corporation and Redwood Solar Development LLC, with ACE continuing on in the role of the Engineering, Procurement and Construction Contractor (**"EPC Contractor"**). *See* Demand for Arbitration, ¶¶ 8-10; Respondent's Answer, ¶ 10.

14.     Redwood Solar Development LLC (**"Redwood"**) allegedly developed six of the various solar projects that are at issue in this proceeding on behalf of Clean Focus Corporation. *See* SL Ex. 238, Tab 3, Affidavit of Sam Wu (**"Wu Aff."**), ¶ 1.  Redwood entered into an Engineering, Procurement and Construction Contract, as amended, with ACE (ACE having by then sold its development rights to Clean Focus Corporation).  *See* Wu Aff., ¶ 5; ACE Hearing Exhibit (**"ACE Ex."**) 33 (**"EPC Contract"**); Tr., Day 1, 246:18-20 [CT]; Tr., Day 5, 993:1-3; 997:18-20 [ZO].

15.     Clean Focus Corporation (**"Clean Focus"**) is a company specializing in financing difficult-to-finance solar energy projects.  *See* SL Ex. 238, Tab 4, Affidavit of Stanley Chin (**"Chin Aff."**), ¶ 3.  On May 24, 2013, Clean Focus, though affiliated entities, purchased 100% membership interests in various solar projects that are at issue in this proceeding from ACE.  *See* Chin Aff., ¶ 7.

16.     ES Boulos Company (**"ES Boulos"**) is one of ACE's electrical subcontractors that controlled an escrow account ACE used to disburse payments made to SunLink for various projects at issue in this proceeding.  *See* ACE Ex. 113; Tr., Day 2, 400:19-402:9 [CT]; Tr., Day 6, 1199:23-1200: 23 [EM].

17.     Florence Electric, LLC (**"Florence Electric"**) is one of ACE's electrical subcontractors that controlled an escrow accounts ACE used to disburse payments made to

SunLink for various projects at issue in this proceeding. *See* ACE Ex. 114; Tr., Day 2, 400:19-402:9 [CT]; Tr., Day 6, 1119:1-22 [EM].

18.     Bridge Bank is a lending bank that does business with SunLink. *See* Tr., Day 1, 289:12-13 [CT].  Bridge Bank was involved with providing SunLink a working capital line for the CVEC Projects. *See* Tr., Day 1, 289:3-11 [CT].

**B.     THE "CVEC PROJECTS"; THE "MASHPEE AND DUXBURY" PROJECTS.**

19.     Through sales contracts, SunLink sold BGMS systems to ACE for installation at the following seven "capped landfill" sites: (i) Barnstable, (ii) Brewster, (iii) Chatham, (iv) Dennis, (v) Eastham, (vi) Harwich, and (vii) Tisbury. *See* SL Ex. 233 (Tabs 1.B, 2.B, 3.B., 4.B, 5.B., 6.B., and 8.B) ("**BGMS Projects**"); Tr., Day 1, 39:10-14; 104:15-106:4 [CT].  Through sales contracts, SunLink sold LGMS systems to ACE for installation at the following two project sites: (i) Katama and (ii) Nunnepog ("**LGMS Projects**"). *See* SL Ex. 233 (Tab 7.B); SL Ex. 36; Tr., Day 1, 104:15-106:4 [CT].[2]  Although the Dennis solar project is separate from the CVEC-related solar projects, for the purposes of this submission, SunLink shall refer to the BGMS Projects and LGMS Projects together as the "**CVEC Projects**."  The CVEC Projects were treated as a "portfolio" of projects by the Parties, as each project site required similar equipment. *See* Tr., Day 1, 40:2-14 [CT]; SL Ex. 106 (where Mr. Osgood refers to building "a successful portfolio of projects"); Tr., Day 6, 1282:1-13; 1340:15-18 [EM] (referring to CVEC Projects as "portfolio of projects" and "large portfolio").

20.     Through a completely separate and distinct Master Sales Contract and Volume Price Agreement, SunLink sold BGMS systems to ACE for installation at project sites in Mashpee and Duxbury, Massachusetts as well. *See* ACE Exs. 76, 77 ("**Mashpee and Duxbury**

---

[2] SunLink seeks recovery against ACE for amounts that are owed <u>only</u> on the seven (7) BGMS Projects. SunLink was paid in full on the LGMS Project at Nunnepog, and was actually slightly overpaid by ACE on the LGMS Project at Katama for which SunLink provides ACE a credit in its ultimate calculation of damages. *See* SL Ex. 233.

Projects"). The Mashpee and Duxbury Projects have completely different owners and are not the subject of the sales contracts or projects which are at issue in this proceeding. *See* Tr., Day 6, 1261:20-1262-23 [EM].

## C.  THE SALES CONTRACTS FOR THE CVEC PROJECTS.

21.    On or about October 17, 2013, the parties executed nine (9) sales contracts for the CVEC Projects. *See* SL Exs. 233 (Tabs 1.B, 2.B, 3.B., 4.B, 5.B., 6.B., 7.B., and 8.B.), 36 (Nunnepog) ("**Sales Contracts**"), with the following relevant terms and conditions substantially similar across all nine (9) Sales Contracts.

### i.    **Product Lead Time; Layouts.**[3]

22.    The Sales Contracts contained two informational boxes with information about product lead time, as follows:

Contract Information

| Credit Approval | All orders subject to credit approval before manufacturing. |
|---|---|
| FOB Point | AZ, CA, CO, CT, IN, MN, OH, PA, TX and/or WV |
| Shipping and Handling Terms | Shipping and Handling is pre-paid by SunLink and added to the invoice. |
| Product Lead Time | All specified lead times are from receipt of signed sales contract, down payment, notice to proceed and proof of payment bond is in place at 100% of contract value. |

---

[3] Product lead times for all Sales Contracts were six (6) weeks, with the exception of Katama which was eight (8) weeks.

Product Information

| Line | Product | Specifications | | Unit Price | Qty | Total |
|---|---|---|---|---|---|---|
| 1 | Ballasted Ground Mount System | Site Name | C-Vec Chatham Site | $661,359.60 | 1 | $661,359.60 $102.60/Module $0.3600/Watt |
| | | Wind Speed | 120 mph | | | |
| | | Wind Exposure | C | | | |
| | | Occupancy | I | | | |
| | Lead Time: 6 weeks | Topo. Factor | 1.00 | | | |
| | FOB California | Snow Load | 35 psf | | | |
| | Points Minnesota | Tilt Angle | 25° | | | |
| | Pennsylvania | Module Name | SunPreme GX 285W | | | |
| | | No. of Modules | 6,446 | | | |
| | | String Length | 11 | | | |
| | | Size | 1,837.11 kW | | | |
| | | Array Layout Drawing 1003562-CVECCHATHAM-081513-ENG-R11 | | | | |

See Sales Contracts, pp. 2, 3.

23.     Product "lead time" refers to the time <u>between</u> receiving deposits, bonds, and notices to proceed and when SunLink's product would <u>start</u> to be delivered. *See* Tr., Day 1, 51:23-52:21; 70:8-12; 111:1-18 [CT]; Tr., Day 2, 462:13-464:2 [CP]; Tr., Day 3, 629:23-630:11 [JE]; Tr., Day 3, 690:7-20 [RP]; Tr., Day 5, 1063:9-1064:3 [ZO].   Product lead time is <u>not</u> a "delivery schedule" and does <u>not</u> refer to the time by which <u>all</u> product would be delivered. *See* Tr., Day 1, 52:22-53:24; 70:8-12; 111:1-18 [CT]; Tr., Day 5, 1063:9-1064:3 [ZO] (comparing "lead time" with "delivery schedule"); *see also*, Tr., Day 4, 782:2-23; 783:5-13 [SC] (describing "lead time" in the construction industry).

24.     Lead time generally would follow a contractual "trigger" to start production such as a "notice to proceed" and/or receipt of a deposit. *See* Tr., Day 1, 57:23-58:22; 70:8-12 [CT]. Also, the Sales Contracts provide that "scheduled delivery dates and/or lead times as set forth in the "Proposal" are approximate." *See* Sales Contracts, pp. 4, 6 (at ¶ 9); Tr., Day 1, 70:8-12; 111:19-112:15 [CT].   The "Proposal" referred to in the Sales Contracts is the first few pages of the Sales Contracts preceding the signatures. *See* Tr., Day 1, 65:15-19 [CT].

25.     The second informational box above also contains a specific "Array Layout Drawing." *See* Sales Contracts, p. 3.  The layouts for each project site are fundamental to the Sales Contracts, as the layout of the "array" impacts the engineering/configuration of the products. *See* Tr., Day 1, 42:7-44:1; 70:8-12 [CT].  As such, the Sales Contracts provide that "[a]ny deviation from the attached layout or any changes to the above information will result in a change in price and/or lead time." *See* Sales Contracts, p. 4; Tr., Day 1, 59:1-23; 60:20-61:2; 70:8-12; 109:13-110:24 [CT].

**ii.     Price and Payment; Late Fees.**

26.     The price for SunLink's Products was set forth in the Proposal referenced in the Sales Contracts and payment was required in "cash, check or wire transfer in accordance with the Payment Terms" in Appendix B to the Sales Contracts. *See* Sales Contracts, p. 5 (at ¶ 3). Appendix B to the Sales Contracts provided the following relevant payment terms/late fees:

1. SELLER STANDARD PAYMENT TERMS
   a. 1.40% of LUMP SUM SALES PRICE with order. Purchaser provides check with signed Sales Contract or Purchase Order. Order fulfillment begins with receipt of payment, in addition to signed Sales Contract and approved credit.
   b. 98.60% of LUMP SUM SALES PRICE shall be due upon shipment unless otherwise agreed by the parties, in writing, in a bill-and-hold or multiple-elements arrangement.
      i. Seller will invoice Purchaser and provide an itemized invoice.
      ii. Terms are net 45 days from date of invoice.
      iii. Payments made more than 45 days late shall be charged a late fee of one and one-half percent of the outstanding balance due (1.5%) per month.

*See* Sales Contracts, p. 9 (Appx. B.).

27.     There are no "pay-if-paid" provisions in the Sales Contracts (i.e., payment by ACE to SunLink was not conditioned upon ACE receiving payment from any other source), *see generally id.*; Tr., Day 1, 70:8-12; 72:8-16; 115:21-116:1 [CT], a fact that ACE was aware of at the time it executed the contracts. *See* Tr., Day 6, 1257:7-18; 1486:9-1487:18 [EM].  Indeed,

10

SunLink would not and could not have agreed to any such provision because SunLink's lender, Bridge Bank, would not agree to such a provision. *See* Tr., Day 1, 72:13-73:18 [CT]; Tr., Day 5, 916:6-917:13 [TR].   Furthermore, there were no requirements to provide lien releases prior to payment or any "flow down" provisions in the Sales Contracts incorporating any terms that, for instance, may be contained in the ACE EPC Contract. *See* Tr., Day 1, 73:19-74:14; 112:19-113:2; 117:21-118:18 [CT].

iii.     **Shipping and Handling; No Delivery Schedule.**

28.     The Parties agreed SunLink's Products were "furnished F.O.B. San Leandro, California, Allen Texas, or Carrolton, Texas *(or any other location designated by [SunLink])*." *See* Sales Contracts, p. 6 (at ¶ 10) (emphasis added).   There was no delivery schedule contained or "defined in" the Sales Contacts.   *See generally* Sales Contracts; Tr., Day 1, 70:8-12; 112:16:18 [CT]; Tr., Day 3, 617:21-618:5 [JE]; Tr., Day 5, 1067:5-15 [ZO]; Tr., Day 6, 1321:7-1322:19 [EM].   There are no "Buy American" provisions in the Sales Contracts. *See generally*, Sales Contracts; Tr., Day 1, 70:8-12; 71:8-72:7; 112:19-113:2 [CT].   The F.O.B. term above relates to which party has the "risk of loss" during shipment; it does not refer to the place where product was to be manufactured; but rather, it refers to where SunLink expected to ship the products from.   *See* Tr., Day 1, 120:18-121:10 [CT].   Also, the F.O.B. point in the Sales Contracts designated when SunLink could issue an invoice to ACE, which would trigger the payment terms (net 45 days from date of invoice) set forth in Appendix B of the Sales Contracts. *See* Tr., Day 1, 116:2-117:5; 120:18-121:10 [CT].

### iv.    Acceptance.

29.    The Sales Contracts contain the followed terms concerning acceptance of SunLink's Products.

> 13. ACCEPTANCE.  Purchaser is expected to inspect SunLink MMS products upon receipt. Claims for shortages or damage resulting from shipping should be addressed to the carrier at time of delivery. Seller can provide expedited replacement service to the Purchaser to make up for goods lost or damaged in transit and the Purchaser shall be billed a reasonable price. The Purchaser is understood to have unconditionally accepted a complete SunLink MMS product fifteen (15) days after shipment is received. The SunLink MMS product warranty begins upon receipt by Purchaser of the shipment(s).

*See* Sales Contracts, p. 6 (at ¶ 13); Tr., Day 1, 67:16-24; 70:8-12 [CT].

### v.    Force Majeure.

30.    The Parties agreed that SunLink "shall not be viewed as in breach of the" Sales Contracts or "liable to" ACE or any third party "for delays in performance caused by . . . acts of God . . . transportation delay, or any other act or cause beyond the reasonable control of" SunLink. *See* Sales Contracts, p. 8 (at ¶ 21.c.); Tr., Day 1, 68:13-22; 70:8-12; 112:2-15 [CT].

### vi.    Limitation of Liability.

31.    The Parties agreed that, in "no event shall [SunLink] . . . be liable to [ACE] or any third party for any special, indirect, incidental, consequential or punitive damages, whether arising in contract, tort or otherwise, even if advised of the possibility of same." *See* Sales Contracts, p. 8 (at ¶ 21.g.); Tr., Day 1, 69:4-23; 70:8-12; 112:2-15 [CT].

## D.    PAYMENT BONDS, DEPOSITS FOR BALLAST PRODUCTION FOR THE CVEC PROJECTS, AND NOTICES TO PROCEED.

32.    ACE had a history of not paying SunLink timely. *See* Tr., Day 1, 36:15-37:5 [CT] (explaining that, although SunLink had a good relationship with ACE, ACE was "notoriously bad at paying . . . on time."); Tr., Day 3, 609:8-12 [JE] (same). As such, the Sales

Contracts included requirements for payment bonds to protect SunLink against ACE failing to pay for SunLink's Products. *See* Tr., Day 5, 912:1-913:1 [TR].

33.    Also, at the time the Sales Contracts were executed, ACE was well aware SunLink needed – and ACE agreed to provide – a $100,000 deposit for SunLink's ballast supplier to expedite the creation of forms/molds for the production of ballasts. *See* Tr., Day 5, 1074:8-1076:1; 1077:16-1079:4 [ZO]; *see also*, SL Ex. 32 (where Mr. Osgood refers to "the down payment for the $100K for forms[,]" and questions "[w]hat check is ACE providing SunLink with in order to begin fulfillment of order?  $100K for forms?"); Tr., Day 1, 100:24-102:15; 107:1-108:5; 109:1-8 [CT] (explaining why $100,000 was needed and that one check for $100,000 was expected); SL Ex. 105 (January 20, 2014 email from Mr. McLean to Mr. Eastwood acknowledging "the $100,000 down payment" for ballasts.); SL Ex. 26 (referring to "initial payment of $100,000 that will permit [SunLink] to expedite production of the molds for the production of the concrete ballast"); Tr., Day 3, 615:23-617:7 [JE] (discussing need for $100,000 and ACE's understanding); Tr., Day 3, 697:2-698:3; 699:2-6 [RP] (SunLink was expecting $100,000 for ballast forms); Tr., Day 5, 912:13-913:21 [TR] (describing need for ballast deposit to provide assurance that project was in fact moving forward in light of the "false starts" experienced with the project); Tr., Day 6, 1292:6-1295:4; 1326:18-1327:2; 1329:5-7 [EM] ((i) agreeing that SunLink proposed to receive a $100,000 deposit, net 30 days and ACE "did it on better terms than net 30[, ACE] ended up doing it immediately" and (ii) admitting that he understood that "SunLink needed $100,000 to order forms" and "John Eastwood needed $100,000 for forms").

34.    The Sales Contracts required ACE to provide all payment bonds, deposits and notices to proceed for SunLink to go into production. *See* Sales Contracts, pp. 2, 3.

35.    The dates on which ACE provided deposits and notices to proceed under the Sales

Contracts are set forth below:

| Site | NTP | Deposit | Amount |
|------|-----|---------|--------|
| **Brewster** | 9-Dec-13 | 16-Dec-13 | $10,705.95 |
| **Chatham** | 3-Jan-14 | 2-Jan-14 | $9,259.03 |
| **Eastham** | 3-Jan-14 | 2-Jan-14 | $7,458.28 |
| **Harwich** | 3-Jan-14 | 2-Jan-14 | $27,137.26 |
| **Barnstable** | 9-Dec-13 | 16-Dec-13 | $25,522.85 |
| **Dennis** | 9-Dec-13 | 16-Dec-13 | $34,273.49 |
| **Tisbury** | 3-Jan-14 | 2-Jan-14 | $10,416.56 |
| **Katama** | 16-Dec-13 | 2-Jan-14 | $10,416.56 |
| **Nunnepog** | 16-Dec-13 | 2-Jan-14 | $11,345.46 |

*See* SL Exs. 56, 60, 66, 68, 80, 112, 155, and 233, Tab 3.

36.    ACE did <u>not</u> provide SunLink the full $100,000 ballast deposit for the CVEC

Projects until January 2, 2014.  *See* 56, 60, 66, 68, 80, 112, 155, and 233, Tab 3; Tr., Day 5,

1067:16-1068:2 [ZO].

**E.    THE PARTIES' FAILURE TO AGREE TO A DELIVERY SCHEDULE.**

    **i.    ACE's *Original* <u>Fifteen-Week</u> Delivery Schedule (August 1, 2013).**

37.    On August 1, 2013, prior to the execution of the Sales Contracts on October 17,

2013, ACE's Jeff Gadomski ("**Mr. Gadomski**") sent SunLink's Jonathan Eastwood ("**J.**

**Eastwood**") – with a copy to Mr. Osgood – a proposed ballast delivery schedule for the seven

(7) BGMS CVEC Projects sites, which are at the center of this proceeding (Barnstable, Brewster,

Chatham, Dennis, Eastham, Harwich, and Tisbury).  *See* SL Ex. 12 ("**ACE August 2013**

**Schedule**"); Tr., Day 5, 1059:13-1060:7 [ZO].  This was the original schedule ACE sent to

SunLink in 2013. *See* Tr., Day 5, 1059:13-1060:7 [ZO]. The ACE August 2013 Schedule was

based on what ACE anticipated would be an August 2013 notice to proceed on the CVEC

Projects. *See* Tr., Day 5, 1060:8-1061:21; 1062:3-6 [ZO].

38.     Among other things, the ACE August 2013 Schedule provided for or contemplated:

    a.     deliveries <u>commencing</u> at the Chatham and Eastham sites on September 25, 2013;

    b.     deliveries <u>ending</u> at the Dennis site on January 9, 2014;

    c.     deliveries occurring five (5) days per week;

    d.     production of 17,460 ballasts (three (3) different types);[4] and

    e.     an approximate four (4) week product lead time.

*See* SL Ex. 12; Tr., Day 3, 690:1-6 [RP]; Tr., Day 5, 1060:8-1061:21 [ZO].

39.     Therefore, the ACE August 2013 Schedule afforded SunLink fifteen (15) weeks to deliver all of the ballasts to the seven (7) CVEC Projects sites. *See* SL Ex. 12; Tr., Day 1, 94:22-95:7 [CT]; Tr., Day 3, 690:21-691:2 [RP]; Tr., Day 5, 1064:19-22 [ZO].  Concomitantly, with a four (4) week lead time, the ACE August 2013 Schedule was nineteen (19) weeks in duration from notice to proceed to final delivery of all ballasts. *See* Tr., Day 1, 94:22-95:7 [CT]; Tr., Day 3, 690:21-691:15 [RP]; Tr., Day 5, 1065:6-10 [ZO].

40.     ACE, however, did not provide a notice to proceed in August 2013 and, as such, the parties did not agree to or implement the ACE August 2013 Schedule. *See* Tr., Day 1, 90:15-92:1 [CT].

**ii.     ACE's <u>Eight-Week</u> Delivery Schedule (January 8, 2014).**

41.     Almost a full three (3) months <u>after</u> entering into the Sales Contracts, on January 8, 2014, Mr. Osgood sent Mr. Purcell a proposed ballast/post delivery schedule for all of the then nine (9) CVEC Projects sites (Barnstable, Brewster, Chatham, Dennis, Eastham, Harwich, Katama, Nunnepog, and Tisbury), i.e., having by then added the two LGMS site at Nunnepog

---

[4] Actually, there were four (4) types of ballasts required for the CVEC Projects. *See* SL Ex. 13 (August 1, 2013 email from J. Eastwood to Mr. Osgood suggesting that ACE update its delivery schedule accordingly).

and Katama. *See* SL Ex. 87 ("**ACE January 8, 2014 Schedule**"); Tr., Day 5, 1090:1-17 [ZO].

The ACE January 8, 2014 Schedule was the <u>first</u> revised ballast delivery schedule ACE provided

to SunLink since ACE provided the ACE August 2013 Schedule. *See* Tr., Day 1, 151:20-23

[CT]; Tr., Day 5, 1090:1-17 [ZO]. ACE's main focus at the time was delivery of ballasts, as

ACE had not yet provided SunLink a schedule to deliver any hardware. *See* Tr., Day 5, 1091:4-8

[ZO].

42.    Among other things, the ACE January 8, 2014 Schedule provided for:

a.    deliveries to nine (9) project sites;

b.    deliveries for the BGMS sites <u>commencing</u> in Barnstable and Dennis on
the week of January 17, 2014, and <u>ending</u> in Dennis on week of March 14,
2014; and

c.    deliveries of posts to the two LGMS CVEC Projects sites (Katama and
Nunnepog) <u>commencing</u> by the week of January 31, 2014 and <u>ending</u> the
week of February 14, 2014.

*See* SL Ex. 87; Tr., Day 5, 1090:1-17; 1100:22-1101:3 [ZO].

43.    Therefore, the ACE January 8, 2014 Schedule afforded SunLink only eight (8)

weeks to deliver all of the ballasts <u>and</u> posts to nine (9) CVEC Projects sites. *See* SL Ex. 87; Tr.,

Day 5, 1090:1-17; 1100:22-1101:3 [ZO].

44.    SunLink did not agree to the ACE January 8, 2014 Schedule. *See* SL Ex. 90; Tr.,

Day 1, 152:1-153:3 [CT].

**iii.    SunLink's <u>Fifteen-Week</u> CVEC Projects Delivery Schedule (January 10,
2014).**

45.    On January 10, 2014, in response to ACE's January 8, 2014 Schedule, Mr. Purcell

sent Mr. Osgood a proposed delivery schedule for ballasts/posts <u>and hardware</u> for all of nine (9)

of the CVEC Projects sites. *See* SL Ex. 90 ("**SunLink January 10, 2014 Schedule**"); Tr., Day

2, 474:23-475:15 [CP].  In addition, the SunLink January 10, 2014 Schedule included deliveries

for the Mashpee and Duxbury Projects – two additional project sites requested by ACE. *See* SL Ex. 90.

46.     Among other things, the SunLink January 10, 2014 Schedule provided for:

a.     deliveries <u>commencing</u> for the CVEC Projects at the Barnstable and Dennis sites during the week of January 27, 2014;

b.     deliveries <u>ending</u> for the CVEC Projects at the Harwich site during the week of May 5, 2014; and

c.     deliveries commencing and ending for the Mashpee and Duxbury Projects during the weeks of April 28 and May 19, 2014, respectively.

*See* SL Ex. 90; Tr., Day 2, 474:23-475:15 [CP].

47.     Therefore, the SunLink January 10, 2014 Schedule afforded SunLink fifteen (15) weeks[5] to deliver all of the ballasts/posts <u>and hardware</u> to nine (9) CVEC Projects sites (final delivery the week of May 5, 2014). *See* SL Ex. 90; Tr., Day 2, 474:23-475:15 [CP]. This duration was substantially similar to the duration of ACE's initial August 2013 Schedule (which again, contemplated ballast deliveries to seven (7) sites only). *Compare* SL Ex. 12 *with* SL Ex. 90; *see* Tr., Day 1, 155:8-156:17 [CT]; Tr., Day 2, 474:23-475:15 [CP]; Tr., Day 5, 1101:16-1103:13 [ZO] (admitting that the SunLink January 10, 2014 Schedule and ACE August 2013 Schedule each had total delivery durations of fifteen (15) weeks).

48.     Although this was the schedule SunLink was "working to" in absence of an agreement, *see* SL Ex. 100; Tr., Day 1, 215:9-216:16 [CT]; Tr., Day 3, 718:16-21 [RP], ACE did not agree to the SunLink January 10, 2014 Schedule. *See* SL Ex. 99 (where ACE seeks revised delivery schedule); Tr., Day 1, 156:18-157:8 [CT].

---

[5] With Mashpee and Duxbury (the non-CVEC projects), the duration was seventeen (17) weeks.

iv.     SunLink's Eleven-Week CVEC Projects Delivery Schedule (January 16, 2014).

49.     On January 17, 2014, Mr. Eastwood sent Messrs. Osgood and McLean a proposed delivery schedule for all ballasts/posts and hardware for all nine (9) of the CVEC Projects sites and the Mashpee and Duxbury Projects sites.  *See* SL Ex. 100 ("**SunLink January 16, 2014 Schedule**").

50.     Among other things, the SunLink January 16, 2014 Schedule provided for:

a.      deliveries commencing for the CVEC Projects at the Barnstable and Dennis sites during the week of January 27, 2014;

b.      deliveries ending for all CVEC Projects sites during or before the last week of March 2014 (with the exception of deliveries ending at the Harwich site during the week of April 7, 2014); and

c.      deliveries commencing and ending for the Mashpee and Duxbury Projects during the weeks of March 10 and April 7, 2014, respectively.

*See* SL Ex. 100; Tr., Day 1, 162:16-165:10 [CT]; Tr., Day 2, 479:13-480:10 [CP]; Tr., Day 3, 623:7-624:15 [JE].

51.     Therefore, the SunLink January 16, 2014 Schedule afforded SunLink eleven (11) weeks[6] to deliver all of the ballasts/posts and hardware to nine (9) CVEC Projects sites (final delivery by the week of April 7, 2014, but mostly before the last week of March 2014).  *See* SL Ex. 100; Tr., Day 2, 479:13-480:10 [CP].  As this proposed schedule was expedited, SunLink informed ACE that it would cost ACE an additional $400,000 or more for SunLink to implement the schedule.  *See* SL Ex. 100; Tr., Day 2, 479:13-480:10 [CP].

52.     ACE did not agree to the SunLink January 16, 2014 Schedule.  *See* SL Exs. 100, 101; Tr., Day 1, 164:19-24; 167:19-23 [CT]; Tr., Day 2, 479:13-480:10 [CP]; Tr., Day 3, 626:7-10 [JE]; Tr., Day 6, 1373:10-15 [EM].  Rather, ACE referred to this schedule – providing for

---

[6] With Mashpee and Duxbury (the non-CVEC projects), the duration was thirteen (13) weeks.

delivery of *all* products within eleven weeks (4 weeks less than ACE's August 2013 Schedule for ballasts for only seven (7) project sites) – as "dog shit" and SunLink's "bullshit schedule." *See* SL Ex. 104.

     **v.**     **SunLink's <u>Thirteen-Week</u> CVEC Projects Delivery Schedule (January 24, 2014).**

    53.    On January 24, 2014, Mr. Purcell sent Messrs. Osgood and McLean a revised, proposed delivery schedule for all ballasts/posts and hardware for all nine (9) of the CVEC Projects sites and the Mashpee and Duxbury Projects sites. *See* SL Ex. 117 ("**SunLink January 24, 2014 Schedule**").

    54.    Among other things, the SunLink January 24, 2014 Schedule provided for:

    a.    deliveries <u>commencing</u> for the CVEC Projects at the Dennis site during the week of January 27, 2014;

    b.    deliveries <u>ending</u> at all CVEC project sites by the week of April 14 (except for the Harwich site where deliveries would end during the week of April 21, 2014); and

    c.    deliveries commencing and ending for the Mashpee and Duxbury Projects during the weeks of April 21 and May 5, 2014, respectively.

*See* SL Ex. 117; Tr., Day 1, 177:6-179:16 [CT]; Tr., Day 5, 1112:3-10 [ZO].

    55.    Therefore, the SunLink January 24, 2014 Schedule afforded SunLink thirteen (13) weeks[7] to deliver all of the ballasts/posts and hardware to nine (9) CVEC Projects sites (with final delivery of all products by the week of April 21, 2014, but mostly during the week of April 14, 2014). *See* SL Ex. 117; Tr., Day 2, 485:15-486:13 [CP]; Tr., Day 5, 1112:3-17 [ZO]. As this proposed schedule was expedited, SunLink informed ACE that it would cost ACE an additional $147,000 for SunLink to implement the schedule. *See* SL Ex. 117; Tr., Day 2, 485:15-486:13 [CP]. At the time, SunLink made clear to ACE that SunLink was "working to" the SunLink

---

[7] With Mashpee and Duxbury (the non-CVEC projects), the duration was fifteen (15) weeks.

January 10, 2014 Schedule in the absence of any agreement on the delivery schedule. *See* SL Ex. 117.

56.     ACE did not agree to the SunLink January 24, 2014 Schedule and never paid the $147,000 for SunLink to implement it. *See* SL Ex. 121; Tr., Day 1, 179:17-180:4; 189:22-190:1 [CT]; Tr., Day 6, 1387:17-1388:2 [EM].

### vi.     SunLink's *Revised* Thirteen-Week CVEC Projects Delivery Schedule (January 28, 2014).

57.     On January 29, 2014, Mr. Purcell sent Messrs. Osgood and McLean a revised, proposed delivery schedule for all ballasts/posts and hardware for all nine (9) of the CVEC Projects sites and the Mashpee and Duxbury Projects sites. *See* SL Ex. 125 ("**SunLink January 28, 2014 Schedule**").

58.     The SunLink January 28, 2014 Schedule was based on the SunLink January 24, 2014 Schedule, as revised to show expedited shipments of hardware for six (6) of the nine (9) CVEC Projects sites (Dennis, Barnstable, Brewster, Chatham, Harwich, and Eastham). *Compare* SL Ex. 117 *with* SL Ex. 125; Tr., Day 5 1122:4-22 [ZO]. Like the SunLink January 24, 2014 Schedule, among other things, the SunLink January 28, 2014 Schedule provided for:

a.     deliveries commencing for the CVEC Projects at the Dennis site during the week of January 27, 2014;

b.     deliveries ending for the CVEC Projects at the Harwich site during the week of April 21, 2014; and

c.     deliveries commencing and ending for the Mashpee and Duxbury Projects during the weeks of April 21 and May 5, 2014, respectively.

*See* SL Ex. 125.

59.    Therefore, like the SunLink January 24, 2014 Schedule, the SunLink January 28, 2014 Schedule afforded SunLink thirteen (13) weeks[8] to deliver all of the ballasts/posts and hardware to nine (9) CVEC Projects sites. *See* SL Ex. 125. Furthermore, like the SunLink July 24, 2014 Schedule, the SunLink January 28, 2014 would also cost ACE $147,000 for SunLink to implement the schedule. *See* SL Ex. 154.

60.    Although there was some confusion between the Parties surrounding the delivery schedules around this time, the Parties never agreed to implement the SunLink January 28, 2014 Schedule, and ACE never paid the $147,000 to do so. *See* SL Ex. 154; Tr., Day 1, 222:23-225:2 [CT]; Tr., Day 5, 1120:9-1222:1 [ZO]; SL Ex. 134 (January 31, 2014 email where Mr. Tilley informs Mr. McLean that SunLink is still working to the schedule noted in Mr. Purcell's email [i.e., the SunLink January 10, 2014 Schedule], not to the new accelerated schedule noted in the email [i.e., the SunLink January 28, 2014 Schedule], "because we still don't yet have agreement on the schedule or know how the costs will be handled"); Tr., Day 6, 1394:9-1396:9; 1405:22-1406:11 [EM].

[intentionally left blank]

---

[8] With Mashpee and Duxbury (the non-CVEC projects), the duration was fifteen (15) weeks.

**F.    SUNLINK'S ADDITIONAL OPTIONS TO EXPEDITE DELIVERY OF PRODUCTS AND RESULTING CHANGE ORDERS; SUNLINK COMPLETES ALL CONTRACT DELIVERIES BY APRIL 18, 2014.**

61.    While continuing to work towards the SunLink January 10, 2014 Schedule, SunLink, at ACE's request, continued to provide a number of additional, expedited delivery options similar to those made earlier in January 2014 by Messrs. Eastwood and Purcell. *See* SL Ex. 117; Tr., Day 1, 196:18-197:5 [CT]. The additional options were separated into categories for ballasts, hardware, and mounting frames as follows:

a.    With regards to ballasts, SunLink gave ACE two options to use as bookmarks, with the potential for negotiating an in-between option. *See* Tr., Day 1, 197:6-198:1 [CT]. The more aggressive plan involved additional costs of between $350,000 and $550,000. *See* SL Ex. 132. The other, less aggressive, schedule involved additional costs of $150,000 and provided for all ballast deliveries to be complete by the first week of May, 2014. *See* SL Ex. 132.

b.    SunLink informed ACE that the rails and hardware could be delivered starting the week of February 24, 2014, and would be fully delivered within a few weeks of that date. *See* SL Ex. 132.

c.    SunLink provided ACE with three options for delivery of the mounting frames. *See* SL Ex. 132. The first option was that 25% of the mounting frames could be delivered by March 10, 2014 by air freight from China with a cost of $310,000. *See* SL Ex. 132. The remaining 75% of the mounting frames would be delivered starting on or about March 31, 2014 and would be completed over the subsequent two to three weeks. *See* SL Ex. 132. The second option was that 50% of the mounting frames would be delivered by March 17, 2014 by air freight from China with a cost of $584,000. *See* SL Ex. 132. The remaining 50% of mounting frames would be delivered starting on or about April 7, 2014 and would be completed over the subsequent two to three weeks. *See* SL Ex. 132. The third option was that the mounting frames would be delivered starting on March 24, 2014 and would be completed within the subsequent three to four weeks. *See* SL Ex. 132. SunLink provided an additional option that 500 mounting frames could be manufactured domestically and delivered during the weeks of March 17 and March 31, 2014, at an additional cost of $25,000. *See* SL Ex. 132. This option could be used in addition to the three options above. *See* SL Ex. 132.

62.     SunLink informed ACE that in order to execute any of the expedited options, a decision (and payment) would have to be made in short order, preferably by the next day. *See* Tr., Day 1, 202:17-203:6 [CT].  ACE did not agree to any of the proposed options either the next day or anytime shortly thereafter. *See* Tr., Day 1, 203:7-18 [CT].

63.     Rather, on or about February 3, 2014, ACE for the first time agreed to an option providing for the expedited shipment of a percentage of the mounting frames required on the CVEC Projects. *See* Tr., Day 1, 207:14-208:8 [CT].  ACE and SunLink agreed to share the cost of the air freight evenly. *See* Tr., Day 1, 208:9-21 [CT].  ACE had still not accepted any options to expedite critical ballast deliveries to the CVEC Projects provided to ACE by SunLink. *See* Tr., Day 1, 209:6-13 [CT].

64.     On February 28, 2014, in the context of yet another acceleration opportunity presented to ACE by SunLink, this time to accelerate the delivery of approximately 1,600 ballasts, ACE for the first time accepted one of SunLink's options to accelerate ballast delivery, albeit orally. *See* Tr., Day 1, 234:7-22 [CT]; SL Ex. 162.  SunLink, however, needed a change order to execute that option. *See* Tr., Day 1, 234:23-235:14 [CT]; SL Ex. 162.[9]

---

[9] In fact, the first signed change order by ACE authorizing accelerated ballast delivery is dated March 3, 2014. *See* Tr., Day 3, 720:19-721:1 [RP]; SL Ex. 234, Tab 4.

65.     Ultimately, between February and early April, 2014, ACE finally agreed with SunLink to the following series of written change orders on the following dates, for the first time authorizing expedited delivery of SunLink mounting frames and ballast:

| Date | Subject | Record Cite |
|------|---------|-------------|
| 2/17/14 | 50% split of mounting frames from China by air (first two 10% shipments) | *See* Tr., Day 3, 724:10-725:7 [RP]; SL Ex. 234, Tab 1 |
| 2/25/14 | 50% split of mounting frames from China by air (third 10% shipment) | *See* Tr., Day 3, 724:10-725:7 [RP]; SL Ex. 234, Tab 2 |
| 3/3/14 | Accelerate delivery of 1608 blocks (Old Castle) from April to March (SunLink pays 20%) | *See* Tr., Day 3, 720:19-721:1 [RP]; SL Ex. 234, Tab 4 |
| 3/13/14 | Production and delivery of 180 ballasts on 5 Saturdays | *See* Tr., Day 3, 721:6-19 [RP]; SL Ex. 234, Tab 5 |
| 3/19/14 | Production and delivery of 80 ballasts (MBO) on 6 Sundays | *See* Tr., Day 3, 721:6-19 [RP]; SL Ex. 234, Tab 6 |
| 4/1/14 | Expediting ballasts to Old Castle from MBO/Scituate (by 4/16) | *See* Tr., Day 3, 722:14-19 [RP]; SL Ex. 234, Tab 8 |
| 4/21/15 | Costs of ballast deliveries from Old Castle for Tisbury (by 4/16) | *See* Tr., Day 3, 722:20-723:1 [RP]; SL Ex. 234, Tab 9 |

66.     It was established through Mr. McLean on cross-examination that ACE ultimately agreed to pay SunLink upwards of $317,000.00 just to expedite <u>ballast</u> deliveries to the CVEC Projects as a result of the above described change orders (*See* SL Ex. 234, Tabs 4, 5, 6, 8, and 9); something which ACE had the opportunity to do starting back on January 17, 2014, when Mr. Eastwood first offered to bring all ballast deliveries on all CVEC Projects into the March 2014 timeframe for an estimated cost to ACE of approximately $400,000.00 which ACE, of course, never acted upon. Tr., Day 6, 1420:15-1427:17; *see also* SL Ex. 100.

67.     As a result of the above-referenced series of change orders finally agreed to by ACE, SunLink was able to dramatically expedite delivery of all required products under the

Sales Contracts, ballasts and hardware alike, such that SunLink completed "all major deliveries" for the CVEC Projects by **April 18, 2014.** *See* SL Ex. 203; Tr., Day 1, 270:21-272:19 [CP].

## G.   ACTUAL DELIVERY OF SUNLINK'S PRODUCTS TO THE CVEC PROJECT SITES; REASONABLENESS OF DELIVERY.

68.    SunLink introduced a single, integrated spreadsheet which tracked and documented the date of <u>all</u> deliveries made by SunLink for the nine (9) CVEC Projects. *See* SL Ex. 241. SunLink's expert witness, Mr. Collins, extracted the relevant delivery information from SunLink's contemporaneous project data contained in SL Ex. 241, and analyzed SunLink's performance on both a cumulative 9-project basis, as well as on an individual basis. *See* SL Exs. A, B, C, and D for Identification (attached hereto as <u>Exhibit A</u>).

69.    Listed below, as taken from SL Ex. 241, are the starting and ending dates for SunLink's delivery of its products to each CVEC Project (additional products ordered by ACE due to customer changes, and/or for supply beyond the quantities initially contracted for, have been excluded):

| CVEC Site | Ballasts Start | Ballasts End | A-Frames Start | A-Frames End | Rails Start | Rails End | Hardware Start | Hardware End |
|-----------|----------------|--------------|----------------|--------------|-------------|-----------|----------------|--------------|
| Barnstable | 2/3/2014 | 4/17/2014 | 3/11/14 | 4/8/14 | 3/11/14 | 4/10/14 | 2/19/14 | 3/12/14 |
| Brewster | 2/18/2014 | 3/24/2014 | 3/11/14 | 3/31/14 | 3/24/14 | 4/14/14 | 2/19/14 | 3/20/14 |
| Chatham | 2/18/2014 | 4/7/2014 | 3/11/14 | 4/8/14 | 4/8/14 | 4/10/14 | 3/3/14 | 4/1/14 |
| Dennis | 1/30/2014 | 4/23/2014 | 3/11/14 | 4/8/14 | 3/3/14 | 4/14/14 | 2/19/14 | 4/1/14 |
| Eastham | 2/13/2014 | 2/27/2014 | 3/11/14 | 4/8/14 | 3/6/14 | 3/10/14 | 3/7/14 | 4/5/14 |
| Harwich | 3/5/2014 | 4/18/2014 | 4/7/14 | 4/8/14 | 3/27/14 | 4/14/14 | 3/7/14 | 3/24/14 |
| Tisbury | 3/24/2014 | 4/14/2014 | 4/7/14 | 4/8/14 | 4/2/14 | 4/10/14 | 3/11/14 | 3/21/14 |

*See* SL Ex. 241.

70.     Although there was no "meeting of the minds" as to an agreed upon delivery schedule between the parties, Mr. Collins nevertheless analyzed SunLink's performance against various schedules exchanged between, but never agreed upon by the parties. *See supra.*, ¶¶ 37, 40, 41, 44, 45, 48, 49, 52, 53, 56, 57, 60.   Specifically, Mr. Collins analyzed SunLink's performance against the ACE August 2013 Schedule, and against the SunLink January 10, 2014, January 24, 2014, and January 28, 2014 Schedules.   *See* SL Exs. A, B, C, and D for Identification; Tr., Day 4, 787:1-803:22 [SC].   Mr. Collins confirmed the completion by SunLink of all base contract deliveries by April 18, 2014, as Mr. Purcell had testified. *See* Tr., Day 4, 809:22-810:10 [SC].   Mr. Collins also confirmed that with respect to ballast deliveries to the CVEC Projects, SunLink exceeded all of the relevant schedules exchanged between the parties. SL Ex. B for Identification; Tr., Day 4, 818:17-821:8 [SC].

71.     Mr. Collins similarly and separately analyzed all "hardware" deliveries to the CVEC Projects, including frames, rails, and miscellaneous hardware.   Tr., Day 4, 839:1-841:3 [SC]; *See* SL Ex. D for Identification.   Mr. Collins testified that, excluding the two (2) post mounted projects (Nunnepog and Katama) for which SunLink is not seeking any damages from ACE, on the central, seven (7) BGMS CVEC Projects, SunLink's delivery of all required hardware under the relevant Sales Contracts was either "consistent with or ahead of" the SunLink January 10, 2014. *See* Tr., Day 4, 849:4-15; 851:11-16 [SC].

72.    Mr. Collins testified that, in his expert opinion, SunLink performed "in a reasonable manner" given the nature, purpose, and circumstances surrounding the nine (9) Sales Contracts at issue.  Tr., Day 4, 852:20-853:2 [SC].  As for the basis of his opinion, Mr. Collins testified as follows:

**Q. Okay. And what is the basis for your opinion?**

A. Well, based on the criteria you set forth, there is a number of considerations that come into effect. There is the sales performance agreement that I considered. It did not include a schedule. If it did include a schedule, the dates would have been approximate. There were six weeks of lead time spelled out for the ballasted systems and I think eight weeks for the ground-mounted systems. In terms of the performance moving forward, no schedules were agreed to my knowledge and to testimony of SunLink witnesses. The actual performance began in advance of the six-week lead time cited in the sales agreements based on the January 2nd receipt of all deposits, which Mr. Tilley and Mr. Purcell spoke to. Various schedules were then exchanged. Options were set forth to expedite two of those schedules. January 24th and 28th in specific came with costs to achieve various options of acceleration. In absence of those being agreed upon, the January 10th schedule was repeatedly referenced by SunLink as the basis of its efforts to accomplish the work. During the performance of the work, the work was subject to layout changes, inclement weather, additional orders for ballasts. There was reallocation of materials between the sites, which was coordinated between both parties on a site level. And the design changes, for instance, seemed to be pretty well accommodated, meaning when they were identified, efforts were made to expedite materials to address those issues, and when you look at those items in relation to the overall performance, taking into account that SunLink did have its challenges, we just looked at a couple, Nunnepog and Katama. Albeit with those, of all the sites, those two sites are not part of the cost dispute. They were paid in full. So the degree to which their potential shortcomings may have an influence, it doesn't seem to be overly significant, at least on the basis of measurement. The balance of the sites, ballast and hardware generally comported with the January 10th schedule that was used as a target, again a schedule that is a target only, since none of the parties ever agreed on a schedule or options to expedite thereto, but for some shipping and other things.

**Q. Okay. And you are also taking into consideration the fact that there were these various options at various times provided to ACE which would have allowed them had they availed themselves of those options to expedite delivery and production more significantly than that which you analyzed? Correct?**

A. That's my understanding of those options and their objectives.

*See* Tr., Day 4, 853:3-855:17 [SC].

**H.      ACE'S BREACH OF THE SALES CONTRACTS.**

73.     Despite receiving timely invoices and accepting <u>all</u> of SunLink's delivered product, ACE did not pay for all invoices within forty-five (45) days of the invoices being issued, as required by the Sales Contracts. *See generally,* SL Ex. 233 (Late Fee Calculation Sheet, which lists invoice dates and due dates).

**I.      ACE'S UNFAIR AND DECEPTIVE BUSINESS PRACTICES.**

**i.      Issuing Notices to Proceed Knowing it Could Not Meet Contractual Payment Terms.**

74.     Prior to issuing any notices to proceed pursuant to the Sales Contracts, ACE was experiencing considerable cash flow problems, which led ACE's counsel, Robert Dowd (**"Mr. Dowd"**), to issue a letter to ACE's creditors requesting patience with ACE. *See* SL Ex. 8. Indeed, a major problem ACE had in the past was the inability to pay subcontractors and vendors. SL Ex. 15, p. 1. ¶ 6; *see supra.,* ¶ 32 (describing ACE's history of not paying SunLink timely for products); *see also,* SL Ex. 1 (January 22 and 23, 2010 emails from Mr. Hunton to Mr. Slatkin – working for SunLink at the time – where Mr. Hunton references an earlier "financial crisis," implores SunLink not to lien ACE's projects, and states "We're good for the money!!"); SL Ex. 2 (January 31, 2011 email from Mr. Slatkin – working for SunLink at the time – providing ACE another reminder to pay an overdue balance of $621,316.33); SL Ex. 3 (February 10, 2012 email from Mr. Eastwood to Mr. McLean regarding liens SunLink had to place on two projects to obtain payment from ACE); SL Ex. 52 (November 26, 2013 email from Reggie Aragones of Bentek Solar Corporation referencing concerns about ACE's payment history).

75.     Furthermore, on November 20, 2013 – prior to providing any notices to proceed to SunLink – ACE knew it could not even make its own payroll until "the CVEC money hits."

*See* SL Ex. 49, p. 2 (email from Mr. Hunton to Mr. Osgood).  At the time, ACE knew it would

<u>not</u> be on "solid ground" until the CVEC monies were provided.  *See* SL Ex. 49, p. 2.

76.     Shortly after entering into the Sales Contracts, in November and December, 2013,

ACE entered into a Funds Disbursement Services Agreement and Strategic Teaming Agreement

with New England Fund Control, LLC and Florence Electric, respectively, which, among other

things, established escrow accounts from which payments to SunLink would be made.  *See* ACE

Exs. 113, 114; Tr., Day 6, 1199:1-1200:23 [EM].  SunLink was not a party to these agreements.

*See* ACE Exs. 113, 114.  Pursuant to these agreements – and despite knowing that the Sales

Contracts did not contain a pay-if-paid provision – ACE relinquished control of ACE's ability to

pay SunLink from these escrow accounts to Florence Electric and ES Boulos.  *See* Tr., Day 6,

1199:1-1200:23; 1335:21-1336:10; 1340:9-12 [EM]; ACE Exs. 113, 114.

77.     Despite (i) its cash flow problems, (ii) knowledge that it was not financially viable

without the "CVEC monies," (iii) knowledge that the Sales Contracts required payment of

SunLink's invoices within forty-five (45) days, (iv) knowledge that the Sales Contracts did not

contain a pay-if-paid provision, and (v) knowledge that it did not control payments to SunLink

under the escrow accounts, ACE issued notice to proceed to SunLink on December 16, 2013 and

January 2, 2014.  *See supra.*, ¶¶ 27, 32, 73-76.  Ultimately, ACE asserted at the hearings that it

has not paid SunLink reportedly because Redwood has not paid ACE and whatever monies that

were placed in the escrow accounts, and earmarked for SunLink, have not been approved for

payment by Florence Electric and ES Boulos because both subcontractors assert that they too are

owed money by ACE.  *See* Tr., Day 6, 1471:10-1473:21 [EM].

ii.     **Misrepresenting the Progress of the CVEC Projects.**

78.     On September 3, 2013, a month and a half before entering into the Sales Contracts

with SunLink, Mr. McLean provided a "Status Report" to CVEC concerning the CVEC Projects.

*See* SL Ex. 29.  Mr. McLean provided this report – intending to show all of ACE's alleged progress – because it was apparent to Mr. McLean that ACE needed to show "more progress" to motivate CVEC to approve proposed amendments to the ACE EPC Contract.  *See* SL Ex. 27 (August 30, 2013 email from John Checklick to Mr. McLean with a copy to Mr. Dowd); Tr., Day 6, 1300:2-6; 1307:12-15 [EM] (admitting that ACE's task was to provide information showing progress on initiating the work); SL Ex. 28 (September 2, 2013 email Bill Peltz and others at Clean Focus with a copy to Mr. Dowd); Tr., Day 6, 1307:24-1309:13 [EM] (intend was to show "more progress" to motivate CVEC to sign amended EPC Contract).  Among other things, in anticipation of receiving "construction funds" in September, Mr. McLean represented to CVEC that:

a.   ACE had *finalized negotiating purchase orders with major capital equipment vendors and placed down payments where required*;

b.   ACE had *secured delivery of the following capital equipment: . . . Sunlink [sic] Racking System* – racking and concrete ballasts for all systems, set to begin delivery seeks weeks after construction funding, *deposit already made.*

*See* SL Ex. 29 (emphasis added); Tr., Day 6, 1317:16-23 [EM].  None of these representations about SunLink, however, were true.  *See supra.*, ¶¶ 35, 36; Tr., Day 5, 1070:12-1073:17 [ZO]; Tr., Day 6, 1317:16-1318:23 [EM].  Similarly, Mr. Mclean also represented in September of 2013 to CVEC that ACE had *"finalized agreements with all major subcontractors."*  *See* SL Ex. 29 (emphasis added).  That representation, however, was not true.  *See* Tr., Day 5, 1074:1-7 [ZO]; SL Ex. 30 (October 4, 2013 email from Mr. McLean to Mr. Osgood and others at ACE asking them to get the "subcontracts done" because ACE was "getting close to an ntp with CVEC" and to make the subcontracts "a high priority"); ACE Ex. 114, p. 1 (indicating that ACE/Florence Electric subcontract executed in December 2013); SL Ex. 40 (October 28, 2013 emails indicating that "ESB" [ES Boulos] does not yet have a contract).

79.     On December 16, 2013, Mr. Osgood sent Sam Wu ("**Mr. Wu**") of Redwood "the project schedules for the" CVEC Project. *See* SL Ex. 64. Within those project schedules, among other things, Mr. Osgood represented to Mr. Wu that the "Racking Ballasts" or "Posts" and "Racking Systems" had been ordered for (i) all the CVEC Projects sites (except for the Brewster site) between July 23 and 29, 2013, and (ii) the Brewster site between July 23 and August 5, 2013. *See* SL Ex. 64; Tr., Day 5, 1084:1-1086:1; 1086:8-13 [ZO]. Those representations were not true. *See supra.*, ¶¶ 35 (deposits only received on December 16, 2013, and January 2, 2014 for SunLink's products); Tr., Day 5, 1083:13-17 [ZO] (admitting that deposits for all CVEC project sites not provided to SunLink as of December 16, 2013); Tr., Day 5, 1086:4-7 [ZO] (admitting that as of July 23, 2013, there was not an operative, signed contract with SunLink).

80.     Furthermore, despite not yet even agreeing to a delivery schedule with SunLink, Mr. Osgood sent Mr. Wu updated construction schedules on January 13 and 18[10], 2014, which contained the same material misrepresentations about when ACE supposedly had ordered ballasts, posts, and racking systems for the CVEC Projects from SunLink. *See* SL Exs. 94, 102, 103.

### iii.     Refusing to Provide or Agree to a Reasonable Delivery Schedule with SunLink.

81.     From the early negotiations of the CVEC Projects in 2012, and up to the time ACE provided its first proposed, *revised* delivery schedule on January 8, 2014, SunLink repeatedly requested ACE to provide a delivery schedule so that SunLink could prepare to ship its products. *See e.g.*, SL Ex. 6 (March 23, 2012 email from Mr. Eastwood to Mr. McLean stating "we urgently need more definitive schedule information concerning deliveries"); Tr., Day 5, 1057:22-1058:19 [ZO] (admitting he was notified of Mr. Eastwood's March 23, 2012 request);

---

[10] The schedule sent on January 18, 2014 was dated January 17.

SL Ex. 66 (December 17, 2013 email from Mr. Purcell to Mr. Osgood requesting an "updated delivery schedule for these projects"); SL Ex. 68 (December 18, 2013 email from Mr. Purcell to Mr. Osgood indicating that SunLink was "just waiting on your schedule to provide a timeline to" SunLink's suppliers); SL Ex. 80 (January 3, 2014 email from Mr. Purcell to Mr. Osgood asking ACE to "send over a schedule for these projects"); Tr., Day 1, 122:1-13 [CT]; Day 2, 464:22-465:17; 466:1-11; 467:16-24 [CP] (explaining, among other things, that SunLink team had been asking for schedule after the Sales Contracts were executed on a "very regular basis"); Tr., Day 3, 620:8-14 [JE] ("I was one of several voices in the chorus asking for schedules"); SL Ex. 80; Tr., Day 5, 1088:2-15 [ZO] (responding to Mr. Purcell's request for a schedule by asking "for SunLink's and its manufacturer's capabilities").

82.    Indeed, as the previously contemplated delivery dates and lead time in the ACE August 2013 Schedule had expired, after executing the Sales Contracts, SunLink was expecting a revised delivery schedule from ACE. Tr., Day 3, 698:17-699:1 [RP]. Yet, although promising to provide a revised delivery schedule, *see* SL Ex. 48 (November 20, 2013 email from Mr. Osgood to J. Eastwood indicating that "Jeff and I will have a better idea at the end of the week about delivery schedules."); Tr., Day 5, 1080:13-1081:8 [ZO]; SL Ex. 66 (December 17, 2013 email from Mr. Osgood to Mr. Purcell indicating "we will have updated delivery schedules to you shortly") – and failing to do so – ACE simply demanded SunLink to deliver "ballasts, posts, and racking materials on all sites . . . as soon as possible" without an agreed-to schedule. *See* SL Ex. 79 (January 3, 2014 email from Mr. Osgood to Mr. Purcell) (emphasis added); Tr., Day 2, 466:1-21; 467:16-24 [CP] (Mr. McLean simply told Mr. Purcell to send products ASAP and all at once); Tr., Day 3, 628:7-630:11 [JE] (referring to ACE's delivery demands not realistic, making "no sense whatsoever" and being "completely irresponsible" under the circumstances).

83.     Thereafter, ACE demanded SunLink to abide by the ACE January 8, 2014 Schedule, which was patently unreasonable, if not impossible to accomplish, under the circumstances. *See* Tr., Day 1, 152:1-153:3 [CT] (where Mr. Tilley explained: "This is absurd"; "This is not rational"); Tr., Day 2, 471:9-472:22 [CP] (detailing why schedule "didn't make sense . . . at all" and "seemed crazy"); Tr., Day 3, 713:2-715:12 [RP] (describing schedule as "damn near impossible"); Tr., Day 3, 734:16-736:16 [RP] (explaining why ACE's request was "unreasonable").   In doing so, Mr. Osgood represented that the CVEC Projects needed to be "operational by April" 2014. *See* SL Ex. 87. That representation was false. *See generally*, SL Ex. 237 (ACE's Verified Complaint in *American Capital Energy, Inc. v. Redwood Solar Development, LLC, et al.*, C.A. No. 1572-cv-00026 (Mass. Sup. Ct.) ("**ACE Verified Complaint**") (where ACE asserts Mechanical Completion required by June 13, 2014).

84.     In addition, when SunLink presented ACE with a proposed schedule with delivery durations consistent with ACE's expectations, i.e., the SunLink January 10, 2014 Schedule, ACE simply rejected it. *Compare* SL Ex. 90 (containing SunLink January 10, 2014 Schedule with a proposed fifteen-week delivery schedule) *with* SL Ex. 108 (where Mr. McLean informs Mr. Eastwood that ACE's expectations for "durations" as of January 20, 2014 were based firmly on the durations in the ACE August 1, 2013 Schedule, i.e., fifteen weeks); SL Ex. 63 (December 16, 2013 email where Mr. Osgood forwarded August 2013 Schedule to Mr. Gadomski); Tr., Day 5, 1082:13-1083:7 [ZO] (admitting that as of December 16, 2013, ACE's "benchmark" schedule for delivery was the ACE August 2013 Schedule); Tr., Day 6, 1382:13-1383:21 [EM]; Tr., Day 5, 1110:18-1111:2 [ZO] (admitting that as of January 20, 2014, ACE's expectations about delivery were based on ACE's August 2013 Schedule); SL Ex. 111 (January 21, 2014 email

from Mr. Osgood to Mr. Eastwood attaching the ACE August 2013 Schedule as an example);
Tr., Day 5, 1062:7-1063:8 [ZO].

85.     Moreover, on January 20, 2014, when the Parties were trying to come to an agreement on a delivery schedule, Mr. McLean forwarded Mr. Eastwood the ACE August 1, 2013 Schedule and stated:

> John,
> This was the original schedule sent over to your team by Jeff in August (see below), this was based on an August NTP and delivery starting 4 weeks after NTP. This expectation was in place on our end.  With a movement of ntp but not durations.  It is roughly a 2 1/2 month delivery schedule.

See SL Ex. 108.  Contrary to Mr. McLean's assertion, the ACE August 1, 2013 Schedule does not provide roughly a 2 ½ month delivery schedule; but rather, it provides almost 4 months for delivery.  See supra., ¶ 85.  Like Mr. McLean, Mr. Osgood was well aware that ACE's "delivery" duration expectations arose from the ACE August 1, 2013 schedule, despite Mr. Osgood's attempt to force SunLink to agree to various expedited schedules at no cost to ACE. See SL Ex. 111 (January 20, 2014 email from Mr. Osgood rejecting SunLink January 16, 2014 Schedule based, in part, on ACE paying for it; January 21, 2014 email forwarding SunLink ACE August 1, 2013 Schedule for discussion purposes); Tr., Day 1, 175:23-176:18 [CT].

86.     Furthermore, when SunLink presented ACE with an expedited eleven-week schedule (that would have met ACE's needs and secured delivery of all products four weeks earlier than ACE's August 1, 2013 Schedule), ACE simply rejected it as "dog shit" and as SunLink's "bullshit schedule[.]"  See SL Ex. 104.  At or around the same time, ACE also was threatening to purchase products from a different supplier if SunLink did not accede to ACE's demands. See SL Ex. 106, 121.

iv.    **Issuing Baseless Default Letters.**

87.    On January 28, 2014, Mr. Osgood sent SunLink a letter purportedly placing

SunLink in default under the Sales Contracts. *See* SL Ex. 123; Tr., Day 5, 1114:17-1115:15

[ZO]. The basis for the alleged default, according to Mr. Osgood, was SunLink's "inability to

meet the delivery schedule defined in the Contacts." *See* SL Ex. 123; Tr., Day 5, 1115:16-

1116:2 [ZO]. Yet, Mr. Osgood was well aware that there was no delivery schedule defined in

the Sales Contracts. *See* Tr., Day 5, 1115:24-1116:6 [ZO] (where Mr. Osgood admits that there

is no delivery schedule defined in the Sales Contracts even though that was the asserted basis of

his default letter); Tr., Day 6, 1321:7-12 [EM]; *see also*, Tr., Day 1, 191:1-11 [CT] ("Just about

everything in here to me appeared to be ludicrous, just not – it didn't make sense."). Nor,

contrary to the assertions in the default letter, had the Parties agreed to the SunLink January 24,

2014 Schedule referenced in the default letter. *See supra.*, ¶ 56; Tr., Day 5, 1117:21-1118:16

[ZO]; Tr., Day 6, 1388:20-1389:13 [EM]. Furthermore, contrary to Mr. Osgood's statements

about "lead time," the first load of ballasts arrived at the Dennis project site on or about January

30, 2014, which was within six (6) weeks of SunLink receiving the deposits for the production of

ballasts (January 2, 2014). *Compare* SL Exs. 127 and 148; Tr., Day 1, 192:23-193:13 [CT]; Tr.,

Day 2, 491:2-7; 495:16-496:12 [CP] *with* Tr., Day 5, 1116:19-1118:22; 1119:6-15 [ZO].

88.    Then, on February 4, 2014, Mr. McLean sent SunLink another letter purporting to

place SunLink in default under the Sales Contracts. *See* SL Ex. 141; Tr., Day 6, 1399:10-14

[EM].[11] This time, ACE based the alleged default on "the terms and conditions" of the Master

Sales Contract and Volume Pricing Agreement (**"Master Sales and VPA"**) signed on March 6,

2012. *See* SL Ex. 141. The Master Sales and VPA, however, expired on its own terms on

---

[11] Remarkably, on this same day, despite its second baseless notice of default, ACE actually awarded SunLink another project, committing to purchase products from SunLink for a project in Charlotte, Vermont. *See* SL Ex. 143; Tr., Day 1, 218:5-219:1 [CT]; Tr., Day 2, 494:17-495:5 [CP]; Tr., Day 6, 1404:11-17 [EM].

December 31, 2012. *See* SL Ex. 4, p. 7 ("specifications and sales price . . . valid for product delivery in the calendar year of 2012); Tr., Day 5, 1055:7-1056:22 [ZO]; *see also*, Tr., Day 5, 1057:5-6 (where ACE's counsel even admitted that the Master Sales and VPA "is inoperable"); Tr., Day 6, 1260:5-7 [EM]. Furthermore, the Sales Contracts were executed in October 2013, and contain an integration clause. *See* Sales Contracts, p. 8 (at ¶ 21.f). Also, in the default letter ACE relied on its alleged transmission of "$903,000" in funds to SunLink, *see* SL Ex. 141; however, the vast majority of those funds ($803,760) were pre-paid for products to be delivered to the Mashpee and Duxbury Project sites, which were different projects with different owners (not CVEC). *See* Tr., Day 1, 130:4-23; 132:11-133:3; 213:10-24 [CT]; Tr., Day 6, 1262:11-23 [EM]; ACE Exs. 76, 77. Finally, ACE asserted that SunLink had failed to inform ACE that some products would be sourced out of the United States and somehow had misled ACE by listing various domestic F.O.B. points in the Sales Contracts. *See* SL Ex. 141. The Sales Contracts, however, do not contain a "manufactured-in-the-USA" clause or requirement. *See generally*, Sales Contracts; Tr., Day 1, 210:17-211:21 [CT]. Also, F.O.B. points relate to where contracting parties contractually agree to shift the risk of loss – they are not points of manufacture for products. *See* Tr., Day 1, 211:22-212:14 [CT]. Even if they were, the Sales Contracts expressly allowed SunLink to designate any F.O.B. points it chose. *See generally*, Sales Contracts, p.6 (at ¶ 10).[12]

> **v.   False Promises of Payment of all Outstanding Invoices to SunLink and Its Lender, Bridge Bank; Securing Additional Products from SunLink with No Intent to Pay.**

89.   On March 7, 2014, Mr. Tilley informed Mr. McLean that SunLink's bank, Bridge Bank, would be contacting ACE to verify invoices and payment as Bridge Bank was providing

---

[12] Additionally, on or before March 6, 2014, ACE informed Sam Wu that SunLink was not performing under the Sales Contracts and had misrepresented to ACE where the products would be manufactured. *See* Tr., Day 1, 247:20-250:4 [CT]; SL Exs. 173, 174.

SunLink a line of credit for working capital tied to SunLink's accounts receivables. *See* SL Ex. 175; Tr., Day 1, 252:21-253:3 [CT]; Tr., Day 5, 920:3-18 [TR]. That same day, Chris Rudberg of Bridge Bank sent Mr. McLean an "AR Verification form" and asked him to complete it, sign it, and sent it back to Bridge Bank. *See* SL Ex. 178.

90.     On March 25, 2014, Mr. Osgood informed Mr. McLean that all of SunLink's invoices (to date) had "been reviewed and have been approved" without qualification. *See* SL Ex. 192. Then, on March 26, 2004, ACE's controller, signed a verification form for the following SunLink Invoices:

| Invoice # | Invoice Date | Anticipated Payment Date | Amount | Confirmed | Comments |
|---|---|---|---|---|---|
| 11099 | 3/14/2014 | Per Contract | $97,607.06 | | Approved |
| 11100 | 3/14/2014 | Per Contract | $133,908.36 | | Approved |
| 11101 | 3/14/2014 | Per Contract | $90,036.81 | | Approved |
| 11102 | 3/14/2014 | Per Contract | $398,625.31 | | Approved |
| 11103 | 3/14/2014 | Per Contract | $141,575.87 | | Approved |
| 11104 | 3/14/2014 | Per Contract | $215,164.48 | | Approved |
| 11105 | 3/14/2014 | Per Contract | $172,157.22 | | Approved |
| 11106 | 3/14/2014 | Per Contract | $529,862.06 | | Approved |
| 11107 | 3/14/2014 | Per Contract | $96,206.46 | | Approved |

*See* SL Ex. 195; Tr., Day 1, 260:23-262:10 [CT]. That form requested ACE to "indicate if any contras, *offsets or credits against the invoices . . . exist* or if there is *any reason why payment will not be made*[.]" *See* SL Ex. 195 (emphasis added). ACE's controller did not indicate that ACE had any offsets or credits or was aware of any reason why payment would not be made. *See* SL Ex. 195; Tr., Day 1, 260:23-262:10 [CT]. Rather, in the "Comments" section of the form, ACE's controller informed Bridge Bank that the invoices had been "Approved." *See* SL Ex. 195; Tr., Day 1, 263:9-20 [CT]. Also, in the "Anticipated Payment Date" section of the form, ACE's controller informed Bridge Bank that payment would be made "Per Contract" (i.e., in forty-five (45) days). *See* SL Ex. 195; Tr., Day 1, 263:9-20 [CT]. Nor does the form signed

by ACE reference ACE's alleged default letters. *See* SL Ex. 195; Tr., Day 1, 262:21-263:8 [CT].

91.     ACE's controller executed another AR verification form on April 2, 2014 for the following SunLink Invoices:

| Invoice # | Invoice Date | Anticipated Payment Date | Amount | Confirmed | Comments |
|---|---|---|---|---|---|
| 11156 | 3/31/2014 | PER CONTRACT | $589,505.13 | APPROVED | |
| 11157 | 3/31/2014 | PER CONTRACT | $143,709.56 | APPROVED | |
| 11158 | 3/31/2014 | PER CONTRACT | $ 86,865.62 | APPROVED | |
| 11159 | 3/31/2014 | PER CONTRACT | $329,798.45 | APPROVED | |
| 11160 | 3/31/2014 | PER CONTRACT | $101,172.97 | APPROVED | |
| 11162 | 3/31/2014 | PER CONTRACT | $539,708.35 | APPROVED | |
| 11163 | 3/31/2014 | PER CONTRACT | $234,367.93 | APPROVED | |
| 11148 | 3/28/2014 | PER CONTRACT | $64,485.30 | APPROVED | |
| 11150 | 3/28/2014 | PER CONTRACT | $21,423.11 | APPROVED | |
| 11153 | 3/28/2014 | PER CONTRACT | $93,349.30 | APPROVED | |
| 11149 | 3/28/2014 | PER CONTRACT | $9,921.77 | APPROVED | |
| 11151 | 3/28/2014 | PER CONTRACT | $22,034.46 | APPROVED | |
| 11152 | 3/28/2014 | PER CONTRACT | $22,034.46 | APPROVED | |

*See* SL Ex. 239 (April 2, 2014); Tr., Day 1, 272:20-275:3 [CT].  ACE's controller did not "indicate if any contras, *offsets or credits against the invoices . . . exist* or if there is *any reason why payment will not be made*[.]" *See* SL Ex. 195 (emphasis added); Tr., Day 1, 272:20-275:3 [CT].  Nor does the form signed by ACE reference ACE's alleged default letters. *See* SL Ex. 239; Tr., Day 1, 272:20-275:3 [CT].  Again, ACE's controller informed Bridge Bank that the invoices had been "Approved." *See* SL Ex. 195; Tr., Day 1, 272:20-275:3 [CT].  Also, in the "Anticipated Payment Date" section of the form, ACE's controller informed Bridge Bank that payment would be made "Per Contract" (i.e., in forty-five (45) days). *See* SL Ex. 239; Tr., Day 1, 272:20-275:3 [CT].

92.     By April 30, 2014, ACE was overdue on paying SunLink's CVEC invoices in the amount of $2,517,962.25, *see* SL Ex. 206, even though ACE had reviewed and approved all of SunLink's invoices and informed Bridge Bank those invoices would be paid.  Although there are no pay-if-paid provisions in the Sales Contracts, *see supra.*, ¶¶ 27, 76, 77, ACE's intent was to

pay SunLink's arrears only when and if ACE received payments from Clean Focus/Redwood. *See* SL Ex. 206, p. 2.

93.     ACE's controller executed another AR verification forms on May 1, 2014 for the following SunLink Invoices:

| Invoice # | Inv Date | Invoice Amount | Confirmed Received (Y/N) | Anticipated Payment Date | Comments |
|---|---|---|---|---|---|
| 11221 | 4/18/14 | $   286,244.16 | YES | PER CONTRACT | |
| 11222 | 4/18/14 | $   266,714.34 | YES | PER CONTRACT | |
| 11223 | 4/18/14 | $   365,993.85 | YES | PER CONTRACT | |
| 11224 | 4/18/14 | $   385,744.88 | YES | PER CONTRACT | |
| 11225 | 4/18/14 | $   260,821.85 | YES | PER CONTRACT | |
| 11226 | 4/18/14 | $ 1,050,855.54 | YES | PER CONTRACT | |
| | | | | | |

*See* SL Ex. 240 (May 1, 2014); Tr., Day 1, 276:13-277:13 [CT].   At no time did ACE's controller "indicate if any contras, *offsets or credits against the invoices . . . exist* or if there is *any reason why payment will not be made*[.]" *See* SL Ex. 240; Tr., Day 1, 276:13-277:13 [CT]. Nor does the form signed by ACE reference ACE's alleged default letters. *See* SL Ex. 240; Tr., Day 1, 276:13-277:13 [CT].   In the "Anticipated Payment Date" section of the form, ACE's controller informed Bridge Bank that payment would be made "Per Contract" (i.e., in forty-five (45) days). *See* SL Ex. 240; Tr., Day 1, 276:13-277:13 [CT].

94.     In the aggregate, without indicating there existed any offsets, credits or any reason why payment would not be made, ACE verified to Bridge Bank that SunLink invoices totaling $6,749,681.00 on the CVEC projects had been approved and, as a result, Bridge Bank loaned money to SunLink. *See* SL Exs. 195, 239, and 240; Tr., Day 1, 277:14-278:4 [CT].

95.     At or around the same time (beginning of May 2014), after SunLink had supplied all base contract required products, ACE was submitting changes orders to SunLink for additional products under the Sales Contracts. *See* SL Exs. 207, 209, and 211. Concerned about the lack of payment, SunLink initially placed all ACE change order shipments on hold until ACE

paid its arrears. *See* SL Ex. 212, p. 2; Tr. Day 1, 283:12-284:1 [CT]. On May 27, 2014, Mr. Ridgway spoke with Mr. McLean about the shipment hold and ACE's arrears and Mr. McLean promised to provide SunLink a payment schedule. *See* Ex. 212, p. 1; Tr., Day 5, 922:20-923:24 [TR]. Similarly, on May 29, 2014, ACE informed Mr. Eastwood that ACE would pay down its arrears early the following week. *See* SL Ex. 215, p. 1. Indeed, that morning, J. Eastwood spoke with Mr. Osgood, who indicated that payment "wires" were scheduled to go out the last week of May or the early the following week. *See* SL Ex. 216. As of May 29, 2014, ACE was more than $4,000,000 past due. *See* SL Ex. 217; Tr. Day 1, 286:11-17 [CT].

96.     On May 30, 2014, Mr. Ridgway informed Mr. McLean that SunLink required a call with Clean Focus, ACE, and Bridge Bank to discuss ACE's arrears and to remedy the need for SunLink to place liens on the CVEC Projects. *See* SL Ex. 219, p. 3. Also, Mr. Ridgway asked Mr. McLean when ACE would send a payment schedule. *See* SL Ex. 219, p. 3. In response, Mr. McLean emailed Mr. Ridgway as follows:

> Working on it now, a lot will depend when they fund ACE. we [sic] have over 11.5 million outstanding, *all is in process just timing*.
>
> *Some payments to you are in process now. You should be receiving some yesterday today [sic] and early next week.*

*See* SL Ex. 218 (emphasis added); Tr., Day 1, 286:18-287:5 [CT]; Tr., Day 5, 924:5-15 [TR]. The vast majority of the outstanding balance, which ACE had promised to pay, was never paid. *See* Tr., Day 1, 287:6-10 [CT].

97.     As of June 2, 2014, ACE was approximately $6,922,953 past due on the CVEC Projects. *See* SL Ex. 220. That day, Messrs. Tilley, Ridgway, McLean and Wu all participated in a conference call with Bridge Bank representatives to discuss ACE's payment plan and Mr. McLean agreed to provide the requested payment schedule as a result of this call. *See* Tr., Day

1, 287:11-290:17 [CT]; Tr., Day 5, 925:12-927:2 [TR] (explaining that ACE said they were "good for the money"). At no point during this call with Bridge Bank was there any discussion about SunLink being in default under the Sales Contracts, offsets, delays, LDs, SRECs, additional subcontracting costs incurred by ACE, claims against SunLink, or anything else that would have justified or warranted ACE withholding payment of any monies owed to SunLink. *See* Tr., Day 1, 290:18-291:15 [CT]; Tr., Day 5, 927:12-17 [TR]. In reliance on Mr. McLean's representations on the June 2, 2014 call, SunLink lifted the hold on shipping the additional products ordered by ACE. *See* Tr., Day 2, 309:12-19 [CT]. The only ACE representative on the call, Mr. McLean, incredibly testified that he "could not recall" anything of what was said on this call. *See* Tr., Day 6, 1445:9-1447:14 [EM].

98.     On June 4, 2014, Mr. McLean provided SunLink with a payment schedule, as he had agreed to do on June 2, 2014. *See* SL Ex. 224, pp. 1-2; Tr., Day 1, 291:16-293:20 [CT]. Although there is a scrivener's error in the spreadsheet, the schedule anticipated full payment of all invoices by the end of June, 2014. *See* SL Ex. 224, p. 3; Tr., Day 1, 291:16-293:20 [CT]. Remarkably, despite not mentioning anything about it on the June 2, 2014 call, Mr. McLean asserts in his cover email that SunLink is in default under the Sales Contracts because of an alleged "late delivery" of equipment and, again, that SunLink will be paid once Clean Focus pays ACE. *See* SL Ex. 224, p. 2. ACE did not make any substantive payments on CVEC Projects invoices pursuant to Mr. McLean's payment plan. *See* Tr., Day 2, 310:13-16 [CT].

**vi.     Issuing Baseless Credit Letter.**

99.     After having agreed to a mediation to occur on June 26, 2014 in Boston, and without any forewarning whatsoever, on June 19, 2014, Mr. Hunton sent Mr. Eastwood a "Credit Letter." *See* SL Ex. 222; Tr., Day 2, 310:19-311:11 [CT]; Tr., Day 3, 633:11-634:20 [JE]; Tr., Day 7, 1554:1-8 [TH]. Remarkably, after being informed earlier in the month that ACE was

approximately $6,922,953 past due, attending the call with Bridge Bank on June 2, 2014, and even sending a payment schedule, ACE asserted a credit against those arrears for – coincidentally – $6,942,172. *See* SL Ex. 222. In the letter, Mr. Hunton claims to have issued the credit pursuant to the "terms of the" the Sales Contracts, and as a result of SunLink's alleged "breach of contract and failure to timely perform and timely delivery materials per contract terms." *See* SL Ex. 222. Furthermore, Mr. Hunton asserted that the credit was comprised of the following costs ACE had "incurred":

- Claims of overtime and lost production by subcontractors of $2,883,217
- ACE direct labor costs of $186,805.
- Claims by Redwood Capital of Liquidated Damages of $1,647,150
- Claims by Redwood Capital lost SREC production of $2,225,000

*See* SL Ex. 222. The Sales Contracts, however, do not contain any "flow down" provisions and do not provide ACE with the ability to claim a "credit" against amounts invoiced. *See generally*, Sales Contracts; Tr., Day 2, 311:22-312:2 [CT]. To the contrary, the Sales Contracts expressly preclude ACE from recovering any "special, indirect, incidental, consequential or punitive damages, whether arising in contract, tort or otherwise, even if advised of the possibility of the same." *See* Sales Contracts, p.8 (at ¶ 21.g); Tr., Day 2, 311:22-312:2 [CT].

100.    According to Mr. Hunton, the basis for the liquidated damages and SREC production offsets was a June 5, 2014 email from Bill Peltz. *See* Tr., Day 7, 1556:22-1557:15 [TH]; ACE Ex. 4, at p. 3. As established during cross-examination, however, the email relates only to the Eastham site and does not contain any "claims" by Clean Focus/Redwood against ACE concerning SREC production or liquidated damages. *See* Tr., Day 7, 1558:1-11 [TH]; ACE Ex. 4, at p. 3. Also, the email merely contains a worksheet detailing certain specific adjustments arising out of ACE's EPC Contract. *See* Ex. 4, at p. 3. In fact, as of June 2015, however, Redwood had not made <u>any</u> claims for liquidated damages or lost SREC production against

ACE. *See* SL Ex. 238, Tab 3 (Affidavit of Sam Wu), ¶ 7 and <u>Exhibit 2</u> attached thereto (asserting that Redwood did not place ACE in default until <u>November 17, 2014</u>); Tr., Day 2, 317:17-318:17 [CT]. Upon receipt of Mr. Hunton's Credit Letter, SunLink realized that ACE essentially had "completely set up" SunLink, was "shooting" SunLink and leaving it "for dead." *See* Tr., Day 2, 315:10-316:20 [CT]; *see also*, Tr., Day 2, 320:12-322:10; 325:4-24 [CT] (describing financial and business impacts on SunLink of ACE's failure to pay and other actions); Tr., Day 3, 634:21-635:12 [JE] (describing impact as "catastrophic" and signing SunLink's "death warrant"); Tr., Day 5, 939:20-941:10 [TR] (describing practical impacts resulting from ACE's failure to pay SunLink's invoices). Unfortunately, based on ACE's non-payment, Mr. Eastwood's ownership interest in SunLink was reduced to just one percent (1%). *See* Tr., Day 3, 642:3-643:2 [JE].

101.    Moreover, it was revealed by ACE's counsel, Mr. Dowd, on Day 4 of the hearings that sometime prior to the commencement of this proceeding, ACE had actually decided <u>not</u> to assess the alleged liquidated damages and SREC offsets against SunLink. *See* Tr., Day 7, 1563:1-6; 1565:2-5 [TH]. Indeed, Mr. Hunton starkly admitted under oath on the final day of these arbitration proceedings that ACE owes and has always owed SunLink at least $3,872,150 in unpaid invoices. *See* Tr., Day 7, 1564:11-13; 1565:10-21 [TH]. ACE even alleges to have requested payment for that very amount for SunLink presumably from Clean Focus/Redwood. *See* Tr., Day 7, 1563:9-15 [TH]. Remarkably, however, Mr. Hunton, a 47.5% owner of the ACE, could not even recall *the year* ACE made the decision not to assert that $3,872,150 as an offset to SunLink's claims or when his company requested payment for SunLink of millions of dollars, presumably from Clean Focus/Redwood/Florence Electric/ES Boulos. *See* Tr., Day 7, 1563:1-20; 1565:17-1566:10 [TH].

102. As to the other two alleged offsets (direct labor, overtime), ACE's assertions in this proceeding are belied by its own verified allegations – signed by Mr. Hennessey – in a pending litigation against Redwood and others. *See generally*, SL Ex. 237 (ACE Verified Complaint), ¶¶ 78-105. Specifically, in the ACE Verified Complaint, ACE alleges, among other things, that:

1. ACE fully performed and timely completed all obligations under its "EPC contracts" with Clean Focus and Redwood. *See* SL Ex. 237, ¶¶ 20-67.

2. Despite ACE's having fully performed its obligations under the contracts, Redwood, "and its affiliate Clean Focus," have "orchestrated the complex payment structure to avoid Redwood's obligations under the EPC contract." *See* SL Ex. 237, ¶ 72.

3. "Redwood caused the delays for which it blames ACE." *See* SL Ex. 237, ¶¶ 78-105.

4. "Because the major delays were caused by [Clean Focus and Redwood's] failures under the EPC contract with regard to the NStar interconnection, ACE has rejected the liquidated damages in the contact adjustment which the Defendants have sought to impose on ACE as a pre-textual basis to not pay ACE for all of its work on the solar projects." *See* SL Ex. 237, ¶ 103.

5. Redwood and Clean Focus breached their contracts with ACE, breach implied covenants of good faith and fair dealing, were unjustly enriched, and have violated G.L. 93A. *See* SL Ex. 237, Counts II-IV.

Put simply, the "offset damages" ACE seeks to recover here are alleged in ACE's verified pleadings in Barnstable Superior Court to be the product of delays occasioned by entities other than SunLink.

103. Tellingly, both Messrs. McLean and Hunton attempted to distance themselves from ACE's Credit Letter at the hearings. *See* Tr., Day 6, 1447:15-1448:15 [EM] (where Mr. McLean alleged he was not sure or did not recall (i) if he participated in drafting it, (ii) whether he was consulted at all about the letter, (iii) who drafted it, or (iv) whether Mr. Dowd provided any legal advice concerning the letter); Tr., Day 7, 1554:17-1556:21 [TH] (where Mr. Hunton

alleged he could not remember or did not know (i) who drafted the letter, (ii) how he received a draft of the letter, (iii) when he first saw it, and (iv) who prepared the calculations for the Liquidated Damages and SREC offsets).

    **vii.**    **Raising and Prosecuting Baseless Defenses.**

    104.    SunLink initiated this proceeding on October 20, 2014.  *See* Demand for Arbitration.  On November 26, 2014, ACE submitted its answer and included a "Thirteenth Affirmative Defense."  *See* Respondent's Answer.  ACE founded its Thirteen Affirmative Defense on the following penultimate assertions:

    a.    The Sales Contracts contained a contractual term that the *lead time for delivery* of the Equipment was six (6) weeks;

    b.    By electronic mail dated October 9, 2013, SunLink confirmed that their *delivery schedule* was five (5) to six (6) weeks for the Equipment; and

    c.    The Sales Contracts contained terms detailing that SunLink's products would be shipped within the United States (as opposed to China), e.g., the F.O.B. terms and/or that SunLink would use only domestic manufacturers.

*See* Respondent's Answer, pp. 7-10 (emphasis added).

    105.    ACE's assertions in its Thirteenth Affirmative Defense were and are baseless. First, ACE's witnesses readily admitted at the hearings that (i) there was no delivery schedule defined in the Sales Contracts and (ii) the six (6) weeks "lead time" in the Sales Contracts concerned "lead time" for production as opposed to "lead time" for delivery. *See supra*, ¶¶ 23, 28. Second, ACE's Mr. Osgood readily admitted that J. Eastwood was <u>not</u> confirming a "delivery schedule" of five (5) to six (6) weeks in J. Eastwood's October 9, 2013 email. *See* Tr., Day 5, 1068:3-1070:1 [ZO]. Rather, J. Eastwood merely was confirming the duration for the product "lead time" that ultimately was set forth in the Sales Contracts. *Compare* ACE Ex. 45 *with* Sales Contracts, pp. 2, 3. Third, the Sales Contracts do not contain any terms indicating that SunLink would use only domestic manufacturers. *See generally*, Sales Contracts.

106.    What is more, in the Thirteen Affirmative Defense, ACE asserted the same $6,942,172 offset set forth in Mr. Hunton's Credit Letter, which included offsets for liquidated damages and lost SREC production. *See* Respondent's Answer, p. 10 (emphasis added). Indeed, the "major issue" on which ACE based its defense in this proceeding was the "SREC" issue." Specifically, in his opening at the hearings on May 13, 2015, Mr. Dowd stated:

> The a [sic] major issue in this case that has not been unfolded or dealt with deals with the SREC issue with respect to the case itself. . . . And that the two things that I would like to emphasize here is that the SRECs, their knowledge of the SRECs, their representations about what they would in fact get done, when in fact it totally would cost us a tremendous amount of money because of it, and we barely made it because of it, but I lay those out.

See Tr., Day 1, 11:7-14:16. Although mid-way through the hearings, Mr. Dowd blamed ACE's prior counsel for not filing an Amended Answer to remove claims for lost SREC production, a good amount of ACE's direct testimony and cross examination of SunLink's witnesses dealt with "the SREC issue." ACE, however, had abandoned seeking any offsets for lost SREC production (and liquidation damages) sometime in 2014 or 2015, *see supra.*, ¶¶ 102-104, and admittedly has not paid at least $3,872,150 ACE owes to SunLink. See Tr., Day 7, 1564:11-13; 1565:10-22 [TH].

107.    Similarly, as to the other two "offsets" (overtime and direct labor), they either are barred by the limitation of liability clause in the Sales Contracts; and/or barred by ACE's verified allegations in pending Superior Court proceedings against Clean Focus/Redwood that any delays in the CVEC Projects were exclusively caused by Clean Focus/Redwood and others, and not SunLink. *See supra.*, ¶ 103. Therefore, ACE completely failed to raise any viable defense to paying either the $3,872,150 withheld for SREC production and liquidated damages; or the remaining $3,070,022 it has withheld for "direct labor" and "overtime" as set forth in the Credit Letter.

**J.    SUNLINK'S DAMAGES.**

108.    The Sales Contracts, with exception of Nunnepog, provided that ACE would pay SunLink a total amount of $7,288,919.80. *See* Tr. Day 5, 927:21-929:1; 931:1-12; SL Ex. 233, Total Damages at A2.

109.    The accumulated invoices that SunLink issued to ACE for the CVEC BGMS Project sites and Katama amounted to $8,161,340.75. *See* Tr. Day 5, 927:21-929:1; 931:1-12; SL Ex. 233, Total Damages at B2.

110.    The accumulated late fees (through April 30, 2015) on unpaid invoices that SunLink issued to ACE for the BGMS Sites and Katama amounted to $1,128,612.70 (and continue to accrue). *See* Tr. Day 5, 927:21-929:1; 931:1-12; SL Ex. 233, Total Damages at C2.

111.    The accumulated total for change orders relating to the CVEC BGMS Sites amounted to $543,203.97. *See* Tr. Day 5, 927:21-929:1; 931:1-12; SL Ex. 233, Total Damages at D2.

112.    The total amount ACE paid to SunLink under the Sales Contracts, with the exception of Nunnepog, amounted to $1,954,007.82. *See* Tr. Day 5, 927:21-929:1; 931:1-12; SL Ex. 233, Total Damages at E2.

113.    The total amount SunLink – less a credit for Katama – was owed in this matter as of April 30, 2015 was $7,879,149.60. *See* Tr. Day 5, 927:21-929:1; 931:1-12; SL Ex. 233, Total Damages at F2. With late fees added up through August 25, 2015, the expected date of Award, the total amount owed SunLink under the Sales Contracts will be $8,260,961.41.

114.    ACE offered no evidence whatsoever to rebut the fact that all SunLink's products were accepted and installed on the CVEC Projects, that SunLink issued timely invoices corresponding to the products it supplied, and that SunLink is otherwise owed the amounts set forth in SunLink's Damages Binder. *See* SL Ex. 233.

## ARGUMENT

**A.   THE MASSACHUSETTS UNIFORM COMMECIAL CODE GOVERNS THE PARTIES' DISPUTE; SUNLINK'S DELIVERY WAS REASONABLE UNDER THE CIRCUMSTANCES.**

As the Sales Contracts did not contain a delivery schedule for SunLink's products, the Massachusetts Uniform Commercial Code ("**MA UCC**") sets delivery performance within a "reasonable time." *See* MASS. GEN. LAWS Ch. 106, § 2-309; Lewin, Mass. Prac. Series, Construction Law ("**Construction Law**"), v. 57, §12.9; Lemelman, Mass. Prac. Series, v. 25, §2.32. What is "reasonable" depends upon the nature, purpose, and circumstances of the contract. *See* MASS. GEN. LAWS Ch. 106, § 1-205(a); Lewin, Construction Law, §12.9.

According to SunLink's expert witness, Mr. Collins, SunLink performed in a reasonable manner given the nature, purpose and circumstances surrounding the Sales Contracts. *See* Tr., Day 4, 852:20-853:2 [SC]. Mr. Collins based his opinion on the following:

a.   The Sales Contracts did not include a schedule for performance. Additionally, six weeks of lead time for ballasted systems and eight weeks of lead time for ground-mounted systems were spelled out in each of the Sales Contracts. *See* Tr., Day 4, 853:3-12 [SC].

b.   No performance schedules were agreed upon by the parties. *See* Tr., Day 4, 853:13-15 [SC].

c.   SunLink's performance under the Sales Contracts began prior to the expiration of the six-week lead time agreed to by the parties. *See* Tr., Day 4, 853:16-20 [SC].

d.   During the course of the CVEC Projects, various performance schedules were exchanged between the parties, including two schedules on January 24 and January 28, 2014. In the absence of agreement on those schedules, SunLink relied on the schedule dated January 10, 2014, and repeatedly reminded ACE of that fact. *See* Tr., Day 4, 853:21-824:1 [SC].

e.   The performance of the work under the Sales Contracts was subject to layout changes, inclement weather, additional orders for ballasts, and reallocation of materials between the CVEC Projects, all of which were outside SunLink's control. *See* Tr., Day 4, 854:6-11 [SC].

f.      SunLink adequately accommodated various design changes in terms of efforts made to expedite materials to address design issues generated by ACE. *See* Tr., Day 4, 854:12-18 [SC].

g.      SunLink's delivery of ballasts and hardware under the Sales Contracts generally comported with the January 10, 2014 schedule that was used by SunLink as a "target." *See* Tr., Day 4, 855:2-8 [SC].

h.      ACE failed to timely avail itself of various options provided to ACE by SunLink to expedite delivery and production even more significantly. *See* Tr., Day 4, 855:9-17 [SC].

ACE chose not to proffer an expert at the hearings on the issue of the reasonableness of SunLink's performance, or otherwise seek to rebut Mr. Collins' testimony. Consequently, the record overwhelmingly supports a finding that SunLink's delivery of its products was done in a reasonable time and manner as contemplated by the MA UCC, and thus there has been no showing by ACE that SunLink breached any of its obligations under the Sales Contracts.

**B.      ACE BREACHED THE SALES CONTRACTS BY FAILING TO PAY SUNLINK ACCORDING TO THE PAYMENT TERMS IN THOSE CONTRACTS.**

Under the MA UCC, a purchaser is obligated to "accept and pay" for goods in accordance with the contract. *See* MASS. GEN. LAWS ch. 106, § 2-301. Accordingly, when a purchaser refuses to make payment to the seller, the purchaser has breached that contract. *See Ken-Weld Co., Inc. v. Eng'g Plastics, Inc.*, No. 04-2315B, 2005 WL 1812316, **2-3 (Mass. Sup. Ct. May 26, 2005) (because a purchaser failed to make payment for goods sold, it "dishonor[ed] the agreed terms to the parties' contract ... [and therefore] breached the contract with the plaintiff"); *see also Cesco Mf. Corp. v. Norcross, Inc.*, 7 Mass. App. Ct. 837, 840-2 (1979) (purchaser breached sales contract under the MA UCC by failing to make payment to seller); *Mexamerican Hides S.A. v. Central Int'l Co.*, No. 1279, 2000 Mass. App. Div. 327, *1 (Dec. 19, 2000) (purchaser was in breach of contract when it failed to pay for contracted goods). Here, the Sales Contracts required ACE to pay each invoice within forty-five days after issuance. *See* SOF

¶ 28.  Unquestionably, ACE failed to do so.  *See* SOF ¶¶ 109, 110, 113, 114.  Consequently, ACE breached the Sales Contracts by its failure to comply with the payment terms within those contracts.

## C.   ACE VIOLATED MASSACHUSETSTS GENERAL LAWS CHAPTER 93A.

ACE's breaches of the Sales Contracts, coupled with ACE's other unlawful conduct, amount to unfair business acts or practices under Massachusetts General Laws Chapter 93A, Section 11 ("**Chapter 93A**").  Although a bare breach of contract alone generally does not amount to a Chapter 93A violation, non-payment of monies owed under a contract is tantamount to commercial extortion and does violate Chapter 93A when the non-payment is designed to force the non-breaching party to renegotiate the bargain or to do what the non-breaching party is otherwise not obligated to do.  *See Commercial Union Ins. Co. v. Seven Provinces Ins. Co., Ltd.*, 9 F. Supp. 2d 49, 68–69 (D. Mass. 1998), *aff'd*, 217 F.3d 33 (1st Cir. 2000), *cert. denied*, 531 U.S. 1146 (2001); *see also Pepsi-Cola Metro. Bottling Co., Inc. v. Checkers, Inc.*, 754 F.2d 10, 18 (1st Cir. 1985) (affirming Chapter 93A award where defendant withheld payment as a "wedge" to force plaintiff to supply more products); *Mass. Emp'rs Ins. Exch. v. Propac-Mass., Inc.*, 420 Mass. 39, 43 (1995) (conduct violates Chapter 93A when it "has a coercive quality" and is "undertaken as leverage to destroy the rights of another party to the agreement while the agreement is still in effect"); *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 475 (1991) (holding that withholding approval as a pretext to *force* a party into changing price of underlying contract violated Chapter 93A); *Physician Ins. Agency of Mass. v. Investors Capital Holdings, Ltd.*, No. 0303597, 2005 WL 3722373, *4 (Mass. Sup. Ct. Dec. 30, 2005) (citing *Pepsi-Cola*); *Atkinson v. Rosenthal*, 33 Mass. App. Ct. 219, 225–26 (1992); *New Kappa City Const. v. National Floors Direct Inc.*, No. 11-ADMS-40002, 2011 Mass. App. Div. 249, **2-3

(Oct. 19, 2011); *D.D.S. Indus., Inc. v. P.J. Riley & Co., Inc.*, SUCV2009-00978 (Mass. Sup. Ct. , May 8, 2014) (unreported) (attached as Exhibit B hereto).

For example, in *New Kappa City Const.*, a flooring installation subcontractor brought an action against a contractor alleging breach of contract and 93A violations, based on bad faith non-payment. *New Kappa City Const.*, 2011 Mass. App. Div. 249 at *1. The parties performed 81 flooring installation projects together over a 14 month period, but the defendant failed to pay on nearly half of those installations citing shoddy workmanship. *Id.* The court found that the defendant's withholding of monies due to the plaintiff based on unsubstantiated claims to avoid payment "[e]ven within the rough-and-tumble world of commerce" violates Chapter 93A. *Id.* at *3.

In *D.D.S. Indus., Inc.*, a mechanical subcontractor brought a cross-claim against the general contractor alleging breach of contract and 93A violations, based on bad faith non-payment. *D.D.S. Indus., Inc.*, SUCV2009-00978 at pp. 1-2. The subcontractor had successfully completed its work on a wastewater treatment plant in Nantucket, but the general contractor arbitrarily withheld a significant sum owing to the subcontractor under the subcontract, falsely placed the subcontractor in default and notified a third party of the bogus default. *Id.* at pp. 7-9. There was no basis for the claim of default and the general contractor was withholding the funds owed to the subcontractor as a wedge against its own potential liability on the project to the owner. *Id.* at 16-18. The Court found the general contractor's conduct inequitable, unreasonable, unfair and in violation of Chapter 93A, awarding the subcontractor multiple damages and attorneys' fees. *Id.* at pp. 19-21.

Even more so than the defendants in *New Kappa City Const.* and *D.D.S. Indus., Inc.*, ACE's conduct here violates Chapter 93A. Specifically, based on what amounts to a largely

unrebutted factual record, ACE clearly engaged in the following unfair acts and practices causing substantial and irreparable harm to SunLink:

1. Issuing notices to proceed under the Sales Contracts <u>with knowledge</u> that ACE could not abide by the contractual payment terms (net forty-five days) because of ACE's cash flow problems and inability to make full payments under the contracts without first obtaining the "CVEC monies," as well as ACE's decision to give control of SunLink's payments to Florence Electric and ES Boulos, who ultimately withheld payments to SunLink based on their own self-interest. *See* SOF, ¶¶ 35, 78, 85.

2. Refusing to provide or agree to a reasonable, revised delivery schedule and attempting to force SunLink to agree to a patently unreasonable delivery schedule. *See* SOF, ¶¶ 40, 44, 48, 52, 56, 60, 82, 83. Indeed, ACE's conduct surrounding the delivery scheduling sought to pressure SunLink to take actions that admittedly exceeded even ACE's own expectations for delivery, not to mention, attempted to force SunLink to take actions not required under the Sales Contracts. *See* SOF, ¶¶ 28, 84, 85.

3. Issuing entirely baseless default letters and falsely informing a third-party that SunLink was not performing. *See* SOF, ¶¶ 87, 88 & n. 12.

4. Verifying SunLink's accounts receivable to SunLink's lender, Bridge Bank, and not indicating, by affirmative omission, that there were any "any contras, **offsets or credits against the invoices . . . exist** or if there is **any reason why payment will not be made**[,]" as well as falsely promising to pay SunLink's invoices while obtaining additional products. *See* SOF, ¶¶ 90, 91, 93.

5. Sending an entirely baseless "Credit Letter" on June 19, 2014. *See* SOF, ¶¶ 99-103. Put simply, ACE now admits to owing SunLink the $3,872,150 it wrongfully withheld for liquidated damages and SRECs under the so-called "Credit Letter" dated June 19, 2014. Furthermore, the remaining two offsets ($3,070,022 for overtime and direct labor) are also plainly barred by the terms of the Sales Contracts.[13]  Therefore, ACE has

---

[13] According to the MA UCC, the parties to a contract may properly limit a party's liability thereunder through the exclusion of consequential damages. *See* Mass. Gen. Laws Ch. 106, § 2-719(3) ("Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable"). Consequential damages by their nature arise because of special circumstances, as opposed to those damages that arise naturally from the claimed breach of contract itself. *See Pentagram Software Corp. v. Voicetek Corp.*, No. 9200873, 1 Mass. L. Rptr. 320, *3 (Mass. Sup. Ct. Nov. 18, 1993) (allowable damages were only payments owed under a contract for sale of goods, and other damages, including marketing costs and relocation expenses, were unrecoverable as consequential damages); *see also, In re Access Cardiosystems, Inc.*, 361 B.R. 626, 643-44 (D. Mass. 2007) (limitation of liability clause prohibiting consequential damages had the effect of barring recovery under breach of contract theory to the purchase price paid under the agreement between the parties). While courts will decide what qualifies as consequential damages on a case-by-case basis, overtime expenses is a category of damages that will be barred by a limitation of

wrongfully withheld payment of at least $6,942,172 from SunLink for well over a year.

6.      Raising and prosecuting baseless defenses in this very proceeding. Counsel for ACE raised for the first time on Day 4 of these proceedings that ACE intended to, but apparently never did, amend its answer and Thirteenth Affirmative Defense in this arbitration proceeding. Requiring SunLink to have to defend against claims that, obviously, were never advanced in good faith in the first place constitutes a flagrant violation of Chapter 93A. *See* SOF, ¶¶ 104-107.

ACE's conduct not only breached the Sales Contacts; but also, it breached the covenant of good faith and fair dealing that is implied in every contract. *See Anthony's Pier Four, Inc.*, 411 Mass. at 471. That alone is an unfair act under Chapter 93A. *See id.*, at 474–76; *Cherick Distribs., Inc. v. Polar Corp.*, 41 Mass. App. Ct. 125, 128 (1996); *Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 54–56 (1st Cir. 1998); *Commercial Union Ins. Co.*, 9 F. Supp. 2d at 68–69; *Trent Partners & Assocs., Inc. v. Digital Equip. Corp.*, 120 F. Supp. 2d 84, 106–07 (D. Mass. 1999). Beyond that, ACE's conduct falls well within concepts of Chapter 93A unfairness. *See Purity Supreme, Inc. v. Attorney General*, 380 Mass. 762, 776-78 (1980) (in determining unfairness, a court looks at whether the conduct complained of falls within some common law, statutory, or other established concept of unfairness, is immoral, unethical, oppressive, or unscrupulous, or is such that would cause substantial injury to customers in general); *see also Morrison v. Toys "R" Us, Inc.*, 441 Mass. 451, 457 (2004).

Furthermore, Chapter 93A <u>mandates</u> recovery of up to three, but not less than two times the amount of actual damages if a defendant's conduct was a willful or knowing violation of Chapter 93A. *See* MASS. GEN. LAWS Ch. 93A, § 11. A plaintiff need not prove that a defendant

---

liability clause as consequential. *See Canal Elec. Co. v. Westinghouse Elec. Co.*, 973 F.2d 988, 990 (1st Cir. 1992) ("Further, the damages the plaintiffs suffered during the July–November 1983 outage were basically 'consequential' damages, such as lost profits and overtime expenses ... [t]he 'limitation of liability' provision strictly barred recovery for such damages"). Similarly, cost of employee services relating to the sale of goods is considered incidental or consequential damage. *See Lowell Paper Box Co., Inc. v. Omni Resources Corp.*, No. 917721, 2 Mass. L. Rptr. 649, *5 (Mass. Sup. Ct. Sep. 23, 1994) (employee hours lost by failure to deliver conforming goods calculated to comprise incidental and consequential damages).

actually knew that that conduct ran afoul of Chapter 93A; but rather, reckless conduct that is willfully engaged in will satisfy the standard. *See Kattar v. Demoulas*, 433 Mass. 1, 16 (2000); *Heller v. Silverbranch Construction Corp.,* 376 Mass. 621, 627 (1978); *Montanez v. Bagg*, 24 Mass. App. Ct. 954, 956 (1987). The concepts of "willfulness" or "knowledge" are separate. *Computer Sys. Eng'g, Inc. v. Qantel Corp.*, 571 F. Supp. 1365, 1374-75 (D. Mass. 1983); *see also In re Swasey*, 488 B.R. 22, 44 (D. Mass. 2013) (discussing willful and knowing standard). Knowledge connotes a respondent's intent or conscious objective. *Still v. Comm'r of Employment & Training*, 423 Mass. 805, 812–13 (1996).

In particular, willfulness may include a lesser state of understanding—recklessness. *Computer Sys. Eng'g, Inc.*, 571 F. Supp. at 1374, 1377. Recklessness occurs when a defendant acts with reckless disregard as to whether or not the underlying conduct was unfair or deceptive or would cause unfair or deceptive results. *See id.* at 1374, *aff'd*, 740 F.2d 59 (1st Cir. 1984). As explained by Judge Keeton in *Computer Systems Engineering, Inc.*:

> to prove that the defendant committed a <u>willful</u> violation by fraud, the plaintiff may prove that agents of the defendant knew that they did not know whether the fact represented was true or false–that they made the representation without knowing whether it was true or false and with reckless disregard for whether it was true or false.

*Id.* at 1375 (emphasis added). Judge Keeton further stated that, although such a reckless state of mind is not the equivalent of <u>knowing</u> the falsity of the fact represented, it "is nevertheless proof of a culpable state of mind—the state of mind of willful disregard for truth or falsity of the fact represented." *See id.* at 1375, *cited in Shaw v. Rodman Ford Truck Ctr., Inc.*, 19 Mass. App. Ct. 709 (1985); *see also Still*, 423 Mass. at 812–13 ("decisions construing the multiple damages provisions of G.L. c. 93A have imposed such damages for 'willful' or 'knowing' violations, equating the former with reckless conduct and the latter with intentional acts."), *cited in Kattar*, 433 Mass. at 16. Here, ACE's conduct goes well beyond being reckless. *See supra.*, ¶¶ 74-107;

pp. 27-46 (describing ACE's unfair acts under Chapter 93A). As a result, ACE willfully and knowingly violated Chapter 93A in its dealings with SunLink.

**D.   SUNLINK IS ENTITLED TO AN AWARD OF REASONABLE ATTORNEY'S FEES AND COSTS UNDER CHAPTER 93A.**

Chapter 93A makes mandatory an award of attorneys' fees and costs upon the finding of an unfair act or practice, regardless of whether that act or practice was willful or knowing. *See* MASS. GEN. LAWS Ch. 93A, § 11.[14] Although Section 11 requires a loss of money or property to maintain a claim, all a plaintiff needs to show under Section 11 to obtain an award of attorneys' fees and costs is that the unfair act or practice caused some "adverse effect" on the plaintiff. *See Chapman v. Katz*, 448 Mass. 519, 536–37 (2007); *Jet Line Servs., Inc. v. Am. Employers Ins. Co.*, 404 Mass. 706, 718 (1989). Here, SunLink not only has clearly demonstrated the requisite "adverse impact," *see* SOF ¶ 100 (describing adverse impacts on SunLink); but also, SunLink as demonstrated a significant loss of money. *See* SOF ¶¶ 108-113 (detailing SunLink's actual monetary loss). Accordingly, SunLink is entitled to a mandatory award of attorneys' fees and costs under Chapter 93A.

---

[14] SunLink does not believe either party would be entitled to an award of attorneys' fees and costs pursuant to the Arbitration Clause in the Sales Contracts. Pursuant to the Commercial Arbitration Rules and Mediation Procedures of the American Arbitration Association ("**AAA Rules**"), an arbitrator may only include attorneys' fees in a final award "if all parties have requested such an award or it is authorized by law or their arbitration agreement." See AAA Rules, R-47(d)(ii). In the Sales Contracts, the parties agreed only that the arbitrator "may apportion costs of the arbitration, including the reasonable fees and disbursements of the parties, between or among the parties in such a manner as the arbitral tribunal considers reasonable[.]" *See* Sales Contracts, p. 7 (at ¶20(e)). This does not amount to a special agreement to award attorneys' fees, because "arbitration fees" are not interchangeable with "attorneys' fees." See AAA Rules, R-1(b) (differentiating between "attorneys' fees" and "arbitration fees and costs"); MASS. GEN. LAWS ch. 251 § 10 ("Unless otherwise provided in the agreement to arbitrate, the arbitrators' expenses and fees, together with other expenses, not including counsel fees, incurred in the conduct of the arbitration, shall be paid as provided in the award") (emphasis added).

## REQUESTED AWARD

Under the circumstances, SunLink is entitled to and hereby respectfully requests that the

Arbitrator enter an Award in favor of SunLink and against ACE providing for:

1.  Damages calculated as follows:

    A.  Actual Damages of $8,260,961.41, plus[15]

    B.  Multiple Damages under Chapter 93A of $16,521,922.82, amounting to[16]

    C.  Total Damages Award of $24,782,884.23.[17]

2.  Attorneys' Fees and Costs under Chapter 93A, to be submitted in an Application

for Attorneys' Fees and Costs within fourteen (14) days of the Award.

Respectfully submitted,

SUNLINK CORPORATION,

By its attorneys,

Paul Murphy, Esq. (BBO 363490)
David G. Thomas, Esq. (BBO 640854)
Greenberg Traurig, LLP
One International Place
Boston, MA 02110
Telephone: (617) 310-6000

**CERTIFICATE OF SERVICE**
I hereby certify that a true copy of the above
document was served upon the attorney(s) of
record for each other party by mail by hand
on AND E-MAIL on 6/17/15

---

[15] The late fee amounts presented in SunLink's "Damages Binder" (SL EX. 233) were calculated as of April 30, 2015. The damages figure here recalculates late fees up through August 25, 2015 (i.e., an additional 117 days of late fees).

[16] For the purposes of calculating multiple damages under Chapter 93A, the amount of actual damages is the baseline and the total award, including actual damages, is either double or treble this baseline. Therefore, to calculate the amount to treble damages under Chapter 93A, the actual damages are multiplied by two (i.e., $8,260,961.41 x 2 = $16,521,922.82).

[17] $8,260,961.41 (actual damages) x 3 (i.e., trebled) = $24,782,884.23 or $8,260,961.41 (actual damages) + $16,521,922.82 (multiple damages) = $24,782,884.23.

# EXHIBIT BB

AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| **SUNLINK CORPORATION** | : | AAA No.01-14-0001-7516 |
| Claimant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| **AMERICAN CAPITAL ENERGY, INC.** | : | |
| Respondent | : | |
| | : | |

# RESPONDENT AMERICAN CAPITAL ENERGY'S

# POST HEARING MEMORANDUM OF LAW

Attorney for
American Capital Energy, Inc.

ROBERT K. DOWD, P.c.

Robert K. Dowd
BBO # 132 800
Robert K. Dowd P.C.
360 Merrimack Street
Building 9, Entrance K, Suite 202
Lawrence Massachusetts 01843

(978) 221-2000
robtdowd@sbcglobal.net

# CONTENTS

STATEMENT OF FACTS................................................................................................1

   FIDUCIARY RELATIONSHIP SUNLINK AND AMERICAN CAPITAL ENERGY...............2

   HISTORY AND CONSTRUCTION OF THE CVEC PROJECT PORTFOLIO ........................5

   ACE-SUNLINK COURSE OF DEALING -ALTERED BY CORPORATE OPERATIVES....13

ARGUMENT.................................................................................................................26

   THE CONSULTING ENGINEERING CONTRACT CULMINATED A COURSE OF
   DEALING TO ESTABLISH SUNLINK AS ACE'S FIDUCIARY ...........................................26

   FIDUCIARY DUITES CAN NOT BE CONTRACTED AWAY ...............................................30

   THE FIDUCIARY BEARS THE BURDEN TO ESTABLISH THE RECTITUDE OF ITS
   CHALLENGED CONCDUCT ...............................................................................................30

   INDUCED TO ENTER THE INITIAL CONTRACTS BY SUNLINK'S FRAUD, THE
   CONTRACTS WERE VOIDED BY ACE ...............................................................................32

   WITH THE CONTRACTS VOIDED BY ACE, SUNLINK'S WRITTEN PROPOSAL FOR
   PREPANELIZATION WAS A WRITTEN OFFER ACCEPTED BY ACE...........................38

   SUNLINK BREACHED THE PREPANELIZATION AGREEMENT.....................................41

   ACE SIGNED CHANGE ORDERS UNDER DURESS ...........................................................42

   UCC's APPLICATION TO ACE – SUNLINK FACTS...........................................................43

   IMPLYING A RESONABLE SCHEDULE FOR DELIVERY ESTABLISHES SUNLINK'S
   NOT ACE'S LIABILITY........................................................................................................43

   THE CONDUCT OF SUNLINK WAS BAD FAITH ...............................................................44

   ACCUSATIONS OF BAD FAITH AGAINST ACE ARE WEIGHTLESS AS NOT FOUNDED
   IN FACT...............................................................................................................................46

   INTEGRATION CLAUSE DID NOT PROVIDE THAT THE CONTRACT'S TERMS WERE
   EXCLUSIVE.........................................................................................................................47

   RECOGNIZE ACE'S SETOFF RIGHTS ...............................................................................47

REQUESTED AWARD..................................................................................................48

# TABLE OF AUTHORITIES

## Cases

*America's Growth Capital, LLC V. PFIP, LLC, Dist. Court, D. Massachusetts 2014*....................36

*Anthony's Pier Four v. HBC Associates, 411 Mass. 451, 583 N.E.2d 806, 820-821 (1991)*...........45

Anthony's Pier Four, Inc. v. HBC Associates 411 Mass 451 (1991)...............................................44

*Armstrong v. Rohm & Haas Co., Inc., 349 F. Supp. 2d 71 (D. Mass. 2004)*...................................36

*Barnette* v. *Wells Fargo Nev. Nat'l Bank,* 270 U.S. 438, 444 (1926)..............................................42

*Bates v. Southgate,* 308 Mass. 170 (1941),..............................................................................33

*Berenson* v. *French,* 262 Mass. 247 (1928)............................................................................33

*Blank v. Chelmsford Ob/Gyn, P.C., 420 Mass. 404 (1995)*.......................................................30

*BP Amoco Chem. v. Flint Hills Res., LLC,* 489 F. Supp. 853 (N.D. Ill. 2007)..............................35

*Briggs* v. *Carol Cars, Inc.,* 553 N.E.2d 930 (Mass. 1990) .......................................................36

*Broomfield v. Kosow 349 Mass. 749 (1965)*.............................................................................28

*Broomfield v. Kosow, 349 Mass. 749 (1965)*...........................................................................28

*Cambridge Plating Co., Inc. v. Napco, Inc.,* 85 F.3d 770 ........................................................46

*Cantell* v. *Hill Holliday Connors Cosmopulos, Inc.,* 55 Mass. App. Ct. 550 (2002) ..................46

Canton Lutheran Church v. Sovik, Mathre, Sathrum & Quanbeck, 507 F. supp. 873 (D.S.D. 1981)28

*Cappy's, Inc.* v. *Dorgan,* 313 Mass. 170 (1943)........................................................................42

*Caputo* v. *Continental Constr. Corp.* 340 Mass. 15, .................................................................47

*Carlo Bianchi & Co. Inc.* v. *Builders' Equip. & Supplies Co.* 347 Mass. 636 ............................47

*Clark* v. *General Cleaning Co.,* 345 Mass. 12 (1962),..............................................................41

*Clark* v. *State St. Trust Co.,* 270 Mass. 140 (1930)..................................................................45

*Collins v. Huculak,* 57 Mass. App. Ct. 387, 391-392 (2003) ...................................................36

*Commerce & Industry Insurance Company v. Bayer Corporation, 433 Mass. 388 (2001)* ...........40

*Computer Systems Engineering, Inc. v. Qantel Corp.,* 571 F.Supp. 1365 (D.Mass.1983)........34, 45

*Coveney* v. *President & Trustees of the College of the Holy Cross,* 388 Mass. 16 (1983) ............42

*Cumis Ins. Society, Inc. v. BJ's Wholesale Club, Inc.,* 455 Mass. 458 (2009),............................36

*Cummings v. HPG Intern., Inc.,* 244 F. 3d 16 - Court of Appeals, 1st Circuit (2001) ..................38

*Cummings v. HPG Int'l, Inc.,* 244 F.3d 16 (1st Cir. 2001);............................................36, 37, 38

*dB Sales, Inc. v. Digital Equipment Corp.,* 951 F. Supp. 1322 - Dist. Court, ND Ohio 1996.........34

Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501 (1997) ..........................................31

*Drucker* v. *Roland Wm. Jutras Assocs.,* 370 Mass. 383 (1976),.................................................45

*Elias Bros. Restaurants, Inc.* v. *Acorn Enterprises, Inc.,* 831 F. Supp. 920 (D. Mass. 1993).........32

*Fauci* v. *Denehy,* 332 Mass. 691 (1955)..................................................................................41

*First Safety Fund Natl. Bank* v. *Friel,* 23 Mass. App. Ct. 583 (1987)..........................................37

*Freeman* v. *Teeling,* 290 Mass. 93 (1935)................................................................................42

*Heller v. Silverbranch Construction Corporation,* 376 Mass. 621 (1978)...................................46

*Huron Tool & Eng'g Co v. Precision Consulting Servs., Inc.,* 209 Mich. App. 365 (1995) ...........35

*Indus. Gen. v. Sequoia Pacific Systems,* 44 F. 3d 40 - Court of Appeals, 1st Circuit (1995 ...........28

*International Underwater Contractors, Inc.* v. *New England Tel. & Tel. Co.,* 8 Mass. App. Ct. 340 (1979) ..............................................................................................................................42

*International Underwater Contractors, Inc.* v. *New England Tel. & Tel. Co., supra. Cabot Corp. v. AVX Corp.,* 448 Mass. 629, 637 (2007)...............................................................................42

*John Hancock Mutual Life Insurance Company v. Banerji,* 62 Mass. App. Ct. 906 (2004) ...........32

*Jom, Inc. v. Adell Plastics, Inc., 193 F. 3d 47 - Court of Appeals, 1st Circuit (1999)* ..................40

ii

*Kattar v. Demoulas*, 433 Mass. 1 (2000) ...................................................................................45

*Klairmont v. Gainsboro Restaurant, Inc.*, 465 Mass. 165(2013) ............................................45

*Levings* v. *Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498 (1979)............................................46

*Lipson* v. *Adelson*, 17 Mass. App. Ct. 90 (1983).....................................................................41

*Lorbrook Corp. v. G & T Indus., Inc.*, 162 A.D.2d 69, 73 (N.Y. 1990) ....................................39

*Luoni v. Berube*, 431 Mass. 729 (2000)...................................................................................29

*Magliozzi v. P & T Container Serv. Co* 34 Mass. App. Ct. 591 (1993).............................38, 39

*Masingill v. EMC Corp.*, 449 Mass. 532 (2007) .....................................................................36

*Massachusetts Employers Insurance Exchange v. Propac-Mass, Inc.*, 420 Mass. 39 (1995).........45

*McEvoy Travel Bureau, Inc. v. Norton Company*, 408 Mass. 704 (1990).................................34

*McGrath* v. *C.T. Sherer Co.*, 291 Mass. 35,  (1935) ................................................................32

*Meehan* v. *Shaughnessy*, 404 Mass. 419 (1989)........................................................................31

*Northeast Data Sys. v. McDonnell Douglas Computer Sys. Co.*, 986 F. 2d 607 - Court of Appeals,
    *1st Circuit (1993)*.................................................................................................................34

*Nota Constr. Corp. v. Keyes Assocs.*, 45 Mass. App. Ct. 15 (1998) .........................................37

*Nycal Corp. v. KPMP Peat Marwick LLP*, 426 Mass. 491 (1998).............................................37

*Pagounis v. Pendleton*, 52 Mass. App. Ct. 270, 273, 753 N.E.2d 808 (2001) ...............................40

*Palmer* v. *Brown*, 127 Cal. App. 2d 44, 273 P.2d 306, 315-16 (Cal. App. 1954...............................28

*Pepsi-Cola Metropolitan Bottling Co., Inc. v. Checkers, Inc.*, 754 F.2d 10 (1st Cir.1985) ............46

*Plumer* v. *Luce*, 310 Mass. 789 (1942)....................................................................................37

*PMP Assocs., Inc.* v. *Globe Newspaper Co.*, 366 Mass. 593 (1975).........................................46

*Popkin v. National Benefit Life Insurance Co.*, 711 F.Supp. 1194 (S.D.N.Y.1989) ................34, 45

*Purity Supreme, Inc. v. Attorney General*, 380 Mass. 762 (1980)..............................................45

RCDI Constr. v. Spaceplan/Architecture, Planning & Interiors, P.A., 2001 WL 1013241, (W.D.N.C.
    Jan. 25, 2001.......................................................................................................................28

*Reisman v. KPMG Peat Marwick LLP*, 57 Mass. App. Ct. 100 (2003) .........................................36

*Robert Industries, Inc. v. Spence* 362 Mass. 751 (1973) ..........................................................47

*Roddy & McNulty Ins. Agency, Inc.* v. *A.A. Proctor & Co.*, 16 Mass. App. Ct. 525 (1983)...........38

*Rutanen v. Ballard*, 424 Mass. 723 (1997)...............................................................................30

*Salamon* v. *Terra*, 394 Mass. 857 (1985) ................................................................................46

*Shaw's Supermarkets, Inc.* v. *Delgiacco*, 410 Mass. 840(1991).................................................33

*Smith v. Jenkins, 718 F. Supp. 2d 155 - Dist. Court, D. Massachusetts (2010)* .............................28

*Smith* v. *Smith*, 222 Mass. 102 (1915) ....................................................................................31

*Snyder* v. *Sperry and Hutchinson Co.*, 333 N.E.2d 421, 428 (Mass. 1975). ................................36

*Softub, Inc.* v. *Mundial, Inc.*, 2014 WL 5151409, *21 (D. Mass. Sept. 30, 2014) ........35, 36, 38, 40

*Starr* v. *Fordham*, 420 Mass. 178 (1995)..................................................................................31

*Tudor Press, Inc.* v. *University Distrib. Co.* 292 Mass. 339 ......................................................40

*Turner v. Johnson & Johnson*, 809 F.2d 90 (1st Cir.1986).................................................33, 36

*Uproar Co.* v. *National Broadcasting Co.*, 81 F.2d 373 (1st Cir.),.............................................45

*Ward* v. *American Mut. Liab. Ins. Co.*, 15 Mass. App. Ct. 98 (1983)........................................46

*Warner Ins. Co.* v. *Commissioner of Ins.*, 406 Mass. 354 (1990) ............................................44

*Wartski v. Bedford, 926 F.2d 11 (1st Cir.1991)* .......................................................................30

*Welch* v. *Bombardieri*, 252 Mass. 84, ....................................................................47
*Witherington v. Nickerson, 256 Mass. 351(1926)* ................................................31
Zannoth v. Booth Radio Stations, Inc., 333 Mich. 233 (Mich. 1952) ...............28
*Zapatha v. Dairy Mart, Inc. 381 Mass. 284 (1980)* ...........................................43
*Zimmerman v. Kent, 31 Mass. App. Ct. 72 (1991)* ...............................................37

## Statutes

G.L.c 106 §1-205......................................................................................................47
G.L.c. 106 § 2-313....................................................................................................37
G.L.c. 106, § 1-203...................................................................................................46
G.L.c. 106, § 1-205...................................................................................................47
G.L.c. 106, § 2-103...................................................................................................47
G.L.c. 106, § 2-202...................................................................................................47
G.L.c. 106, § 2-208...................................................................................................47
G.L.c. 106, § 2-309...................................................................................................47
M.G.L. c. 112, § 81M...............................................................................................27

## Other Authorities

American Society of Civil Engineers Code of Ethics...........................................27

## Treatises

*2 Anderson, Uniform Commercial Code § 2-207:5, at 272-273* .........................39
28 S. Williston, Contracts § 71:3 at 431 (4th ed. 2003) ......................................42
7 A. Corbin, Contracts § 28.1 (rev. ed. 2002); .....................................................42
*Clark v. Gen. Cleaning Co., 345 Mass. 62 (1962)* ..............................................40
*Pagounis v. Pendleton,* 52 Mass. App. Ct. 270 (2001).........................................40
*R.A. Anderson, Uniform Commercial Code § 2-207:78, at 602 (3d ed. rev. 1997)* .......................40
Restatement (Second) of Contracts § 164 (1981)...........................................32, 33
Restatement (Second) of Contracts § 175 (1981)................................................42
*Restatement (Second) of Torts § 552 (1977)* .......................................................37
W.L. Prosser & W.P. Keeton, *Torts* § 53, at 358-359 (5th ed. 1984).................28
Williston, Contracts (2d ed.) § 1875......................................................................40

## Regulations

250 CMR 5.00 ...........................................................................................................27

## STATEMENT OF FACTS

1.     American Capital Energy Inc. (hereinafter ACE) is a small closely held company founded and owned by Dr. Juris Kalejs (deceased 2015) an internationally recognized physicist in the solar industry with numerous solar patents; Tom Hunton, President of ACE, who developed several patents including creation of what is now known as the SREC program of Massachusetts, and Art Hennessey, the CFO of ACE. (Transcript Page 1511 Line 8) Combined the three gentlemen had over seventy years of experience in the solar industry with a particularly unique specialty in the construction of solar arrays on landfills. ACE has constructed more solar arrayed landfill projects than any other individual or entity in the country. (Transcript Page 1172 Line 1)

2.     Far different from the description provided in the post Arbitration memorandum, Sunlink provided major engineering assistance to ACE which was a predominant reason for ACE hiring Sunlink. (Transcript Page 28 Line 2) (Transcript Page 1006 Line 19 through Page 1007 Line 9) Especially important was the agreement to provide certified engineering documents necessary for approval and issuance of permits and Certificates of Occupancy for the ACE constructed landfills. (Transcript Page 1311 Line 17) The association of the two entities and the assistance provided to ACE established by course of dealing alone, created a fiduciary relationship between the parties with Sunlink providing the guidance of engineering, wind loads, panel placement, panel tilt, and sealing and certifying plans for Permits and Certificates of Occupancy. Sunlink's attempts at Arbitration through the presentation of testimony of corporate operatives, to minimize and mischaracterize the relationship of the Parties as one of purchase and sale of concrete and steel for the Ballasted Ground Mounted Solar (BGMS) systems, ignores the essential dependence that ACE had on Sunlink and its engineers in designing and certifying the BGMS systems. (Transcript Page 1007 Line 3) Such dependence and interrelationship created a fiduciary relationship which, with respect to the CVEC Project Portfolio, culminated with the execution of a written agreement memorializing the fiduciary relationship between the parties. (Transcript Page 1311 Line 17) (Exhibit ACE-090 and

1

ACE-091) The fiduciary relationship on the CVEC Portfolio of Projects was established on August 8, 2013. (Exhibit ACE-090) In the Agreement between ACE and Sunlink, Sunlink assumed the responsibility to provide Consulting Engineering Services for Sunlink Ground Mounted Systems to be constructed on the CVEC project Portfolio. (Exhibit ACE-090). The full description and legal authorities supporting this fiduciary relationship are noted *infra*. From that date forward as a fiduciary to ACE, Sunlink owed ACE the highest duty of good faith, candor and disclosure required to be afforded by a fiduciary. Sunlink's failure to provide such utmost good faith, candor and disclosure and the resulting damage to ACE for delays, labor costs overruns and change orders executed under duress, resulting from breaches of contract by Sunlink and breaches of their fiduciary duty to ACE.

## FIDUCIARY RELATIONSHIP SUNLINK AND AMERICAN CAPITAL ENERGY

3. A Consulting Engineering Agreement (Exhibit ACE-090) (Transcript Page 1311 Line 17) noted that Sunlink would provide Consulting Engineering Services for the Sunlink Ground Mount Systems for the CVEC Project Portfolio; the Portfolio is described as consulting Engineering services in connection with the Sunlink ground mount systems for 10-PV Projects which are specifically listed on the Engineering Consulting Services contract noting each site, each size, modules, manufacturer, module model and total service size as noted below;

2



August 8, 2013

American Capital Energy
Attn: Zac Osgood and Eric McLean
1001 Pawtucket Blvd, Suite 278
Lowell, Massachusetts 01854

Subject: Cover Letter for Consulting Engineering Services
SunLink Ground Mount Systems
CVEC Project Portfolio

Dear Zac and Eric,

Project Ref: ACE-CVEC

Thank you for the opportunity to submit this proposal to provide Consulting Engineering
*Services* in connection with the SunLink ground mount systems for the following 10 PV projects
located at 9 different sites:

| C-VEC Portfolio Summary | System | tilt | Address | City | Zip Code | Number Of modules | Manufacturer | Module Model | total System Size' |
|---|---|---|---|---|---|---|---|---|---|
| BGMS | | | | | | | | | |
| Barnstable Landfill | BGMS | 20 | 45 Flint Street | Marston Mills | 02648 | 13,904 | ET Solar | ET-P672-300WS | 4171 |
| Brewster Landfill | BGMS | 25 | 201 Run Hill Road | Brewster | 02631 | 4,246 | ET Solar | ET-P672-290WB | 1231 |
| Chatham Landfill | BGMS | 25 | 97 Sam Ryder Road | Chatham | 02633 | 6,446 | Supreme | GX-285W | 1837 |
| Dennis landfill | BGMS | 25 | Theophilus F. Smith Road | Dennis | 02660 | 24,112 | Supreme | ' GJC72-24SW | 5907 |
| Eastham | BGMS | 25 | 255 Old Orchard Rd | Eastham | 2642 | 2,024 | ET Solar | ET-P672-25.0WS | 587 |
| Harwich - landfill | SGMS | 20 | 205 Queen Anne Road | Harwich | 02645 | 15,488 | ET Solar | ET-P672-290W^ | 4492 |
| Tisbury landfill | BGMS | 25 | 59 High Point lane | Tisbury | 02568 | 4,048 | ET Solar | ET-P672-290WB | 1174 |
| LGMS | | | | | | | | | |
| Katama Farm ET Solar | LGMS | 20 | 14 AeroAve | Edgartown | 02539 | 2,926 | ET Solar | ET-P672-300WB | 878 |
| Katama Farm-Supreme | LGMS | | | | | 1,606 | Supreme | <3X-72-24SW | 393 |
| Nunnepog Well | JGMS | 20 | 23rdStreet | Edgartown | 02539 | 5.060 | Supreme | GX-285W | 1442 |
| | | | | | | | | | 22.113 |

This proposal is explicitly limited to Consulting Engineering Services related to the 10 listed projects as defined by the Scope of services below. Sunlink Corporation, as Consultant, proposes to provide the following:

**Scope of Services**

1. SunLink Engineering Documentation Package for each project signed and sealed by a professional engineer registered in                    ·Massachusetts.

2. Sunlink Ground Mount System layout shop drawings for each project signed and sealed by a professional engineer registered in Massachusetts.

3. Design and specification of the pile foundation system required to support the SunLink Large-Scale Ground Mount System, signed and sealed by a professiona[l] engineer registered in Massachusetts. This design will rely upon and be based upon the existing soils reports performed by the American Capital Energy soils consultant and previously provided to SunLink.

4. Reasonable coordination with Engineer of Record for Engineering/Construction Affidavits.

4.      In addition, Sunlink entered into a similar consulting services contract with American Capital Energy for the Mashpee and Duxbury ballasted ground mount systems (BGMS) (Exhibit ACE-091).

5.      Sunlink represented to ACE

"Through a VPA as ACE's exclusive supplier of Ballasted Ground Mount Systems (B-GMS) for the projects listed herein, SunLink can deliver cost savings for both the concrete ballast and the mounting hardware, while providing the highest level of engineering. operational and project management support. With a designated team including an account manager, project manager, operations manager and structural engineer, Sun Link will be able to respond quickly to the needs and requests made by ACE with individuals familiar with and knowledgeable of each project." (Exhibit ACE-005)

6. Both contracts called for consulting services with Sunlink providing Engineering Documentation Packages for each project - including certified engineering documents signed and sealed by a professional engineer, Sunlink Ground Mount System layout, design and specifications of the pile foundation systems and coordination. (Exhibit ACE-090 and Exhibit ACE-091) (Transcript Page 1311 Line 17)    Execution of the Consulting Services Agreement with Sunlink constituted the final step to the establishment a fiduciary relationship between Sunlink and ACE. The execution of the CVEC Project Portfolio engineering Consulting Services Agreement required that Sunlink, as a fiduciary and engineering firm offer advice, counsel and certification of drawings for the CVEC Portfolio to American Capital Energy and required them to provide full disclosure

4

of any events that would affect the construction of the Sunlink BGMS for the CVEC Project Portfolio and the Mashpee and Duxbury landfills. Sunlink's violation of its duties to provide the utmost good faith, candor and full disclosure will be enumerated *infra* in the context of the CVEC Project Portfolio History and construction.

## HISTORY AND CONSTRUCTION OF THE CVEC PROJECT PORTFOLIO

7.      The CVEC projects were created by the issuance of contracts to ACE by CVEC, a semi utility authorized by the State of Massachusetts to assist towns in their energy needs,  for the construction of numerous solar arrays on landfills sites located on towns across Cape Cod and Martha's Vineyard herein described as the CVEC, Portfolio of Projects. Note – Dennis although under CVEC executed a separate contact with ACE.  (Transcript Page 39 Line 10 through Page 40 Line 14 ) ACE contacted Sunlink; ACE in conjunction with Sunlink had constructed over 50 solar arrays costing over several hundred million dollars. Within months of execution of the agreements with CVEC to construct the CVEC Portfolio of Projects, ACE entered into a Master Sales Contract with Sunlink which was executed March 12, 2012. (Exhibit ACE-005). Said contract noted that Sunlink would provide for the Massachusetts portfolio of contracts

The Sunlink process for doing business was noted in each of the landfill budget proposals as follows:



## Appendix A – SunLink Process

1. **REQUEST A QUOTE** – originates from the form on the SunLink website


2-3 Days

2. **CREATE LAYOUT** – SunLink provides a layout, typically within *2-3 business days*



3. **BUDGETARY ESTIMATE (BE)** – SunLink provides an estimate of pricing, subject to change after engineering

 


5-7 Days

4. **ENGINEERING** – Wind load analysis, ballast pan or connector placement, roof loading, etc., typically within *5-7 business days*

5. **SALES CONTRACT** – SunLink provides a firm quote with final pricing




4 – 8 Weeks

6. **MANUFACTURING** – with a deposit & approved credit, manufacturing starts – *typically 4 weeks for roof mount, 8 weeks for ground mount*


5-6 Days

7. **SHIPPING** – SunLink provides a shipping form for delivery specifications, typically *5-6 business days, 2-3 weeks for Hawaii*.

Proprietary & Confidential
Re: 1G03562 - C-Vec Barnstable - 10/5/2011 2:05 PM

Page 3 of 3

CONFIDENTIAL

SL0011503

8.     Between March 6[th] and 9[th], 2012, the Sunlink Master Sales Contract was executed by the parties. The CVEC Project Portfolio was then analyzed by Cathy Powers, Sunlink Project Manager who submitted to ACE a detailed project schedule for said portfolio (Exhibit ACE-014) and an analysis of the specific production delivery schedule for project completion, for each project, which analyzed delivery time for Sunlink products for each project in the CVEC Portfolio of projects. Powers represented that the hardware which includes the A-Frames and rails would be manufactured in 26 days and shipped in 5 days or 1 day. The Sunlink process was not possible with Sunlink issuing special purchase orders for the manufacture of A-frames in China with delivery to be made by ship.  (Transcript Page 1187 Line 11 through Page 1188 Line 2)

> "From:   Cristy Powers [cristy.powers@sunlink.com]
> Sent:   Friday, April 06, 2012 6:16 PM
> To: zac.osgood@americancapitalenergy.com
> Cc: emclean@americancapitalenergy.com
> Subject: RE: ACE BGMS Projects
> Attachments: ACE Project Schedule CP.mpp
>
> Zac,
>
> I have updated the production schedule based on what information 1 currently have. 1 want to preface that we are still waiting for POs in order to start production of ballast molds, ballast blocks, and hardware. Production cannot be started until receipt of POs. That being said, this schedule gives a timeline of each item, once POs are in place. "(Exhibit ACE-014)

| ID | | Task Name | Duration | Start | Finish | Physical % Complete | Predecessors | Apr 8, '12 |
|----|--|-----------|----------|-------|--------|---------------------|--------------|-----|
| 1 | | ACE Project Portfolio | 131 days | Wed 4/11/12 | Wed 10/10/12 | 0% | | |
| 2 | | Eastham | 69 days | Wed 4/11/12 | Sat 6/30/12 | 0% | | |
| 3 | | Signed PO or Sales Order | 1 day | Wed 4/11/12 | Fri 4/13/12 | 0% | | 6-ACE |
| 4 | | Ship Plans Confirmed | 7 days | Wed 4/11/12 | Thu 4/19/12 | 0% | | SunLink Project |
| 5 | | Order Ballast Melds | 12 days | Mon 4/16/12 | Tue 5/1/12 | 0% | 3 | |
| 6 | | Manufacturer Ballast Blocks | 34 days | Thu 4/26/12 | Tue 6/12/12 | 0% | 5 | |
| 7 | | Manufacturer Batch 1 | 8 days | Thu 4/26/12 | Mon 5/7/12 | 0% | | |
| 8 | | Manufacturer Batch 2 | 8 days | Tue 5/8/12 | Thu 5/17/12 | 0% | 7 | |
| 9 | | Manufacturer Batch 3 | 9 days | Fri 5/18/12 | Wed 5/30/12 | 0% | 8 | |
| 10 | | Manufacturer Batch 4 | 9 days | Thu 5/31/12 | Tue 6/12/12 | 0% | 9 | |
| 11 | | Ballast Block Ship Dates | 23 days | Tue 5/15/12 | Thu 6/14/12 | 0% | | |
| 12 | | Batch 1 Ballast Block Ship Date | 1 day | Tue 5/15/12 | Tue 5/15/12 | 0% | 7FS+5 days | |
| 13 | | Batch 2 Ballast Block Ship Date | 1 day | Mon 5/21/12 | Mon 5/21/12 | 0% | 8FS+1 day | |
| 14 | | Batch 3 Ballast Block Ship Date | 1 day | Fri 6/1/12 | Fri 6/1/12 | 0% | 9FS+1 day | |
| 15 | | Batch 4 Ballast Block Ship Date | 1 day | Thu 6/14/12 | Thu 6/14/12 | 0% | 10FS+1 day | |
| 16 | | Ballast Block Delivery dates | 1 day | Wed 5/16/12 | Wed 6/16/12 | 0% | | |
| 17 | | Batch 1 Delivery Date | 1 day | Wed 5/16/12 | Wed 5/16/12 | 0% | 12 | |
| 18 | | Batch 2 Delivery Date | 1 day | Wed 5/16/12 | Wed 5/16/12 | 0% | | |
| 19 | | Batch 3 Delivery Date | 1 day | Wed 5/16/12 | Wed 5/16/12 | 0% | | |
| 20 | | Batch 4 Delivery Date | 1 day | Wed 5/16/12 | Wed 5/16/12 | 0% | | |
| 21 | | Manufacturer SunLink Hardware | 52 days | Fri 4/20/12 | Mon 7/2/12 | 0% | 3FS+4 days | |
| 22 | | Tubes | 28 days | Fri 4/20/12 | Fri 5/25/12 | 0% | | |
| 23 | | A Frames | 28 days | Mon 5/28/12 | Mon 7/2/12 | 0% | 22 | |
| 24 | | Tilt Arms | 30 days | Fri 4/20/12 | Thu 5/31/12 | 0% | | |
| 25 | | Fasteners | 16 days | Fri 4/20/12 | Thu 5/10/12 | 0% | | |
| 26 | | Clamps | 15 days | Fri 4/20/12 | Thu 5/10/12 | 0% | | |
| 27 | | SunLink hardware Ship Dates | 31 days | Mon 5/28/12 | Mon 7/9/12 | 0% | 22 | |
| 28 | | Tubes | 5 days | Mon 5/28/12 | Fri 6/1/12 | 0% | | |
| 29 | | A Frames | 5 days | Tue 7/3/12 | Mon 7/9/12 | 0% | 23 | |
| 30 | | Tilt Arms | 5 days | Mon 5/28/12 | Fri 6/1/12 | 0% | | |
| 31 | | Fasteners | 6 days | Mon 5/28/12 | Fri 6/1/12 | 0% | | |
| 32 | | Clamps | 9 days | Mon 5/28/12 | Fri 6/1/12 | 0% | | |
| 33 | | Chatham | 86 days | Mon 4/2/12 | Sat 6/30/12 | 0% | | |
| 34 | | Signed PO or Sales Order | 1 day | Fri 4/13/12 | Fri 4/13/12 | 0% | | 6-ACE |

| | | | | |
|---|---|---|---|---|
| Task | | External Milestone | | Manual Summary Rollup |
| Split | | Inactive Task | | Manual Summary |
| Milestone | | Inactive Milestone | | Start-only |
| Summary | | Inactive Summary | | Finish-only |
| Project Summary | | Manual Task | | Progress |
| External Tasks | | Duration-only | | Deadline |

Project: Commercial Construction
Date: Mon 3/11/16

Page 1

9.     Unfortunately, ACE and Sunlink could not proceed under the Master Sales Agreement as a result of delays by NSTAR in completing its required cost analysis, which is necessary predicate to entering an interconnection agreement, which in turn, is required for SREC qualification. (Transcript Page 988 Line 20 through Page 989 Line 12 )  The CVEC Portfolio of Projects were delayed for two years by NSTAR and not completed until ACE filed a formal protest with the Massachusetts DOER against NSTAR to force NSTAR to set costs and execute Interconnection Agreements for the CVEC Portfolio of Projects.  (Transcript Page 989 Line 18 through Page 990 Line 6)

10.     However, negotiations continued between John Eastwood at Sunlink with Eric McLean of ACE; they maintained constant contact concerning the developments of the CVEC Portfolio of Projects. (Transcript Page 1109 Line 17)  Further, Ace continued working with Sunlink on other projects with Sunlink providing engineering, consulting and racking systems for major projects such as one in California constructed in the spring of 2013, the Eversource

(WMECO) project engineered and constructed in the fall of 2013 and a project in Charlotte, Vermont, in February of 2014. (Transcript Page 362 Line 15 through Page 363 Line 15 ) (Exhibit ACE-094) (Transcript Page 494 Line 5 through Page 494 Line 22) (Exhibit ACE-143)    It should be noted there were no schedules submitted by ACE or requested by Sunlink for said solar projects. As ACE's Osgood testified,

> "We've never provided them a schedule. We've never had a problem with delivering. When you coordinate delivery schedule, that's what it is to me. When a truck shows up. When you get delivered, right? It's not when they start manufacturing." (Transcript Page 1158 Line 23)

11.    Meanwhile, the CVEC portfolio was further complicated when the Massachusetts Department of Energy Resources (DOER), issued notice that the 400 MW SREC program had been filled (Transcript Page 991 Line 11) thereby ending the financial viability of financing and construction of the CVEC Portfolio of Projects.

> "CVEC acting for the Towns of Barnstable. Brewster, Chatham, Eastham, Harwich, Edgartown and Tisbury entered into an Energy Management Service Agreement (EMSA) with ACE as well as agreements with Dennis, Mashpee and Duxbury. The projects are shovel ready having already seemed all approvals including interconnection agreements executed with NSTAR. In May of 2013, ACE executed a Membership Interest Purchase Agreement and an Agreement for the Engineering, Procurement and Construction of these projects. The Notice to Proceed on these Agreements was to be issued on May 30th." (Exhibit ACE-001)

> "On May 29th, the Massachusetts Department of Energy Resources (DOER), the agency responsible for administering the solar carve-out program in Massachusetts sent a letter to developers notifying them that the solar carve-out cap of 400MW had been reached and that no further applications would be accepted under the 400MW program limit. While the DOER was required to keep the developers abreast of any remaining capacity under the program, not only did the DOER not comply but also permitted the flooding of the market with unqualified applications submitted to manipulate the intent of the government regulation for projects not only not shovel ready but also not having applied for permits or interconnection. The paper applications, most of which, will never be constructed create a threat

9

to the entire Massachusetts Solar Energy program." (Exhibit ACE-001)

Units that have not received an Authorization to Interconnect on or before December 31, 2013 will be provided an extension to March 31, 2014 only if it can demonstrate to the satisfaction of Department that the project has expended at least 50 of its total construction costs by December 31, 2013." (Exhibit ACE-001A)

The DOER ruling eliminated SREC I qualification and resulted in the loss of $84,000,000 of certificates as a result of the announced inability of CVEC to qualify for the ten year State SREC 400 MW carve out program.

> Q. Now the SREC-1 pool, what was the value of being
> in the SREC-1 pool as to how many SRECs would be
> generated from the CVEC project, the Duxbury,
> Mashpee, Dennis projects?
> A. Millions. I mean it accounts in the first year
> alone, you know, a rough guess -- I mean I know
> -- a rough guess probably seven, eight million
> dollars worth of SRECs.
> Q. Over a 10-year period of time, is there a
> methodology for trying to come up with a
> computation based on what was anticipated from
> the production?
> A. There is.
> Q. And what would that computation show?
> A. So it would show over the 10-year period, you
> know, upwards of 80 to 90 million dollars worth
> of SRECs.
> Q. And if it wasn't constructed by June of 2014,
> would there be any qualification for that 84
> million in SRECs?
> A. No. We would have lost them all.
> (Transcript Page 999 Line 2 through 22)

Notice was immediately provided to John Eastwood by email on June 12, 2013, notifying him of the demise of the CVEC Portfolio. Eastwood replied, "This is indeed most frustrating after all the effort that has been dedicated to these projects." (Transcript Page 383 Line 10) (Exhibit ACE-001)

12.    The DOER stepped up to rectify what had been described as the "Death of the Solar Industry in Massachusetts", by issuing Emergency Regulations to permit projects which were shovel-ready and which had already obtained Interconnection Agreements with NSTAR, to qualify

for the SREC 1 program thereby restoring the CVEC Projects ability to obtain the $84,000,000 in SRECs. The Emergency Regulations were forwarded to John Eastwood. (Exhibit ACE-001A). Eric McLean remained in constant contact with John Eastwood on the developments and progress of the Emergency Regulations awaiting their publication and finalization. As the regulations became viable, ACE entered into an Engineering Agreement with Sunlink on August 8, 2013 noted *supra* and also an Engineering contract on September 4, 2013 for the Mashpee-Duxbury solar projects noted *supra*.

13.     With execution of the August 8, 2013 contract with ACE, Sunlink began a course of action for its own benefit, in failing to disclose major changes to the course of dealing with ACE. Sunlink admits it knew, if disclosed to ACE, that Chinese sourcing of supplies would be "sticking point" to execution of contracts between ACE and Sunlink for the purchase of concrete and steel for the racking system to construct the CVEC Portfolio of Projects.

> "Aframe lead time will be ~8-9 weeks from China. HOWEVER because it's a sticking point for ACE I have contacted the supplier to confirm best case scenario, which I believe we can start delivery in 6-7 weeks. It's a matter of material sourcing as throughput is not a bottleneck. I will revert when I receive confirmation this evening.
>
> Stay tuned,
> Scott"
> (Exhibit ACE-006)

14.     Despite years of course of dealing, with Sunlink producing steel A-frames in the US and delivered by truck in the US, as noted in the testimony of ACE's Osgood (Transcript Page 1229 Line 4 through Line 21) Sunlink for its own benefit, for cash flow reasons, for cheaper A-frames and to commence Sunlink A-frame production in China, determined to manufacture A-frames for the first time in China.

> "From: Rob Ward
> Sent: Thursday, August 21, 2014 6:01 PM
> To: Yury Reznikov
> Cc: Kate Trono; Wes Lao; Scott Morrison; Isaac Childress; Ranjan Prasad
> Subject: 8-GMS 1.5 mounting frames
>
> Yury,
>
> CVEC used two custom Chinese 8-GMS mounting frames:

81-0017-02 (20 deg tilt /1085 mm rail spacing / 40mm x40mm x2.5mm tubing)
81-0018-02 (25 deg tilt/ 1085 mm rail spacing / 40mm x40mm x2.5mm tubing)

These mounting frames were calc'd and optimized for CVEC only.

Engineering then designed 6 standard 8-GMS mounting frames (81-0020 through 81-0025) to handle 3 tilts (20, 25, 30), 2 rail spacings (1000 mm and 1350mm), and whatever the 12 ga Core rails can deliver to them, for use with all other 8GMS 1.5 projects going forward. These were designed for a US supply chain. They're in Arena and the Project Engineering calc template is set up for these mounting frames.

If the latest plan, as I've heard, is to sell only B-GMS 1.5 going forward, and only Chinese mounting frames, what are we going to be selling?

If we are planning the sell the CVEC frames for other projects, we'll need to do additional calculations to make sure that the mounting frames work, and the mounting frames may drive the panel size limit in some cases. We'll also need to make sure the rail spacing is workable with the module, and we'll need to do some more work on the BGMS 1.5 template.

If we're going to increase the number Chinese mounting frame options, I'd recommend that any additional frames match as closely as practical the US versions we designed.

Thanks,
Rob "
(Exhibit ACE-049)


Other reasons that the delays inherent in Chinese manufacture benefitted Sunlink are noted by Sunlink's president Chris Tilley as follows:

"From :      Chris Tilley
Date : January 22, 2014 12:22 am
To  :   All

I'll also reiterate that we have I had found ourselves in serious financial difficulty over the last few years when customers have told us to go into production and then held of accepting delivery - and therefore payment. From my perspective, this is why we
couldn't go into production before having a delivery schedule and why I/we pressed so hard to get one from ace, to no avail. This project is too

big to have run that risk Given the history here and all the other falsely
set ntp expectations, I don't think
it's reasonable to have expected us to rushed it to be completed prior to
chineese new year, without a delivery date."  (Exhibit ACE-010)

## ACE-SUNLINK COURSE OF DEALING -ALTERED BY CORPORATE OPERATIVES

15.     The course of dealings between ACE and Sunlink in providing engineering and
racking systems for construction of solar arrays is evidenced by the WMECO (Eversource) project
which occurred simultaneously with the CVEC Portfolio Project, as noted in (Exhibit ACE-094
through Exhibit ACE-099).  Those exhibits encompass an eight week process from ACE issuance
of a Notice to Proceed on November 14, 2013 (Transcript Page 363 Line 18 through 19) to
completion of Delivery by Sunlink on January 16, 2014. (Transcript Page 367 Line 21 through
Page 368 Line 13) (Exhibit ACE-099) The 4.2 MW WMECO (Eversource) Project, which equated
to the similarly-sized CVEC Portfolio projects, was delivered and constructed without issue,
mainly because China was not involved.

16.     There were no schedules given by or sought from ACE. It should be noted that with
the CVEC Portfolio project, there were no issues arising from places to store construction materials
- there was no lack of space or security:

> "Q. Can you describe the site as far as ability to
> stack, supply materials?
> A. Sure. So many of these projects are giant
> landfills, so there is abundant space on the
> landfill cap and then around surrounding the
> landfill itself. Most of -- all of these
> projects were fenced in, and we had abundant
> area to store materials and have, you know,
> adequate work space for our guys. A lot of
> times what we would do is store the modules up
> in place in the array where they are supposed to
> be deployed." Transcript Page 1016 Line 1 through Line 16)

Deliveries were primarily arranged in the field as noted in the testimony of ACE's Osgood and
McLean who testified that Casey Purcell (Purcell), the project manager of Sunlink, rarely attended

the weekly calls regarding delivery and arranging for delivery of materials to the sites. (Transcript Page 1229 Line 4 through Line 21) (Transcript Page 435 Line 8 through Line 24)

17.     Schedules involved delivery only, there was no construction scheduling or critical path scheduling, the only issue was what and when would Sunlink deliver the products that ACE ordered from Sunlink. ACE signs a standard form Sunlink Contract for the purchase of goods and issues a Notice to Proceed, Sunlink orders the products from its US suppliers from ballasts, rails, and A-frames to nuts and bolts – all of the materials were then delivered to the site.

18.     The process consisted of a series of e-mails as noted specifically in the WMECO project [Exhibits ACE-096 and ACE-099], as noted above.

19.     After ACE Notice to Proceed, Purcell issued an e-mail dated December 11, 2013 setting the delivery schedule which he updated on December 16, 2013, consisting a simple list stating what is coming and when.  There is no discussion, no debate, no exchange of schedules, what is available and when, which is issued by Sunlink concerning deliveries.

20.     On January 13, 2014 Purcell notes that the last delivery of the final hardware would be on January 16, 2014, eight weeks after the issuance of the Notice to Proceed. (Exhibit ACE-094 through ACE-099)

21.     During the course of dealing with Sunlink on the CVEC Project, ACE also executed Sunlink's form contract to construct a solar array in Charlotte, Vermont. Once again, no schedules. A Notice to Proceed was issued, the product was ordered by Sunlink from US distributors, notice was given by Sunlink of scheduled deliveries to ACE, product was delivered and the project got built within weeks.  (Exhibit ACE-024 through Exhibit ACE-032).

22.     In 2013, the CVEC Portfolio projects finally came to fruition with the execution of the Interconnection Agreement with NSTAR, execution of EPC contracts with Redwood, Execution of $5,000,000 SREC purchase agreement with CF CVEC OWNER ONE LLC, (Transcript Page 1263 Line 12).  The EPC contract noted that:

> "Provided, that together with the delivery of the Limited Notice to Proceed the Customer shall deposit with the EPC Provider an advance payment of Five Million Dollars ($5,000,000) which shall be credited as mutually agreed between the Customer and the EPC Provider. This

14

> advance payment shall be shown on the schedule of Milestone Payments
> and Schedule of Values as applied as an advance payment to the agreed
> upon Milestone Payment or Milestone Payments." (Exhibit ACE-033)

Also included in the finalization of the project was the execution of MIPA (Member Interest Purchase Agreement) selling the CVEC contacts executed in June of 2011 to CF CVEC OWNER ONE LLC, there was negotiation for pricing with Sunlink and the entry of the Engineering Consulting Contract with Sunlink. All of which Eastwood was advised of (See ACE Ex-01A and testimony of McLean).

23.     Had it been disclosed that the A-frames would be manufactured in China, ACE would never have executed the contracts with Sunlink. (Transcript Page 1187 Line 11) The reasons were evident and well-known to Sunlink, which is why Sunlink knew it was a "sticking point" for ACE, (Transcript Page 1188 Line 14) and why Sunlink could not disclose their intentions. (Transcript Page 1186 Line 18 to Page 1188 Line 2) (Exhibit ACE-006)

24.     Ordering steel frames from China is not done according to the testimony. It is especially not done when there is a risk of losing $84,000,000 SREC certificates resulting from delays in shipping, manufacturing of a new special order product, delays due to the Chinese New Year and issues of quality all of which preclude such an order. Chinese manufactured steel was a concern even for Clean Focus the Owner of the CVEC projects who, when they found out about the China production, directed questions to Chris Tilley of Sunlink about the Chinese company.

> "From: Chris Tilley
>
> Sent:Thursday, March 06, 2014 07:30 PM
>
> To: Ranjan Prasad; Joost deWilde; Scott Morrison
>
> Subject: Versol Qualification Process documentation and production and shipment information on Ace A- Frames
>
> I just spoke with Clean Focus (CF) and the calls from Eric about inspecting our suppliers in China has come from Clean Focus.
>
> Here's the issue and the proposed solution.
>
> ACE told Clean Focus that we switched from a US supplier for these parts to a Chinese supplier at the last minute. Their (CF) impression based on

this was that we didn't do any real qualification and were doing this by the seat of the pants. CF's board has asked Sam to verify the situation and make sure that the A-frames are being built and there is appropriate quality control. I spoke with him and told him we had an extensive qualification process, that this supplier was also qualified by both Fluor and SunEd and that we had used them before. I also told him that the A-frames were nearly complete and we had been on site to inspect last week.

He asked that we provide him information on the supplier and our qualification process, as well as details on the production of the A-frames and schedule for their shipment. He thought that information with a representation from me that it was correct would put it all to bed with his board. Could you please provide the above information to me? Note, I would prefer that the Versol's name and address are redacted from the materials as I would prefer not to share that information.

Thanks,

Chris "

(Exhibit ACE-063)

And as stated by Ranjan Prasad, there was a savings of only "A couple dollars. Maybe two, three four dollars" (Transcript Page 746 Line 24 through 747 Line 23) on steel products that had to be shipped from China unless there were other economic reasons.  Sunlink had other motives; such as cash flow economics, getting the contract from ACE, factoring from Bridge Bank and delaying payment to suppliers as long as possible until delivery.

25.    ACE, of course, was not aware of the Chinese production as noted in the following:

"A. So I had no knowledge they were ordering A-frames from China. They had never done that on any of our projects in the past. They typically came out of Ohio or somewhere else local.
It would be a sensitive point for us, absolutely, because it adds 30 days automatically, if not longer with customs, on delivery. And so it would have been a very sensitive issue for us."
(Transcript Page 1187 Line 11 to 20)

16

"Q. Are there any other issues that are involved
with regards to ordering things from China?
A. Yeah. In this case, they had never done it
before so we had some concerns about quality.
When we found out, this was, you know,
later on. We had concerns about quality. They
had never manufactured before there. Quality
control from China can be an issue in a lot of
manufacturing. So --"

(Transcript Page 1188 Line 3 to 11)

"Would the contracts have been entered
into or not?
A. No. I would not have entered into the contracts
with SunLink had I known that."

(Transcript Page 1189 Line 11 to 14)

"Q. If SunLink had come to you with previous
contracts and said that we're going to build
these A-frames in China, what would have been
the -- would the contract have been executed?
MR. THOMAS: Objection.
ARBITRATOR EVANS: Overruled.
A. Over -- over the years we have done business, I
was never aware they ever sourced anything from
China. If they had, it would have been a
problem. If I had known, we would not have
entered into these contracts with them."

(Transcript Page 1528 Line 12 to 22)

"A. The same ones I mentioned earlier. My main
concern is shipping costs. You are shipping
heavy, heavy steel. Of probably equal
importance are the issues of quality and issues
of having it have to be just in time. In other
words, it takes a month or more to ship from
China to get it to the United States, depending
how it is shipped, and then it can take another
week depending if it comes into California to
get it across the country. Those types of time
frames on a racking system, which is one of the
first things you end up building, are completely

17

a nonstarter for us. "

(Transcript Page 1529 Line 6 to 18)

26.    The economics of delay is evidenced by the mask worn and cloud of smoke thrown up by Sunlink requesting schedules that never existed before, seeking the creation of schedules one after another, each with a delay tactic in mind and no known delivery date. The stalling persisted even when ACE's Vice President of Operations on December 17, 2013, urged Sunlink - about scheduling - start production forget schedules.

> "From: Eric McLean
> [mailto:eric.mc/ean@americancapitaienergy.com]
> Sent: Tuesday, December 17, 2013 12:31 PM
> To: Casey Purcell
> Cc: Zac Osgood; Jonathan Eastwood; Eric McLean; Jeff Gadomski
> Subject: Re: Barnstable, Dennis, Brewster
>
> We need delivery ASAP. So please start production. Please do not
> wait for a schedule.
>
> Thank you,
> Eric"

(Exhibit ACE-065)

27.    In January, 2013, Sunlink, was having all kinds of problems with delivery of major components; Sunlink had not even sent samples of the items they needed for the CVEC Portfolio projects, nor was the method of shipment finalized. None of this was disclosed to ACE as noted below:

> "From: Scott Morrison
> Sent: Monday, January 13, 20149:51 PM
> To: mary.ma
> Cc: Ranjan Prasad; Joost deWilde
> Subject: summary
> Hi Mary,
>
> Nice to speak with you via skype this evening. Your shipping schedule
> for all the post frames is January 27th. This will consist of approx. 9-
> 10 containers @ 400 pcs per container. You are clear on the packaging
> plan and will process according to our instructions.

18

For the Mounting Frames we will receive the sample pieces Feb 3 and contact you during the Chinese holiday with feedback. Your mass production will start on Feb is" with a ship date of March 4th for the first batch of 9230 pieces 81-0017-02. The second batch consisting of 9535 pcs 81-0018-02 will follow shortly thereafter. You will let me know in the next few days if the ship date will be March 4th or a few days thereafter for 81-0018-02

We are working with our engineers to provide you with 3D images of the mounting frame packaging detail as your concerned about the width of the crates exceeding the width of the container, not leaving you enough room to load the parts in the container correctly. Both parties will continue to design the most cost effective and efficient way of packaging the mounting frames.

We will talk again tomorrow or Wednesday night our local time about the packaging plan and shipping dates for the 2nd batch of mounting frames.

Thank you,

Scott"

(Exhibit ACE-042)

"From: Ranjan Prasad
Sent: Tuesday, January 14, 2014 10:56 AM
To: Scott Morrison
Cc: Joost deWilde
Subject: RE: summary


Guys,

Let's talk about this. We can't take all of the mounting frames at once. ACE won't take them and we can't float them for 2-3 months. We need the shipments spread out per the schedule I distributed last week.

Thanks,

Ranjan "

(Exhibit ACE-042)

ACE made it clear it could take any and all material.  Sunlink went as far as to hope for a blizzard to justify their delayed delivery thereby delaying their duty to pay their suppliers.

> Q. Under 3D:
> "Rail schedule isn't falling into place,
> so Ranjan and Chris T. are leaning on the
> supplier to pick up the pace. Not much we can
> do but hope they stay busy with the A-frames
> next week. Another blizzard would help."
> (Transcript Page 973 Line 22 through Page 974 Line 2) (Exhibit ACE-116)

28.     On January 14, 2014, the truth concerning China production was finally disclosed to ACE during a trip to Sunlink's office in San Francisco by Zac Osgood and Eric McLean, of ACE.  The trip was necessitated by a schedule issued on January 7, 2014 by Sunlink which would have resulted in failure to meet the DOER Emergency Regulations for qualifications for SREC 1. (Exhibit ACE-055)  Only then, was the Chinese production plan finally disclosed along with the fact the ACE order had not even been placed, in fact, discovery revealed that samples had not even been sent by Sunlink to China.

> "For the Mounting Frames we will receive the sample pieces Feb 3
> and contact you during the Chinese holiday with feedback. Your
> mass production will start on Feb 15th with a ship date of March
> 4th for the first batch of 9230 pieces 81-0017-02. The second batch
> consisting of 9535 pcs 81-0018-02 will follow shortly thereafter.
> You will let me know in the next few days if the ship date will be
> March 4th or a few days thereafter for 81-0018-02
>
> We are working with our engineers to provide you with 3D images
> of the mounting frame packaging detail as your concerned about
> the width of the crates exceeding the width of the container, not
> leaving you enough room to load the parts in the container
> correctly. Both parties will continue to design the most cost
> effective and efficient way of packaging the mounting frames. "

(Exhibit ACE-042)

The delay game is in full play. Eastwood announces during the January 14th visit that ACE's funds paid in full for Mashpee-Duxbury saved Sunlink, half the Sunlink building is empty and the fact is finally disclosed, that Sunlink was going to China to produce the A-Frames.

"A. So he had told us that our money that we sent,
the down payments for the CVEC and Dennis
projects as well as the Mashpee and Duxbury full
payment saved SunLink." (Transcript Page 1025 Line 9)

"That was the first time we heard that
they were getting any of the major components
from China. And it initially set off a big
alarm. John assured me that they could make it
work, that, you know -- I was concerned
immediately about Chinese New Year because it
was coming up.
But if they had -- if the purchase
orders were in then, you had time to get -- all
you had to do was get them on the water before
the New Year and we would have been okay."
(Transcript Page 1210 Line 12 to 22)

29.    ACE objections were asserted and ACE sought a substituted racking system from
US producers of racking systems.  Further, ACE advised Eastwood that ACE would have to pull
the plug on the contracts for their delivery failure, for failure to have even started production, let
alone the obstacles of shipping from China by boat which causes a month-long shipping delay and
the delays attendant to the Chinese New Year.  All of these factors threatened the $84,000,000
qualification for the SREC I program set forth by the DOER, all of which was well known to
Sunlink especially John Eastwood. On January 20, 2014, Eric McLean sent an email to John
Eastwood about current issues.

"With the current schedule I am now faced with a decision of , the
>possibility of major liquidated damages (in excess of 20% of the
>project), canceling some or all of your order and finding a new
>solution, paying you excess to make deliver on a schedule that still
>doesn't fully work for ACE and that you should have been able to (and
>assured me you could) deliver on from the beginning. As it stands I
>cannot but ACE in a situation where we may face the LOs that could bring us
down.
>
>If this is a cash flow issue (which I find hard to believe because I
>have sent you almost $1,000,000 in the last four weeks), then ACE may
>be able to help, but at this point I am not sure I can send more money
>your way on another promise to complete the work.

>1 am available Monday and all day Tuesday to discuss. ACE is going to
>have to make a decision by Thursday on a path forward. I am hopeful

>that there is still a solution that can avoid me making a difficult
>decision that we both don't want.
>
>Zac will be responding to your team that this is unacceptable but I
>wanted to discuss one on one. Please call at your earliest convenience.
>I am hopeful we can work something out.
>
>Thank you,"
(Exhibit Sunlink-105)

30.     John Eastwood verifies the predicament with Renny Slatkin, an ACE employee, a former employee of Sunlink who was also a shareholder in Sunlink along with Chris Tilley and Ranjan Prasad. Slatkin disclosed to Eastwood that ACE was contacting and negotiating with other racking companies and was pulling the plug on the contracts due to the liquidated damages and losses it could face. (Transcript Page 1507 through 1508) Slatkin further noted that Sunlink is killing ACE. (Transcript Page 1509 Line 8 through 15) He further noted that Sunlink built a custom system consisting of their process for design of the system, engineering it and a protocol for selling it. (Transcript Page 1497 Line 16 to 22)

31.     After meeting with Slatkin, receiving Eric McLean's comments about terminating the CVEC contract, and receipt of the default letter on January 27, 2014 (Exhibit ACE-002), John Eastwood forwarded an email disclosing the urgency of the situation (Exhibit ACE-010) and sets forth a plan, a new agreement which is forwarded to ACE on January 28, 2014 (Exhibit ACE-003)

   a.  "SunLink is committed to the successful completion of these projects
       and stands ready to work with ACE in a collaborative manner to achieve
       that objective. SunLink relies upon the Contracts between the parties, as
       well as the statements made by ACE, and has committed substantial
       resource to procuring materials for each of the projects. Pricing for the
       materials to be used at each site was achieved by the volume ordered
       from our suppliers, and any cancellation will inevitably adversely
       impact this item. Additionally, please understand that the Chinese New
       Year celebration is an event which essentially stops production and is
       beyond our control."

22

b. "To demonstrate the level of commitment to ACE and the projects, SunLink has worked hard to shorten its delivery schedule and will propose that the projects be staged using a Pre-panelization technique. This was mentioned in telephone calls with Art Hennessey and Eric McLean this am and will provide efficiencies at the installation stage and permit an improvement in the dates for delivery of the hardware. (A link to the Tiger Electric BGMS Pre-panelization Video using the SunLink MMS is here: http://www.youtulbe._com/watch?v=J8ttPQ9Q3I0)."

32.     Eastwood's letter to deliver rails for pre-panelization was proposed by Sunlink, a proposal which despite putting additional burdens on ACE, was accepted by ACE along with the additional construction expense, through Eric McLean. On February 3, 2014 McLean whose acceptance to the pre-panelization plan was based on the representations that rails would be delivered by February 21, 2014 wrote

"From: Eric McLean [mailto:emclean@americancapitalenergy.com]
Sent: Monday, February 03, 2014 7:54 PM
To: Chris Tilley
Cc: Casey Purcell; Jonathan Eastwood; Ranjan Prasad; Joost deWilde; 'Osgood Zac'; 'Jeff Gadomski'; Ted Ridgway; Mark Ginalski; John Eastwood; 'Bob Dowd'; 'Art Hennessey'
Subject: RE: Follow-up from today's call
Chris,

Thank you for the prompt email and for the call today.

I want to make sure I understand the option:

•All tubes and other mounting (for pre penalization) will begin to arrive the week of on February 24th and essentially finish completely March 17th (this is based on an email from Casey dated 1/29) I believe this to be the case and am having my team confirm

•       A-frames:

o 10% delivered no later than March 3rd (hopefully earlier) We are working to have 10% of the A-frames delivered asap. Per my email yesterday, my expectation (not confirmed yet with our Chinese supplier) is that

23

we will be able to deliver the first of these the week of March 3rd. We are pushing to get the first delivery done by Feb 28.

o 10% delivered no later than March 10th (hopefully earlier) My expectation is that we should be able to get the second 10% delivered a week from the delivery of the first 10%. Again to be confirmed early next week when we can revisit with our supplier.

o The remainder come by boat and all arrive by March 31? I am unclear here so please let me know if this assumption is correct. The current schedule shows us delivering the final 75% of frames the weeks of March 24th, March 31, and April 7th. Air lifting the first 20% doesn't move up the delivery of the remaining 80%. Again, we will speak with our supplier and try to bring these in, but for right now, that is the working schedule.

o The cost to airlift the 20% is approximately $240,000. Yes, that is my understanding as well.

In principal this solution is better and we would like to move forward with it (we may need some slight tweaks), as I stated today we are willing to share in some portion of the cost to help execute on the projects as timely as possible."

(Exhibit ACE-073)

33.     This e-mail between Sunlink and ACE's representatives represents a delivery schedule of the rails by the February 24, 2014, thereby allowing the pre-panelization process of attaching solar modules to rails and then attaching to the ballasts upon receipts of the delayed A-frames from China. (Exhibit ACE-073)

34.     The plan conceived by Sunlink and accepted by ACE failed, because no rails were provided as represented. As noted in (Exhibit ACE-017), only 41 per cent of the rails had been manufactured as of March 24, 2014, almost two months after the promises of Eastwood and Sunlink to produce rails for pre-panelization

"From: Zac Osgood mailto:zac.osgoodamericancapitalenergy.com

Sent: Tuesday, March 25, 2014 7:23 AM

To: Joost deWilde

Cc: John Eastwood; 'Eric McLean'; Ranjan Prasad; Chris Tilley; art.hennessey©americancapitalenergy.com; Scott Morrison; 'Jeff Gadomski'; Casey Purcell; 'Bill Guinasso'

Subject: RE: Update

Joost,

I am extremely concerned with the schedule and dates provided below. ACE placed purchase orders for these projects back in December 2013 and a majority of the rails still have not been fabricated as of 3/25/14 (per your email yesterday only 41% of the rails have been fabricated — sequence 1-10). These dates will not work for ACE, we need ALL rails on site by the end of March.

I do not understand the delay and need to know why these rails have not been fabricated. Thank you,

Zac Osgood
Project Manager
American Capital Energy, Inc."

35.     This late delivery of panels resulted in a total breach by Sunlink of its obligations under the Pre-panelization Agreement and resulted in the total inability of ACE to undertake the prepanelization process on the CVEC Portfolio of Projects. Even Sunlink's expert acknowledges that the late delivery of rails prevented the use of a pre-panelization process. (Transcript Page 882 and 883)

36.     The results of Sunlink's actions, in putting its own interests ahead of those of its beneficiary ACE and Sunlink's not disclosing the China sourcing and Sunlink's delivery and production delays, all left ACE in the predicament having to build a $100,000,000 array with 87,000 solar modules in a period of eight weeks. (Transcript Page 1052 Line 4 through 24)

37.     Sunlink's breaches of contract and breaches of their fiduciary duties resulted in enormous additional costs to ACE for labor and engineering which included being forced to hire 450 electricians, 180 of whom were union and a total of over 500 workers to complete the CVEC Project by June 2014 in order to save the $84,000,000 Massachusetts SREC I credits from complete dissipation.

38.     Additional offsets that have to be considered include, the Change Orders as noted in the testimony of Eric McLean.  It was presented to ACE - either sign the Change Orders or the deliveries would stop Eric McLean (Transcript Page 1474 and 1475). Signing change orders or lose $84,000,000 in SREC 1 credits in not a realistic choice.

39.     Additional set-offs are due ACE for payments made to Sunlink in full for Mashpee but which were not paid to subcontractors of Sunlink such as Oldcastle. Other offsets apply including payments to subcontractor Oldcastle for debts owed by Sunlink which are included in Sunlink's request for damages in the Arbitration.

# ARGUMENT

## THE CONSULTING ENGINEERING CONTRACT CULMINATED A COURSE OF DEALING TO ESTABLISH SUNLINK AS ACE'S FIDUCIARY

The parties entered into a "Consulting Engineering" Agreement on August 8, 2013 (Ex ACE 090) for the CVEC Project Portfolio.  This engagement, culminated the course of years of dealing and transformed the parties' legal relationship, particularly the duty owed by Sunlink.

By the fall of 2013, there was a well-established course of dealing between Sunlink and ACE. The companies had worked together on over 50 projects. (McLean 1296) There never were schedules given by ACE, there never were products sourced from China. (McLean 1358, Osgood 958, Hunton 1528) Deliveries were always made by Sunlink within weeks. The common basis for understanding and the routines justified an expectation that the routines would be followed on the CVEC project.

Sunlink warranted in its engineering agreement that it would perform in keeping with accepted professional practices in the engineering profession. (ACE Ex 90 at 6) In the role of consulting engineer, Sunlink was performing a duty as an agent, a regulated professional, subject to the rules governing the conduct of engineers. Sunlink was hired and paid by ACE to give professional advice about materials and equipment specifications. The professional practices of Registered Professional Engineers, subject to M.G.L. c. 112, § 81M, are governed by 250 CMR 5.00/ which includes a Code of Professional Conduct 5.02: Professional Conduct.

> **5.02** (4) Conflicts of Interest. A Registrant shall act professionally for each employer or client as a faithful agent and shall avoid conflicts of interest, or the appearance of conflicts of interests.
>
> (a) A Registrant shall make full prior disclosures to the Registrant's employers or clients of potential conflicts of interest or other circumstances which could influence or appear to influence the Registrant's judgment or the quality of their services. The Registrant bears responsibility for maintaining documentation of compliance with this requirement.
>
> (b) A Registrant shall not accept compensation, financial or otherwise, from more than one party for concurrent services on the same project unless the circumstances are fully disclosed in writing to all interested parties.

The American Society of Civil Engineers Code of Ethics holds its members to similar ethical obligations.

> Canon 3 reminds engineers that professional reports and statements must be objective and truthful, must include all relevant information, and must be based on adequate knowledge, competence, and "honest conviction."
>
> Canon 4: "Engineers shall act in professional matters for each employer or client as faithful agents or trustees and shall avoid conflicts of interest."

27

While not every design or engineering engagement establishes a fiduciary relationship, neither is it rare.[1] Under the rules it was subject to, Sunlink at a minimum, had a duty to speak, to candidly disclose to its principal ACE, its plan for remote sourcing, which Sunlink knew was inimical to ACE's interests.   At the very latest, by August 8, 2013 Sunlink's professional services engagement regarding advice about specified materials, established Sunlink's duty to ACE as that of a fiduciary.

The question of whether, in a particular factual setting, a fiduciary relationship exists is a question of fact. *Indus. Gen. v. Sequoia Pacific Systems, 44 F. 3d 40 - Court of Appeals, 1st Circuit (1995) See, e.g., Broomfield v. Kosow, 349 Mass. 749, 212 N.E.2d 556, 560 (1965)* Factors to consider include "the relation of the parties prior to the incidents complained of, the plaintiff's business capacity or lack of it contrasted with that of the defendant, and the readiness of the plaintiff to follow the defendant's guidance in complicated transactions wherein the defendant has specialized knowledge." *Smith v. Jenkins, 718 F. Supp. 2d 155 - Dist. Court, D. Massachusetts (2010)*

The plaintiff alone, by reposing trust and confidence in the defendant, cannot thereby transform a business relationship into one which is fiduciary in nature. The catalyst in such a change is the defendant's knowledge of the plaintiff's reliance upon him. *Broomfield v. Kosow 349 Mass. 749 (1965) Famm Steel, Inc. v. Sovereign Bank, 571 F. 3d 93 - Court of Appeals, 1st Circuit (2009)* ACE's McLean communicated to Sunlink's Eastwood the substantial completion imperatives. (McLean 1177, 1184,1384) `The concept of `duty' . . . `is only an expression of the sum total of . . . considerations of policy which lead the law to say that the plaintiff is entitled to protection. . . . No better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it

---

[1] Zannoth v. Booth Radio Stations, Inc., 333 Mich. 233, 52 N.W.2d 678, 684 (Mich. 1952)(architect has primary duty of good faith and loyalty to employer and must make full disclosure of all known matters which employer should learn); Palmer v. Brown, 127 Cal. App. 2d 44, 273 P.2d 306, 315-16 (Cal. App. 1954)(architect owes client fiduciary duty of loyalty and good faith);  Palmer v. Brown, 127 Cal. App. 2d 44, 59 (Cal. Ct. App. 1954) ("An architect owes to his client a fiduciary duty of loyalty and good faith") (citation omitted); RCDI Constr. v. Spaceplan/Architecture, Planning & Interiors, P.A., 2001 WL 1013241, at *5 (W.D.N.C. Jan. 25, 2001) (under North Carolina statutory law an architect owes fiduciary duties to his client), aff'd, 29 F. App'x 120 (4th Cir. 2002); Canton Lutheran Church v. Sovik, Mathre, Sathrum & Quanbeck, 507 F. supp. 873, 878 (D.S.D. 1981) (holding that the architect-client relationship is fiduciary under South Dakota law)

exists.'" *Luoni v. Berube*, 431 Mass. 729 (2000), quoting W.L. Prosser & W.P. Keeton, *Torts* § 53, at 358-359 (5th ed. 1984).

With the August 8, engagement by ACE of Sunlink for professional advice about CVEC equipment, the Sunlink duty rose to that of fiduciary.  Sunlink positioned itself on two sides of the same transaction, advising ACE about recommended materials while hiding from ACE its own secret plan to purchase those items from a source that would imperil ACE's profits.

Sunlink, planning to supply the materials it specified, owed a duty of candor and full disclosure, to reveal conflicts of interests it could not avoid.

Sunlink was hiding its corporate cash flow problems when the CVEC deal was being considered in the fall of 2013.  Their office was full of empty cubicles and boxes and they were attempting in January 2014 to sublet huge portions of their office space. (Osgood 1025) They gave ACE a deep discount for paying 100% up front -- almost $800,000 for Dennis and Mashpee. (McLean 1202, ACE Ex 77) Eastwood said the down payments from ACE had "saved Sunlink". (Osgood 1025)  They insisted upon a $100,000 payment for CVEC not reflected in the contracts. (Eastwood 617)

Due to Sunlink's financial condition, it was required to factor against invoices "so it could pay... vendors". (Ridgeway 914) This practice provided temporary cash at a large cost; this is expensive money.  This arrangement gave Sunlink cash flow between the time an invoice issued (October 15, 2013 for the CVEC portfolio projects) and the time that payment became due –after delivery.  In order to maximize this liquidity, Sunlink hatched a plot to go as far afield as possible for supplies, intending that delivery be delayed for as long as possible.

Sunlink knew time was of the essence to ACE, and losing all economic benefit from the projects due to loss of SRECS was a "sticking point". (ACE Ex 6) Sunlink had to hide this scheme from ACE.  From ACE's perspective, sourcing racking systems from China was never an option due to shipping costs, quality and other concerns. (Hunton 1518) ACE never would have signed

the CVEC contracts had Sunlink revealed the truth of its hidden plan to source the goods from the other side of the world, and Sunlink knew it. (McLean 1188)

Sunlink's desire to lengthen the delivery time between was a direct conflict with what Sunlink knew was ACE's need for delivery ASAP. Faced with this conflict, Sunlink did not reveal to ACE its China sourcing scheme, in fact, Sunlink the disloyal agent, put its competing interests ahead of those of ACE.

This direct breach of duty by Sunlink as fiduciary harmed ACE.

## FIDUCIARY DUITES CAN NOT BE CONTRACTED AWAY

Once Sunlink established itself as ACE's fiduciary on the CVEC projects, it could not shirk the obligations of the role, or write itself out of the obligations.

The fiduciary relationship created by the Sunlink engineering agency agreement with ACE established a high duty that Sunlink's later merchant contract could not obviate. Under Massachusetts law, "the fact that [the parties] entered into an ... agreement ... does not relieve [Lifespan] of the high fiduciary duty" imposed by tort law. _Blank v. Chelmsford Ob/Gyn, P.C., 420 Mass. 404 (1995); cf. also Wartski v. Bedford, 926 F.2d 11, 20 (1st Cir.1991)_ (explaining that a fiduciary duty "cannot be negated by the words of the [parties'] agreement" under Massachusetts law). Exculpatory clause held ineffective to shield trustee for ordinary breach of fiduciary duties. _Rutanen v. Ballard, 424 Mass. 723 (1997_)

## THE FIDUCIARY BEARS THE BURDEN TO ESTABLISH THE RECTITUDE OF ITS CHALLENGED CONCDUCT

Sunlink's cash flow benefit from long lead time deliveries was in direct conflict with the interest of ACE in having materials as soon as possible. Sunlink chose to position itself as both advisor and supplier to ACE for the CVEC projects. When the interests of Sunlink and its client

conflicted, Sunlink took its own benefit over the interests of its principal ACE in a stark breach of duty. Sunlink was using the Chinese supply route for other, future work and evidence reveals Sunlink's lament that the CVEC materials made in China could not be swapped to other jobs. "If we are planning the sell the CVEC frames for other projects, we'll need to do additional calculations to make sure that the mounting frames work" (ACE Ex 049) By choosing to go to China to benefit its own pecuniary interests, Sunlink harmed ACE's.

Fiduciaries owe strict duties of full, candid, disclosure of all conflicts, strict integrity, loyalty and utmost good faith. Sunlink's conduct violated each of these requisites.

When the conduct of a fiduciary is challenged, it is the fiduciary, not the beneficiary who bears the burden of proof in justifying the trustee's actions as appropriate. Sunlink in this arbitration, must justify and establish with evidence, how the advice it gave ACE about materials and the failure to disclose its own harmful sourcing pact for those same materials squares with its elevated duty.

"[T]he general rule is that one acting in a fiduciary capacity for another has the burden of proving that a transaction with himself was advantageous for the person for whom he was acting. " *Witherington v. Nickerson, 256 Mass. 351, 356 (1926). Smith v. Smith, 222 Mass. 102, 106 (1915)* Once a fiduciary relationship is established, however, the fiduciary who benefits in that relationship must show that he has fulfilled his duty. *Cleary v. Cleary, 427 Mass. 286 (1998)* . *Nycal Corp. v. KPMP Peat Marwick LLP, 426 Mass. 491, 496 (1998). Zimmerman v. Kent, 31 Mass. App. Ct. 72, 77 (1991)*Nysa

This "fundamental fairness" test places the burden on the fiduciary who acquires a corporate (or partnership) opportunity, or who engages in self-dealing, "to prove that his or her actions were intrinsically fair, and did not result in harm to the corporation or partnership." *Meehan v. Shaughnessy, 404 Mass. 419, 441 (1989).* See *Starr v. Fordham, 420 Mass. 178, 183 (1995).* Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501 (1997) at 530.

Sunlink breached its duty of candid disclosure; its conduct was disloyal; its self-dealing in opposition to ACE was an actionable breach.

## INDUCED TO ENTER THE INITIAL CONTRACTS BY SUNLINK'S FRAUD, THE CONTRACTS WERE VOIDED BY ACE

The CVEC project required SREC qualification- it made no economic sense otherwise. As an example, ACE moved mountains to get 83,000 solar panels delivered to the CVEC sites by December 31, 2013 to meet one requirement of qualifying for the SREC support program.

Having the sites operational no later than June 2014 was critical; Sunlink knew of the looming deadline which if missed, would obliterate all economic benefit from the CVEC project. In ACE's 2013 dealings with the Sunlink material fabricators, each side knew that delivery to allow for SREC credits was the basis of the bargain, the essential purpose of the agreement.

Sunlink induced ACE into entering the contracts by fraud[2], by false affirmative assurances and by knowingly hiding from ACE the material fact that Sunlink was opting to source the goods from the other side of the earth under a scheme that would destroy all economic benefit of the eight figure deals for all other participants.

Contracts procured by fraud are voidable by the defrauded party and ACE cancelled its contract by defaulting Sunlink.

Massachusetts common law has long instructed that a party "seasonably may rescind a contract which he has been induced to enter into in reliance upon false and fraudulent representations as to material facts." *John Hancock Mutual Life Insurance Company v. Banerji, 62 Mass. App. Ct. 906 (2004) Elias Bros. Restaurants, Inc. v. Acorn Enterprises, Inc., 831 F. Supp. 920, 927 (D. Mass. 1993)*, quoting from *McGrath v. C.T. Sherer Co., 291 Mass. 35, 58 (1935)*.

---

[2] ACE asserted fraudulent inducement as its 9[th] Affirmative Defense.

Contracts induced by fraudulent misrepresentations are not void *ab initio*; they are voidable at the election of the party who justifiably relied on the misrepresentations. *Shaw's Supermarkets, Inc.* v. *Delgiacco*, 410 Mass. 840, 842 (1991). See *Berenson* v. *French*, 262 Mass. 247, 260-261 (1928); Restatement (Second) of Contracts § 164 (1981). Intent to deceive is not required, but a non-fraudulent misrepresentation does not make a contract voidable unless the misrepresentation is material. Restatement (Second) of Contracts § 164 and comment b (1981).

When ACE first learned to its horror that its trusted supplier intended to issue deliveries past the project qualification deadline, ACE declared them in default for material breach. (ACE Ex 2).

While recognizing the sanctity of contract, legal precedent prompts Courts act to protect defrauded parties, to prevent profiteering from contractual chicanery. The Sunlink statements, conduct and intentionally hidden scheme to source goods from China, simply for the unilateral enjoyment of a longer time with its factored cash, was fraudulent as to ACE.

The Supreme Judicial Court, citing the seminal Massachusetts case of *Bates v. Southgate, 308 Mass. 170 (1941)*, "recognized that a balance must be struck between two competing values: contractual certainty and protecting innocent parties from fraud." *Turner v. Johnson & Johnson, 809 F.2d 90 (1st Cir.1986)*. The public policy of permitting avoidance of a promise procured by fraud is not to be circumvented "by means of contractual devices." *Id.* at 96 quoting *Bates v. Southgate, supra*, 308 Mass. at 182, 31 N.E.2d at 551.

When a contract … is to some extent left undefined, and the plaintiff's understanding of the agreement logically may be colored by the defendant's prior statements, fraudulent or otherwise, and where there is nothing on the face of the contract to trigger alarm, in such a case, barring a fraud claim would, in effect, allow parties to contract out of fraud. *Turner v. Johnson & Johnson, 809 F.2d 90 (1st Cir.1986)*.

Sunlink's false assurances to ACE's delivery inquiries and its intentional deception of ACE about the China plan, fraudulently induced the inception of the contracts and so polluted the process as to make Sunlink's supply agreements legally voidable by ACE.

33

Fraudulently inducing the plaintiff to form the contract in the first place was not essentially a breach of contract claim, a 93A claim based on fraudulent inducement is outside the parties' agreement. The plaintiff in *Computer Systems Engineering, Inc. v. Qantel Corp., 571 F.Supp. 1365 (D.Mass.1983),* did not claim that the defendant *broke* a contract, but rather that the defendant fraudulently *induced* the plaintiff to *form* the contract in the first place. *See id.* at 1367 *cf. Popkin v. National Benefit Life Insurance Co., 711 F.Supp. 1194, 1201-02 (S.D.N.Y.1989)* A jury found the defendant in *Northeast Data Sys. v. McDonnell Douglas Computer Sys. Co., 986 F. 2d 607 - Court of Appeals, 1st Circuit (1993)* fraudulently induced plaintiff to enter the contract by failing to tell of certain sales.

Even as among business people, under Massachusetts case law, a court may consider pre-execution oral agreements even if such agreements contradict the unambiguous terms of a contract. *McEvoy Travel Bureau, Inc. v. Norton Company,* 408 Mass. 704, 563 (1990). To induce the *McEvoy* plaintiffs to sign, [the defendant] pointed to a particular provision of the final contract and fraudulently promised that it would not invoke the provision."

The *McEvoy* court added:

> We continue to believe that parties to contracts, whether experienced in business or not, should deal with each other honestly, and that a party should not be permitted to engage in fraud to induce the contract. ... We therefore see no reason to create, as *Turner* suggests, a new rule or an exception to fit cases between sophisticated business enterprises involving contracts which have been induced by the fraud of a party.

*McEvoy Travel Bureau, Inc. v. Norton Company,* 408 Mass. 704 (1990) 713. Through the final quoted passage, the Supreme Judicial Court makes clear that knowingly false statements will not be immune from fraud claims merely because the duped party is considered a "sophisticated business enterprise." *dB Sales, Inc. v. Digital Equipment Corp., 951 F. Supp. 1322 - Dist. Court, ND Ohio 1996 applying Massachusetts law.*

Other jurisdictions address fraud in the inducement and highlight trends in the enforcement of punishment for this conduct. "Fraud in the inducement presents a special situation where parties to a contract appear to negotiate freely-which normally would constitute grounds for invoking the economic loss doctrine-but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior." *Huron Tool & Eng'g*

34

*Co v. Precision Consulting Servs., Inc.,* 209 Mich. App. 365, 368 (1995); *BP Amoco Chem. v. Flint Hills Res., LLC,* 489 F. Supp. 853 (N.D. Ill. 2007)

Fraud in the inducement addresses a situation where the claim is, that one party was tricked into contracting. It is based on pre-contractual conduct which is, under the law, a recognized tort. *Williams Electric Co, Inc. v Honeywell, Inc.,* 772 F Supp 1225, 1237-1238 (ND Fla, 1991) *Groeb Farms, Inc. v. Alfred L. Wolff, Inc.,* No. 08-cv-14624, 2009 WL 500816 at *7 (E.D. Mich. Feb. 27, 2009).

Analysis of the parties' conduct, whether under Massachusetts common law or under Massachusetts-enacted Uniform Commercial Code G.L.c. 106 leads to the same conclusion – Sunlink may not escape the consequences of its duplicity. Delivery pursuant to established custom, pursuant to assurances, in time to secure SREC benefits was, as both sides well knew, the basis for the CVEC bargain. Whether the nomenclature of misrepresentation or warranty attaches, depending on whether the claim sounds primarily in tort or contract, both proscribe the conduct evidence shows Sunlink engaged in.

G.L.c. 106 § 2-313 section provides that:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

G.L.c. 106, § 2-313(1). For an affirmation or description to be actionable as an express warranty, it must have become "part of the basis of the bargain." *Id.* "It is not necessary to the creation of an express warranty that the seller use formal words such as `warrant' or `guarantee' or that he have a specific intention to make a warranty

*Softub, Inc. v. Mundial, Inc.,* 2014 WL 5151409, *21 (D. Mass. Sept. 30, 2014)

Common law fraud in Massachusetts requires the plaintiff to establish the following elements: 1) that the defendant made a knowingly false statement; 2) that the defendant made the false statement with intent to deceive; 3) that the statement was material to the plaintiff's decision

to sign the contract; 4) that the plaintiff reasonably relied upon the statement; and 5) that the plaintiff suffers harm as a result of the reliance. *Turner v. Johnson & Johnson,* 809 F.2d 90 (1st Cir.1986). In order to establish a cause of action for fraud in Massachusetts, a plaintiff must demonstrate that "(1) the defendant made a false representation of material fact, (2) with knowledge of its falsity, (3) for the purpose of inducing the plaintiff to act in reliance thereon, (4) the plaintiff relied upon the representation, and (5) the plaintiff acted to his detriment." *America's Growth Capital, LLC V. PFIP, LLC,* Dist. Court, D. Massachusetts 2014 *Armstrong v. Rohm & Haas Co., Inc.,* 349 F. Supp. 2d 71, 81 (D. Mass. 2004); see also *Reisman v. KPMG Peat Marwick LLP,* 57 Mass. App. Ct. 100, 109 (2003). *Cumis Ins. Society, Inc. v. BJ's Wholesale Club, Inc.,* 455 Mass. 458, 471 (2009), citing *Masingill v. EMC Corp.,* 449 Mass. 532, 540 (2007). It is a *sine qua non* of the tort, that a plaintiff's reliance be reasonable under the circumstances. *Collins v. Huculak,* 57 Mass. App. Ct. 387, 391-392 (2003)

All of the elements for Sunlink fraud and/or misrepresentation are in evidence here. Sunlink assured ACE the customary lead times would be honored knowing that sourcing the goods from China would involve deliveries beyond the Massachusetts regulatory deadline. Sunlink's internal 'sticking point' references were an internal signal to maintain the deception by withholding the crucial information from ACE and that same internal signaling betrays Sunlink's awareness of the matter's materiality to ACE. ACE would not have signed had it known that goods were to be ordered from China. (McLean 1188) ACE absolutely and reasonably relied on its long-time business colleague and professional agent's veracity and trustworthiness. As a direct and proximate result of the fraud, ACE was required to perform the entire project with hundreds of workers at exorbitant additional expense.

Conduct alone can satisfy the requirement of a representation. In creating the deception actionable conduct need not be overt concise statements.

An intentional misrepresentation may result from an implied or express representation. *Softub, Inc. v. Mundial, Inc.,* 2014 WL 5151409, *21 (D. Mass. Sept. 30, 2014) *Briggs v. Carol Cars, Inc.,* 553 N.E.2d 930, 933 (Mass. 1990). Proof of intent to deceive is not required, so long as there is proof of a false representation of fact susceptible of the speaker's knowledge. *Cummings v. HPG Int'l, Inc.,* 244 F.3d 16, 22 (1st Cir. 2001); *Snyder v. Sperry and Hutchinson Co.,* 333 N.E.2d 421, 428 (Mass. 1975).

The evidence also supports an actionable claim for negligent misrepresentation for those Sunlink actors who might be found to lack fraudulent *scienter*.

"In order to recover for negligent misrepresentation a plaintiff must prove that the defendant (1) in the course of his business, (2) supplies false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and (6) with failure to exercise reasonable care or competence in obtaining or communicating the information." *Nota Constr. Corp. v. Keyes Assocs., 45 Mass. App. Ct. 15, 19-20 (1998)*. See also *Cumis Insurance Society, Inc. v. BJ's Wholesale Club, Inc., 455 Mass. 458 (2009) 471-472 (same)*; *Restatement (Second) of Torts § 552 (1977)*. In order to recover for negligent misrepresentation, a plaintiff must prove that the defendant, in the course of his business, made a false representation of material fact for the purpose of inducing the plaintiff to rely upon it, and that the plaintiff did rely upon the representation as true, to his damage. *Nycal Corp. v. KPMP Peat Marwick LLP, 426 Mass. 491, 496 (1998) Zimmerman v. Kent, 31 Mass. App. Ct. 72, 77 (1991)*. "[T]he degree of culpability a plaintiff must prove to establish liability for negligent misrepresentation is different, and less demanding, than that to establish liability for deceit." *Cummings v. HPG Int'l, Inc., 244 F.3d 16, 24 (1st Cir. 2001)*. Generally, when analyzing negligent misrepresentation claims, Massachusetts courts ask whether the speaker was negligent in failing to recognize the falsity of his or her statements. Id. at 25

Whether intentional or negligent, the essential elements of a misrepresentation claim are: misrepresentation of a material fact, made to induce action, and reasonable reliance on the false statement to the detriment of the person relying. See *Zimmerman v. Kent, 31 Mass. App. Ct. 72, 77 (1991)*. See also *Plumer v. Luce, 310 Mass. 789, 805 (1942)*; *First Safety Fund Natl. Bank v. Friel, 23 Mass. App. Ct. 583, 588-589 (1987)*.

ACE's reliance on Sunlink's assurances was reasonable.  ACE cannot be held to expect that its long time business colleague would for the first time ever, on a job with tight precipitous

deadlines, source ordinary metal parts from a supplier half a world away.  ACE reasonably believed the false Sunlink reassurances given to evade ACE sticking points because they were believable and in keeping with customs in the trade and those between the parties.

While statements of opinion cannot give rise to an action for intentional or negligent misrepresentation, "a statement that in form is one of opinion `may constitute a statement of fact if it may reasonably be understood by the recipient as implying there are facts to justify the opinion or at least that there are no facts that are incompatible with it." _Softub, Inc._ v. _Mundial, Inc._, 2014 WL 5151409, *21 (D. Mass. Sept. 30, 2014)  _Cummings v. HPG Intern., Inc._, 244 F. 3d 16 - _Court of Appeals, 1st Circuit (2001)_ at 22 (quoting _McEneaney v. Chestnut Hill Realty Corp._, 38 Mass. App. Ct. 573 (1995)

As in the Softub and Cummings cases, statements of Sunlink agents may have been inflected with opinion, but they all imply underlying facts that Sunlink knew were false, _see_ _Cummings_, 244 F.3d at 22, _Softub, Inc._ v. _Mundial, Inc._, 2014 WL 5151409, *21 (D. Mass. Sept. 30, 2014)

## WITH THE CONTRACTS VOIDED BY ACE, SUNLINK'S WRITTEN PROPOSAL FOR PREPANELIZATION WAS A WRITTEN OFFER ACCEPTED BY ACE

As was its right, when ACE learned it had been duped by its fiduciary agent, and fraudulently induced to enter the Sunlink contract, ACE voided that pact buy issuing a notice of Default. (ACE Ex 2)

Sunlink's written prepanelization proposal created a new contract under the UCC when it was accepted by ACE. (ACE Ex 3, 73)

The agreement between the parties was either a new agreement or a novation.  Generally, it is a question of fact whether a party intends to relinquish contractual rights by entering into a subsequent agreement. _Roddy & McNulty Ins. Agency, Inc._ v. _A.A. Proctor & Co._, 16 Mass. App. Ct. 525, 536 (1983). _Magliozzi v. P & T Container Serv. Co_ 34 Mass. App. Ct. 591 (1993)

The Uniform Commercial Code applies to give legal shape to the parties' 2014 interactions. ACE knew that all of the schedules proffered by Sunlink would result in economic catastrophe – except the Eastwood proposal featuring early delivery and prepanelization.  Sunlink knew that ACE intended to discharge it from the supply pact and to secure a replacement supplier.(Osgood 1026,1192, McLean 1218)  At this critical juncture, Eastwood issued the prepanelization offer included hard delivery dates with time sufficient for idle workers to pre-assemble parts. (ACE Ex 3, ACE Ex 73)

G.L.c. 106, § 2-207 referred to as the UCC's 'battle of the forms' section, applies when offer and acceptance do not contain identical terms.

ACE gave a definite and seasonable acceptance of the prepanelization proposal for deliveries to begin in March. ACE clearly and in writing accepted this offer. (ACE Ex 73) McLean 1222) Sunlink also demanded new funds in connection with this offer.  Agreement on that term did not result in mutual accord.  ACE did not acquiesce or flatly reject the new funds demand. Conduct of the parties indicated the existence of a contract (under G.L.c. 106, § 2-207(3)) Sunlink ordered rails and ACE prepared workers for prepanelization.

The terms of the contact are those that are a mirror image of one another – ACE and Sunlink agreed that rails would arrive at a set time and prepanelization would ensue.  Conflicting additional terms – Sunlink's demand for additional resources – are knocked out and replaced by the UCC 'gap fillers' G.L.c. 106, § 2-207(3).

Once agreement has been reached and performance has commenced, § 2-207 does not operate to make additional terms that are proposed unilaterally in a later writing part of the complete agreement. *Lorbrook Corp. v. G & T Indus., Inc., 162 A.D.2d 69, 73 (N.Y. 1990). See also 2 Anderson, Uniform Commercial Code § 2-207:5, at 272-273 Magliozzi v. P & T Container Serv. Co 34 Mass. App. Ct. 591 (1993)*

However, "where for any reason the exchange of forms does not result in contract formation[,] . . . a contract is nonetheless formed' [under subsection (3) of § 2-207] if [the parties'] subsequent conduct—for instance, the seller ships, and the buyer accepts the goods—demonstrates

that the parties believed that a binding agreement had been formed." _Softub, Inc. v. Mundial, Inc.,_ _2014 WL 5151409, *21 (D. Mass. Sept. 30, 2014)_, _Commerce & Industry Insurance Company v._ _Bayer Corporation, 433 Mass. 388 (2001)_ (quoting _Jom, Inc. v. Adell Plastics, Inc., 193 F. 3d_ _47 at 54 - Court of Appeals, 1st Circuit (1999)_ (modification in original).

The contract between ACE and Sunlink was created under subsection (3) of § 2-207, and its terms "consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of [UCC Article 2]. G.L.c. 106, § 2-207).

As in the case of _Softub, Inc. v. Mundial, Inc., 2014 WL 5151409, *21 (D. Mass. Sept. 30,_ _2014)_, the contract consists primarily of UCC "gap-fillers," see generally, _Jom, Inc. v. Adell_ _Plastics, Inc., 193 F. 3d 47 at 54 - Court of Appeals, 1st Circuit (1999) w_hich "include those that may be established by a course of dealing, course of performance, and usage of the trade." _Commerce & Industry Insurance Company v. Bayer Corporation, 433 Mass. 388 (2001)_ (quoting _2 R.A. Anderson, Uniform Commercial Code § 2-207:78, at 602 (3d ed. rev. 1997)) Softub, Inc. v._ _Mundial, Inc., 2014 WL 5151409, *21 (D. Mass. Sept. 30, 2014)_

Alternatively, if for any reason the initial contracts are found not to have been voidable, there was a default and novation on a new agreement. The parties through their conduct manifested an intent to go forward together under the new terms.

Novation, like other forms of payment, discharge or modification of existing liability, is an affirmative defense as to which the defendant has the burden of proof." _Tudor Press, Inc. v._ _University Distrib. Co._ 292 Mass. 339, 340-341. Williston, Contracts (2d ed.) § 1875 It requires "the agreement of the parties to an extinguishment of the prior contract and to a substitution of the new contract." _Pagounis v. Pendleton,_ 52 Mass. App. Ct. 270, 273, 753 N.E.2d 808, 811 (2001). "Under Massachusetts law, novation is an affirmative defense and may be inferred from the conduct of the parties. _Clark v. Gen. Cleaning Co.,_ 345 Mass. 62, 64, 185 N.E.2d 749, 750 (1962).

Although "a substituted contract or novation may be inferred despite a lack of express language to that effect," *Lipson* v. *Adelson,* 17 Mass. App. Ct. 90, 94 (1983), and may be based solely on the circumstances and conduct of the parties, *Clark* v. *General Cleaning Co.,* 345 Mass. 62, 64 (1962), a finding of an intent to discharge the preexisting indebtedness should rest on a "clear and definite indication" of such intent. *Lipson* v. *Adelson, supra* at 92-93, citing 58 Am. Jur. 2d Novation § 20, at 534 (1971). Whether the parties intended a novation was a factual question, see *Fauci* v. *Denehy,* 332 Mass. 691, 697 (1955), and cases cited, as to which Pendleton, asserting it as an affirmative defense, bore the burden of proof. *Clark* v. *General Cleaning Co., supra* at 64.

ACE committed itself to working with Sunlink and not dismissing them from the project, to save its position as supplier for CVEC, Sunlink offered the new agreement.


## SUNLINK BREACHED THE PREPANELIZATION AGREEMENT


Despite the parties' accord on the prepanelization agreement – Sunlink breached it, causing ACE to suffer additional costs as workers sat idle, unable to perform work that would have diminished the need for overtime at the finish.  (McLean 1230-2, Osgood 1146)


ACE had hundreds of electricians at the ready, able to commence prepanelization as soon as Sunlink could deliver the rails.  The day before the established delivery date, Sunlink first informed ACE that only 41% of the goods had even been fabricated by that time.


The delivery date for rails was the material provision for ACE's assent to the prepanelization plan. (McLean 1476)  Sunlink's failure to have 59% of the rails fabricated by the supposed delivery date was a material breach of the new agreement.  Sunlink's own testifying expert crucially conceded that the pre-panelization benefits would be (and were) defeated by the delivery of materials in April.  (Collins p 882-3)

## ACE SIGNED CHANGE ORDERS UNDER DURESS

Sunlink threatened to stop deliveries unless ACE agreed to change orders. If changes were not signed, Sunlink's Ridgeway and Eastwood told ACE's McLean- product would not come, Sunlink would stop (McLean 1474) which McLean knew, would cause the loss of $85million in SRECS.

It is well established that a contract entered into under duress is voidable. *Barnette* v. *Wells Fargo Nev. Nat'l Bank,* 270 U.S. 438, 444 (1926). *Coveney* v. *President & Trustees of the College of the Holy Cross,* 388 Mass. 16, 22 (1983), citing *Avallone* v. *Elizabeth Arden Sales Corp.,* 344 Mass. 556, 561 (1962). *Cappy's, Inc.* v. *Dorgan,* 313 Mass. 170, 174 (1943). *Freeman* v. *Teeling,* 290 Mass. 93, 95 (1935). Restatement (Second) of Contracts § 175 (1981). See 7 A. Corbin, Contracts § 28.1 (rev. ed. 2002); 28 S. Williston, Contracts § 71:3 at 431 (4th ed. 2003) (Williston). Such duress need not be physical; it may be economic in nature. Demonstrating economic duress requires "(1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party." *Id.* at 637-638, quoting from *International Underwater Contractors, Inc.* v. *New England Tel. & Tel. Co.,* 8 Mass. App. Ct. 340, 342 (1979). To demonstrate coercive acts, "the assertion of duress must be proved by evidence that the duress resulted from defendant's wrongful and oppressive conduct and not by plaintiff's necessities." *Id.* at 638, quoting from *International Underwater Contractors, Inc.* v. *New England Tel. & Tel. Co., supra. Cabot Corp. v. AVX Corp., 448 Mass. 629, 637 (2007).*

Blowing up an $85 million project is oppressive coercion amounting to duress. The change orders ACE signed should be treated as work to be compensated under a *quantum meruit* theory rather than on the basis of a fairly bargained for exchange.

42

## UCC's APPLICATION TO ACE – SUNLINK FACTS

The obligation of good faith in the performance and enforcement of a contract imposed by G.L.c. 106, § 1-203. The specialized definition of "good faith" in the sales article means "in the case of a merchant ... honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." G.L.c. 106, § 2-103(1) (b), as appearing in St. 1957, c. 765, § 1. *Zapatha v. Dairy Mart, Inc.* 381 Mass. 284 (1980)

Course of dealing and usage of trade (G.L.c. 106, § 1-205) or course of performance (G.L.c. 106, § 2-208) can explain or supplement the terms because the signed contract was not a complete and exclusive statement of the terms of the agreement. G.L.c. 106, § 2-202(a,b)

G.L.c 106 §1-205. (1) A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

(2) A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. If it is established that such a usage is embodied in a written trade code or similar writing the interpretation of the writing is for the court.

## IMPLYING A RESONABLE SCHEDULE FOR DELIVERY ESTABLISHES SUNLINK'S NOT ACE'S LIABILITY

Where contracts for the sale of goods do not specify a time for delivery the UCC fills the gap with an implied term for reasonable delivery. G.L.c. 106, § 2-309(1).

Sunlink's slow boat delivery was unreasonable.

Despite recognizing that delivery time must be reasonable, Sunlink's proffered expert can only arrive at the conclusion condoning his client's conduct, by completely ignoring the looming

43

SREC expiration deadline, known by all parties to the agreement. As such, his opinion is not based on a foundation of facts. Sunlink's expert assumes the parties had all the time in the world to perform, his opinion about "reasonable" time lacks a foundation in the realities facing the parties. The opinion of an expert who disregards crucial facts should itself be disregarded.

## THE CONDUCT OF SUNLINK WAS BAD FAITH

Under Massachusetts law through the UCC, all sellers of goods owe a non-waivable duty of good faith and fair dealing. Sunlink breached this duty to ACE. Through voluntary exchange, two sides each can possibly be better off and at least, no worse off. But this equation relies on mutual *bona fides*.

Through misrepresentations to induce ACE to enter the contracts and to continue using Sunlink, they created non-excusable delays that were not only foreseeable, they were actually foreseen.

Sunlink created the delivery crisis by sourcing A-frames from Asia then tried to make it ACE's problem. The die was cast on December 18, 2013 when Sunlink placed the far-flung purchase order. Sunlink, through an invoicing scheme benefitting only itself, to provide oxygen for its own cash-strapped enterprise, to garner miniscule procurement cost advantages and, with scienter, hid from ACE, the secret pact to source rails from China despite the annihilative impact on ACE and every other project participant. Sunlink lied about it at the reassurance meeting and continues to lie about it.

Sunlink's blithe disregard for laying waste to all the efforts and huge investments of so many others, is astonishing and, it is bad faith.

"Every contract implies good faith and fair dealing between the parties to it." Anthony's Pier Four, Inc. v. HBC Associates 411 Mass 451 (1991) *Warner Ins. Co.* v. *Commissioner of Ins.*, 406 Mass. 354, 362 n. 9 (1990), quoting *Kerrigan* v. *Boston,* 361 Mass. 24, 33 (1972) . See *Clark*

v. *State St. Trust Co., 270 Mass. 140, 152-153 (1930).* The implied covenant of good faith and fair dealing provides "that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract...." *Drucker v. Roland Wm. Jutras Assocs., 370 Mass. 383, 385 (1976),* quoting *Uproar Co. v. National Broadcasting Co., 81 F.2d 373, 377 (1st Cir.),* cert. denied, 298 U.S. 670 (1936).

Unfairness in the 93A context has been described as immoral, unethical, oppressive, or unscrupulous... conduct that causes substantial injury to consumers (or competitors or other businessmen)." A practice may be "deceptive" if it "could reasonably be found to have caused a person to act differently from the way he otherwise would have acted." *Purity Supreme, Inc. v. Attorney General, 380 Mass. 762 (1980)*

Whether the particular violation or violations qualify as unfair or deceptive conduct "is best discerned `from the circumstances of each case.'" *Klairmont v. Gainsboro Restaurant, Inc.,* 465 Mass. 165(2013) *Kattar v. Demoulas, 433 Mass. 1, 14 (2000),* A breach of the duty of good faith may lead to chapter 93A liability. See *Anthony's Pier Four v. HBC Associates, 411 Mass. 451, 583 N.E.2d 806, 820-821 (1991); accord Massachusetts Employers Insurance Exchange v. Propac-Mass, Inc., 420 Mass. 39 (1995)* ("breach of the implied covenant of good faith and fair dealing may constitute an unfair or deceptive act or practice");

Sunlink's conduct of using unreasonable delivery lag to finance its operational cash flow needs, despite its knowledge of the devastating impact such conduct had on all other project participants was bad faith. Sunlink's threats to stop deliveries all together, unless ACE capitulated to its change order demands- was bad faith.

*Computer Systems Engineering, Inc. v. Qantel Corp., 571 F.Supp. 1365 (D.Mass.1983),* (Chapter 93A claim partially based on fraudulent inducement); *see also id.* at 1370 (because tort-like claims predominate over contract-like claims in compound 93A claim, 93A claim is outside parties' agreement); *cf. Popkin v. National Benefit Life Insurance Co., 711 F.Supp. 1194, 1201-02 (S.D.N.Y.1989)*

Common law fraud can be the basis for a claim of unfair or deceptive practices under the 93a statute, see *PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975)*; *Levings v. Forbes & Wallace, Inc., 8 Mass. App. Ct. 498, 504 (1979),* and an intentional fraud can constitute a basis for the multiplication of damages.

Callous and intentional violations of section 11 warrant multiple damages. *Heller v. Silverbranch Construction Corporation, 376 Mass. 621 (1978)* (interpreting similar language in section 9); *Cambridge Plating Co., Inc. v. Napco, Inc., 85 F.3d at 770* (citing this language from *Heller* in section 11 case).


# ACCUSATIONS OF BAD FAITH AGAINST ACE ARE WEIGHTLESS AS NOT FOUNDED IN FACT

Sunlink may be entitled to the fair value of the materials and services they did provide under a theory of *quantum meruit.*

The underlying basis for awarding *quantum meruit* damages in a quasi-contract case is unjust enrichment of one party and unjust detriment to the other party. *Salamon v. Terra, 394 Mass. 857, 859 (1985) (Salamon)*, *Cantell v. Hill Holliday Connors Cosmopulos, Inc., 55 Mass. App. Ct. 550, 554 n.6 (2002).* ACE tried to get appropriate payment to Sunlink.

Sunlink knew its payments were subject to approval by escrow agents. (SL Ex 21)   The release of funds to Sunlink has been blocked by the escrow agreement Sunlink knew about all along.  Sunlink cannot blame ACE with bad faith for the acts of others outside of ACE's control – the payment escrow agents.

Not every breach of contract between merchants constitutes bad faith.   *Pepsi-Cola Metropolitan Bottling Co., Inc. v. Checkers, Inc., 754 F.2d 10, 18 (1st Cir.1985)* (simple breach of contract does not violate Chapter 93A) It is well established that a material breach by one party excuses the other party from further performance under the contract. *Ward v. American Mut. Liab. Ins. Co., 15 Mass. App. Ct. 98, 100 (1983)*

## INTEGRATION CLAUSE DID NOT PROVIDE THAT THE CONTRACT'S TERMS WERE EXCLUSIVE

The signed agreement allowed for additions and clarifications. Section 21 f states that the Sales Contract constitutes the complete agreement between the parties with respect to the supply of Sunlink MMS products and services. It did not say the terms were exclusive.

Eastwood testified there was an additional provision for ACE to pay $100,000 that was not included in the text. Sunlink refused to perform without the cash first. The parties agree there was no explicit delivery schedule stated.

*Robert Industries, Inc. v. Spence  362 Mass. 751 (1973)* Compare *Welch v. Bombardieri*, 252 Mass. 84, 87; *Caputo v. Continental Constr. Corp.* 340 Mass. 15, 18; *Carlo Bianchi & Co. Inc. v. Builders' Equip. & Supplies Co.* 347 Mass. 636, 643-644; Restatement 2d: Contracts


## RECOGNIZE ACE'S SETOFF RIGHTS

ACE has suffered damages as the direct result of being defrauded by Sunlink and by the breach of Sunlink of the prepanelization agreement. ACE incurred substantial costs and liabilities from subcontractors. ACE has committed to satisfying some of Sunlink's suppliers and ACE should enjoy equitable subrogation for satisfying the debts of Sunlink.

## REQUESTED AWARD

American Capital Energy respectfully requests that the Arbitrator enter an award in keeping with ACE's arguments:

1. That Sunlink's had and breached a fiduciary duty to ACE
2. That Sunlink's concealment a breach of its legal duties and caused harm to ACE
3. That ACE recover under MGL c 93A for Sunlink's violations of that law
4. That ACE's conduct be determined not to have violated MGL c 93A
5. That ACE legitimately voided the parties' contract
6. That the prepanelization Agreement was breached by Sunlink
7. That Sunlink's work be afforded recompense under the theory of *quantum meruit*
8. That ACE's setoff rights due to Sunlink's breaches be determined by further evidence
9. That all other relief not granted be denied.

Respectfully Submitted

Attorney for
American Capital Energy, Inc.

ROBERT K. DOWD, P.c.

Robert K. Dowd
BBO # 132 800
Robert K. Dowd P.C.
360 Merrimack Street
Building 9, Entrance K, Suite 202
Lawrence Massachusetts 01843

(978) 221-2000
robtdowd@sbcglobal.net

48

## CERTIFICATE OF SERVICE

I, Robert K. Dowd, attorney for American Capital Energy, Inc., hereby certify that on this date I served the foregoing

### RESPONDENT'S POST HEARING MEMORANDUM OF LAW

By first-class mail, postage prepaid to all counsel who have entered an appearance in this case.

Paul J. Murphy, BBO #363490
David G Thomas BBO #640854
GREENBERG TRAURIG, LLP
One International Place
Boston MA 02110

(617) 310-6063
murphyp@gtlaw.com
thomasda@gtlaw.com

Signed under the pains and penalties of perjury this 8[th] day of July , 2015.

American Capital Energy, Inc.

By Its Attorney

Robert K. Dowd
BBO # 132 800
Robert K. Dowd P.C.
360 Merrimack Street
Building 9, Entrance K, Suite 202
Lawrence Massachusetts 01843

(978) 221-2000
robtdowd@sbcglobal.net