# EXHIBIT CC

AMERICAN ARBITRATION ASSOCIATION

SUNLINK CORPORATION,

Claimant,

v.

AMERICAN CAPITAL ENERGY, INC.,

Respondent.

**AAA NO. 01-14-0001-7516**

# SUNLINK CORPORATION'S REPLY MEMORANDUM

SUNLINK CORPORATION,
Claimant,

By its attorneys,

Paul J. Murphy (BBO # 363490)
David G. Thomas (BBO # 640854)
Greenberg Traurig, LLP
One International Place
Boston, MA 02110
Tel: 617-310-6000
Fax: 617-310-6001

Dated: July 22, 2015

**TABLE OF CONTENTS**

**INTRODUCTION** ........ 1

**REPLY ARGUMENT** ........ 4

A. ACE'S *NEW* THEORY OF THE CASE – THAT SUNLINK WAS A FIDUCARY – FAIRS NO BETTER THAN THE THEORIES ACE ABANDONED DURING THE HEARING AND BY OMISSION IN THE ACE MEMORANDUM ........ 4

1. No Fiduciary Relationship Arose Between SunLink And Ace By Virtue Of The Consulting Services Agreement ........ 4

2. No Fiduciary Relationship Arose Between SunLink And ACE By Virtue Of A Disparity Of Position Or Other Equitable Factor ........ 8

3. The Sales Contracts Preclude The Imposition Of A Fiduciary Duty ........ 11

B. SUNLINK DID NOT FRAUDULENTLY INDUCE ACE INTO BELIEVING THAT SUNLINK WOULD "BUY AMERICAN" OR COMPLETE DELIVERY OF ALL PRODUCTS WITHIN SIX TO EIGHT WEEKS. ........ 13

C. ACE DID NOT VOID THE SALES CONTRACTS BY SENDING THE FIRST DEFAULT NOTICE. ........ 16

D. THE PARTIES DID NOT ENTER INTO A NOVATION CONCERNING PRE-PANELIZATION. ........ 18

E. ACE HAS NOT PROVEN DURESS SURROUNDING ANY CHANGE ORDERS. ........ 23

F. ACE MEMORANDUM CONTAINS REMARKABLE ADMISSIONS THAT (1) SUPPORT SUNLINK'S POSITIONS IN THIS PROCEEDING AND (2) FURTHER EVIDENCE A *CONTINUING* CHAPTER 93A VIOLATION ........ 27

**CONCLUSION** ........ 30

# TABLE OF AUTHORITIES

## Federal Cases

*Baker v. Goldman Sachs & Co.*,
656 F. Supp. 2d 226 (D. Mass. 2009) ........ 6

*Café La France, Inc. v. Schneider Securities, Inc.*,
281 F. Supp. 2d 361 (D.R.I. 2003) ........ 7, 8

*Gemini Investors, Inc. v. Ches-Mont Disposal, LLC*,
629 F. Supp. 2d 163 (2009) ........ 8

*Hogan v. Eastern Enterprises/Boston Gas*,
165 F. Supp. 2d 55 (D. Mass. 2001) ........ 16

*Hoover v. Osley & Whitney, Inc.*,
Nos. 89-1672, 89-1725, 915 F.2d 1556 (1st Cir. 1990) ........ 22

*Industrial General Corp. v. Sequoia Pac. Sys. Corp.*,
44 F.3d 40 (1st Cir. 1995) ........ 9, 13

*Jordon v. McDonald*,
803 F. Supp. 493 (D. Mass. 1992) ........ 7

*Pizzeria Uno Corp. v. Pizza by Pubs, Inc.*,
No. 09-12015-DJC, 2011 WL 4020845 (D. Mass. Sep. 9, 2011) ........ 17, 23, 24

*Republic Services, Inc. v. Liberty Mut. Ins. Co.*,
No. Civ. A. 03-494KKSF, 2006 WL 2792220 (E.D. KY Sep. 25, 2006) ........ 8, 9

*Teamsters Local No. 25 v. Penn Transp. Corp.*,
359 F. Supp. 344 (D. Mass. 1973) ........ 17

*Todd Cnty. v. Barlow Projects, Inc.*,
No. CV04-4218ADM/ELE, 2005 WL 1115479 (D. Minn. May 11, 2005) ........ 4

*Zurich American Ins. Co. v. Watts Regulator Co.*,
860 F. Supp. 2d 78 (D. Mass. 2012) ........ 18

## State Cases

*Adams v. Bernard*,
No. 02-P-379, 2003 WL 22204115 (Mass. App. Ct. Sep. 23, 2003) ........ 15

*Anthony's Pier Four, Inc. v. HBC Associates*,
411 Mass. 451 (1993) ........ 26, 27

*Atkinson v. Rosenthal*,
33 Mass. App. Ct. 219 (1992) ........ 26

*Broomfield v. Kosow*,
349 Mass. 749 (1965) ........ 8, 9

*Cabot Corp. v. AVX Corp.*,
448 Mass. 629 (2007) ........................................23, 24, 25, 26

*Carlson v. Sala Architects, Inc.*,
732 N.W.2d 324 (Minn. Ct. App. 2007)........................................5

*Citizens Bank of Massachusetts v. Bishay*,
No. 95-1312A, 1997 WL 785596 (Mass. Sup. Ct. Nov. 24, 1997)........................................17

*Clark v. General Cleaning Co., Inc.*,
345 Mass. 62 (1962) ........................................18

*D.D.S. Indus., Inc. v. P.J. Riley & Co., Inc.*,
SUCV2009-00978 (Mass. Sup. Ct., May 8, 2014)........................................27, 28

*Davidson v. General Motors Corp.*,
57 Mass. App. Ct. 637 (2003)........................................6, 8, 11

*Greenery Rehabilitation Group, Inc. v. Antaramian*,
36 Mass. App. Ct. 73 (1994)........................................15

*Hills v. Chambers*,
No. 96-0072B, 2000 Mass. Super LEXIS 399 (Sup. Ct. Aug. 1, 2000)........................................17

*Int'l Underwater Contractors v. New Eng. Tel. & Tel. Co.*,
8 Mass. App. Ct. 340 (1979)........................................23

*Larson v. Jeffrey-Nichols Motor Co.*,
279 Mass. 362 (1932) ........................................18

*Lipson v. Adelson*,
17 Mass. App. Ct. 90 (1983)........................................18

*Massachusetts Employers Ins. Exch. v. Propac-Mass, Inc.*,
420 Mass. 39 (1995) ........................................26, 27

*Munn v. Thornton*,
956 P.2d 1213 (Alaska 1998)........................................4

*Page* v. *Frazier*,
388 Mass. 55 (1983) ........................................15

*Pagounis v. Pendleton*,
52 Mass. App. Ct. 270 (2001)........................................18

*Patsos v. First Albany Corp.*,
433 Mass. 323 (2001) ........................................8

*Renovator's Supply v. Sovereign Bank*,
72 Mass. App. Ct. 419 (2008)........................................28

*Routh v. Preusch*,
No. CV030197042, 2004 WL 2165906 (Conn. Super. Ct. Sep. 1, 2004) ........................................4

*Russell v. Cooley Dickinson Hosp., Inc.*,
437 Mass. 443 (2002) ........................................14

*Schwanbeck v. Federal-Mogul Corp.*,
31 Mass. Appt. Ct. 390 (1991) ........ 7

*Shelfield Dev. Co, Inc. v. Carter & Burgess*,
No. 02-11-00204-CV, 2012 WL 6632500 (Tex. Ct. App. Dec. 21, 2012) ........ 5

*Strauss Veal Feeds, Inc. v. Mead and Hunt, Inc.*,
538 N.E.2d 299 (Ind. Ct. App. 1989) ........ 4

*Tufankjian v. Rockland Trust Company*,
57 Mass. App. Ct. 173 (2003) ........ 28

*Wang Labs, Inc. v. Business Incentives, Inc.*,
398 Mass. 854 (1986) ........ 26, 27

*Warsofsky v. Sherman*,
326 Mass. 290 (1950) ........ 11

**State Statutes**

MA UCC § 2-207 ........ 22

MA UCC § 2-207(3) ........ 22

MA UCC § 2-305(4) ........ 22

MASS. GEN. LAWS, ch. 93A, § 2 ........ 3

MASS. GEN. LAWS, ch. 93A, § 11 ........ 3

MASS. GEN. LAWS, ch. 106, § 1-303(b) ........ 15

MASS. GEN. LAWS, ch. 106, § 1-303(e) ........ 15

MASS. GEN. LAWS, ch. 106, § 2-207(2)(c) ........ 22

**Other Authorities**

Prosser and Keeton, Law of Torts, 5th Ed. (West 1984), § 106, pp. 737-38 ........ 15

Restatement (Second) Torts, § 551 ........ 15

## INTRODUCTION

American Capital Energy, Inc.'s ("**ACE**") Post-Hearing Memorandum of Law ("**ACE Memorandum**") is nothing more than a loose collection of (i) distorted, attenuated inferences and facts, (ii) grandiose claims of implausible, fraudulent schemes, (iii) conclusory legal arguments (some old, but most new) manifestly unsupported by any *actual* evidence from the hearings, and (iv) random statements of legal principles and citations to case law untethered to any cognizable legal argument.[1] ACE's *current* theory of defense begins with the false premise that the parties' innocuous Consulting Services Agreement ("**CSA**") (somehow) created a *fiduciary* relationship between the parties, which then (somehow) hemorrhaged its way into and controlled the parties' ultimate sale of goods under the MA UCC and the Sales Contracts themselves.[2] The CSA, however, has no relevance to either the Sales Contracts or to this proceeding. Moreover, Massachusetts law is clear: no fiduciary relationship can be found to exist in an arm's-length, business transaction between two sophisticated, commercial contracting parties such as this.[3]

ACE's argument that SunLink somehow duped ACE into believing SunLink would "buy American," and/or complete delivery of all of SunLink's products within six to eight weeks after receiving a notice to proceed, similarly, finds no support whatsoever in the record. What is even more remarkable is that ACE persists with this argument despite all of the evidence to the contrary adduced at the hearings from *ACE's own witnesses*. Nor is there any credible evidence

---

[1] Indeed, many of ACE's "facts" and arguments are unaccompanied by record citations. Rather, the ACE Memorandum appears to be more of a stream-of-conscious recitation of a theory of the case that either was not presented or was unmistakably rebutted at the hearings.

[2] Terms defined in SunLink's Post-Hearing Memorandum of Law ("**SunLink Memorandum**") are not further defined herein unless otherwise noted.

[3] ACE, of course, failed to (i) even mention the term "fiduciary" during the seven full days of hearings or (ii) plead this new defense, affirmatively or otherwise, in its Answer.

– apart from ACE's *ipse dixit* – that SunLink embarked on and implemented a vast scheme to defraud ACE starting in 2012, which SunLink allegedly somehow maintained throughout all of the trials and tribulations of ACE's dealings with countless third-parties to bring the CVEC Projects to fruition; dealings in which SunLink, of course, had absolutely no involvement. ACE's arguments are pure fiction; unhinged to any evidentiary foundation or reality.

There also exists no credible evidence that the parties entered into a "novation" to allow ACE to "pre-panelize" SunLink's products, as ACE now alleges. Putting aside the fact that ACE (again) failed to raise novation as an affirmative defense in its Answer, the alleged evidence ACE relies on (two out of literally hundreds of emails exchanged during the parties' attempt to expedite delivery of products) does not support the "clear and definite" meeting of the minds Massachusetts law requires to (i) abandon the Sales Contracts and (ii) enter into a new bargain necessary to form ACE's "Pre-panelization Agreement." Regardless, the *quality* and *quantity* of evidence offered by SunLink rebuts any such intent without reasonable question or qualification. ACE's sundry other arguments, including ACE's hollow claim that it actually "voided" the Sales Contracts (which ACE, yet again, never raised as an affirmative defense), are nothing more than late, bald attempts to mount some (any) reason for not paying SunLink approximately $7,000,000 for products delivered, accepted without complaint, and not returned.

Finally, rather than rebutting the factual predicate and legal arguments[4] set forth in the SunLink Memorandum, all of which are supported by citation to the record and case law, the ACE Memorandum actually provides even further support for concluding that ACE violated (and continues to violate) Chapter 93A. Specifically, ACE *continues* to withhold payment from

[4] Unbelievably, despite these proceedings being about the Sales Contracts, ACE does not even mention them until page 47 of its 48-page memorandum.

SunLink by relying on languid legal theories and arguments unsupported by any credible facts or known case law, arguments which fly in the face of the remarkable admissions made by ACE during the hearings and in the ACE Memorandum, (e.g., "lead time" actually does not mean completed delivery time and "yes", ACE definitely owed SunLink *at least* $3,872,150). SunLink has waited long enough to be paid for its products, which it delivered within a reasonable time as set forth by the un-rebutted testimony of Steve Collins, SunLink's expert witness. Moreover, SunLink's products have been installed and in service now for more than *15 months* while ACE has thrown up one specious reason after another for refusing to pay. SunLink deserves to be paid; and, further, ACE's flagrant, purposeful, unfair and deceptive campaign to embargo funds belonging to SunLink, while falsely claiming SunLink defaulted under the Sales Contracts and trying to evade ACE's clear cut (now admitted) payment responsibilities, warrants an award in favor of SunLink of multiple damages, attorneys' fees and costs pursuant to Chapter 93A, §§ 2 and 11.

## REPLY ARGUMENT

### A. ACE'S *NEW* THEORY OF THE CASE – THAT SUNLINK WAS A FIDUCARY – FAIRS NO BETTER THAN THE THEORIES ACE ABANDONED DURING THE HEARING AND BY OMISSION IN THE ACE MEMORANDUM.

#### 1. No Fiduciary Relationship Arose Between SunLink And Ace By Virtue Of The Consulting Services Agreement.

Having had its "Thirteenth Affirmative Defense"[5] shredded at the hearings, ACE offers an entirely *new* theory of potential defense in the ACE Memorandum: "breach of fiduciary duty." Nowhere, however, in (i) its Answer, (ii) any of its motion papers, (iii) its counsel's opening statement, or (iv) ACE's case in general, is there mention of an alleged "breach of fiduciary duty" by SunLink.[6] Rather, like most of the argument contained in the ACE Memorandum, this new argument is supported solely by ACE's after-the-fact assertions of "reliance" and rhetorical flourishes. ACE begins the construction of this "house of cards" defense by precariously asserting that an entirely separate and distinct "Consulting Services Agreement" (**"CSA"**) executed between SunLink and ACE on August 8, 2013, almost two months *before* execution of the fully integrated Sales Contracts which are the subject of this proceeding, somehow, in and of itself, establishes a fiduciary relationship between SunLink and ACE that (somehow) governs the Sales Contracts.[7] ACE tries in vain to saddle SunLink with

---

[5] Until now, the Thirteen Affirmative Defense contained ACE's main legal theory – i.e., that (i) SunLink promised to complete delivery of all products within six to eight weeks (and failed to do so), and (ii) ACE validly withheld approximately $7,000,000.00 in payments from SunLink through ACE's Default Notices and Credit Letter. Unquestionably, SunLink rebutted that theory during the hearings and/or ACE effectively conceded the same. *See* SunLink Memorandum, pp 13-20; 35-36; 41-45.

[6] A search of the 7-volume hearing transcript reveals not a single mention of the word "fiduciary."

[7] In most jurisdictions, including Massachusetts, there is no legal presumption of a fiduciary relationship between an engineer and its customer. *See, e.g., Todd Cnty. v. Barlow Projects, Inc.*, No. CV04-4218ADM/ELE, 2005 WL 1115479, *10 (D. Minn. May 11, 2005) (holding that no fiduciary relationship exists as a matter of law between engineer and design professionals and their clients); *Munn v. Thornton*, 956 P.2d 1213, 1220 (Alaska 1998) ("As fiduciary duties are reserved for relationships involving heightened levels of trust, we decline to create a fiduciary relationship between contractor and owner under a cost-plus contract"); *Routh v. Preusch*, No. CV030197042, 2004 WL 2165906, *2 (Conn. Super. Ct. Sep. 1, 2004) ("The relationship of client and architect does not impose on the

much greater duties and responsibilities than it in fact assumed under the CSA, effectively seeking to transform SunLink into the "Engineer of Record" on these Projects, *which it was not*. As explained more fully below, the CSA (like the fiduciary duty argument, never featured in these proceedings until now) sets forth an extremely limited scope of services and has no nexus whatsoever with the Sales Contracts executed in October 2013, which are at the core of this proceeding. The Sales Contracts did not even become operative until ACE, acting at its sole discretion, finally paid all necessary deposits and otherwise triggered Notice to Proceed on the Projects in early January 2014, well after SunLink had fully performed the minimal, discrete *services* contracted for under the CSA, services entirely *unrelated* to SunLink's supply of *goods* under the Sales Contracts, which is what this case is all about.[8] *See* SunLink Memorandum, Statement of Facts ("**SL SOF**") ¶¶ 32-36.

SunLink contracted in the CSA to provide ACE's "Engineer of Record" (not SunLink) with specifications for its products, and "layout shop drawings" for each CVEC Project. *See* ACE Exs. 90, 91. For these limited services, it was agreed SunLink would be (and was) *separately* paid the relatively minor sum of $4,500.00 per Project on the seven (7) BGMS (ballasts) Projects, and $2,000.00 per Project for the two (2) LGMS (post/pile foundation) Projects. *See id.* As the comparatively minute amount of fees[9] received by SunLink would

---

defendant the unique level of loyalty or trust which characterizes a fiduciary relationship"); *Strauss Veal Feeds, Inc. v. Mead and Hunt, Inc.*, 538 N.E.2d 299, 303 (Ind. Ct. App. 1989) ("An architect does not owe a fiduciary duty to its employer; rather, the architect's duties to its employer depend upon the agreement it has entered into with that employer") (citation omitted); *Carlson v. Sala Architects, Inc.*, 732 N.W.2d 324, 331 (Minn. Ct. App. 2007) (holding that "the relationship of architect and client is not a fiduciary one"); *Shelfield Dev. Co, Inc. v. Carter & Burgess*, No. 02-11-00204-CV, 2012 WL 6632500, *10 (Tex. Ct. App. Dec. 21, 2012) ("We have found no cases recognizing a fiduciary duty as a matter of law of engineers to their clients").

[8] As explained below, the CSA is most certainly not an "agency agreement" between SunLink and ACE as repeatedly (and intentionally) misrepresented by ACE in its Memorandum. *See* ACE Memorandum pp. 27, 30.

[9] This is less than *0.4%* of the amount invoiced by SunLink on the seven seminal BGMS Projects ($31,500 [$4,500 × 7] ÷ $8,161,340.75 [SL SOF ¶ 109]); and an even lesser percentage on the LGMS Projects.

indicate, SunLink's "engineering" scope of services under the CSA is a very limited one. The CSA specifically excludes, among other things, "[g]eotechnical services of any kind[,]" design and specification of any soil or site improvements "required for the installation of the PV array," onsite investigation of any kind, and "[o]ther engineering services of any kind." *See* ACE Ex. 90, at p. 2. The CSA also contains and incorporates six (6) single-spaced pages of general terms and conditions which reinforce the highly limited nature of the engagement, and rebut any suggestion that SunLink functioned as the "agent" of ACE for any purposes. *See* ACE Ex. 91, at pp. 3-8. Like the later executed Sales Contracts, the CSA also contains a comprehensive integration clause. *See* ACE Exs. 90, 91. Furthermore, there is no language of *any* kind contained within the CSA describing the SunLink/ACE relationship as being one of "trust and confidence," or of "partnership," or of any other characterization indicative of a fiduciary relationship. Rather, the CSA, like the later Sales Contracts, speaks exclusively to an arm's-length business transaction between two sophisticated parties.

In Massachusetts, the party claiming a fiduciary duty in a contractual relationship "must set forth allegations that, apart from the terms of the contract, the parties created a relationship of higher trust than would arise from their contracts alone so as to permit a cause of action for breach of a fiduciary duty independent of the contractual duties." *See Baker v. Goldman Sachs & Co.*, 656 F. Supp. 2d 226, 236 (D. Mass. 2009). This is because "[a] fiduciary duty is an extra-contractual duty." *Id.* If both parties to a commercial contract are sophisticated entities, "they cannot be heard to allege that they didn't really mean what they said or that they didn't understand what they were doing" in claiming the breach of a fiduciary duty. *See Davidson v. General Motors Corp.*, 57 Mass. App. Ct. 637, 643 (2003) (plaintiffs lost investment with auto manufacturer, but there was no fiduciary relationship since they had a duty to investigate risks

and were sophisticated parties). No evidence of a relationship involving the requisite "higher trust" that Massachusetts law requires is offered by ACE; no such evidence exists.

ACE also seems to suggest (but never develops, much less supports) the notion that SunLink's alleged fiduciary duty somehow arose as a product of the parties' negotiations leading up to the execution of the CSA. This implied argument, however, is also contrary to Massachusetts law, which recognizes that negotiations between prospective business partners involves an adversarial, not a fiduciary, relationship. *Schwanbeck v. Federal-Mogul Corp.*, 31 Mass. Appt. Ct. 390, 405 (1991), *rev'd on other grounds*, 412 Mass. 703 (1992) ("It is understood that, when parties bargain, each tries to get the best from the trade. They are in an adversary, not a fiduciary, relationship."); *see also Jordon v. McDonald*, 803 F. Supp. 493, 495-6 (D. Mass. 1992) (plaintiff not entitled to treble damages under fraud statute based on fraudulent inducement of her purchase of limited partnership interests because prior to purchase general partner owed no partnership duty to plaintiff) (as cited in *Bromberg and Ribstein* on Partnership, § 16.06(b)).

On these points, *Café La France, Inc. v. Schneider Securities, Inc.*, 281 F. Supp. 2d 361 (D.R.I. 2003) is not only instructive but it resonates with a common sense rejoinder to ACE's claims of fiduciary duty in the context of business negotiations. In *Café*, a case involving a breach of fiduciary duty claim against a securities firm, the District Court explained that

> [a] sales pitch, however, does not a fiduciary relationship create. Were that the case, each of millions of commercial transactions that take place every day would give rise to duties that far exceed the scope of the relationships that created them. While Schneider certainly expected Café to trust it, so too does every merchant who contracts with another 'trust' the other party to perform.

*Id.* at 373. "The same is true of any commercial relationship, however; were it otherwise each entity would be entirely self-sufficient." *Id.*; *see also Gemini Investors, Inc. v. Ches-Mont Disposal, LLC*, 629 F. Supp. 2d 163, 169-170 (2009).

The same analysis applies here and renders immaterial ACE's penchant for touting its alleged "reliance" upon SunLink, when SunLink merely provided product specifications and layout shop drawings for ACE's actual "Engineer of Record" to incorporate into the overall design of the Projects. There can be no fiduciary duty found to exist on the part of SunLink arising purely out of the negotiation and/or execution of the CSA in August of 2013. Nor can any such relationship be implied into the Sales Contracts. The CSA was an entirely separate and distinct agreement from the Sales Contacts, involving a discrete set of highly limited services, separately performed and paid for, and thus has zero relevance in these proceedings, as reflected by the utter lack of any developed record evidence pertaining to it. Simply stated, the newly advanced "fiduciary duty theory" based on the parties unrelated CSA is a construct entirely of ACE's making; nothing more.

2. No Fiduciary Relationship Arose Between SunLink And ACE By Virtue Of A Disparity Of Position Or Other Equitable Factor.

The rule is well established that a person may not unilaterally transform a business relationship into a fiduciary or confidential relationship by supposedly reposing trust and confidence in the defendant. *See Davidson*, 57 Mass. Appt. Ct. at 643 (citing *Patsos v. First Albany Corp.*, 433 Mass. 323, 335-336 (2001)); *see also Broomfield v. Kosow*, 349 Mass. 749, 754 (1965); *Republic Services, Inc. v. Liberty Mut. Ins. Co.*, No. Civ. A. 03-494KKSF, 2006 WL 2792220, *8 (E.D. KY Sep. 25, 2006) (citing *Davidson, supra.*). "Instead, a fiduciary relationship is generally found when certain indicia are present, including when one party is in a position of great disparity or inequality relative to the other party, or the disparity in a

relationship has been abused to the benefit of the more powerful party." *Republic Services, Inc.*, 2006 WL 2792220 at *8 (citing *Industrial General Corp. v. Sequoia Pac. Sys. Corp.*, 44 F.3d 40, 44 (1st Cir. 1995)); *see also Broomfield,* 349 Mass. at 755 (factors considered are the relation of the parties prior to the incident complained of, the plaintiff's business capacity or lack of it contrasted with that of the defendant, and the readiness of the plaintiff to follow the defendant's guidance in complicated transactions wherein the defendant has specialized knowledge).

Again, ACE offers no evidence of any disparity in business ability or any other vulnerability on its part here; or any conduct by SunLink that even remotely suggests that SunLink was in a position to take advantage of ACE. On the contrary, ACE in its Memorandum explains that it was founded by an "internationally recognized physicist in the solar industry with numerous solar patents[;]" credits its president, Tom Hunton, with actually "creating" the Solar Renewable Energy Credit (SREC) Program of Massachusetts; and touts that ACE's founder, its president, Mr. Hunton, and Art Hennessy, its CFO, on a combined basis, have "over seventy years of experience in the solar industry with a particularly unique specialty in the construction of solar arrays on landfills." *See* ACE Memorandum, SOF ¶ 1. ACE further bluntly proclaims that "ACE has constructed more solar arrayed landfill projects than any other individual or entity in the country." *See* ACE Memorandum, SOF ¶ 1. ACE is no business neophyte.

SunLink thus did not enjoy *any* favorable disparity in terms of business knowledge and/or experience in ACE's business; nor was ACE in any sense vulnerable. On the contrary, the record overwhelmingly supports the fact that ACE, as the Engineering, Procurement & Construction ("**EPC**") contractor on the Projects, dictated business terms and imposed performance criteria on SunLink under the Sales Contracts, not the other way around; ACE unilaterally controlled when Notices to Proceed would issue on the Projects, *see* SL SOF, ¶ 34;

ACE unilaterally refused to provide or agree to a delivery schedule with SunLink despite myriad requests from SunLink for the same, *see* SL SOF ¶¶ 81-86; ACE unilaterally attempted (falsely and in bad faith) to place SunLink in default under the Sales Contracts, while at the same time accepting and installing all SunLink products without rejection or return, *see* SL SOF, ¶¶ 87-88; ACE several times promised payment to SunLink and to SunLink's lender, Bridge Bank, of all outstanding SunLink invoices and convinced SunLink to supply yet additional, unpaid-for products, *see* SL SOF, ¶¶89-95; and, of course, despite the stunning admission of ACE's president Tom Hunton that ACE owes (and has always owed) SunLink *at least* $3,872,150 in unpaid invoices, ACE elected unilaterally and without notice or justification to "offset" against SunLink for amounts including alleged liquidated damages and "lost SREC production" allegedly to be charged against ACE by the owners of the Projects, *see* SL SOF, ¶¶ 99-103. To now suggest, for the first time, that ACE was somehow "abused" in connection with the parties' relationship, or that SunLink experienced any form of "unjust enrichment" as a result of this transaction, is plainly absurd.[10]

Similarly, the evidentiary record establishes that ACE hardly stood "ready" to follow SunLink's guidance and advice in terms of accelerating deliveries to the Projects. Rather, the record reveals ACE flatly rejected virtually all of SunLink's proffered guidance in terms of how to expedite deliveries to the sites. SunLink provided numerous options to ACE throughout the course of the Projects to expedite project deliveries. The vast majority of these were rejected,

[10] ACE's "deception" theory, i.e., its allegation that SunLink "hatched a plot to go as far afield as possible for supplies[,]" *see* ACE Memorandum p. 29, not only has no support in the record, it simply makes no sense. SunLink invoices upon shipment of its products from FOB points identified in the Sales Contracts, Tr., Day 1, 116:18 [CT], not the date of the Sales Contracts themselves as ACE misrepresents in its Memorandum. *See* ACE Memorandum, p. 29. SunLink then "factors" the invoices/receivables with its lender under its line of credit, *after* receiving ACE's verification that the invoices have been approved and that ACE has no offsets and knows of no reason why the invoices will not be paid. *See* SL SOF, ¶¶ 89-98. Delaying deliveries gains SunLink nothing; in fact, it only increases the likelihood that SunLink will not be able to either access its line of credit, or else, timely repay the same – both of which occurred here. *See* SL SOF, ¶ 100.

ignored, or else, acted upon too late by ACE to achieve maximum acceleration at minimum, reasonable cost. *See* SL SOF ¶¶ 61-67. In short, the record here reveals none of the indicia of fiduciary relationships recognized by the Massachusetts courts.[11]

3. The Sales Contracts Preclude The Imposition Of A Fiduciary Duty.

The Sales Contracts affirmatively preclude ACE's ability to argue that it reasonably relied on SunLink and thereby transformed an otherwise arm's-length business deal into a fiduciary relationship. This case is akin to *Davidson*, where the Appeals Court ruled that *no* fiduciary duty could arise out of an arm's-length deal where the plaintiff was on notice that the defendant in the case was acting to protect and advance its own interests. 57 Mass. App. Ct. at 642-3 (plaintiffs "receive a death wound from the summary judgment record [because] it is undisputed that plaintiffs knew that [defendant] was acting to protect and advance its own interests"). This knowledge precluded the imposition of a fiduciary duty in *Davidson*, notwithstanding that the plaintiffs were encouraged not to investigate the proposed deal on their own and simply to defer to the wishes of another party. *Id.* at 643.

Indeed, one would be hard-pressed to find a more arm's-length agreement between two sophisticated parties than the Sales Contracts entered into between SunLink and ACE on the CVEC Projects. The Sales Contracts were, as a practical matter, under negotiation between SunLink and ACE off and on since the fall of 2011, years before the CSA, the execution of the Sales Contracts, and/or Notice to Proceed in January 2014. There was also a precursor to the

---

[11] The often-cited case of *Warsofsky v. Sherman*, 326 Mass. 290 (1950) is a good example of a confidential or fiduciary duty being imposed on a defendant which resulted from the defendant's abuse of the plaintiff's confidence. In that case, the plaintiff was an applicant for a loan to finance the purpose of property. The defendant bank officer, who received the information regarding the property in confidence, and in his official capacity and for the purpose of enabling him and other members of the bank to evaluate the loan, bought the property himself. The Court had little difficulty under the circumstances imposing a constructive trust on the property to remedy the defendant's self-deal in breach of the confidential relationship with the plaintiff. There is nothing remotely analogous in this case.

Sales Contracts, a "Master Sales Agreement," providing for the supply of all Projects, actually negotiated and executed between SunLink and ACE on March 6, 2012. The Master Sales Agreement was, however, never activated by ACE and expired by its terms on December 31, 2012. The Sales Contracts of October 2013, which are the subject of this proceeding (although ACE ignores them completely in its Memorandum under its newly espoused theory in the case), were the product of seemingly endless negotiation and renegotiation by and between SunLink and ACE, involving essentially all of the same Projects. Scrutiny of the Sales Contracts, however, reveals numerous provisions negotiated by SunLink which clearly put ACE on notice that SunLink was acting to protect and advance its own interests, such as, the provision of late fees, the lack of pay-if-paid provisions, the lack of any "buy American" provision, *force majeure* protections (including for transportation delay), limitations of liability for indirect/consequential/punitive damages, expansive integration clause, etc. *See* SL SOF ¶¶ 21-31.

Critically, the Sales Contracts also contain no scheduled or defined delivery dates and, therefore, no penalties for late delivery by SunLink. *See* SL SOF ¶ 28. This fact, coupled with ACE's refusal for months to even discuss the Project schedule with SunLink, clearly establishes that SunLink was not and could not have been aware that ACE was purportedly reposing trust and dependence in SunLink to meet any imminent Project deadlines, much less that a confidential relationship between the parties had arisen. As between SunLink and ACE, ACE was the only party fully aware and in control of the salient facts concerning expected completion of the Projects. The record evidence provides that, other than generalized statements made to SunLink of potential exposure if the Projects were somehow delivered "late," ACE never provided SunLink any concrete information on the subject. *See* SL SOF ¶¶ 81-86.

Thus, as the *Industrial General* decision makes clear, no fiduciary duty can arise where there are no facts that would have alerted SunLink to a "heightened fiduciary status." 44 F.3d at 45 ("even if we were to agree with the district court that [plaintiff], having been lulled by [defendant's] blandishments and visions of lucre, looked to [defendant] to watch out for its interests, the record is devoid of any evidence that [defendant] knew of this reliance. In short, the facts overwhelmingly suggest that to the extent [plaintiff] reposed 'trust and dependence' in [defendant], it did so unilaterally.") (internal citation omitted). Here, as in the *Industrial General* decision, there is simply no record evidence which suggests that SunLink *knew* that ACE was seeking to impose on it a heightened status with respect to the Sales Contracts. Like the plaintiff in *Industrial General*, to the extent ACE did repose any form of "trust and dependence" in SunLink, which SunLink completely denies and this record completely fails to support, it did so unilaterally.

In summary, there is no evidence of any disparity, much less a *great* disparity, in the business ability of the respective parties; no evidence that ACE reasonably reposed trust and confidence in SunLink for anything; no evidence that SunLink was aware that it was acting in a heightened fiduciary capacity with respect to ACE's interests; and thus, no fiduciary relationship.

**B. SUNLINK DID NOT FRAUDULENTLY INDUCE ACE INTO BELIEVING THAT SUNLINK WOULD "BUY AMERICAN" OR COMPLETE DELIVERY OF ALL PRODUCTS WITHIN SIX TO EIGHT WEEKS.**

ACE bases its fraudulent inducement argument solely on the premise that SunLink had a duty to disclose (1) SunLink would not be able to complete delivery within its *alleged* customary time frame - six to eight weeks, and (2) A-frames would be sourced from China. *See* ACE

Memorandum, ¶¶ 13, 15, and pp. 27, 28, 32, 33, and 36.[12] SunLink, however, never represented it would complete delivery of its products within six to eight weeks as ACE's witnesses readily admitted during the hearings despite what ACE now argues. *See* SL SOF ¶¶ 22, 23. Nor did ACE have any duty to disclose *where* it intended to source the A-frames as SunLink was not acting as ACE's fiduciary. *See supra.*, pp. 7-16. ACE's conclusory argument to the contrary is not supported by Massachusetts case law or the actual facts adduced during the hearings.

To prevail on its fraudulent inducement claim, ACE must prove that SunLink made a material misrepresentation of fact, on which ACE reasonably relied, and which caused damages to ACE. *See Russell v. Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 458 (2002). ACE cannot support such a claim on any *affirmative* misrepresentation by SunLink. As set forth in SunLink's Memorandum, at no time did SunLink ever represent to ACE it would *complete* delivery according to the "lead times" set forth in the Sales Contracts. *See* SL SOF ¶¶ 23, 24. To the contrary, regardless of the parties' alleged course of dealing, during the time ACE argues it was duped by SunLink, ACE's expectation was that SunLink would be able to deliver its products in nineteen (19) weeks (15 weeks delivery after a 4 week lead time). *See* SL SOF ¶ 84; SL Ex. 108 (where Mr. McLean readily admitted that ACE's delivery duration expectations were based on the ACE August 2013 Schedule, i.e., 15 weeks after a 4 week lead time, i.e., 19 weeks); SOF ¶¶

[12] Although ACE does not tie it to its fraudulent inducement argument, ACE cannot rely on the Master Sales Contract and Budgetary Estimates, or Christy Powers's alleged revisions to a production schedule from 2012 as a basis for any of its claims. *See* ACE Memorandum, ¶¶ 7-9. As ACE readily admits, the parties did not proceed under the Master Sales Agreement. *See* ACE Memorandum, ¶ 9. Furthermore, the Budgetary Estimates (which contained the general "SunLink Process" page) were not incorporated into the Sales Contracts in October 2013, and not discussed by the parties when the CVEC Projects were revived after ACE almost went out of business. *See generally*, Sales Contracts; SL Ex. 8 (ACE's June 6, 2013 letter to credits). Moreover, the Budgetary Estimates concerned different SunLink products. Tr., Day 2, 446:17-448:7 [CT]. Finally, Ms. Powers's revisions to a draft production schedule arising out a contract that was not followed cannot possibly trump ACE's schedule expectations for the contracts that were both communicated to and followed by SunLink. *See* SL SOF ¶ 37-39, 84; SL Ex. 108. ACE simply is trying to recreate history. ACE's attempt fails.

37-39.[13] That ACE still holds on to its claim in its Thirteen Affirmative Defense – that lead time meant completed delivery – after the directly contrary testimony by its own Mr. Osgood, *see* SL SOF ¶¶ 23, 105, is simply unbelievable. Nevertheless, ACE cannot point (and has not pointed) to a shred of evidence that could support a fraudulent inducement claim arising from the parties' use and understanding of six to eight weeks "lead time."[14]

ACE's argument that SunLink committed fraud by failing to disclose SunLink intended to source A-frames from China fairs no better than its tortured affirmative fraud argument. Under time-honored Massachusetts law, a party may not be held liable for non-disclosure if there was no duty to speak. *See Greenery Rehabilitation Group, Inc. v. Antaramian*, 36 Mass. App. Ct. 73, 77 (1994). The rule reflects longstanding principles of bargaining between contracting parties and is altered only when one party has a duty to speak arising out of a fiduciary or confidential relationship or when one party discloses partial information that would be misleading without further disclosure. *See* Restatement (Second) Torts, §551, Comment a;

[13] ACE's reliance to the parties' *alleged* course of dealing during the WMECO and Charlotte projects and testimony from Mr. Osgood that SunLink had not requested delivery schedules on those projects are pure red herrings. *See* ACE Memorandum, ¶¶ 10, 15-22 and p. 27. Course of dealing describes "conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting the parties' expressions of other conduct." *See* MASS. GEN. LAWS, ch. 106, § 1-303(b). The parties' course of performance prevails over course of dealing. *See* MASS. GEN. LAWS, ch. 106, § Sec. 1-303(e). Regardless of how the parties handled any other project (WMECO and Charlotte were single-sites), the parties performed the CVEC Project (multiple sites) differently. In particular, ACE not only provided the first delivery schedule, *see* SL SOF ¶ 37; but also, continuously promised to provide a revised schedule to set the parties' delivery expectations. *See* SL SOF ¶¶ 81-82.

[14] ACE's negligent misrepresentation argument suffers the same fate. *See Page* v. *Frazier*, 388 Mass. 55, 68 (1983) (holding that because "there was no evidence of any representations on behalf of the [defendant] to [the plaintiff], this finding also precludes recovery on the basis of negligent misrepresentation"); *Adams* v. *Bernard*, No. 02-P-379, 2003 WL 22204115, *2 (Mass. App. Ct. Sep. 23, 2003) ("There can be no claim for negligent misrepresentation where . . . there is no evidence of a representation."). Under Massachusetts law, an omission on its own—as opposed to an omission of fact within the context of a representation, making the representation misleading—is not actionable as a negligent misrepresentation. *Cf. Page*, 388 Mass. at 67 ("In the absence of some evidence of affirmative conduct on the part of the bank, there could be no reasonable understanding or reliance by the plaintiffs at the time the plaintiffs would have had to rely on such conduct, i.e., before [the transaction at issue].").

Prosser and Keeton, Law of Torts, 5th Ed. (West 1984), § 106, pp. 737-38. As set forth above, the parties were never in a fiduciary or confidential relationship. *See supra.*, pp. 7-16. Furthermore, nowhere does ACE proffer a single fact proving that SunLink represented to ACE that it would source A-frames domestically. To the contrary, the parties agreed that the Sales Contracts did not contain a "buy American" clause, or any other restriction or provision requiring that all products be sourced domestically. *See generally,* Sales Contracts; Tr., Day 1, 70:8-12; 71:8-72:7; 112:19-113:2 [CT]; Tr., Day 5 1255:20-1257:6 [EM]. ACE could have bargained for a "buy American" clause, but it did not. ACE may not renegotiate the parties' bargain now, let alone assert that SunLink's decision to purchase the A-frames from a non-domestic manufacturer is tantamount to fraud.

## C. ACE DID NOT VOID THE SALES CONTRACTS BY SENDING THE FIRST DEFAULT NOTICE.

ACE's argument – unadorned with any legal or factual support – that ACE affirmatively "voided" the Sales Contracts by issuing the First Default Notice on January 28, 2014 (ACE Memorandum, p. 41; ACE Ex. 2) is absurd. First, the notice itself demands that SunLink *remedy* its alleged default under the Sales Contracts, it did not void the Sales Contracts. *See* ACE Ex. 2. Second, if ACE had truly believed it had *voided* the Sales Contracts by issuing the First Notice of Default, there would have been no need to send the Second Default Notice or issue the Credit Letter <u>pursuant to those Sales Contracts</u>. *See* SL Exs. 141 and 222. Nor would there have been any reason for ACE to validate the Sales Contracts *again and again* by approving SunLink's accounts receivable with Bridge Bank and then promising SunLink ACE would pay under those Sales Contracts, all of which ACE admittedly did. *See* SL SOF ¶¶ 89-95.

Nonetheless, a party's right to void a contract on account of fraudulent inducement (which fraud did not occur here, *see supra*, pp. 16-19) will be deemed to have been waived if the

party does not act promptly to repudiate the contract. *See Hogan v. Eastern Enterprises/Boston Gas*, 165 F. Supp. 2d 55, 62-3 (D. Mass. 2001) (party ratified contract by conduct when he did not seek to void the release for two years). A party seeking to avoid a voidable contract "must, in some appropriate fashion, give notice that he or she chooses no longer to be obligated under the contract." *See Hills v. Chambers*, No. 96-0072B, 2000 Mass. Super LEXIS 399, **31-2 (Sup. Ct. Aug. 1, 2000) (party ratified voidable contract by waiting to disavow the agreement and by accepting the benefit of the bargain); *Pizzeria Uno Corp. v. Pizza by Pubs, Inc.*, No. 09-12015-DJC, 2011 WL 4020845, *6 (D. Mass. Sep. 9, 2011) (defendants that waited to rescind contract until they filed their answer to the complaint – a year after signing the contract – waived their right to do so considering that they had made payments under the contract for ten months); *Citizens Bank of Massachusetts v. Bishay*, No. 95-1312A, 1997 WL 785596, *12 (Mass. Sup. Ct. Nov. 24, 1997) (defendant's failure to object to the contract until a complaint was filed against him nine months after execution resulted in ratification of that contract). ACE did none of this.

Rather, unlike what ACE *now* argues, ACE took affirmative action pursuant to the Sales Contracts and validated their existence every step of the way. Indeed, ACE's choice to go to arbitration under the Sales Contracts, as well as having made partial payments under the same, is incompatible with a defense that they were voided by the First Notice of Default. *See Teamsters Local No. 25 v. Penn Transp. Corp.*, 359 F. Supp. 344, 349 (D. Mass. 1973) (party claiming that it was unlawfully coerced into executing a contract "was required to assert its claim of coercion and to renounce its obligations when [plaintiff] first filed suit seeking enforcement of its contractual rights"). Much like ACE's other *new* arguments, ACE did not even raise this theory as an affirmative defense. It is too late for ACE to void the Sales Contracts (after accepting the benefits) in the ACE Memorandum.

**D. THE PARTIES DID NOT ENTER INTO A NOVATION CONCERNING PRE-PANELIZATION.**

ACE's argument that the parties abandoned the Sales Contracts and entered into an alleged "pre-panelization agreement" (hinged on the delivery of rails, as opposed to ballasts, A-Frames, and other hardware) finds no credible support in the record. Again, much like ACE's other *new* arguments, ACE does not even raise "novation" as an affirmative defense in its Answer. Nonetheless, the argument is contradicted by the parties' statements and conduct, as well a remarkable admission in the ACE Memorandum itself. ACE's attempt to avoid the Sales Contracts altogether and pursue an alleged novation merely highlights the weakness of ACE's rebuttal of the SunLink Memorandum and SunLink's case-in-chief.

To establish a novation, a party must prove that (1) there was an existing valid original obligation, (2) there were an agreement of all parties to a new contract, (3) the old contract was extinguished, and (4) a new valid contract was created. *See Zurich American Ins. Co. v. Watts Regulator Co.*, 860 F. Supp. 2d 78, 90 (D. Mass. 2012) (*citing Larson v. Jeffrey-Nichols Motor Co.*, 279 Mass. 362 (1932)). When asserted by a defendant, novation is an affirmative defense for which the defendant has the burden of proof. *See Clark v. General Cleaning Co., Inc.*, 345 Mass. 62, 64 (1962); *Pagounis v. Pendleton*, 52 Mass. App. Ct. 270, 273 (2001). Importantly, without the agreement of the parties to (1) extinguish the alleged prior contract and (2) substitute that contract with a new contract, *there can be no novation. See Pagounis*, 52 Mass. App. Ct. at 273. The requisite finding that the parties mutually intended to discharge the alleged prior contract should rest on a "clear and definite indication" of such intent. *See id.*; *Lipson v. Adelson*, 17 Mass. App. Ct. 90, 92 (1983). Even if there existed some evidence of intent, unless the evidence as a whole evidences the requisite clear and definite indication of intent, there can be no finding of novation. *See Pagounis*, 52 Mass. App. Ct. at 274 (intent not found based on

whole of evidence, which left the Appeals Court with "the definite and firm conviction that a mistake has been committed" by the trial court). ACE simply has not met its burden.

No credible evidence exists to support a finding that ACE and SunLink intended to extinguish the Sales Contracts and replace them with the alleged pre-penalization agreement. Beyond ACE's conclusory statements, ACE relies solely on two (2) emails to establish the formation of the alleged pre-panelization agreement (which purportedly required delivery of "rails" starting on February 24, 2014 and ending on March 17, 2014). *See* ACE Memorandum, ¶¶ 31 (citing January 28, 2014 email from Mr. Eastwood to Mr. Osgood to "propose" a pre-panelization procedure); 32 (citing a February 3, 2014 email from Mr. McLean to Mr. Tilley purportedly accepting SunLink's proposal).[15] Those emails, however, clearly evidence the parties' *ongoing negotiations* during the relevant time to expedite delivery of various products – including rails – pursuant to ACE's ever-changing demands. In particular, ACE's purported "acceptance" email merely asserts Mr. McLean's *belief* that the options provided by Mr. Tilley were a better solution in "principal" – subject to tweaks and an agreement on cost-sharing. *See* ACE Ex. 73, p. 3. Furthermore, the alleged acceptance email itself requested further information from Mr. Tilley about various assumptions provided by Mr. McLean. *See id.* The email hardly can be construed to constitute a clear and definite intent to accept all material terms of the alleged pre-panelization agreement.

Moreover, in his response to Mr. McLean's email, Mr. Tilley made abundantly clear that SunLink would not be able to "nail down the timing of the first air shipped deliveries of the mounting frames" until the following week as SunLink's "Chinese suppler" was "simply not available" to respond to SunLink's requests. *See* ACE Ex. 73, p. 2. Mr. Tilley also expressly

[15] *See also*, SL Ex. 139 (continuing Mr. McLean's email without the subsequent responses).

stated (in his comments to Mr. McLean's bullet points) that he had to confirm that schedule with SunLink's "team." *See* ACE Ex. 73, pp. 2-3. Nor did the parties execute a change order – as required by the Sales Contracts – to that effect. *Compare* Sales Contracts, ¶ 5 (Modifications and Changes Orders) with SL Ex. 234 (listing changes orders for mounting frames, ballasts, combiner boxes, and additional rails and hardware and not to expedite shipment of rails pursuant to the alleged pre-panelization agreement).

To the contrary, the record is replete with evidence demonstrating the parties did not enter into the alleged pre-panelization agreement. In particular:

1. On February 4, 2014, Mr. McLean sent SunLink the Second Default Notice, which clearly and unambiguously stated that ACE believed SunLink was in default under the Sales Contracts, all of which Mr. McLean specifically listed in the "re:" line in the letter. *See* SL Ex. 141. In doing so, Mr. McLean failed to list – let alone even mention – the alleged pre-panelization agreement. *See* SL Ex. 141. Also, Mr. McLean (the same ACE representative who entered into the alleged pre-panelization agreement the day before) even asked SunLink for another "delivery schedule" and demanded a "revised schedule" by February 7, 2014. *See* SL Ex. 141. Put simply, if the parties had agreed to a new schedule for pre-panelization, it would have been mentioned in the Second Default Notice.

2. On February 12, 2014, SunLink's general counsel, Mark Ginalski ("**Mr. Ginalski**"), responded to the Second Default Notice and referenced proposals provided by SunLink on January 24, 2014 (by Mr. Purcell, i.e., SL Ex. 117) and January 31, 2014 (by Mr. Tilley, i.e., SL Ex. 132). *See* SL Ex. 149. Nowhere does Mr. Ginalski reference the alleged pre-panelization agreement offered by Mr. Eastwood, *see* ACE Ex. 3, or confirm that Mr. McLean had accepted the alleged proposal, *see* ACE Ex. 73, and the material terms of a novation had been agreed to by the parties.

3. On February 24, 2014, Mr. Tilley made abundantly clear that the alleged pre-panelization schedule was never implemented because it was tied to an "additional $147,000 in forms and rebalancing costs" that were "never agreed upon." *See* SL Ex. 154. Concomitantly, Mr. Tilley made clear that SunLink was working towards the SunLink January 10, 2014 Schedule, which did not include expedited deliveries for pre-panelization. *See* SL Ex. 154. Mr. Tilley reiterated that position in a summary email on February 25, 2014, to Mr. McLean. *See* SL Ex. 155. No evidence was

presented a trial that Mr. McLean even responded to Mr. Tilley's summary email or asserted that the parties had entered into a novation. *See* Tr., Day 6, 1413:9-1414:9 [EM].

4. On February 26, 2014 when forwarding Mr. Tilley's summary email to other ACE employees, Mr. McLean stated that he met with Mr. Eastwood and informed him that SunLink's schedule was "no good" and that Mr. McLean intended to "come up with our own schedule[.]" *See* SL Ex. 157. Nowhere does Mr. McLean mention the alleged pre-panelization agreement. Nor would he have complained about SunLink's schedule if another one had been negotiated.

5. The parties exchanged various communications in February, March, and April 2014 concerning deliveries of hardware with no mention of the alleged pre-panelization agreement. *See* SL Ex. 160 (February 26, 2014); 161 (February 27, 2014); 164 (March 2, 2014); 166 (March 3, 2014); 167 (March 3, 2014); 176 (March 11, 2014); 194 (March 26, 2014); and 204 (April 15, 2014). Rather, the parties' emails evidence an understanding that SunLink would complete delivery of all contracted-for hardware for the CVEC Projects by mid-April 2014. *See* SunLink Exs. 194 and 204. That is exactly what occurred. *See* SL SOF ¶¶ 65, 68-72.

6. On March 5, 2014, when providing Mr. Wu the status of SunLink's delivery schedule and intending to provide Mr. Wu with all of the "salient points on the site," Mr. Osgood failed to mention anything about the alleged pre-panelization agreement. *See* ACE Ex. 35. If the pre-panelization agreement had been the agreed-to, surely Mr. Osgood would have informed Mr. Wu. Rather, Mr. Osgood informed Mr. Wu that ACE has still not yet confirmed SunLink's schedule and "until ACE receives the final delivery schedule for the revised ballasts and hardware timeline, ACE cannot accurately project delivery quantities[.]" *See* ACE Ex. 35.

7. On June 19, 2014, Mr. Hunton provided Mr. Eastwood with the Credit Letter, which clearly and unambiguously stated that ACE believed SunLink was issuing the letter pursuant to the terms of the <u>Sales Contracts</u>, all of which Mr. Hunton specifically listed in the "re:" line in the letter. *See* SL Ex. 222. In doing so, Mr. failed to list – let alone mention – the alleged pre-panelization agreement. *See* SL Ex. 222. If the parties had agreed to the pre-panelization agreement and had SunLink breached it, surely Mr. Hunton would have listed it as a basis for withholding approximately $7,000,000.00 from SunLink. He did not.

8. On November 26, 2014, ACE submitted its Answer and Affirmative Defenses in this proceeding. *See* <u>Exhibit A</u> attached hereto (a copy of ACE's Answer and Affirmative Defenses). Nowhere in its Answer and Affirmative Defenses did ACE even mention the alleged pre-panelization

Agreement or raise a novation affirmative defense. *See* Exhibit A. Rather, the only agreements referenced were the Sales Contracts. *See* Exhibit A.

9. Finally, on July 8, 2015, when submitting the ACE Memorandum ACE remarkably admitted that the parties did not enter into the alleged pre-panelization agreement: specifically, ACE stated: "**Agreement on the term [price] did not result in a mutual accord.**" *See* ACE Memorandum, p. 39 (emphasis added).[16] Despite arguing that ACE is entitled to offset damages because SunLink breached the alleged pre-panelization agreement – which was, according to ACE, critical to ACE performing under the EPC Contract – ACE actually admits in its post-hearing papers that the parties never reached an accord on that alleged agreement. *See Hoover v. Osley & Whitney, Inc.*, Nos. 89-1672, 89-1725, 915 F.2d 1556, *4 (1st Cir. 1990) (there is no agreement on the price of goods under the MA UCC if the parties did not intend to form a binding agreement); *see also* MA UCC § 2-305 (4) ("Where, however, the parties intend not to be bound unless the price be fixed or agreed and it is not fixed or agreed there is no contract.").

If the parties had agreed to extinguish the Sales Contracts and enter into the alleged novation, which SunLink then allegedly breached, surely there would have been discussion about that alleged novation during the relevant time and the agreement would have been cited in ACE's Second Default Notice, Credit Letter, and ACE's Answer, at the very least. There was none and it was not. There is no credible evidence supporting the abandonment of the Sales Contracts or entering into the alleged pre-panelization agreement.[17]

[16] Despite this admission, ACE later attempts to argue that SunLink breached the argument despite "the parties' accord on the prepanelization agreement." *See* ACE Memorandum, p. 41.

[17] Nor was there a "battle of the forms" as ACE dizzyingly argues. *See* ACE Memorandum, pp. 38-40 (referring to ACE Exs. 3 and 73 as the "forms" under MA UCC § 2-207). As set forth above, Mr. Tilley made it abundantly clear that there was no such agreement absent ACE's consent to increased costs, which ACE never agreed to. That, according to the MA UCC, prevents contract formation. *See* MASS. GEN. LAWS ch. 106, § 2-207 (2) (c) (additional terms do not become part of a contract when notification of objection to such terms has been given). Nor does the evidence show that the parties' conduct created the alleged pre-panelization agreement by conduct under the MA UCC § 2-207(3), as ACE argues – without record citation to or discussion of any conduct in the evidentiary record. *See* ACE Memorandum, pp. 39-40. Rather, as set forth above, the parties' conduct proves they did not enter into any such agreement. *See supra.*, pp. 18-22.

**E. ACE HAS NOT PROVEN DURESS SURROUNDING ANY CHANGE ORDERS.**

ACE's claim of "duress" associated with several change orders ACE executed to accelerate the delivery of various SunLink products to the CVEC Projects is utterly baseless. There was no involuntary acceptance of the subject change orders on the part of ACE; ACE chose from among a myriad of alternatives provided by SunLink before finally agreeing to and executing the change orders at issue; and nothing remotely resembling the type of "coercion" Massachusetts law requires on the part of SunLink is present here. Moreover, the argument is a non-starter in any event because, as the undisputed material facts of record clearly establish, and as a matter of law, ACE subsequently ratified all of the change orders at issue between the parties by, among other things, accepting the benefits afforded under the change orders, and by remaining silent or acquiescing in the change orders after having the opportunity to avoid them.

The standard for establishing economic duress under Massachusetts law is "difficult to meet." *Pizzeria Uno*, 2011 WL 4020845 at *5. Massachusetts courts have long recognized that,

> It is not infrequent that when two commercial parties enter into an agreement, one of them has a decided economic advantage over the other, and that the weaker party often must often enter into the bargain because of his economic circumstances, a disparity in bargaining power to his disadvantage, or some combination of the two. Because an element of economic duress is thus present when many contracts are formed or releases given, the ability of a party to disown his obligations under a contract or release on that basis is *reserved for extreme and extraordinary cases.* Hard bargaining is not unlawful; it is not only acceptable, but indeed, desirable in our economic system, and should not be discouraged by the courts.

*Id.* (emphasis added); *see also Cabot Corp. v. AVX Corp.*, 448 Mass. 629, 639 (2007).

The elements of economic duress are: (1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party, that is, "the duress resulted from defendant's wrongful and oppressive conduct and not by plaintiff's necessities." *Cabot*, 448

Mass. at 637-638 (quoting *Int'l Underwater Contractors v. New Eng. Tel. & Tel. Co.*, 8 Mass. App. Ct. 340, 342 (1979). Where "sophisticated and substantial commercial parties" are involved (typically with legal counsel involved), and the contract in question "was designed to settle differences that arose during a course of business including multiple prior contractual agreements between the parties," the three elements are "strictly construed against the party asserting duress." *See Pizzeria Uno*, 2011 WL 4020845 at *6; *see also Cabot*, 448 Mass. at 638. The reasoning behind this principle is explained by Justice Cordy in *Cabot* as follows:

> In these circumstances, we will strictly construe the requirements of economic duress against the party asserting it, so as not to undercut the well-established public policy favoring the private settlement of disputes. [citation omitted]. As the motion judge concluded, "[w]here knowledgeable and fully represented parties choose to embody their relationship in a carefully crafted document, negotiated over several months, they are entitled to and should be held to the language they chose.

*Cabot*, 448 Mass. at 638.

These are precisely the circumstances presented here. The agreed-upon accelerations of SunLink's performance, embodied in the change orders ultimately agreed upon between the parties, were the product of negotiations beginning in mid-January of 2014, shortly after ACE had triggered Notice to Proceed under the Sales Contracts. On January 17, 2014, John Eastwood of SunLink first proposed an expedited 11-week schedule to ACE that would have resulted in the delivery of <u>all</u> products to <u>all</u> sites mostly by the last week of March 2014. This option, however, would have cost ACE an additional $400,000 under the Sales Contracts. *See* SL SOF ¶51. Although ACE cavalierly dismissed this offering by SunLink as "dog shit", SL SOF ¶52, and after additional acceleration options were advanced by SunLink, and promptly rejected by ACE for one pretextual reason or another, ACE ultimately accepted a series of piecemeal change orders for the accelerated delivery of various SunLink products through mid-April 2014, when

an even better result could have been achieved by ACE's acceptance of Mr. Eastwood's proposal made in mid-January, 2014. *See* SL SOF ¶65.

The fact that SunLink insisted upon receiving signed change orders from ACE before committing to and directing its vendors to accelerate production, as the Sales Contracts expressly contemplated and required, simply does not constitute the "wrongful and oppressive" business conduct on the part of SunLink that ACE is strictly required to show here. The record evidence demonstrates ACE had myriad opportunities presented to it by SunLink to allow it to meet whatever completion deadlines it may have faced on the Projects. Plain and simple – ACE refused to pull the trigger and commit to paying SunLink the cost to implement any of the acceleration opportunities that were presented, until months later when it finally signed change orders with SunLink. Thus, ACE, itself, wasted whatever precious time it had to complete its work, not SunLink. To the extent this delay caused ACE adverse repercussions; the same are purely of ACE's own making. In any event, this is not the stuff that "economic duress" is made of in Massachusetts.

To the extent ACE did suffer "economic duress" (which SunLink obviously vehemently denies), the undisputed record evidence clearly establishes that ACE *ratified* the change orders (and the Sales Contracts in general for that matter) by its actions. Again, as stated by Justice Cordy:

> A contract that is voidable for duress may be ratified and affirmed. The subsequent conduct of one who seeks to set aside a transaction voidable on account of fraud or duress bars him from relief if such conduct amounts to a waiver or affirmation of the transaction. A party must complain promptly of coercive acts that allegedly forced it into the contract or the defense of duress is waived, and the contract ratified. The requirement that the party claiming duress disclaim the contract or release about which he is complaining promptly or be held to have forfeited his right to do so protects the stability and reliability of such agreements by denying the weaker party the 'heads I win, tails you lose' option of

> waiting to see how the arrangement works out and then deciding whether to seek to undo it. Under this rule, shortly after the execution of a contract or release, the rights and duties under it become free of doubt engendered by assertions of duress.

*Cabot*, 448 Mass. at 642-643 (internal quotations and citations omitted).

A party may ratify an agreement entered into under duress in a number of different ways, such as, intentionally accepting benefits under the contract, remaining silent or acquiescing in the contract for a period of time, and by recognizing its validity. *See Cabot*, 448 Mass. at 643. ACE did all of the foregoing with respect to the change orders at issue (and, again, under the Sales Contracts more generally). ACE accepted and installed all SunLink delivered products, thus accepting all benefits under the change orders (and the Sales Contacts); did not raise the defense of "duress" until the filing of its Answer in this arbitration proceeding on November 26, 2014, *see* ACE's Answer, ¶14 (almost 9.5 months after signing the first in the series of change orders it executed); and many times acknowledged the change orders and the amounts owing thereunder to both SunLink and its lender, Bridge Bank. *See* SunLink SOF ¶89-98.

Substituting "ACE" for "AVX" in the following quotation from the *Cabot* decision, Justice Cordy could as easily have been addressing ACE's duress argument here:

> AVX cannot simply accept the terms of a supply contract favorable to it, obtain the supply its needs, and claim it did not intend to ratify the contract because some terms were unfavorable to it. Stated otherwise, it cannot 'wait [ ] to see how the arrangement works out and then decid[e] whether to seek to undo it.'

*Cabot*, 448 Mass. at 646 (internal citation omitted). This is an apt description of ACE's unfair and unlawful game here.

### F. ACE MEMORANDUM CONTAINS REMARKABLE ADMISSIONS THAT (1) SUPPORT SUNLINK'S POSITIONS IN THIS PROCEEDING AND (2) FURTHER EVIDENCE A *CONTINUING* CHAPTER 93A VIOLATION.

ACE only devotes one-half of a page to rebutting SunLink's argument that ACE violated Chapter 93A. *See* ACE Memorandum, p. 46. In doing so, ACE parsimoniously asserts the familiar maxim that not every breach of contract constitutes bad faith. *See id.* That is true; however, SunLink need not prove bad faith to support a Chapter 93A claim. Rather, although a bad-faith breach of contract designed to achieve undeserved benefits will violate Chapter 93A, *see Massachusetts Employers Ins. Exch. v. Propac-Mass, Inc.*, 420 Mass. 39, 43 (1995); *Anthony's Pier Four, Inc. v. HBC Associates*, 411 Mass. 451, 476 (1993); *Wang Labs, Inc. v. Business Incentives, Inc.*, 398 Mass. 854, 857 (1986); *Atkinson v. Rosenthal*, 33 Mass. App. Ct. 219, 225-6 (1992), so too will acts or practices of an extortionate or coercive character designed to extract concessions from an adversary by intentional denial of payments or benefits to which an adversary is entitled. *See Massachusetts Employers Ins. Exch.*, 220 Mass. at 43; *Anthony's Pier Four, Inc.*, 441 Mass. at 476; *Wang Labs, Inc.*, 398 Mass. at 857.

In particular, a contracting party knowingly and willfully violates Chapter 93A by (1) unilaterally embargoing monies due its adversary, (2) basing that withholding on erroneous assertions, (3) erroneously placing its adversary in default, and (4) pursuing ineffective legal theories in an effort to delay payment. *See D.D.S. Indus., Inc. v. P.J. Riley & Co., Inc.*, No. SUCV2009-00978 (Mass. Sup. Ct., May 8, 2014) (unreported) (attached as Exhibit B to the SunLink Memorandum). As explained by the Honorable Thomas A. Connors in *D.D.S. Indus., Inc.*:

> The chapter 93A business tort count Riley has brought focuses squarely upon Carlin's decision to withhold a substantial payment which Riley contends it was due under its contract, $42,913.00. . . . Carlin argues that it is not subject to c. 93A liability, even if it ultimately was not entitled to have withheld those sums. **It cites the familiar maxim of**

> **law that a simple and unadorned breach of contractual duties, without more, does not subject a defendant to § 11 liability.** While this is an accurate statement of the law, the conduct of Carlin transcends that principle. . . . **Beyond the fact of Carlin's erroneous assertion of its entitlement to withhold funds from Riley for indemnification for possible financial loss, it is the manner in which Carlin pressed its claim against its subcontractor Riley which informs the determination of whether its refusal to pay Riley for the work it had done under the parties' contract renders it liable for business tort.** . . . Carlin, instead of waiting to determine and compute what its actual financial losses were, unilaterally embargoed funds legitimately due Riley as a hedge against some unascertained prospective expenses. **In addition, Carlin's arbitrary action in withholding a significant sum was accompanied by its letter to Riley asserting the latter was in default of its obligations to Carlin.** Carlin additionally took the step of notifying Riley's surety, Western, of that inaccurate assertion of subcontractor default and making claim against that entity upon Riley's surety bond. . . . Carlin's conduct was motivated by a desire to rid itself of a relatively small dollar value dispute with its sub-subcontractor DDS by withholding a larger amount properly due the subcontractor Riley in the hope that Riley would resolve that dispute in order to access the funds legitimately due it. In these circumstances, the conduct of the general contractor had the flavor of a type of coercive tactic upon which c. 93A liability has been found in other contexts.

*See D.D.S. Indus.*, No. SUCV2009-0978 at pp. 13-14; 16-18 (internal citations omitted and emphasis added); *see also*, *Renovator's Supply v. Sovereign Bank*, 72 Mass. App. Ct. 419, 430 (2008); *Tufankjian v. Rockland Trust Company*, 57 Mass. App. Ct. 173, 179 (2003).

Here, much like the defendant in *D.D.S. Indus.,* ACE unilaterally withheld and continues to withhold payment under the Sales Contracts and did so through issuing baseless default letters and an equally baseless credit letter. *See* SL SOF ¶¶ 87-88. Also, despite knowing that ACE owed SunLink at least $3,872,150, ACE pursued and continues to pursue ineffective legal theories to delay payment. *See* SL SOF ¶¶ 99-103. Indeed, ACE's *new* excuse for nonpayment – by blaming third-party escrow agents – does not cure ACE's knowing, willful, and wrongful withholding of SunLink's monies.[18] Furthermore, ACE continues to rely on baseless defenses,

[18] ACE implication that SunLink agreed to those escrow arraignments is specious. There is no evidence whatever that SunLink did. Rather, the only evidence presented at the hearings is a pre-contract formation email from Mr. Eastwood indicating he was aware that SunLink's payment would be paid from an escrow. *See* SL Ex. 21.

despite overwhelming evidence to the contrary (e.g., "lead time" was a schedule for completed delivery, etc.). Moreover, ACE even admits in the Ace Memorandum that SunLink should be paid and that one of its new main legal theories – a novation – was never agreed to *See* ACE Memorandum, p. 39. *Finally*, ACE even seeks affirmative relief in its post-hearing brief for a counterclaim ACE never filed. *See* ACE Memorandum at p. 48 (seeking damages under Chapter 93A). All of this conduct – as well as the litany of other conduct detailed in the SunLink Memorandum – goes well beyond a simple breach of contract as ACE contends. Rather, ACE's conduct – every step of the way – was designed to delay payment to SunLink based on erroneous grounds, which is the very type of withholding that violates Chapter 93A.

Nowhere is there any evidence that the actual terms of the escrow agreements were disclosed to SunLink by ACE at any time. The parties' agreement on payment was 45 days after SunLink issued an invoice. *See* SL SOF ¶¶ 26, 28.

## CONCLUSION

ACE's requested award is baseless and/or arises from a counterclaim ACE never brought in this proceeding. The evidence overwhelmingly supports the award requested in the SunLink Memorandum.

CERTIFICATE OF SERVICE
I HEREBY CERTIFY THAT A TRUE COPY OF THE ABOVE DOCUMENT WAS SERVED UPON THE ATTORNEY OF RECORD FOR EACH OTHER PARTY BY ~~MAIL~~ electronic and regular mail ~~(BY HAND)~~ ON 7/22/15

# EXHIBIT A

AMERICAN ARBITRATION ASSOCIATION

SUNLINK CORPORATION,
Claimant,

v.

AMERICAN CAPITAL ENERGY, INC.,
Respondent.

AAA No. 01-14-0001-7516

**RESPONDENT'S ANSWER**

The Respondent, American Capital Energy ("ACE"), hereby responds to the Claimant's Demand for Arbitration, paragraph by paragraph, as follows:

1. ACE admits the allegations contained in Paragraph 1 of the Demand for Arbitration.

2. ACE admits that it has a principal place of business as alleged, and is in the business of developing, building, and operating commercial and utility scale solar power projects. ACE is a New Jersey corporation.

3. ACE admits the allegations contained in Paragraph 3 of the Demand for Arbitration.

4. ACE admits the allegations contained in Paragraph 4 of the Demand for Arbitration.

5. ACE admits the allegations contained in Paragraph 5 of the Demand for Arbitration.

6. ACE admits the allegations contained in Paragraph 6 of the Demand for Arbitration, except ACE denies the last sentence in Paragraph 6 of the Demand for Arbitration.

7. ACE admits the first sentence contained in Paragraph 7 of the Demand for Arbitration, and is without information as to the truth of the second sentence in Paragraph 7 of the Demand for Arbitration.

8. ACE denies the allegation contained in Paragraph 8 of the Demand for Arbitration.

9. ACE denies the allegation contained in Paragraph 9 of the Demand for Arbitration.

10. ACE admits the allegations contained in Paragraph 10 of the Demand for Arbitration.

11. ACE admits the allegations contained in Paragraph 11 of the Demand for Arbitration, except the Contracts were not executed until November, 2013 and notices to proceed were not issued until December, 2013.

12. ACE denies the allegations contained in Paragraph 12 of the Demand for Arbitration. Further answering, ACE's construction of the solar projects was part of the Solar Renewable Energy Certificate Program ("SREC") which was required to support the Projects. In order to be eligible under the SREC Program, the Projects were required to be completed within strict time deadlines. If the Projects were not completed by June 30, 2014, then the Project owners would lose out on SREC program qualification and potentially losing over $100,000,000, and would by contract pass those damages through to ACE as liquidated damages. ACE and Sunlink's negotiations with regard to the Massachusetts Projects date back to 2011. It was always the subject matter of discussion between ACE and Sunlink that, due to the SREC Program and financial incentives, time was of the essence for the delivery of concrete blocks and steel racking systems (the "Equipment") once contracted for order by ACE. Similarly, it is well known in the industry, and was made known to Sunlink, that if the Massachusetts Projects went forward, Sunlink's timely compliance with any delivery times was required in order to ensure that the Projects received SREC qualification. From the earliest proposals put together by Sunlink for ACE concerning the Massachusetts Projects, Sunlink estimated a four (4) to eight (8) week time period to manufacture the Equipment. Such timeframes, if actually performed by Sunlink, were acceptable to ACE. ACE has done business with Sunlink for over ten (10) years and Sunlink always manufactured similar equipment in the United States.

13. ACE denies the allegations contained in Paragraph 13 of the Demand for Arbitration, except that ACE does admit that upon its receipt of notices to proceed from the owner in December, 2013, it promptly gave notice to proceed to Sunlink, and Sunlink was aware of its obligations to timely and promptly deliver the Equipment consistent with the contracts. Moreover, the reference to "China" or the "Chinese New Year" and/or the "China supply line" is irrelevant as ACE was led to believe by

Sunlink that the Equipment was being manufactured in the United States based upon all prior knowledge, experience between Sunlink and ACE, as well as the terms and conditions of the Contract.

14. While ACE does not deny that there were changeorders, those changeorders were necessitated because of Sunlink's breach of its contractual obligations, which put the projects into jeopardy, and ACE agreed to the change orders solely to mitigate its damages, but did not waive the significant defaults under the contracts with Sunlink. The changeorders were signed only after ACE had already notified Sunlink of its defaults for late delivery and the changeorders were signed under protest and duress because otherwise Sunlink would not take the necessary steps to expedite the delivery so as to reduce the damage to ACE. ACE had a right to mitigate its damages for Sunlink's breach.

15. ACE denies the allegations contained in Paragraph 15 of the Demand for Arbitration, although ACE admits that Sunlink eventually did complete the projects.

16. ACE is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 16 of the Demand for Arbitration, with the exception that it denies the final sentence as it relates to ACE.

17. ACE admits the approximate aggregate contract value as alleged, but denies the remaining allegations contained in Paragraph 17 of the Demand for Arbitration.

18. ACE is without information sufficient to form a belief as to the truth of the allegations contained in Paragraph 18 of the Demand for Arbitration and, therefore, denies same.

19. ACE is without information sufficient to form a belief as to the truth of the allegations contained in Paragraph 19 of the Demand for Arbitration and, therefore, denies same.

20. ACE denies the allegations contained in Paragraph 20 of the Demand for Arbitration. Further answering, ACE never agreed that the sums were due without contingency, and was merely confirming scheduled payment dates based upon expected events, while always intending to hold Sunlink accountable for its damages and never indicated otherwise. ACE had already issued default

notices and reasonably assumed Sunlink kept its lender informed of such notices. Moreover, ACE's offsets and damages were not known in April or May, but were realized thereafter.

21. ACE is without information sufficient to form a belief as to the truth of the allegations contained in Paragraph 21 of the Demand for Arbitration and, therefore, denies same.

22. ACE denies the allegations contained in Paragraph 22 of the Demand for Arbitration.

23. ACE denies the allegations contained in Paragraph 23 of the Demand for Arbitration.

24. While ACE does not deny the portions of the contracts which are quoted correctly, ACE denies the overall allegation that it has any liability to Sunlink, or it has somehow breached the contracts with Sunlink.

25. ACE denies the allegations contained in Paragraph 25 of the Demand for Arbitration.

26. ACE denies the allegations contained in Paragraph 26 of the Demand for Arbitration. Further answering, ACE admits that it has claimed a credit against the amounts claimed by Sunlink based upon Sunlink's default.

27. ACE denies the allegations contained in Paragraph 27 of the Demand for Arbitration.

28. ACE denies the allegations contained in Paragraph 28 of the Demand for Arbitration.

29. ACE denies the allegations contained in Paragraph 29 of the Demand for Arbitration.

30. ACE realleges herein its answers to Paragraphs 1 through 29 of the Demand for Arbitration.

31. ACE denies the allegations contained in Paragraph 31 of the Demand for Arbitration.

32. ACE denies the allegations contained in Paragraph 32 of the Demand for Arbitration.

33. ACE realleges herein its answers to Paragraphs 1 through 32 of the Demand for Arbitration.

34. ACE denies the allegations contained in Paragraph 34 of the Demand for Arbitration.

35. ACE denies the allegations contained in Paragraph 35 of the Demand for Arbitration.

36. ACE denies the allegations contained in Paragraph 36 of the Demand for Arbitration.

37. ACE realleges herein its answers to Paragraphs 1 through 36 of the Demand for Arbitration.

38. ACE denies the allegations contained in Paragraph 38 of the Demand for Arbitration.

39. ACE denies the allegations contained in Paragraph 39 of the Demand for Arbitration.

40. ACE denies the allegations contained in Paragraph 40 of the Demand for Arbitration.

41. ACE denies the allegations contained in Paragraph 41 of the Demand for Arbitration.

42. ACE realleges herein its answers to Paragraphs 1 through 41 of the Demand for Arbitration.

43. ACE denies the allegations contained in Paragraph 43 of the Demand for Arbitration.

44. ACE denies the allegations contained in Paragraph 44 of the Demand for Arbitration.

45. ACE denies the allegations contained in Paragraph 45 of the Demand for Arbitration.

46. ACE denies the allegations contained in Paragraph 46 of the Demand for Arbitration.

47. ACE realleges herein its answers to Paragraphs 1 through 46 of the Demand for Arbitration.

48. ACE responds to Paragraph 48 of the Demand for Arbitration by stating that this is an allegation of law to which no answer is required.

49. ACE denies the allegations contained in Paragraph 49 of the Demand for Arbitration.

50. ACE denies the allegations contained in Paragraph 50 of the Demand for Arbitration.

51. ACE denies the allegations contained in Paragraph 51 of the Demand for Arbitration.

52. ACE denies the allegations contained in Paragraph 52 of the Demand for Arbitration.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The Claimant's claims are barred, in whole or in part, by the first to breach rule.

### SECOND AFFIRMATIVE DEFENSE

The Claimant's breach of contract bars it from the recovery it seeks in this matter.

**THIRD AFFIRMATIVE DEFENSE**

The Claimant's damages, all of which are denied by the Respondent, if any are proven, are subject to offset by the damages the Claimant caused to the Respondent.

**FOURTH AFFIRMATIVE DEFENSE**

The Claimant is not entitled to recover under quantum meruit where an actual contract exists between the parties.

**FIFTH AFFIRMATIVE DEFENSE**

The damage limitation provisions in the contracts have been rendered unenforceable by Sunlink's material breach of contract and misrepresentations at the time the contracts were entered into as to when the product would be delivered.

**SIXTH AFFIRMATIVE DEFENSE**

The Claimant is barred by the doctrine of waiver.

**SEVENTH AFFIRMATIVE DEFENSE**

The Claimant's claims are barred by the doctrine of estoppel.

**EIGHTH AFFIRMATIVE DEFENSE**

The Claimant's claims are barred by the doctrine of unclean hands.

**NINTH AFFIRMATIVE DEFENSE**

The contracts at issue were procured by fraud in the inducement.

**TENTH AFFIRMATIVE DEFENSE**

The Claimant's damages, if any, were caused by others for whom the Respondent is not responsible.

**ELEVENTH AFFIRMATIVE DEFENSE**

The Respondent is not responsible for the alleged damages sustained by the Claimant in this matter.

TWELFTH AFFIRMATIVE DEFENSE

The Claimant has not sustained any cognizable damages for which the Respondent is responsible.

THIRTEENTH AFFIRMATIVE DEFENSE

ACE's construction of the solar projects was part of the Solar Renewable Energy Certificate Program ("SREC") which was required to support the Projects. In order to be eligible under the SREC Program, the Projects were required to be completed within strict time deadlines. If the Projects were not completed by June 30, 2014, then the Project owners would lose out on SREC program qualification and would suffer financially, and would lose over $100,000,000, and would by contract pass those damages through to ACE as liquidated damages. ACE and Sunlink's negotiations with regard to the Massachusetts Projects date back to 2011. It was always the subject matter of discussion between ACE and Sunlink that, due to the SREC Program and financial incentives, time was of the essence of the delivery of the Sunlink photovoltaic equipment (the "Equipment") once contracted for order by ACE. Similarly, it is well known in the industry, and was made known to Sunlink, that if the Massachusetts Projects went forward, Sunlink's timely compliance with any delivery times was required in order to ensure that the Projects received SREC qualification. From the earliest proposals put together by Sunlink for ACE concerning the Massachusetts Projects, Sunlink estimated a four (4) to eight (8) week time period to manufacture the Equipment. Such timeframes, if actually performed by Sunlink, were acceptable to ACE. As negotiations continued into 2012 (and there was some delays as the SREC Program evolved), the issue of timing was always paramount in the discussions between ACE and Sunlink. For example, in April, 2012, when Christy Powers of Sunlink became the project manager for the Projects, the issue of timing and the Project schedule was one of the first items discussed with Ms. Powers and the issue of timing was always paramount in the discussions between ACE and Sunlink.

The initial Master Sales Contract between ACE and Sunlink signed on March 6, 2012 provided for equipment delivery in four (4) to six (6) weeks. That initial contract was then not acted upon by issuance of a Purchase Order. As further negotiations ensued, and prior to the execution of the actual Contracts for the Projects, ACE again asked Sunlink to confirm the lead time which Sunlink required in order to deliver the equipment upon receipt of a purchase order from ACE. By electronic mail dated October 9, 2013, Sunlink confirmed that their delivery schedule was five (5) to six (6) weeks for the Equipment. In reliance upon that representation, and all other prior representations which were consistently made to ACE from Sunlink, Sunlink and ACE then entered into nine (9) Contracts dated October 15, 2013 concerning nine (9) of the Projects. The nine (9) Projects contained the contractual term that the lead time for the delivery of the Equipment was six (6) weeks. Notably also, each of the Contracts spelled out exactly from where the Equipment would be shipped within the continental United States, and none of the nine (9) Contracts in any way identified a Chinese manufacturer. The shipping points located within the continental United States were consistent with all prior discussions and representations made by Sunlink to ACE.

A tenth (10th) contract was entered into approximately two (2) months later on December 18, 2013, for Duxbury and Mashpee, and that contract identified a lead time of a minimum of six (6) weeks and a maximum of eight (8) weeks lead time needed for delivery of the equipment (the "Duxbury/Mashpee Contract"). Between December 14, 2013 and January 4, 2014, ACE made all of the required deposits to Sunlink for the Equipment ordered for the Projects. In fact, for the Duxbury/Mashpee project, ACE paid Sunlink in full in December, 2013. ACE continued to impress upon Sunlink the need for delivery "ASAP" and wanted to ensure commencement of production in December, 2013. Sunlink continued to ensure prompt delivery and that they were "in production". In reality, upon information and belief, the $900,000 paid to Sunlink was not paid to Sunlink's manufacturers, but instead was diverted to meet other financial needs of Sunlink. ACE continued to follow up with Sunlink about project delivery dates. At the beginning of 2014, not yet having received

a delivery schedule from Sunlink, ACE continued to press Sunlink for the delivery schedule given that, under the ten (10) Project Contracts, deliveries should have begun in January, 2014.

On January 7, 2014, to ACE's complete surprise, Sunlink delivered a delivery schedule which failed to provide for a delivery within the six (6) week, or even an eight (8) week time period, previously represented and then promised in the Contracts. Instead, the delivery schedule projected that complete delivery of all of the Projects would not occur until August, 2014. Promptly upon receipt of the initial delivery schedule from Sunlink, ACE rejected the delivery schedule and insisted that Sunlink deliver the Equipment consistent with all of its oral and written representations, including within the Contracts. Because the timing of the delivery of equipment was so important for SREC qualification, ACE's representatives responsible for completing the Projects flew to California to speak with Sunlink about their attempted unilateral modification of the delivery dates to explain in detail the damages that would result to ACE, and for which ACE would hold Sunlink responsible, if the equipment was not delivered in a timely fashion as promised. It was during such meetings that ACE was first informed by Sunlink that Sunlink was using Chinese manufacturers, instead of domestic manufacturers.

Sunlink then threatened to make no delivery at all unless ACE entered into a changeorder so that some of the equipment could be flown to the United States from China, which Sunlink indicated would significantly speed up its delivery time. So as to mitigate its own damages, ACE reluctantly agreed to the changeorders while preserving its right and advised Sunlink that ACE fully intended to hold Sunlink responsible for all damages which ACE incurred as a result of Sunlink's delivery failures. As of January 27, 2014, by when Sunlink had not adhered to the Contracts and had given every indication that it would be unable to adhere to the Contracts, ACE issued a default notice to Sunlink under the Contracts. Upon completion of the Projects by Sunlink, ACE again gave notice of its dispute per the Contracts to Sunlink and requested mediation, which did not result in any agreement by Sunlink to mediate.

Thereafter, as ACE had suffered significant monetary consequences as a result of Sunlink's default, ACE issued a credit memo to Sunlink to account for the direct costs, expenses, and damages suffered by ACE as a result of Sunlink's failures, which was in the amount of $6,942,172.00. Those offset damages are not static and continue to accrue. ACE has been made a defendant in a number of lawsuits by a Sunlink subcontractor (Old Castle) which claims to be owed monies from Sunlink, and which has placed a mechanic's lien on one or more of the Projects. As part of one lawsuit, Old Castle claims that it is owed over $277,809.50 on the Mashpee project, a project on which Sunlink was already fully paid by ACE.

On June 30, 2014 Sunlink filed a UCC financing statement with the Massachusetts Secretary of State's Office claiming secured party status against ACE concerning the equipment. Sunlink attached as Exhibits to the UCC-1 financing statement the Contracts for the Project. ACE has never granted a security agreement to Sunlink in any of ACE's assets, including but not limited to the Equipment. Moreover, Sunlink did not reserve to itself a security interest in the equipment once delivered and installed at the Projects. Sunlink recorded the UCC financial statement claiming to be a secured party despite its knowledge that it is not a secured party. Notably, during the Projects, Sunlink never claimed to be a secured creditor of ACE. As further evidence of its unfair and deceptive behavior, in addition to naming ACE as Sunlink's "DEBTOR," Sunlink sought to bring as much pressure to bear as possible on ACE by naming every other entity and even individual persons associated with the Projects as "additional Debtors" to Sunlink. Sunlink's behavior in this guard is illegal, inappropriate, but further evidence of its overall approach with ACE after it secured the contracts but was unable to deliver the Equipment as promised.

**PRAYERS FOR RELIEF**

WHEREFORE, the Respondent, American Capital Energy, Inc., respectfully prays that the Claimant's Demand for Arbitration be dismissed, that an award be entered in ACE's favor, and for such other and further relief as the arbitrator may deem just and appropriate.

AMERICAN CAPITAL ENERGY, INC.

By Its Attorneys,
RIEMER & BRAUNSTEIN LLP

Dated: November 26, 2014

Dennis E. McKenna, BBO #556428
Riemer & Braunstein LLP
Three Center Plaza
Boston, Massachusetts 02108
(617) 880-3454
dmckenna@riemerlaw.com

CERTIFICATE OF SERVICE

I, Dennis E. McKenna, Esquire, hereby certify that on this 26 day of November, 2014, I caused a true and accurate copy of the foregoing document to be served by first class mail, postage prepaid, upon the following: Paul J. Murphy, Esquire, Greenberg Traurig, LLP, One International Place, Boston, MA 02110.

Dennis E. McKenna

1768313.2